UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RONALD McALLISTER, on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | Case No. |
| THE ST. LOUIS RAMS, LLC, d/b/a The St. Louis Rams Partnership, A Delaware General Partnership, | JURY TRIAL DEMANDED |
| Defendant. | |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PARTIES ............................................................................................................................ 2

JURISDICTION AND VENUE ........................................................................................ 2

BACKGROUND ALLEGATIONS .................................................................................. 3

    The Purported Fans, Inc. Contract:  An Illusory Agreement .............................................. 6

    The Purported Rams Partnership Contract:  An Illusory Agreement ................................. 7

    Plaintiff is entitled to recover for unjust enrichment ......................................................... 8

    Plaintiff is entitled to recover for money had and received ............................................... 8

    Alternatively, Defendant breached its contracts with Plaintiff and the Class .................... 8

    Provisions barring claims and lawsuits are unconscionable ............................................. 12

    Breach of implied covenant of good faith and fair dealing .............................................. 13

    Rams' violation of the MMPA .......................................................................................... 13

CLASS ACTION ALLEGATIONS ................................................................................ 14

JURY DEMAND .............................................................................................................. 17

COUNT I:  Declaratory Judgment that the Purported Contracts Were Illusory, Never Properly
    Formed and Void ............................................................................................................... 17

COUNT II:  Unjust Enrichment ........................................................................................ 18

COUNT III:  Money Had and Received ............................................................................ 19

COUNT IV:  Breach of the Purported FANS, Inc. Contract ............................................ 20

ii

COUNT IV:  Breach of the Purported Rams Partnership Contract .............................................. 21

COUNT V:  Breach of the Implied Covenant of Good Faith and Fair Dealing (Purported FANS, Inc. Contract) ........................................................................................................... 21

COUNT VI:  Breach of the Implied Covenant of Good Faith and Fair Dealing (Purported Rams Partnership Contract) ............................................................................................... 23

COUNT VII:  Violation of the MMPA.......................................................................................... 24

PRAYER FOR RELIEF ................................................................................................................ 26

COMES NOW Ronald McAllister ("Plaintiff"), on behalf of himself and all others similarly situated, and for his Class Action Complaint against The St. Louis Rams, LLC, d/b/a The St. Louis Rams Partnership, A Delaware General Partnership ("Defendant" or "the Rams"), alleges upon personal knowledge as to his own acts and upon information and belief (based on the investigation of counsel) as follows:

## INTRODUCTION

1.      Tens of thousands of St. Louis Rams season ticket holders purchased at great expense Personal Seat Licenses ("PSLs" or "CPSLs") that gave them the right to buy St. Louis Rams season tickets through the 2024 season.  However, in January 2016 the Rams announced that they were moving to Los Angeles, rendering these PSLs valueless.

2.      The Rams have not reimbursed PSL owners for what they paid for the portion of the PSLs that are now unusable.  Plaintiff therefore brings this lawsuit on his own behalf and behalf of his fellow St. Louis Rams PSL owners to recover the value of the unusable portion of their PSLs.

3.      Specifically, Plaintiff seeks, among other remedies, (a) a declaratory judgement that the purported PSL agreements between them and the Rams are, in fact, illusory contracts of no force and effect; (b) restitution of the pro rata amount of the unused portion of the PSLs that have unjustly enriched the Rams; (c) money had and received by the Rams in keeping what they were paid for PSLs for their unusable portions; (d) in the alternative, in the event that the Court finds that there is a valid contract between the Rams and PSL holders, damages for breach of that contract; (e) damages for breach of the obligation of good faith and fair dealing; (f) damages for violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.* ("MMPA"); and (g) punitive damages because the Rams' actions were willful and malicious.

## PARTIES

4.      Plaintiff is a citizen of Missouri and a resident of St. Louis County.  He is the owner of two Rams PSLs, which he purchased and used for personal, family or household purposes.  He bought the first in 1995 from FANS, Inc., the Rams' agent for sale of PSLs before they moved to St. Louis.  He bought the second from the Rams in 2005.  He paid $1,000 for each PSL.  In the Rams' 21 seasons in St. Louis, he used his PSLs to buy tickets to all of the Rams' 172 home regular season and playoff games and personally attended 169 of the 172 games and both Super Bowls.

5.      Defendant The St. Louis Rams, LLC is a Limited Liability Company chartered in Delaware that owns the Rams franchise in the National Football League ("NFL").  According to the California Secretary of State, Defendant's principal place of business is One Rams Way, St. Louis, MO 63045-1525.  According to the Missouri Secretary of State, Defendant is the registered owner of the Fictitious Name, "The St. Louis Rams Partnership, A Delaware General Partnership."  Defendant succeeded to the rights to sell Rams season tickets to PSL holders from FANS, Inc.  In January 2016, Defendant announced that it was moving its football team to Inglewood, California, where it or affiliated companies will build a $3 billion multi-use complex.[1]

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this class action pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d)(2), (5), and (6).  The amount in controversy exceeds $5 million, exclusive of interest or costs; the proposed class includes at least 100 members, and there is minimal diversity of citizenship.  The members of the Class are citizens of Missouri,

---

[1] http://www.forbes.com/sites/keithflamer/2016/01/15/future-sleek-stadium-wins-rams-chargers-right-to-move-nfl-back-to-los-angeles/#4397fbc87ad3 (accessed February 5, 2016).

