# Exhibit A

**FANS, Inc.,** 10 S. BROADWAY, SUITE 425, ST. LOUIS, MO 63102

## STANDARD TERMS AND CONDITIONS OF REGULAR PATRON CPSL AGREEMENT

1. **CPSL License Fee and Stadium Area.**
   Licensor promises, upon full payment of the License Fee, to grant to Licensee the number of Regular Patron Charter Personal Seat Licenses ("CPSL(s)") stated on the Signature Page. The CPSL(s) granted to Licensee by Licensor entitle Licensee to purchase the number of Season Ticket(s) for the designated Stadium Area shown on Exhibit A. "Season Ticket(s)" shall mean general admission ticket(s) on a season-by-season basis to all, but not less than all, pre-season, regular season and post-season home games (excluding the NFL's Super Bowl or Pro Bowl), subject to Licensee's obligation to pay a separate fee for NFL playoff games (the "Games"), played by the RAMS in the Stadium at America's Center (the "Stadium") located in the City of St. Louis, Missouri, during the term and subject to the terms and conditions of this Agreement. Licensee acknowledges and agrees that the exact location of Licensee's seats ("Licensee's Seats") within the Section of the Stadium shown on the Signature Page which are subject to Licensee's CPSL(s) will not be determined until after Licensee has paid the full amount of the License Fee shown on the Signature Page. Once Licensee's Seats have been determined, Licensee will be entitled to the opportunity to purchase Season Ticket(s) to Licensee's Seats for all Games at the Stadium until March 1, 2025, subject to Licensee complying with all of the terms and conditions of this Agreement.

2. **Additional CPSL Conditions.**
   A. Licensee agrees to purchase all of the Season Tickets(s) with respect to a particular NFL season upon the terms and conditions set by the RAMS. Licensor shall have no liability for the number of Games included within a Season Ticket(s) package or for the RAMS failure to play Games in the Stadium.
   B. Licensor may limit the number of CPSL(s) licensed to any one individual or entity in its sole discretion.
   C. The rights licensed under this Agreement are rights of personal privilege and do not under any circumstance confer upon Licensee any interest or estate in real property or any leasehold interest in the Licensee's Seat or the Stadium.

3. **Transfer Terms.**
   A. Until March 1, 1996, Licensee shall not sell, pledge, hypothecate or transfer in any manner a CPSL except upon the occurrence of a Special Event. A Special Event shall be as follows:
      (1) The occurrence of a circumstance beyond the control of Licensee such as death, disability, employment relocation, or similar event;
      (2) The transfer to a Qualifying Lender, either as a pledge or other encumbrance by Licensee pursuant to, or due to Licensee's default under, the Qualifying Lender's CPSL financing documents;
      (3) The transfer to an Immediate Family Member or Related Party;
      (4) The transfer in conjunction with a major business transaction in which the acquisition of the CPSL is not the intent of the transaction.
      Further, in no event shall a CPSL be transferred more than once each year, except for a Special Event. All transfers, whether pursuant to a Special Event or after March 1, 1996, shall be subject to a Transfer Fee.
   B. All transfers shall be in accordance with such reasonable rules and regulations and in such form as established by Licensor from time to time, including but not limited to the transferee assuming all obligations of the transferor in a form acceptable to Licensor, provided that a Qualifying Lender shall not be required to assume Licensee's obligations, nor shall such Qualifying Lender have any of Licensee's rights, until the transfer of a CPSL to the Qualifying Lender due to Licensee's default. Until a transfer is properly recorded on Licensor's records, the transfer of a CPSL by Licensee will not be recognized by Licensor or the RAMS under the terms of the CPSL being transferred.
   C. "Qualifying Lender" shall mean any bank or other financial institution, or employer, or affiliate of an employer, of a Licensee that loans funds to Licensee which are used to pay for part or all of Licensee's CPSL License Fee. Licensee hereby acknowledges and agrees that (1) the RAMS shall be under no obligation to deliver Season Ticket(s) to Licensee if Licensee is in default under the Qualifying Lender's CPSL financing agreements and the RAMS are notified of the same at least fifteen (15) business days prior to the date on which Season Ticket(s) would otherwise be delivered to Licensee; and (2) Licensee hereby waives any and all claims Licensee may have against the RAMS, Licensor and/or any Qualifying Lender for any failure by the RAMS to deliver Season Ticket(s) to Licensee after receipt by the RAMS of any such notice from Licensor or Licensee's Qualifying Lender.
   D. "Immediate Family Member" means any grandparent, parent, spouse, child, stepchild, sibling, grandchild and great-grandchild of an individual Licensee; "Related Party" means any person or entity which owns or controls, or is owned or controlled by, Licensee.
   E. The "Transfer Fee" shall be equal to the greater of $25.00 or ten percent (10%) per CPSL of the CPSL transfer price. A Transfer Fee shall be charged on a "per CPSL per transaction" and not on a "per transferee per transaction" basis.

