UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MCALLISTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16-CV-172 SNLJ |
| | ) | No. 4:16-CV-262 |
| | ) | No. 4:16-CV-297 |
| THE ST. LOUIS RAMS, LLC, | ) | CONSOLIDATED |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is comprised of three consolidated lawsuits[1] relating to the St. Louis Rams football team's January 2016 decision to move the team to a new stadium in Inglewood, California. The Rams' home stadium had been located in St. Louis, Missouri since 1995. The St. Louis Rams required football fans who wished to purchase season tickets to buy Personal Seat Licenses ("PSLs") that entitled the PSL holder to buy one season ticket per year in a designated section of the stadium. Approximately 46,000 PSLs were sold. Upon the announcement that the Rams would move to California, lawsuits were filed by PSL holders and others against the Rams claiming damages arising from the Rams' move. This matter is currently before the Court on three motions: (1) and (2) are motions by defendant, The St. Louis Rams, LLC, for judgment on the pleadings with respect to the complaints filed in the *Envision* and *Arnold* cases (No. 4:16-

---

[1] *McAllister v. The St. Louis Rams*, No. 4:16-CV-172 SNLJ (E.D. Mo.); *Envision, LLC, et al. v. The St. Louis Rams, LLC*, No. 4:16-CV-00262-CDP (E.D. Mo.); *Arnold, et al. v. The St. Louis Rams, LLC*, No. 4:16-cv-00297-SNLJ (E.D. Mo.).

1

cv-262, #17; No. 4:16-cv-297, #24),[2] and (3) is plaintiff McAllister's motion for partial judgment on the pleadings in his case, No. 4:16cv172 (#35).

## I. Legal Standard

"Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Faibisch v. Univ. of Minnesota*, 304 F.3d 797, 803 (8th Cir. 2002). When considering a motion for judgment on the pleadings, the Court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). The parties agree that Missouri law applies to the Missouri contracts that are central to this case.

## II. Discussion

The defendant's motions in *Envision* and *Arnold* will be discussed separately from plaintiff's motion in *McAllister*.

### A. Defendant Rams' Motions in *Envision* and *Arnold*

The *Envision* and *Arnold* plaintiffs claim that the Rams should continue to honor their PSL agreements by extending them to the purchase of tickets at the Rams' new California home. The defendant contends that it is entitled to judgment on the pleadings in those cases because the PSL agreements between the team and the PSL holders are by their terms no longer in effect now that the team has moved to California. For the reasons set forth below, the Court will grant the motions in part and deny them in part.

---

[2] The motions were filed under the individual cases' numbers rather than in the lead case because the motions were filed before the cases were consolidated.

The plaintiffs[3] and defendant were parties to Personal Seat License Agreements ("PSL Agreements" or "Agreements") that governed the issuance of Rams' season tickets to games played in the new Stadium at America's Center in St. Louis, Missouri (the "Stadium").[4] There are two nearly-identical agreements at issue. The original license agreements were issued by the Rams' ticketing agent, FANS, Inc., and that agreement is referred to as the "FANS" Agreement. Subsequent PSLs were sold directly by the Rams using an almost identical contract ("Rams" Agreement).

Key provisions in the FANS Agreements include

Paragraph 1. **CPSL License Fee and Stadium Area.** Licensee will be entitled to the opportunity to purchase Season Ticket(s) to Licensee's seats for all Games at the Stadium until March 1, 2025.

Paragraph 8. **Best Efforts**. If the RAMS play any of their [National Football League ("NFL")] games other than at the Stadium (e.g. at Busch Stadium if the Stadium is not completed on time), Licensor will use its best efforts to assure Licensee the right to purchase…tickets for seats in the stadium where the transferred games are played. Licensee shall be obligated to buy tickets for Games played in the Stadium in St. Louis and NFL games played at Busch Stadium for which tickets are available for purchase by Licensee.

Paragraph 9. **Representations of Licensee.** Licensee hereby represents, warrants and/or acknowledges as follows: … C. Licensee is acquiring the CPSL(s) solely for the right to purchase Season Ticket(s) to NFL Games played in the Stadium.

Paragraph 12. **Additional Terms.** (A.) … All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the RAMS agreement to relocate to St. Louis. Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the

---

[3] For the purposes of this Section (A), "plaintiffs" refers to the plaintiffs in the *Envision* and *Arnold* cases.

[4] The Stadium was formerly known as the Edward Jones Dome.

> Stadium by the RAMS, up to a maximum of thirty (30) years. Licensee acknowledges that Licensee has no claim against the RAMS with respect to this CPSL and/or its termination whatsoever. Licensee understands and acknowledges the possibility that the RAMS may not play its games in the Stadium or St. Louis for the entire term contemplated by this License. Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this CPSL, including without limitation should the RAMS not play its home games in the Stadium or St. Louis for any reason.