Illinois and, on information and belief, other states.  As a Limited Liability Corporation, the

Defendant is a citizen of each state in which its members are citizens.  Upon information and

belief, the sole member of the St. Louis Rams, LLC is Enos Stanley Kroenke, who is a citizen of

the state of Wyoming.  At least one member of the Class is a citizen of a State different from

Defendant.

7.      This Court has personal jurisdiction over Defendant because it is registered to do

business in Missouri and engaged in most or all of the acts at issue in this case in Missouri.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## BACKGROUND ALLEGATIONS

9.      In 1995, before the start of that year's football season, the Los Angeles Rams of

the NFL moved to St. Louis, which had been without professional football since the St. Louis

(football) Cardinals moved away eight years earlier.  The Los Angeles Rams then became the St.

Louis Rams.

10.      To satisfy the enormous demand for tickets in St. Louis, the Rams required

football fans who wished to purchase season tickets to buy PSLs.  Based on the Rams'

representations, one PSL would entitle the purchaser to buy one season ticket per year in the

designated section of the stadium (now known as the Edward Jones Dome at America's Center)

through the 2024 season.  The price of the PSLs varied depending on where the seats were

located, but according to Forbes magazine,[2] the average price was $2,085.  Plaintiff bought one

of those PSLs.  Since, according to Forbes,[3] the Rams sold approximately 46,000 PSLs, they

received a total of approximately $96 million for the initial PSLs.

---

[2] http://www.forbes.com/pictures/fflf45eld/14-st-louis-rams/ (accessed February 4, 2016).

[3] http://www.forbes.com/pictures/fflf45eld/14-st-louis-rams/ (accessed February 4, 2016).

11.     The Rams gave PSL owners documents that they represented were contracts. Those purported contracts had three key provisions setting forth the rights and obligations of the parties:  1)  The PSL owner would be able to buy season tickets through the 2024 season; 2) If the PSL owner defaulted, the Rams could terminate the PSL and owe the PSL owner nothing; 3) If the Rams terminated the purported agreement for any other reason, they had to refund all or part of the PSL owner's purchase price.

12.     PSL owners were allowed to transfer their PSLs to others upon paying a transfer fee to the Rams.  Thus, when the Rams left St. Louis in 2016, some of the PSL owners were not original PSL purchasers, but they succeeded to the rights of the PSL owners whose licenses they had acquired.

13.     Other PSL owners, such as Plaintiff with respect to one of his PSLs, bought them from the Rams after the Rams moved to St. Louis.  Their PSLs also gave the owners the right to buy one season ticket per year through the 2024 season.

14.     During the period when FANS, Inc., was the agent for the Rams in the sale of PSLs, the purported contract was titled: "STANDARD TERMS AND CONDITIONS OF REGULAR PATRON CPSL AGREEMENT" (hereinafter referred to as "purported FANS, Inc. contract").  (Note:  Here and elsewhere the purported agreements refer to a PSL as a "CPSL," meaning "Charter Personal Seat License.")  A copy of this document, as presented to Plaintiff McAllister, is attached hereto as Exhibit A and incorporated herein by reference.

15.     The Rams are a third-party beneficiary of the purported FANS, Inc. contract according to Paragraph 12.B.

16.     Pursuant to Paragraph 7.B of the purported FANS, Inc. contract, the Licensor (Rams) had the right "to assign, pledge as collateral, transfer or sell all or any part of the rights

and obligations of Licensor and Licensee under this Agreement to one or more third parties who shall succeed to all or any part of the rights vested in and granted herein to Licensor." Upon information and belief Defendant succeeded to FANS, Inc.'s rights and obligations under the purported FANS, Inc. contract pursuant to this provision and thereby became the "Licensor."

17.   Subsequently, the Rams sold PSLs directly, rather than going through FANS, Inc. During this period, the purported contract, attached hereto as Exhibit B and incorporated herein by reference, was titled: "REGULAR PATRON CPSL AGREEMENT" (hereinafter referred to as "purported Rams Partnership contract").

18.   In Paragraph 1 of the purported FANS, Inc. contract, the licensor purports to promise the PSL owner, referred to as the "licensee," that he or she would have the right to buy season tickets until March 1, 2025 (or through the 2024 season):

> Licensor promises, upon full payment of the License Fee, to grant to Licensee the number of Regular Patron Charter Personal Seat Licenses ("CPSL(s)") stated on the Signature Page.  The CPSL(s) granted to Licensee by Licensor entitle Licensee to purchase the number of Season Ticket(s) for the designated Stadium Area shown on Exhibit A. ...  Once Licensee's Seats have been determined, Licensee will be entitled to the opportunity to purchase Season Ticket(s) to Licensee's Seats for all Games at the Stadium until March 1, 2025, subject to Licensee complying with all of the terms and conditions of this Agreement.