4. **Refunds.**
   If the RAMS do not move to St. Louis by September 1, 1996, all CPSL payments made by Licensee will be refunded to Licensee without interest.

5. **Default.**
   Failure by Licensee to make any payment when due under this Agreement or to comply with any of the other terms and conditions of this Agreement or any of the terms and conditions of the sale of the Season Ticket(s) (including without limitation the timing of payment therefor and conduct at games) imposed by the RAMS shall be a default. If Licensee defaults under this Agreement, then, at the sole option of Licensor, (a) this Agreement may be terminated, (b) Licensee shall hold no further rights to acquire the CPSL(s) or Season Ticket(s) associated therewith, (c) Licensor shall be entitled to retain all payments previously made by Licensee to Licensor hereunder, and (d) Licensee shall remain liable to Licensor for all losses suffered as a result of such default. In addition, upon default by Licensee, Licensor shall be entitled to recover all reasonable attorneys' fees and court costs incurred in connection with Licensee's default. Notwithstanding the foregoing, if Licensee's actions result in the loss of Licensee's rights to purchase or retain Season Ticket(s) for reasons other than Licensee's failure to timely purchase Season Ticket(s), Licensee shall be entitled to sell or transfer Licensee's CPSL in a bona fide transaction occurring within sixty (60) days of the date Licensee is notified of Licensee's loss of rights to Licensee's Season Ticket(s), subject, however, to the rights of such Licensee's Qualifying Lender, if any.

6. **Disclaimer.**
   Licensee covenants and acknowledges that neither Licensor, the Authority (as defined below), the Stadium Manager (as defined below), nor the RAMS have made any representations whatsoever regarding the CPSL(s) other than as may be set forth in this Agreement.

7. **Reservation of Rights by Licensor.**
   In addition to all rights at law or equity or under the other terms of this Agreement, Licensor hereby expressly reserves the following rights:
   A. The right to terminate this Agreement and refund part or all of Licensee's deposit, either if Licensor determines that Licensee's credit is not satisfactory for this License and the future obligation of Licensee to acquire tickets, or for any other reason satisfactory to Licensor in its sole discretion, including, but not limited to, the right to reduce the total number of CPSL(s) purchased by Licensee if necessary; and
   B. The right to assign, pledge as collateral, transfer or sell all or any part of the rights and obligations of Licensor and Licensee under this Agreement to one or more third parties who shall succeed to all or any part of the rights vested in and granted herein to Licensor.

8. **Best Efforts.**
   If the RAMS play any of their NFL games other than at the Stadium (e.g. at Busch Stadium if the Stadium is not completed on time), Licensor will use its best efforts to assure Licensee the right to purchase, on a pro rata priority basis, tickets for seats in the stadium where the transferred games are played. Licensee shall be obligated to buy tickets for Games played in the Stadium in St. Louis and NFL games played at Busch Stadium for which tickets are available for purchase by Licensee.

9. **Representations of Licensee.**
   Licensee hereby represents, warrants and/or acknowledges as follows:
   A. Licensee has read and understands the terms of this Agreement;
   B. Licensee is not acquiring the CPSL(s) as an investment and has no expectation of profit as a licensee of the CPSL(s);
   C. Licensee is acquiring the CPSL(s) solely for the right to purchase Season Ticket(s) to NFL Games played in the Stadium;
   D. Licensee is acquiring the CPSL(s) for Licensee's own use and not with a view to the distribution of the CPSL(s) to others;

Ex. A

E. Licensee will not have any equity or other ownership interest in either Licensor, the Authority, the Stadium Manager, the RAMS, or the Stadium or any of the Stadium's facilities and will not have any rights to dividends or other distribution rights from Licensor or any other party or entity described in this Agreement as a result of being a licensee of a CPSL, and further will not have any voting rights with respect to Licensor matters as a result of being a licensee of a CPSL;

F. The transfer of the CPSL(s) will be restricted and the CPSL(s) may be terminated under certain conditions, as explained in this Agreement; and

G. Licensee has full authority to enter into and sign this Agreement and carry out its terms and conditions and when signed, this Agreement shall be a binding obligation on Licensee, enforceable in accordance with its terms.