The *Envision* and *Arnold* plaintiffs maintain that the Paragraph 8 "Best Efforts" provision of the Agreements entitles them to the opportunity to buy tickets for games --- "transferred games" --- to be played at the new Rams stadium that will be built in California.

The Agreements in question are license agreements, which are contracts governed by the general principles of contract law. *Monsanto Co. v. Garst Seed Co.*, 241 S.W.3d 401, 406 (Mo. App. 2007). "The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." *J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973). "A court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language for there is nothing to construe." *Id.* The intention of the parties is presumed expressed by the plain, natural, and ordinary meaning of contract provisions. *Id.*; *see also Gohagan v. Cincinnati Ins. Co*., 809 F.3d 1012, 1015 (8th Cir. 2016). The Court is to look to the contract "as a whole" and must "avoid an interpretation that renders other provisions meaningless." *Gohagan v. Cincinnati Ins. Co*., 809 F.3d 1012, 1015 (8th Cir. 2016) (quoting *Nodaway Valley Bank v. E.L. Crawford Constr., Inc.*, 126 S.W.3d 820, 827 (Mo. App. 2004)). "Even seeming contradictions must be harmonized away if that be reasonably possible." *J.E. Hathman*, 491 S.W.3d at 264.

1. **FANS Agreement**

Both Agreements say that PSL holders must buy tickets for games at the Stadium (FANS and Rams ¶ 1) and that the Rams will use best efforts so that PSL holders can buy tickets for "transferred games" played in other stadiums (FANS ¶ 8; Rams ¶ 7).  But the FANS Agreement further states that "this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years." (FANS ¶ 12(A).)  Thus, the Rams argue that the FANS Agreement is clear that the Agreement became invalid and indeed terminated upon the Rams' announcement that the team was moving to California, as the RAMS would no longer play NFL Football at the Stadium.  Plaintiffs counter that the Best Efforts provision (FANS ¶ 8; Rams ¶ 7) applies to any venue to which the Rams transfer their home games --- including a permanent change of home games such as relocation to California.  Plaintiffs say that the acknowledgement that the Rams may not play all their games at the Stadium or in St. Louis for the entire contract term (FANS ¶ 12(A); Rams ¶ 11(A)) is entirely consistent with the Rams' promise to use best efforts to secure tickets for PSL holders to those "transferred games."

Unfortunately, the Agreements fail to define "transferred games."  The Rams' reading is that "transferred games" means games transferred on a temporary basis where St. Louis and the Stadium remain the team's home venue.  Plaintiffs read "transferred games" as constituting any home game played anywhere other than the Stadium for the 30-year duration of the contract.  But plaintiffs' reading, at least of the FANS Agreement, fails to give effect to the overarching provision that the Agreement "remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty

5

(30) years." (FANS ¶ 12(A).) This provision appears to trump all other provisions to the contrary, including the "Best Efforts" provision.

Plaintiffs claim, though, that this reading would make the "Best Efforts" provision superfluous and meaningless, and, at the least, render the Agreements hopelessly ambiguous. This Court disagrees. In the FANS Agreement, the two provisions can be harmonized by using the meanings that necessarily flow from the four corners of the contract. Paragraph 12(A) makes clear that the very validity of the contract is contingent on the condition that "NFL Football is played at the Stadium by the RAMS." This condition is no longer satisfied because of the Rams' move to California. As a result, the FANS Agreement is invalid and terminated by its own terms. It follows, then, that "transferred games" under the Best Efforts provision necessarily refers to temporarily transferred games, not permanently transferred games. Otherwise the Paragraph 12(A) invalidity provision would never come into play. It would itself become superfluous and meaningless, as it could never be invoked if the Best Efforts provision referred to permanently transferred games.

By way of example, suppose the Stadium is rendered unusable by a tornado or other natural disaster. While the Stadium is being repaired, the Rams transfer home games to the stadium at the University of Missouri in Columbia, Missouri. Pursuant to the Best Efforts provision, the Rams must make tickets to those games available to the PSL holders. The contract itself has not been rendered "invalid" by Paragraph 12(A) because the natural meaning of "Football is played at the Stadium by the RAMS" is still satisfied. In contrast, where the team decides to move its home venue permanently to another stadium in California, the condition requiring that "Football is played at the

Stadium by the RAMS" is not met. Only in that situation does the FANS Agreement become invalid and terminate.

Because NFL Football is no longer played at the Stadium by the Rams, the contract has terminated just as it would have if the contract had run its full 30-year course. The Best Efforts provision is rendered ineffective (along with the rest of the Agreement) as a result. The *Envision* and *Arnold* plaintiffs' claims based upon the FANS Agreement are therefore without merit, and judgment on the pleadings will be granted to defendant Rams on those claims.