19.   Similarly, in the purported Rams Partnership contract, the Rams purport to promise the PSL owner or "licnsee" the right to buy season tickets through the 2024 season from the Rams, referred to in the contract as "the Team."  In language that tracks the above quoted language from the purported FANS, Inc. contract, Paragraph 1 of the purported Rams Partnership contract states:

> The Team promises, upon full payment of the License Fee shown on Schedule 1, to grant to the undersigned licensee (the "Licensee") the number of CPSL(s) stated on Schedule 1. The CPSL(s) granted to Licensee by the Team entitle Licensee to

5

> purchase the number of Season Ticket(s) for the designated
> Stadium Area described on Schedule 1. …  Once Licensee's Seats
> have been determined, Licensee will be entitled to the opportunity
> to purchase Season Ticket(s) to Licensee's Seats for all the Games
> at the Stadium until March 1, 2025, subject to Licensee complying
> with all of the terms and conditions of this Agreement.

20.     However, as described below, the promises that the Rams made in these purported

contracts were illusory, the written contracts are void, and the Rams are liable to Plaintiff and the

Class for unjust enrichment for keeping the full payments for the PSL despite terminating them

before March 1, 2015.

21.     In the alternative, if they are not illusory, the Rams breached those purported

contracts because they require that the Rams are to pay a refund in the event of termination for

any cause other than the PSL owner's default, and the Rams have paid no such refunds.

**The Purported Fans, Inc. Contract:  An Illusory Agreement**

22.     The licensor's promises under the purported FANS, Inc. contract are illusory.

Paragraph 12 of that purported contract contains a provision under which the licensee

relinquished any claim against the Rams with respect to the CPSL, as well as an unlimited

promise not to sue the Rams for damages or injunctive relief related to the CPSL:

> Licensee acknowledges that Licensee has ***no claim against the
> RAMS with respect to this CPSL and/or its termination
> whatsoever***. … Licensee expressly agrees ***not to sue the RAMS
> for damages or injunctive relief related to this CPSL***, including
> ***without limitation*** should the RAMS not play its home games in
> the Stadium or in St. Louis for any reason.

(Emphasis added.)

23.     Because the purported FANS, Inc. contract provided that the PSL owner had no

claim on the Rams "whatsoever" with respect to the CPSL and because the purported contract

took away the right of the PSL owner to sue the Rams for any relief related to the PSL, the

Rams' promises under this purported agreement were without consideration, and it is an illusory

contract.  Without providing the PSL owner any means to hold the Rams to their supposed promises, the purported contract allows the Rams to perform their obligations or not, solely on condition of their whim.

**The Purported Rams Partnership Contract:  An Illusory Agreement**

24.     Similarly, the Rams' promises in the purported Rams Partnership contract, such as the document that the Rams presented Plaintiff when he bought his second PSL in 2005, are also illusory.

25.     As with the purported FANS, Inc. contract, this promise is illusory because it contains an unlimited agreement by the PSL owner not to sue the Rams for damages or injunctive relief.  Paragraph 11.A of the purported Rams Partnership contract states:  "Licensee expressly agrees not to sue the Team for damages or injunctive relief related to this CPSL, including without limitation should the Team not play its home games in the Stadium or in St. Louis for any reason."

26.     Because the purported Rams Partnership contract took away the right of the PSL owner to sue the Rams for any relief, the Rams' promises under this purported agreement were without consideration, and it is an illusory contract.  Without providing the PSL owner any means to hold the Rams to their supposed promises, this purported contract allows the Rams to perform their obligations or not, solely on condition of their whim.

27.     Because the Rams' promises under both the purported FANS, Inc. contract and the purported Rams Partnership contract are all illusory, Plaintiff asks the Court to declare that no contract was ever formed and these purported contracts are void and of no effect.

**Plaintiff is entitled to recover for unjust enrichment**

28.     The Rams were enriched, at the expense of Plaintiff and the Class, by the receipt of money for PSLs with respect to the years 2016-2024 because they have taken away the right of Plaintiff and Class members to buy season tickets for those years.

29.     For the Rams to retain that money is unjust.

**Plaintiff is entitled to recover for money had and received**

30.     Defendant has received money from Plaintiff and the Class for selling the right to buy season tickets to Rams home games from 2016-2024 that in equity and good conscience ought to be returned to Plaintiff and the Class.

**Alternatively, Defendant breached its contracts with Plaintiff and the Class**

31.     In the alternative, should the Court find that the purported FANS, Inc. and Rams Partnership contracts were properly formed and exist, Defendant has breached its promises in those contracts to reimburse Plaintiff and other PSL owners should it terminate the PSL agreements for any reason other than default of the PSL owner.

32.     Both purported contracts give Defendant the right to terminate the agreements. However, except in the case of default by the PSL owner, termination must be accompanied by a total or partial refund to the PSL owner.

33.     Paragraph 9.F of the purported FANS, Inc. contract states that the PSL owner acknowledges that the PSL may be terminated under certain conditions that are explained elsewhere in the purported agreement:

> Licensee hereby represents warrants and/or acknowledges as follows:

> ***

> F.     The transfer of the CPSL(s) will be restricted and
> **the CPSL(s) may be terminated under certain
> conditions, as explained in this Agreement** ….

(Emphasis added.)

34.     None of the other references to termination allow the Rams to terminate the

agreement without payment of a refund to the PSL owner, except in the case of default by the

PSL owner.  Termination is mentioned in only three other places in the purported FANS, Inc.

contract.