### 10. Use of Seats.

Licensee and Licensee's invitees shall at all times maintain proper decorum while using the Licensee's Seats and shall abide by all applicable governmental laws, ordinances, orders, directions, rules and regulations and by such rules and regulations as are adopted and revised from time to time regarding Licensee's Seats or for the Stadium. Licensee shall be responsible for all damages caused to the Licensee's Seats by Licensee and Licensee's invitees, ordinary wear and tear excepted. In addition, Licensee shall not take any action which would cause an increase in premiums of any insurance policy carried by either Licensor, the Authority, the Stadium Manager or the RAMS, by causing Licensor or any other party to fail to meet any requirement or condition of such policy or otherwise. Without limiting the foregoing, Licensee specifically agrees that neither Licensee nor Licensee's invitees will: (a) bring into the Stadium any alcoholic or intoxicating beverage, any illegal drugs or, except as prescribed by a physician, any controlled substance; (b) permit the Licensee's Seats to be used for any illegal, improper, immoral or objectional purpose, or in any way obstruct or interfere with the rights of any other licensees or Game attendees; or (c) film, record or transmit from the Licensee's Seats all or any portion of any NFL Football game or other event, or any description thereof, by any means (including without limitation radio or television broadcasting, whether broadcast "live" or by means of film or tape).

### 11. Assumption of Risk; Liability; Indemnity.

Licensee, for Licensee and Licensee's invitees, assumes all risk of personal injury to, or for any damage to or any loss of property of, Licensee or its invitees, arising out of, during or related to their attendance at events held in the Stadium. Licensee acknowledges that alcoholic beverages will be available in the Stadium and that attendance at sporting events may expose attendees to certain risks of injury including, but not limited to, incidents involving other patrons who have consumed alcoholic beverages, injury from thrown or dropped objects, spills of food or beverages and the unruly behavior of other patrons. Licensee hereby agrees to assume all responsibility and liability for the consumption in the Stadium of alcoholic beverages by Licensee and its invitees and for the conduct and behavior of Licensee and its invitees. Licensee agrees to indemnify and hold harmless Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., and the RAMS, and the respective owners, officers, directors, employees and agents of each such entity, from and against any claims, damages, actions, suits and expenses, including attorneys' fees and other costs, arising out of or related to this Agreement, the use of alcohol at the Stadium by Licensee or Licensee's invitees, the conduct and behavior of Licensee and Licensee's invitees and/or the use of the Licensee's Seats by Licensee or Licensee's invitees, whether such claims are now existing or later arising, and whether or not such loss is alleged to be caused by the negligence of Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., or the RAMS, the respective owners of each such entity, or their respective officers, directors, employees or agents.

### 12. Additional Terms.

A. Licensee acknowledges that the Stadium will be managed, maintained and operated by The Regional Convention and Visitors Commission (the "Stadium Manager") pursuant to certain agreements between the Stadium Manager and The Regional Convention and Sports Complex Authority (the "Authority") (collectively the "Stadium Agreements"). All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the RAMS agreement to relocate to St. Louis. Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years. Licensee acknowledges that Licensee has no claim against the RAMS with respect to this CPSL and/or its termination whatsoever. Licensee understands and acknowledges the possibility that the RAMS may not play its games in the Stadium or St. Louis for the entire term contemplated by this License. Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this CPSL, including without limitation should the RAMS not play its home games in the Stadium or in St. Louis for any reason.

B. Licensee hereby acknowledges that although the RAMS are not a party to this Agreement, the RAMS are a third party beneficiary under this Agreement and will directly and/or indirectly realize certain benefits from this Agreement. In addition, Licensee acknowledges that various other parties named in Sections 10 and 11 above, namely the Stadium Manager, the Authority, and St. Louis NFL Corp., are also third party beneficiaries of this Agreement and may directly or indirectly realize certain benefits from this Agreement. There are no other third party beneficiaries to this Agreement.

C. This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri without regard to the laws of conflict. Any action, suit or other proceeding brought by or against the Licensee or Licensor, including any claim for injuries or damages relating to the license of a part of the Stadium, the Licensee, and Licensee's guests and invitees, shall be brought in the United States District Court for the Eastern District of Missouri, Eastern Division, or in the Circuit Court of the State of Missouri, Twenty-First (21st) Judicial Circuit.

D. All notices and other communication required to be given pursuant to this License to Licensor or to Licensee shall be in writing and shall be sent to the addresses set forth on the Signature Page of this Agreement. Any notice given herein shall be deemed delivered when addressed as above provided, postage prepaid, certified mail, return receipt requested, and deposited in a United States General or Branch Post Office or with a nationally recognized overnight courier. Licensee hereby authorizes Licensor to provide Licensee's Qualifying Lender with a copy of any notice or other communication which Licensor may give to Licensee hereunder.

E. This Agreement contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any representations or agreements previously made or entered into by the parties hereto. No modification hereto shall be permitted by Licensee whatsoever.

F. This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, and their permitted successors and assigns. This Agreement may be assigned by Licensor in whole or part without any notice to Licensee; this Agreement shall not be assigned or transferred by Licensee except as set forth above. This License Agreement shall not be binding and enforceable until completed as stated on the Signature Page.

G. Notwithstanding the foregoing, neither Licensor nor the RAMS shall have any liability to Licensee or a Qualifying Lender for any failure to comply with the provisions of Sections 3.B or 12.D above.

### EXHIBIT A — STADIUM DIAGRAM

**Lower Level**



**Upper Level**



351 M