### 2. Rams Agreement

The Rams Agreement, however, is different and requires further discussion. Although none of the parties fully address this distinction, the FANS Agreement includes language that the Rams Agreement does not. The italicized language in the FANS Agreement "Additional Terms" is entirely absent from the Rams Agreement "Additional Terms":

> All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the RAMS agreement to relocate to St. Louis. *Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years. Licensee acknowledges that Licensee has no claim against the RAMS with respect to this CPSL and/or its termination whatsoever.* Licensee understands and acknowledges the possibility that the RAMS may not play its games in the Stadium or St. Louis for the entire term contemplated by this License. Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this CPSL, including without limitation should the RAMS not play its home games in the Stadium or St. Louis for any reason.

The inexplicable absence of the validity language in the Rams Agreement is critical to the analysis. Unlike the FANS Agreement, the validity of the Rams Agreement

7

is not contingent on the Rams playing football at the Stadium. Looking to the entirety of the Rams Agreement, the Agreement remains in effect until 2025, and, regardless of where the Rams play their home games, they are required to use "Best Efforts" to allow PSL holders the right to purchase "tickets for seats in the stadium where the transferred games are played." (Rams ¶ 7.) Even though the Licensee understands that the Rams may not play their games in the Stadium for the entire term (Rams ¶ 11(A)), that is entirely consistent with the Best Efforts clause, and there is nothing in the Agreement to render the Best Efforts provision invalid.

The Court observes that both the FANS and Rams Agreements include language that the PSL holder "expressly agrees not to sue the Team for damages or injunctive relief related to this CPSL, including without limitation should the Team not play its home games in the Stadium or in St. Louis for any reason."[5] Although this provision is present in both Agreements, the Rams do not rely on it or even mention it in their briefing on the motions. In any event, had the Rams relied on the PSL holders' promise not to sue the Rams, that promise would seem to render the Rams' own promises unenforceable and arguably render the Agreements illusory.

In sum, the Rams Agreement requires the Rams to use Best Efforts to secure tickets for seats at games where the transferred home games are played. Judgment on the pleadings is therefore denied to the Rams with respect to the Rams Agreement.

---

[5] Paradoxically, the Agreements also state that "any action, suit or other proceeding brought by or against the Licensee or Licensor…shall be brought in" this Court. (FANS ¶ 12(C); Rams ¶ 11(C).)

### B. Plaintiff's Motion in the *McAllister* case

The *McAllister* plaintiff's claims are entirely distinct from those in *Envision* and *Arnold*. In contrast to those plaintiffs, who claimed the Agreements' Best Efforts provision require the Rams to make tickets available to games in California, McAllister claims that the Agreements have been terminated and defendant is in breach. The *McAllister* plaintiff argues that the Agreements gave the Rams the right to terminate the Agreements, but that the termination must be accompanied by a refund to the PSL owner (except in the case of default by the PSL holder). The FANS and Rams Agreements are substantively identical and state as follows:

> [The Licensor] hereby expressly reserves the following rights: A. <u>The right to terminate this Agreement and refund part or all of Licensee's deposit</u>, either if the Licensor determines that Licensee's credit is not satisfactory for this License and future obligations of Licensee to acquire tickets, <u>or for any other reason satisfactory to Licensor in its sole discretion</u>, including, but not limited to, the right to reduce the total number of CPSL(s) purchased by Licensee if necessary.

(FANS ¶ 7 (emphasis added); *see also* Rams ¶ 6.) Plaintiff, like the plaintiffs in *Envision* and *Arnold*, purports to bring his case on behalf of a class of at least 40,000 PSL holders.

The Rams contend that the Agreements terminated when the Rams no longer played football in the Stadium, thus all other provisions terminated along with it. The Rams explain that any duty to refund deposits could not have survived expiration of the Agreements. They argue, "[r]ather, as written, the 'refund' provision simply provided the Rams with a non-controversial right to limit the number of seats sold to any Licensee and, if a deposit had been made, to refund all or a portion of it back." (#42 at 6.) The Rams characterize the agreements as having "expired" upon their relocation, not that the Rams "terminated" the contracts; the Rams further observe that the Agreements state that

9

the Rams have "no liability" for the team's "failure to play games in the Stadium."[6] (*Id.* at 6-7.)

McAllister agrees that, if there was a contract, it has terminated. This Court agrees that, as explained above in Section II.A.1, the FANS Agreement has terminated. Whether the FANS Agreement merely "expired" passively or was actively "terminated" by the Rams, however, is irrelevant according to the plain language of the Agreement. In fact, "expiration" is a synonym for "termination." *See The Random House Webster's Unabridged Dictionary* (2nd ed. 2001) at 681. The Agreements state that the Rams have the "right to terminate this Agreement…and refund …Licensee's deposit, either if Licensor determines that Licensee's credit is not satisfactory …, or <u>for any other reason</u> satisfactory to Licensor in its sole discretion, <u>including, but not limited to</u>, the right to reduce the total number of CPSL(s) purchased by Licensee if necessary…."