35.     One of those provisions is Paragraph 5 of the purported FANS, Inc. contract,

entitled "Default."  It provides that the Rams may terminate the agreement if the PSL owner fails

to comply with his or her obligations:

> Failure by Licensee to make any payment when due under this
> Agreement or to comply with any of the other terms and conditions
> of this Agreement or any of the terms and conditions of the sale of
> the Season Ticket(s) (including without limitation the timing of
> payment therefor and conduct at games) imposed by the RAMS
> **shall be a default. If Licensee defaults under this Agreement,
> then, at the sole option of Licensor, (a) this Agreement may be
> terminated** ….

(Emphasis added.)

36.     Assuming that the purported FANS, Inc. contract is a valid contract, Plaintiff has

fulfilled his obligations and has not defaulted.

37.      Another reference to termination is in Paragraph 12.A, described above, that

deprives the PSL owner of any claim against the Rams with respect to the PSL or its termination.

Not only does that provision render the purported contract illusory, but, as alleged below, it is

unconscionable and should be given no effect.

38.     And, even if not unconscionable, that provision is contrary to the provision,

described immediately below, requiring a refund in the event of termination.  That conflict

9

renders the contract ambiguous.  Such ambiguity must be resolved against the Rams, as the

drafter of the document, meaning that the provision requiring a refund in the event of termination

should be given effect.

39.     The only other provision of the purported FANS, Inc. contract that allows the

Rams to terminate is Paragraph 7.A.  That provision allows the Rams to terminate the agreement

for any reason in its sole discretion upon payment of a refund to the Licensee:

> In addition to all rights at law or equity or under the other terms of
> this Agreement, Licensor hereby expressly reserves the following
> rights:
>
> A.      The right to terminate this Agreement **and refund part or
>         all of Licensee's deposit**, either if Licensor determines that
>         Licensee's credit is not satisfactory for this License and the
>         future obligation of Licensee to acquire tickets, **or for any
>         other reason satisfactory to Licensor in its sole discretion**,
>         including, but not limited to, the right to reduce the total
>         number of CPSL(s) purchased by Licensee if necessary.

(Emphasis added.)

40.     Neither that provision, nor any other provision of the purported FANS, Inc.

contract allows the Rams to terminate the purported agreement without providing a refund,

except in the case of default by the PSL owner.  This provision does not state how much the

Rams were to refund, but a reasonable amount would be a pro rata amount representing the

unused portion of the PSL.

41.     The purported Rams Partnership contract contains somewhat different provisions

regarding termination than the purported FANS, Inc. contract, but it also requires that the Rams

provide a refund if it terminates the contract, except in the case of the PSL owner's default.

42.     The purported Rams Partnership contract does not provide that the PSL owner has

no claim against the Rams regarding the PSL or its termination.  It also does not provide, as the

purported FANS, Inc. contract does in Paragraph 9.F, that "[t]he transfer of the CPSL(s) will be

restricted and the CPSL(s) may be terminated under certain conditions."  The corresponding provision of the purported Rams Partnership contract, Paragraph 8.F, only mentions transfer of a CPSL but not termination of the CPSL.  It simply states:  "The transfer of the CPSL(s) will be terminated under certain conditions, as explained in this Agreement …."

43.     Paragraph 4 of the purported Rams Partnership contract contains the same provision regarding termination in the event of the PSL owner's default as in the purported FANS, Inc. contract.  *See* Ex. B, Paragraph 4.  Assuming the purported Rams Partnership contract is a valid agreement, Plaintiff has fulfilled his obligations and has not defaulted.

44.     The third reference to termination in the purported Rams Partnership contract contains the same provision as in the purported FANS, Inc. contract that allows the Rams to terminate the agreement for any reason it deems satisfactory, but only with a refund to the PSL owner:

> In addition to all rights at law or equity or under the other terms of this Agreement, the Team hereby expressly reserves the following rights:
>
> A.      The right to terminate this Agreement ***and refund part or all of Licensee's deposit***, either if the Team determines that Licensee's credit is not satisfactory for this License and future obligation of Licensee to acquire tickets, ***or for any other reason satisfactory for this the Team [s*ic] in its sole discretion***, including, but not limited to, the right to reduce the total number of CPSL(s) purchased by Licensee if necessary.

45.     Neither that provision, nor any other provision of the purported Rams Partnership contract allows the Rams to terminate the purported agreement without providing a refund, except in the case of default by the PSL owner.  This provision does not state how much of the deposit the Rams were to refund, but a reasonable amount would be a pro rata amount representing the unused portion of the PSL.

46.     On information and belief, the Rams determined, in their sole discretion, that the opportunity to move the Rams to Southern California was a sufficient reason to terminate the PSLs of Plaintiff and other PSL owners.  Accordingly, they terminated Plaintiff's PSLs and those of the other PSL owners.

47.     However, the Rams did not refund anything to Plaintiff or Class members.  As a result, they have breached these purported contracts (assuming they are valid contracts).  The damages of Plaintiff and Class members are the pro rata amounts they (or the original owners if they purchased it in a third-party transaction) paid for the PSLs, representing the NFL seasons from 2016 through 2024, during which these PSLs are unusable.

**Provisions barring claims and lawsuits are unconscionable**

48.     As noted above, the purported contracts contain provisions that would take away the right of a PSL owner to make any claim against the Rams with respect to the PSL or to sue the Rams for damages or injunctive relief related to the PSL (Paragraphs 12.A in the purported FANS, Inc. contract and 11.A in the purported Rams Partnership contract).  These provisions are unconscionable and should be given no effect.  No person "in his senses and not under delusion would make" an agreement that would be unenforceable in the event of a breach by the other party.[4]

49.     Furthermore, the purported contracts were not negotiable.  They consist of fine print and are difficult for the average consumer to understand.  FANS, Inc. and the Rams were in superior bargaining positions.

50.     Thus, if the court were to enforce these purported contracts it should be without regard to these unconscionable provisions.

---

[4] *Brewer v. Missouri Title Loans*, 364 S.W.3d 486, 495 (Mo. 2012) (citations omitted).

**Breach of implied covenant of good faith and fair dealing**

51.      Alternatively, assuming that there is a valid PSL contract between the Rams and PSL owners, the Rams breached the implied covenant of good faith and fair dealing that is present in this and every other contract.

52.      No provision in the purported FANS, Inc. and Rams Partnership contracts expressly allows the Rams to terminate the PSLs without refunding a pro rata share of the price paid for the PSL, representing the unused portion.

53.      The Rams and PSL owners had a common purpose of allowing the PSL owners to buy season tickets to Rams football games through the 2024 season.

54.      Plaintiff and Class members had the justified expectation that the Rams would either allow them to buy season tickets through the 2024 season or refund them the amounts paid to the Rams for the unused portions of their PSLs.

55.      By terminating the PSLs but not refunding a pro rata share of the price paid representing the unused portions, the Rams acted in bad faith and violated the implied covenant of good faith and fair dealing.

**Rams' violation of the MMPA**

56.      The MMPA, Mo. Rev. Stat., § 407.020, declares to be unlawful "[t]he act, use or employment by any person of any … unfair practice in connection with the sale or advertisement of any merchandise in trade or commerce …"

57.      Furthermore, the statute declares that "[a]ny act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation." *Id.*

58.     Pursuant to Missouri regulations, an unfair practice, as prohibited by the MMPA, is "any practice which (A) … is unethical, oppressive or unscrupulous and (B) [p]resents a risk of, or causes, substantial injury to consumers."  15 Mo. Code Regs. 60-8.020.

59.     Another Missouri regulation provides that "[i]t is an unfair practice for any person in connection with the advertisement or sale of merchandise to violate the duty of good faith in solicitation, negotiation and performance, or in any manner fail to act in good faith …."  15 Mo. Code Regs. 60-8.040.

60.     Yet another Missouri regulation provides that "[i]t is an unfair practice for any person in connection with the sale of merchandise to unilaterally breach unambiguous provisions of consumer contracts …."  15 Mo. Code Regs. 60-8.070.

61.     To terminate the PSLs of Plaintiff and other Class members while refusing to refund the amounts paid for the unusable portions is unfair because it violates the duty of good faith, is not an act in good faith, unilaterally breaches unambiguous provisions of consumer contracts, and is unethical, oppressive and unscrupulous.

62.     Defendant's actions, as alleged herein, were performed intentionally, willfully, knowingly and maliciously.

## CLASS ACTION ALLEGATIONS

63.     Pursuant to Fed. R. Civ. P. 23, Plaintiff seeks to represent the following Class and Subclasses:

> **Class.**  All individuals who, as of the end of the 2015 season, owned a Rams PSL.
>
> **FANS, Inc. Subclass.**  All individuals who, as of the end of the 2015 season, owned a Rams PSL originally sold by FANS, Inc.
>
> **Rams Partnership Subclass.**  All individuals who, as of the end of the 2015 season, owned a Rams PSL originally sold by the Rams Partnership.

**MMPA Subclass.**  All individuals who, as of the end of the 2015 season, owned a Rams PSL that they used for personal, family or household purposes.

Excluded from the proposed Class and Subclasses are Defendant, its Officers, Directors, and employees, as well as employees of any subsidiary, affiliate, successors, or assignees of Defendant.  Also excluded is any trial judge who may preside over this case.

64.     Plaintiff is a member of the Class and each of the Subclasses.

65.     The Class is believed to comprise many consumers, the joinder of whom is impracticable, both because they are geographically dispersed and because of their number.

66.     Class treatment will provide substantial benefits to the parties and the Court.  A well-defined commonality of interest in the questions of law and fact involved affect Plaintiff and the putative Class Members.  Common questions of law and fact include:

A.     Whether the promises the Rams made in the purported FANS, Inc. contract are illusory.

B.     Whether the promises the Rams made in the purported Rams Partnership contract are illusory.

C.     Whether the purported FANS, Inc. contract was ever formed.

D.      Whether the purported Rams Partnership contract was ever formed.

E.     Whether the provisions in the two purported contracts pursuant to which the PSL owner gave up any claim against the Rams relating to the PSL or gave up the right to sue the Rams for damages or injunctive relief related to the PSL are unconscionable.

F.     Whether, assuming that the purported FANS, Inc. contract is a properly formed and valid agreement, Defendant was obligated to refund all or a portion of PSL owners' payments in the event it terminated the PSLs before March 1, 2025.

G.      Whether, assuming that the purported Rams Partnership contract is a properly formed and valid agreement, Defendant was obligated to refund all or a portion of PSL owners' payments in the event it terminated the PSLs before March 1, 2025.

H.      Whether the purported FANS, Inc. contract allows the Rams to terminate the agreement without paying a refund for the unusable amount.

I.      Whether the purported Rams Partnership contract allows the Rams to terminate the agreement without paying a refund for the unusable amount.

J.      Whether Defendant violated the purported contracts by not reimbursing PSL owners the pro rata amounts that they paid for the unusable portions of their PSLs.

K.      Whether it was a breach of Defendant's implied covenant of good faith and fair dealing for it to terminate the purported FANS, Inc. and Rams Partnership contracts without paying the PSL owners a pro rata refund.

L.      Whether Defendant's retention of the amounts paid for the unusable portion of the PSLs after their termination was unjust.

M.      Whether Defendant's retention of the amounts paid for the unusable portion of the PSLs after their termination was unfair pursuant to the MMPA.

N.      Whether appropriate damages would be a pro rata refund measured by that fraction of the original price of the PSL equal to nine years divided by the number of years starting from the date when FANS, Inc. or the Rams sold the PSL and ending March 1, 2025.

O.      Whether the MMPA Subclass is entitled to punitive damages.

P.      Whether the MMPA Subclass is entitled to costs and attorneys' fees.

67.     Questions of law and fact common to members of the Class and Subclasses, some of which are set forth above, predominate over any questions affecting only individual members of the Class and Subclasses.  The resolution of common questions will resolve the claims of both Plaintiff and the Class and Subclasses.

68.     Plaintiff's claims are typical of the claims of the proposed Class and Subclasses in that Plaintiff and all members of the Class purchased PSLs that were terminated by the Rams in January 2016.

69.     Plaintiff will fairly and adequately represent and protect the interests of the proposed Class and Subclasses.  Plaintiff has no interests antagonistic to those of the Class and Subclasses.  Plaintiff has retained competent and experienced counsel in the prosecution of this type of litigation.

70.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy because members of the Class and Subclasses are numerous and individual joinder is impracticable.  The expenses and burden of individual litigation would make it impracticable or impossible for proposed Class and Subclass Members to prosecute their claims individually.  Trial of Plaintiff's claims is manageable.

71.     This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23.

**JURY DEMAND**

72.     Plaintiff demands trial by jury on all issues so triable.

**COUNT I:  Declaratory Judgment that the Purported Contracts Were Illusory, Never Properly Formed and Void**
(Plaintiff and the Class)

73.     Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

74.     The promises that the Rams made in the purported FANS, Inc., contract (after the Rams succeeded to the rights and obligations of FANS, Inc.) were illusory because those documents provided that the PSL owner had no claim against the Rams with respect to the CPSL (in the case of the purported FANS, Inc. contract) and an unlimited agreement not to sue the Rams for damages or injunctive relief related to the CPSL (in the case of both purported contracts).

75.     As a result, the Rams' promises under these purported contracts were without consideration, and they are illusory contracts.  Without providing the PSL owner any means to hold the Rams to their supposed promises, these purported contracts allow the Rams to perform their obligations or not, solely on condition of their whim.

76.     WHEREFORE, Plaintiff asks the Court to declare that (1) these contracts are illusory, (2) no valid contract was ever formed, and (3) these purported contracts are void and of no effect.

<u>**COUNT II:  Unjust Enrichment**</u>
(Plaintiff and the Class)

77.     Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

78.     The Rams were enriched, at the expense of Plaintiff and the Class, by the receipt of money for PSLs with respect to the years 2016-2024 because they have taken away the right of Plaintiff and Class members to buy season tickets for those years.

79.     The amount by which the Rams have been unjustly enriched is measured by the pro rata amount of the original purchase price they received that is allocable to the NFL seasons of 2016-2024.

80.     Thus, for a PSL that was sold in 1995, such as Plaintiff's first PSL, the Rams were unjustly enriched by an amount measured by that fraction of the original price of the PSL equal to nine years divided by 30, the total number of years that the PSL was to be usable.  Since that fraction is 9/30 or 30%, the Rams were unjustly enriched by 30% of the original purchase price.

81.     For a PSL that the Rams sold later, such as the PSL that Plaintiff bought in 2005, the Rams were unjustly enriched by an amount measured by that fraction of the original price of the PSL equal to nine years divided by the number of NFL seasons remaining through the 2024 season.  For Plaintiff's PSL sold in 2005 that fraction is 9/20 or 45%.

82.     WHEREFORE, Plaintiff and the Class pray for restitution in an amount that would return the sums by which the Rams have been unjustly enriched.

### COUNT III:  Money Had and Received
(Plaintiff and the Class)

83.     Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

84.     Defendant has received money from Plaintiff and the Class for selling the right to buy season tickets to Rams home games from 2016-2024 that in equity and good conscience ought to be returned to Plaintiff and the Class.

85.     Plaintiffs are injured by the amount of money that ought to be returned to them.  That amount of that money is the pro rata amount of the original purchase price they received that is allocable to the NFL seasons of 2016-2024.

86.     Thus, for a PSL that was sold in 1995, such as Plaintiff's first PSL, the PSL owner is injured by an amount measured by that fraction of the original price of the PSL equal to nine years (for the seasons from 2016 through 2024) divided by 30 (the total number of years

that the PSL was to be usable).  Since that fraction is 9/30 or 30%, Plaintiff is injured by 30% of the original purchase price.

87.     For a PSL that the Rams sold later, such as the PSL that Plaintiff bought in 2005, the PSL owner is injured by an amount measured by that fraction of the original price of the PSL equal to nine years (for the NFL seasons from 2016 through 2024) divided by the number of NFL seasons remaining through the 2024 season at the time PSL owner bought the PSL from the Rams.  For Plaintiff's PSL bought from the Rams in 2005, that fraction is 9/20 or 45%.

88.     WHEREFORE, Plaintiff and the Class pray for the relief set forth in the Prayer for Relief.

### COUNT IV:  Breach of the Purported FANS, Inc. Contract
(Plaintiff and the FANS, Inc. Subclass)

89.     Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

90.     Alternatively, assuming there is a valid contract between Rams and PSL owners as set forth in the purported FANS, Inc., contract, Defendant breached its obligation to refund part or all of the Licensee's deposit upon termination of the PSL.

91.     Although the purported FANS, Inc. contract does not specify how much of the Licensee's deposit is to be refunded, a reasonable amount would be the pro rata portion of the amount paid for the PSL.

92.     Thus, the damages of Plaintiff and the FANS, Inc. Subclass for breach of contract are an amount measured by that fraction of the original price of the PSL equal to nine years (for the seasons from 2016 through 2024) divided by 30 (the total number of years that the PSL was to be usable).  Since that fraction is 9/30 or 30%, the damages of Plaintiff and the FANS, Inc. Subclass are 30% of their purchase price.

93.     WHEREFORE, Plaintiff and the FANS, Inc. Subclass pray for the relief set forth in the Prayer for Relief.

### COUNT IV:  Breach of the Purported Rams Partnership Contract
(Plaintiff and the Rams Partnership Subclass)

94.     Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

95.     Alternatively, assuming there is a valid contract between Rams and PSL owners as set forth in the purported Rams Partnership contract, Defendant breached its obligation to refund part or all of the Licensee's deposit upon termination of the PSL.

96.     Although the purported Rams Partnership contract does not specify how much of the Licensee's deposit is to be refunded, a reasonable amount would be the pro rata portion of the amount paid for the PSL.

97.     Thus, the damages of Plaintiff and the Rams Partnership Subclass for breach of contract are an amount measured by that fraction of the original price of the PSL equal to nine years (for the NFL seasons from 2016 through 2024) divided by the number of NFL seasons remaining through the 2024 season at the time PSL owner bought the PSL from the Rams.  For Plaintiff's PSL bought from the Rams in 2005, that fraction is 9/20 or 45%.

98.     WHEREFORE, Plaintiff and the Rams Partnership Subclass pray for the relief set forth in the Prayer for Relief.

### COUNT V:  Breach of the Implied Covenant of Good Faith and Fair Dealing (Purported FANS, Inc. Contract)
(Plaintiff and the FANS, Inc. Subclass)

99.     Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

100.    Alternatively, assuming that there is a valid PSL contract between the Rams and PSL owners as set forth in the purported FANS, Inc. contract, the Rams breached the implied covenant of good faith and fair dealing that is present in this and every other contract.

101.    No provision in the purported FANS, Inc. contract expressly allows the Rams to terminate the PSLs without refunding a pro rata share of the price paid for the PSL, representing the unused portion.

102.    The Rams and PSL owners had a common purpose of allowing the PSL owners to buy season tickets to Rams football games through the 2024 season.

103.    Plaintiff and Class members had the justified expectation that the Rams would either allow them to buy season tickets through the 2024 season or refund them the amounts paid to the Rams for the unused portions of their PSLs.

104.    By terminating the PSLs but not refunding a pro rata share of the price paid representing the unused portions, the Rams violated the implied covenant of good faith and fair dealing.

105.    Thus, the damages of Plaintiff and the FANS, Inc. Subclass for breach of the implied covenant of good faith and fair dealing are an amount measured by that fraction of the original price of the PSL equal to nine years (for the seasons from 2016 through 2024) divided by 30 (the total number of years that the PSL was to be usable).  Since that fraction is 9/30 or 30%, the damages of Plaintiff and the FANS, Inc. Subclass are 30% of their purchase price.

106.    WHEREFORE, Plaintiff and the FANS, Inc. Subclass pray for the relief set forth in the Prayer for Relief.

## COUNT VI:  Breach of the Implied Covenant of Good Faith and Fair Dealing (Purported Rams Partnership Contract)
(Plaintiff and the Rams Partnership Subclass)

107.     Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

108.     Alternatively, assuming that there is a valid PSL contract between the Rams and PSL owners as set forth in the purported Rams Partnership contract, the Rams breached the implied covenant of good faith and fair dealing that is present in this and every other contract.

109.     No provision in the purported Rams Partnership contract expressly allows the Rams to terminate the PSLs without refunding a pro rata share of the price paid for the PSL, representing the unused portion.

110.     The Rams and PSL owners had a common purpose of allowing the PSL owners to buy season tickets to Rams football games through the 2024 season.

111.     Plaintiff and Class members had the justified expectation that the Rams would either allow them to buy season tickets through the 2024 season or refund them the amounts paid to the Rams for the unused portions of their PSLs.

112.     By terminating the PSLs but not refunding a pro rata share of the price paid representing the unused portions, the Rams violated the implied covenant of good faith and fair dealing.

113.     Thus, the damages of Plaintiff and the Rams Partnership Subclass for breach of the implied covenant of good faith and fair dealing are an amount measured by that fraction of the original price of the PSL equal to nine years (for the seasons from 2016 through 2024) divided by 30 (the total number of years that the PSL was to be usable).  Since that fraction is

9/30 or 30%, the damages of Plaintiff and the Rams Partnership Subclass are 30% of their purchase price.

114.    WHEREFORE, Plaintiff and the FANS, Inc. Subclass pray for the relief set forth in the Prayer for Relief.

### COUNT VII:  Violation of the MMPA
(Plaintiff and the Class)

115.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

116.    The MMPA, Mo. Rev. Stat., § 407.020, declares to be unlawful "[t]he act, use or employment by any person of any … unfair practice in connection with the sale or advertisement of any merchandise in trade or commerce …."

117.    Furthermore, the statute declares that "[a]ny act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation." *Id.*

118.    Pursuant to Missouri regulations, an unfair practice, as prohibited by the MMPA, is "any practice which (A) … is unethical, oppressive or unscrupulous and (B) [p]resents a risk of, or causes, substantial injury to consumers."  15 Mo. Code Regs. 60-8.020.

119.    Other Missouri regulations provide that "[i]t is an unfair practice for any person in connection with the advertisement or sale of merchandise to violate the duty of good faith in solicitation, negotiation and performance, or in any manner fail to act in good faith …" and that "[i]t is an unfair practice for any person in connection with the sale of merchandise to unilaterally breach unambiguous provisions of consumer contracts …."  15 Mo. Code Regs. 15 Mo. Code Regs. 60-8.040 and 60-8.070.

120.     Defendant's termination of the PSLs of Plaintiff and other MMPA Subclass members while refusing to refund the amounts paid for the unusable portions of those PSLs is unfair in violation of the MMPA and the above-quoted regulations.

121.     Defendant's actions, as alleged herein, were performed intentionally, willfully, knowingly and maliciously.

122.     Under § 407.025.1 of the MMPA, "[a]ny person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages."

123.     The PSLs sold to Plaintiff and MMPA Subclass members are merchandise as defined in the MMPA.[5]

124.     Defendant is a person as that term is defined in the MMPA.[6]

125.     Defendant's sales of PSLs are trade and commerce, as that term is defined in the MMPA.[7]

126.     Plaintiff and members of the MMPA Subclass purchased PSLs for personal, family or household purposes.

127.     Defendant's actions alleged herein violated the MMPA in that they constituted an unfair practice within the meaning of the MMPA because they are unethical and caused

---

[5] Mo. Rev. Stat. § 407.010(4).

[6] Mo. Rev. Stat. § 407.010(5).

[7] Mo. Rev. Stat. § 407.010(6) and (7).

substantial injury to Plaintiff and the other members of the Class who lost substantial value of their PSLs because of Defendant's actions without being compensated.[8]

128.     WHEREFORE, Plaintiff and the Class pray for the relief set forth in the Prayer for Relief.

129.     Defendant's actions, as alleged herein, were performed intentionally, willfully, knowingly and maliciously.

## PRAYER FOR RELIEF

130.     WHEREFORE, Plaintiff, on his own behalf and on behalf of the members of the putative Class and Subclasses, prays for a judgment:

A. Certifying the Class and Sub-Classes as defined herein;

B. Entering an order appointing Law Office of Richard S. Cornfeld, The Bruning Law Firm, LLC and Goldenberg Heller & Antognoli, P.C., as counsel for the Class and Sub-Classes;

C. Awarding Plaintiff and the Class compensatory damages in an amount to be determined at trial including interest calculated from the date of purchase of the PSL;

D. Awarding restitution to Plaintiff and the Class in an amount to be determined at trial;

E. Awarding punitive damages in an amount to be determined at trial;

F. Awarding Plaintiff and the Class their costs of suit and reasonable attorneys' fees;

G. Providing such further relief as the Court may deem fair and reasonable.

Respectfully submitted,

LAW OFFICE OF RICHARD S. CORNFELD

By:  */s/ Richard S. Cornfeld*
Richard S. Cornfeld, #31046MO

---

[8] Mo. Rev. Stat. § 407.020.1.

1010 Market Street, Suite 1720
St. Louis, MO 63101
P. 314-241-5799 / F. 314-241-5788
rcornfeld@cornfeldlegal.com

and

Anthony S. Bruning, #30906MO
Anthony S. Bruning, Jr., #60200MO
Ryan L. Bruning, #62773MO
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, MO 63101
P. 314-735-8100 / F. 314-735-8020
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

and

Mark Goldenberg, #13305MO
Thomas P. Rosenfeld, #35305MO
Kevin P. Green, #63497MO
GOLDENBERG HELLER & ANTOGNOLI, P.C
2227 South State Route 157
Edwardsville, IL 62025
P. 618-656-5150 / F. 618-656-6230
tom@ghalaw.com
kevin@ghalaw.com

***Attorneys for Plaintiff***