Far from limiting the terminate-and-refund language to reducing PSLs, the Reservation of Rights language gives the Rams carte blanche to "terminate…and refund" for "any…reason." The right to reduce a Licensee's total PSLs was "include[ed]," but it was "not limited to" that right. The language of the contract says nothing about the manner of termination or its cause; rather, it is clear that it can happen for any reason in the Rams' "sole discretion." As this Court discussed in Part II.A, the Rams terminated the FANS Agreement. By the Agreement's own terms, the right to terminate and a

---

[6] The Rams again stop short of invoking the Agreements' provisions that state the PSL holders may not sue the Rams for any reason. Rather, they merely state, without any analysis or argument, that the PSL holders agreed that the Rams have "no liability." Regardless, even if the Rams did insulate themselves from liability with respect to failure to play games in the Stadium generally, the provision does not obliterate the Rams' right and duty to "terminate…and refund" as discussed below.

10

refund of deposits go hand-in-hand.  Accordingly, the Rams must now "refund…deposit[s]."

The matter of what amount must be refunded --- what constitutes a "deposit" --- is a matter of damages, not liability.  It is unclear from the FANS Agreement just what would or could constitute a "deposit" in the context of the Agreement.  McAllister alleges that he paid $1,000 for each of his PSLs, but the Rams maintain those payments constitute "License Fees" discussed in Paragraph 1, not "deposits."  On the other hand, McAllister argues that the License Fees were "given as security or in part payment" of what a Licensee needed to pay to acquire season tickets, *Random House Dictionary* 535; *i.e.*, the payments were "money given as a down payment," *Merriam-Webster* 335, and money placed to secure "the performance of a contract," *Black's Law Dictionary* 450 (7th ed. 1999).

The Rams point out, however, that the FANS Agreement (but not the Rams Agreement) includes a Paragraph 4, titled "Refunds," that states "If the RAMS do not move to St. Louis by September 1, 1996, all CPSL payments made by Licensee will be refunded to Licensee without interest."  That appears to be the only other mention of "refunds" in either Agreement.  The Rams argue that if a "deposit" were the same as a "License Fee," Paragraph 4 of the FANS Agreement would have also referred to "deposits."  That argument does not hold.  Although Paragraph 4's application has been mooted by the fact that the Rams *did* move to St. Louis, it does not present the only context in which a "refund" could be due in light of the fact that the Reservation of Rights language allows termination "for any other reason."

The Rams terminated the FANS Agreement because it became invalid on the Rams' move to California and now must "refund…deposit(s)," but the Court cannot fully

11

grant judgment on the pleadings because the issue of damages will be wholly tied to what constitutes a "deposit" under the contract. Damages will therefore be determined at a later date.

As for the Rams Agreement, as explained above in Section II.A.2, there has been no termination. The Licensees' remedy, although not the remedy sought by the McAllister plaintiff, is to obtain tickets to the transferred games in California through the Best Efforts provision. The termination/refund provision is inapplicable.

Finally, the Court notes that McAllister also brought a claim for relief on the alternative ground that the Agreements are illusory in that PSL holders would have no remedy in the event of a breach by the Rams. Because plaintiff will be granted judgment on his breach of contract claim as to the FANS Agreement, and because plaintiff has a remedy on the Rams Agreement through the Best Efforts clause, his alternative claim that the contract is illusory is moot.

### III. Conclusion

Neither the FANS Agreement nor Rams Agreement offers up a model of contractual clarity. However, the four corners of the FANS Agreement establish that, in the event the Rams moved their home venue away from the Stadium, the contracts terminated; in contrast, the four corners of the Rams Agreement establish that the Rams have the obligation to use Best Efforts to offer tickets at the Rams' new home venue to St. Louis Rams PSL holders. The Rams are thus entitled to judgment on the pleadings for the *Envision* and *Arnold* complaints to the extent those plaintiffs' claims are based on the FANS Agreement. The Rams are not entitled to judgment on the pleadings as to the Rams Agreement claims. As for the *McAllister* complaint and its entirely different claims, that plaintiff's motion for judgment on the pleadings is granted as to defendant's

12

liability on the FANS Agreement but not on the Rams Agreement because only the FANS Agreement has terminated.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motions for judgment on the pleadings (No. 4:16-cv-262, #17; No. 4:16-cv-297, #24) are GRANTED as to the FANS Agreement but DENIED as to the Rams Agreement claims.

**IT IS FURTHER ORDERED** that plaintiff's motion for partial judgment on the pleadings (No. 4:16-cv-172, #35) is GRANTED as to the FANS Agreement but DENIED as to the Rams Agreement claims.

Dated this  21st  day of September, 2016.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE