## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| JAMES PUDLOWSKI, LOUIS C. CROSS, III, GAIL HENRY, and STEVE HENRY<br><br>On behalf of themselves and all others similarly situated;<br><br>    Plaintiffs,<br><br>    v.<br><br>THE ST. LOUIS RAMS, LLC,<br><br>    Defendants. | Case: 4:16-cv-00172-SNLJ |

Expert Report by Charles D. Cowan, Ph.D.

Estimation of the Proportion of Missouri Citizens Among Class Members

## Personal Summary

1. My name is Charles Cowan. I reside in San Antonio, TX. I was retained by the Plaintiffs in this case to propose and implement a scientifically sound methodology for estimation of the proportion of Missouri citizens among proposed class members.

## Education and Experience

2. My background covers over 40 years of research and study in the areas of statistics, economics, and their application to business problems. I am Managing Partner of Analytic Focus LLC, a company headquartered in San Antonio, TX with offices in Birmingham, Alabama and Washington, DC. A portion of our work is conducting research for legal matters, including providing litigation support and expert witness services when requested. Some of our work focuses on measurement and mitigation of risk for financial intermediaries. The final area of our practice is in support of Federal and State agencies needing economic and financial analysis to pursue their missions. Prior to starting Analytic Focus LLC, I served as Chief Statistician for the Federal Deposit Insurance Corporation. I was also a Director for Price Waterhouse where I headed the Financial Services Group in the Quantitative Methods Division.

3. I served for 12 years at the U.S. Bureau of the Census where I was responsible for the evaluation of the Decennial Census and held the title of Chief of the Survey Design Branch.

4. I am a professor in the School of Public Health at the University of Alabama – Birmingham (UAB) and previously served as a professor in the Business School at UAB, as a visiting professor at the University of Illinois, and in other academic and professional positions.

1

5.  My complete resume and a listing of all my publications are presented in Appendix 1.  A listing of past cases in which I have been deposed or presented testimony at trial within the last five years is presented in Appendix 2.

## Scope of Assignment & Compensation

6.  I was asked to consider the details of the original Petition filed in this case and subsequently the Court's Memorandum and Order[1] regarding Plaintiff's motion to remand, and to propose a statistical resolution to the controversy over jurisdictional status.  I was then asked to design and implement a survey for estimating state citizenship among proposed class members using sales data provided by Defendants.  This report describes my methodology and survey results, and presents my conclusions in these matters.

7.  For expert representation, depositions, and testimony, my hourly rate is $725.

## Introduction

8. It is my understanding that support for a local controversy exception in this case is demonstrated by greater than two-thirds of the proposed class members being citizens of the State of Missouri.  It is also my understanding that the court will accept as evidence an estimate of the proportion of Missouri citizens among the proposed class members, provided the estimate is based on a random and representative sample.

9.  The purpose of this document is to outline the methods used to generate a sample that is both random and representative for estimation of the relevant proportion, and to present results of

---

[1] Case: 4:16-cv-00172-SNLJ  Doc. #: 66  Filed: 12/15/16

2

a survey to determine state citizenship.   A description of the data files provided by Defendants and how they were processed, combined and filtered to form the sampling frame, are followed by the sampling methodology and a summary of results.

## Description of Data Received

10. I received the following Excel files containing ticket and merchandise sales data provided by Defendants:

| Bates Number | File Description |
|---|---|
| Rams-Pudlowski000001 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER) | 2010 Ticket Report |
| Rams-Pudlowski000002 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER) | 2011 Ticket Report |
| Rams-Pudlowski000003 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER) | 2012 Ticket Report |
| Rams-Pudlowski000004 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER) | 2013 Ticket Report |
| Rams-Pudlowski000005 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER) | 2014 Ticket Report |
| Rams-Pudlowski000006 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER) | 2015 Ticket Report |
| Rams-Pudlowski000007 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER) | www.ramsfanshop.com Report |

11. Among the provided data files there are three types of spreadsheets:  Ticket Sales, Ticket Customer Information and Online Fan Shop Customer Information for Merchandise purchases.

12. The first six listed Excel files contain Ticket Sales and Customer Information for the years 2010 through 2015.  Each of these files has two worksheets:

- a. The *Ticket Sales* worksheet contains

  - Owner Name, or purchaser of tickets

3

- Number of Seats purchased
- Zip Code of purchaser
- Purchase Date

    b. The *Customer Info* worksheet contains

- Owner Name
- Full name – Primary purchaser
- Full name – Secondary purchaser (typically used if Owner or Primary purchaser is a business)
- Salutation – informal first name, formal last name, "Season Ticket Holder" or other
- 3 Address fields – Street and Number, City, State and Zip
- 3 Phone number fields – Daytime, Evening and Fax
- Email Address

13. The last of the seven Excel files listed above contains the following information for Merchandise sales from the online store Ramsfanshop.com:

- Client First Name, Last Name and Email
- Order Date
- Billing Information - Includes Name, Street Address, State, Zip and Country (7 fields)

14. This and forthcoming details about the data are necessary in the discussion of the sampling frame because the layout of the data and the fields contained in each spreadsheet are such that datasets are not easily linked in obvious ways. For example, Owner Name, which is in both the ticket sales and corresponding customer information worksheets, does not yield a perfect systematic match of records. The ability of the sampling frame to generate a representative sample is determined by the data available for its construction, and thus requires a thorough examination of any limitations.

## Construction of the Sampling Frame

15. The goal in constructing the Sampling Frame is to create a list of unique persons who made at least one relevant purchase while residing in Missouri.  The Frame should be as complete as possible so as to generate a representative sample.  Coverage is addressed below, followed by a discussion of data issues and their resolutions.

*Coverage*

16. A Class Member is defined in the original Petition as: "All Missouri residents who purchased Rams tickets and/or merchandise and/or concessions from the Defendants between April 21, 2010 and January 4, 2016, in the State of Missouri for personal, family or household purposes."  In constructing the Sampling Frame and in the context of representativeness of the resulting sample, it is relevant to note the dates represented by sales records provided by Defendants.  These dates are shown in the table below.

| Purchase Type | Records Start Date | Records End Date |
|---|---|---|
| Ticket | April 21, 2010 | December 18, 2015 |
| Merchandise | May 7, 2014 | January 3, 2016 |

17. There appear to be some limitations in the data with regard to the range of dates relative to the class period for potential class members that are purchasers of merchandise.  It is unknown, for example, whether the online store was selling merchandise before May 7th, 2014.

18. Regardless, since merchandise purchases are not limited to the online store, and ticket purchasers have likely also made merchandise purchases, the lack of online store merchandise purchase records from April 21, 2010 through May 6, 2014 does not present a coverage issue.

19. I believe that the available records provide sufficient coverage for the sampling frame with respect to each of Ticket Sales, Concession Sales and Merchandise Sales. That is, the absence of any relevant records not provided by Defendant does not limit the Sampling Frame in terms of its ability to produce a sample that represents all types of purchases for the full range of dates defining the class period.

### *Data Inconsistencies*

20. Construction of the Sampling Frame requires a merging of data files in order to create a list of persons who made at least one relevant purchase while residing in Missouri. Various issues were encountered in the data that impacted the systematic merging of files.

21. These issues and other observed inconsistencies are listed by spreadsheet type.

a. Ticket Sales

   i. Zip Codes did not always conform to standard lengths of 5, 9, or 10. Standard examples are "78230", "782301075", or "78230-1075". Zip codes with a length of less than 5 are assumed to be preceded by zeroes. Fields without a dash that are short – with lengths greater than 5 but less than 9 – may require preceding zeroes either on the 5-digit zip code or on the extension (i.e., "1234567" could be "12345-0067" or "01234-0567"). These required an address lookup. There are many zip codes with alpha

characters, indicating possible international codes.  Some zip codes have been found to have typos, and there are many that are missing.

ii.   Owner Name may not be consistent across different purchase dates.  It is not always clear if slight differences in name indicate a distinct purchaser, even if the zip code is the same.  For example:

| Count | Owner Name | Zip Code | Date |
|---|---|---|---|
| 1 | Adams, Patrick | 63011-1778 | 4/26/2010 |
| 2 | Adams, Patrick | 63011-1778 | 5/4/2010 |
| 1 | Adams, Patrick K. | 63011 | 6/4/2010 |

iii.  It is conceivable that different purchasers may have the same name, in which case they should have a different address.  It is also conceivable, however, that a purchaser changes address from one purchase to the next.  Below is an example of records with the same (or similar) Owner Name and different zip codes.

| Count | Owner Name | Zip Code | Date |
|---|---|---|---|
| 2 | Johnson, Michael | 63011-1773 | 9/2/2010 |
| 2 | Johnson, Michael | 63303-1704 | 5/8/2010 |
| 2 | Johnson, Mike | 85374 | 8/4/2010 |

b.  Ticket Customer Info

i.   The same issues regarding Owner Name and Zip Code in the Ticket Sales data are found in this spreadsheet.  Zip Code, however, is not a separate field in this spreadsheet, and due to the inconsistent layout of the fields, extraction of zip code from any one of three available address fields was less reliable than simply scanning the three fields for state in the identification of Missouri addresses.

7

ii.     Many phone numbers are missing area code, or are missing altogether.  There are some phone numbers that are incorrectly formatted and not likely recoverable.  There are many records that are missing both daytime, evening and fax numbers.  Should these individuals be identified as class members, alternative information is available for contact, such as address and/or email.

iii.    Address fields are completely missing for some records.  There are many PO Boxes and some address fields with invalid data. Class membership can be determined with minimal information from address – zip code or state.

iv.     A customer may have multiple records with the same address but different phone number(s) or email address.  Since there is no date information other than year on this spreadsheet it is not clear which information is most current.

c.  Online Merchandise Sales

i.     There are many duplicate records with the exact same information for all fields. Duplicates were removed.  If a purchaser had multiple records with different information, billing address and email recorded at the latest purchase was retained for the Sampling Frame.

### *Combining the Files*

22. Ticket Sales data was aggregated by Name and 5-digit zip code, and used to identify unique purchasers and their Missouri residency status based on zip code.  Five-digit zip code was constructed using rules described in the previous section (20.a.i.)  Missouri residency took precedence when a purchaser had multiple records indicating an address in Missouri at one time

8

and an address outside of Missouri at another time. Residency Status by Zip Code from the Ticket Sales data was merged to the Customer Info Data by Name. Inconsistencies in name were addressed for proper merging. Residency Status by scanning for state in the three address fields was compared to Residency Status by Zip Code, and inconsistencies were managed manually. Disagreement between the two required looking up an address online to verify zip code. This often resulted in finding zip code typos that had incorrectly classified residency.

23. Merchandise Sales data was then merged to Ticket Sales data iteratively making use of Name, email address and billing address: A match on any two of these was considered a successful match.

24. Businesses were identified using an algorithm that searched for key words/acronyms in business names, and removed from the combined data set. It was expected that some businesses would not be identified as such and would remain in the Sampling Frame with the possibility of being selected in the sample. All records selected for the sample were further screened to exclude any remaining businesses.

25. Finally, all records with a non-Missouri address were dropped, and then only the latest dated record for each purchaser was kept to establish the Sampling Frame.

*Assumptions*

26. The current Sampling Frame was constructed with the following assumptions:

a. Ticket purchaser names with the same zip code in a given year are assumed to be unique individuals. It is possible that two distinct individuals with the exact same name (as

9

recorded, character for character) and same zip code purchased tickets in the same year. However, given the inconsistencies in the data it may not be possible to resolve this issue completely, and regardless, this is not expected to occur with more than negligible frequency.

b.  In establishing Missouri residency for class membership, inconsistencies between address and zip code are assumed to indicate an incorrect zip code.  For example, an address may have a non-Missouri state and a Missouri zip code.  Sometimes border states will share a zip code, so this is not necessarily a problem, but needs to be verified.  If the state does not border Missouri, the zip code is assumed to be wrong.  If only one of them (address or zip code) is incorrect, it is less likely to be the street address that is wrong.  In these instances, addresses were looked up online and zip codes corrected.

c.  A purchaser is considered a potential class member if he/she has made a relevant purchase while residing in Missouri, even if he/she has made another relevant purchase at a later date while residing in a non-Missouri state.

d.  In the Merchandise Sales spreadsheet, the field for Billing Address State has the same value for all records, indicating that all are proposed class members since billing address at the time of purchase was in Missouri.  It is assumed that these records have been pre-filtered to exclude non Missouri residents, and are otherwise complete.

## Sampling Methodology

27. The figure below shows the distribution of purchasers across the state, revealing that while a large majority of Ticket purchasers are from St. Louis or the zip code areas in Missouri surrounding St. Louis, purchasers can be found throughout the entire state.  The light yellow parts

of the density plot below represent zip codes with lower numbers of ticket purchasers relative to the St. Louis area.

*Figure 1:  Density Plot of Proposed Class Members by Zip Code*



28. In consideration of sample representativeness and to ensure that the entire state was considered for the sample despite the concentration of purchasers in St. Louis and surrounding vicinity, a proportionally allocated stratified sampling approach based on proximity[2] to St. Louis was used to select the sample.

29. The table below shows the number and percent of proposed class members in each of four strata.  Among all purchasers in the current sampling frame, 33.5% of purchasers had residences in St. Louis at the time of purchase, and 87.7% of purchasers resided in either St. Louis or a bordering 3-digit zip codes.

---

[2] Residence Proximity to St. Louis is defined by 3-digit zip code and city:  0=St. Louis resident, 1=in the St. Louis zip but not in St. Louis, or in a bordering zip, 2=in a zip bordering the area defined by 1, 3=all other zips in the state.

| Proximity To St. Louis | All Purchasers Count | All Purchasers Percent |
|---|---|---|
| In St. Louis | 8,848 | 33.49% |
| Bordering | 14,318 | 54.20% |
| Farther | 2,074 | 7.85% |
| Farthest | 1,176 | 4.45% |
| TOTAL | 26,416 | 100% |

## Survey and Implementation

30. The Survey instrument was conducted primarily by phone, using phone numbers provided at the time of purchase. The format of the questionnaire is as follows:

*Hello, my name is _____ and I am calling because you have been identified in a class action suit against the St. Louis Rams and you may be eligible for compensation for purchases that you made. I have just a few very short questions to ask you.*

*This is important information that will assist the Court in determining how the case proceeds.*

*1.      Did you purchase St. Louis Rams tickets anytime between April 21, 2010 and January 4, 2016 for personal or family use?*

*2.      Did you purchase concessions at any St. Louis Rams game between April 21, 2010 and January 4, 2016 for personal or family use?*

*3.      Did you purchase St. Louis Rams merchandise anytime between April 21, 2010 and January 4, 2016 for personal or family use?*

*4.      Did you live in Missouri at the time you made any of these purchases?*

*5.      Did you still live in Missouri as of January 13, 2016?*

*6.      Did you have plans to move out of the State of Missouri as of January 13, 2016?*

*7.      Thank you very much for your participation. Is this the best way to contact you if there is additional information about the case?*

12

31. Callers were instructed to record any reasons for nonresponse and the date/time of each call.  Repeat calls were made at different times of the day.   Up to three calls were made if no answer, and only one message was left on answering machines.

*Missouri Citizenship*

32. A respondent is classified as a proposed class member if he/she responds positively to Question 4 and at least one of Questions 1-3.  That is, he/she must have made at least one relevant purchase while living in Missouri.  A proposed class member is classified as a Missouri citizen if he/she claims to still live in Missouri as of January 13, 2016 and did not have plans to move out of the state ("Yes" to Question 5 and "No" to Question 6.)

33. Address lookups were conducted online for both respondents and non-respondents to determine if purchaser name was (still) currently associated with the same address on record[3].  Additionally, if an address did not find a match or if a matched address was associated with a name different from the purchaser name, St. Louis County property tax records[4] were searched for evidence that a purchaser had moved to a new property located in St. Louis.  This was done in order to assess the extent to which these measures of residency correlate with citizenship established by questionnaire for respondents.

---

[3] http://www.melissadata.com/lookups/index.htm

[4] https://revenue.stlouisco.com/Collection/ppInfo/

13

34. It is important to note that the distinction between residency and citizenship is not lost in the interpretation of the results below.  Correlation between the two among the group of Respondents is used for the purpose of understanding Non-Respondents.

## Sample Results

35. A random sample of 500 records was selected from the sampling frame.  A sample this large was deemed necessary to accommodate anticipated non-response[5] of at least 70% while ensuring reasonable precision of estimates.

36. The selected sample resulted in 116 respondents, 4 of which were not originally in the sample (friends/family wanting to participate) and 5 of which were individuals purchasing on behalf of a business.  These were excluded from sample results.  All of the remaining n=107 respondents had made at least one type of purchase while a resident of Missouri during the relevant time period.

37. The table below shows the breakdown of responses to the survey residency questions.  Of the 107 respondents defined as potential class members, 93 (87%) are classified as Missouri citizens based on their responses.

---

[5] Some of the sampled purchasers were found to be ineligible (such as businesses that were not filtered out of the frame), some purchasers declined to participate and some were not reachable within reasonable effort and time.

14

*MO Citizenship By Responses to Residency Questions*

| MO Citizen | Q4.Resident of MO at time of Purchase | Q5.Current Resident of MO | Q6. Plans to Leave MO | Frequency | Percent |
|---|---|---|---|---|---|
| No | Yes | No | No | 4 | 3.74% |
| No | Yes | No | Yes | 7 | 6.54% |
| No | Yes | Yes | Yes | 3 | 2.80% |
| Yes | Yes | Yes | No | 93 | 86.92% |
|  |  |  |  | **107** | **100%** |

38. The sample proportion of Missouri citizens among proposed class members for each purchase type is shown below. Interval estimates of the proportion are at the 95% confidence level and with a maximum margin of error of approximately 6.5%.

|  | Purchasers | MO Citizens | Percent | 95% Lower Limit | 95% Upper Limit |
|---|---|---|---|---|---|
| Tickets | 106 | 92 | 86.8% | 80.3% | 93.2% |
| Concessions | 102 | 89 | 87.3% | 80.8% | 93.7% |
| Merchandise | 85 | 78 | 91.8% | 85.9% | 97.6% |

39. Assuming that non-respondent purchasers are no different than respondent purchasers in terms of their Missouri citizenship status, these estimates allow us to conclude that greater than two-thirds of the proposed class members are citizens of the State of Missouri. That is, they provide the necessary evidence to support a local controversy exception in this case.

40. It is conceivable, however, that the inability to contact a proposed member may indicate that the individual has moved, and possibly out of the state.  If true, this would introduce a bias to the estimates above.  For this reason, residency of the non-respondents must be understood.

*Addressing Non-Response*

41. The response rate is moderate.  It turns out that, after removing ineligible businesses from the entire original sample, a total of 472 purchasers remain, resulting in a response rate of just under 23%.

| | |
|---|---|
| Respondent | 107 |
| Decline | 44 |
| No Contact | 321 |
| **TOTAL** | **472** |

42. A total of 321 purchasers from the eligible sample of 472 (68%) could not be reached using available phone records within a one week period.  This raises concerns about sample estimates and the extrapolation of results to all proposed class members.  To address this issue, attempts were made to establish current residency for purchasers in the full sample without the benefit of personal contact.

43. As mentioned earlier, address lookups were conducted online for both respondents and non-respondents to determine if purchaser name was currently associated with the same address on record, or alternatively if property tax records indicated a current St. Louis address for

16

purchasers in the sample[6].  The auxiliary information collected allows us to assess the extent to which these measures of residency correlate with citizenship established by questionnaire for respondents.

44. Based on auxiliary information gained from online searches of addresses and names, 472 eligible purchasers in the sample were classified into three mutually exclusive groups as follows:

a. Current Missouri Residents:

- "Group A":  A match on purchaser address and name is found in current property database, indicating that purchaser is likely to still reside at the Missouri address listed in purchase records.

- "Group B":  Not in Group A, but an exact name match was found in St. Louis property tax records.  Some matches on name also matched on address, or a variation of the same address.  Otherwise, it is likely that purchaser has moved, but remained in the state (in St. Louis.)

b. Unknown Residence:

- "Group C":  A match on purchaser address is found in the current property database with a different name and no other match was found, or no clear match was found on either name or address.  A majority of these (76 out of 112 in this group, or 68%) are matches on address with a different name, indicating that the purchaser may have moved.  The remaining addresses have no name on the

---

[6] Property records for other Missouri tax areas could also be searched.  Since a large percentage of purchasers are from the St. Louis area and because results sufficiently demonstrated correlation with respondent citizenship, no other property records were searched.

property record (#32 - many are listed as P.O. Boxes or apartment units) or do not find a match at all (#4).  While it is likely that these purchasers have moved, it is unknown whether or not they still reside in the state.

45. The table below shows the breakdown of the sample by classification.  Purchasers in groups A and B are likely to be current residents of Missouri, based on the above criteria.

| Group | ALL | | Respondents | | Non Respondents | |
|---|---|---|---|---|---|---|
| | Frequency | Percent | Frequency | Percent | Frequency | Percent |
| A | 301 | 63.77% | 70 | 65.42% | 231 | 63.29% |
| B | 59 | 12.50% | 15 | 14.02% | 44 | 12.05% |
| C | 112 | 23.73% | 22 | 20.56% | 90 | 24.66% |
| | 472 | 100.00% | 107 | 100.00% | 365 | 100.00% |

46. It is important to note that purchasers in group C are not necessarily non-residents of Missouri – they have unknown residency.  As such, the percent of current Missouri residents using these classifications, approximately 79% for respondents and 75% for non-respondents, is likely to be underestimated.

47. The table below shows the classification of sample members to Citizenship status based on the Questionnaire (respondents only) by Residency status based on auxiliary data.

| | Respondents | | | |
|---|---|---|---|---|
| | MO Citizen | Non-Citizen | Non Respondents | TOTAL |
| MO Resident | 79 | 6 | 275 | 360 |
| Unknown Residency | 14 | 8 | 90 | 112 |
| TOTAL | 93 | 14 | 365 | |

18

48. Among 85 sampled purchasers (respondents) that were classified as Missouri residents by use of auxiliary data, 79 (93%) were classified as Missouri citizens by questionnaire.  Among the remaining 22 respondents that were not able to be classified as Missouri residents by use of auxiliary data, 14 (64%) were classified as Missouri citizens by questionnaire.

49. It is reasonable to assume that non-respondents would be similarly classified as citizens given their residency status, i.e., 93% of the 275 classified as Missouri residents and 64% of the 90 with unknown residency are likely to be Missouri citizens.  As such it is estimated that 313, or 85.7% of the 365 non-respondents are Missouri citizens – slightly lower than the 87% estimated among respondents using questionnaire data.

50. In this way the auxiliary data can be used to compute an adjusted estimate based on the entire sample of 472.  A bootstrap estimate based on 10,000 resamples for the proportion of proposed class members that are Missouri citizens using auxiliary data is shown below.

Point Estimate:                86.0%

95% Confidence Interval:     (79.4%,  92.5%)

## Corroborating Outcomes

51. The Census Bureau's American Housing Survey can be used to get a sense of the rate at which people move out of the state of Missouri after having lived there at least a year.  The table below shows that annual move-out rates for the state of Missouri are quite small, less than 3%. This historical perspective tells us that it is very unlikely that proposed class members have moved

out (or intend to move out) of the state at a rate as high as 33.3% over a 5-year period. The Census data supports the theory that a high proportion of proposed class members are Missouri citizens.

| Year | Missouri Population | Moved out of Missouri | Percent Moved Out |
|------|---------------------|----------------------|-------------------|
| 2010 | 5,920,858 | 156,772 | 2.6% |
| 2011 | 5,937,896 | 171,344 | 2.9% |
| 2012 | 5,951,913 | 157,172 | 2.6% |
| 2013 | 5,973,448 | 154,533 | 2.6% |
| 2014 | 5,992,195 | 158,473 | 2.6% |
| 2015 | 6,015,580 | - | - |

Source: U.S. Census Bureau, 2010-2015 American Community Survey, 1-Year Estimates

## Conclusions

52. It is my professional opinion that the survey results presented here provide a reliable and scientifically sound resolution to the jurisdictional status controversy. Careful considerations in the construction of the sampling frame, in the sampling and in dealing with non-response have ensured that estimates are reliable for extrapolation to the population of class members.

53. Findings from Census data, survey results and Missouri residency verification are consistent in their support of a greater than two-thirds citizenship among proposed class members. Sample results are statistically significant: I estimate the true proportion of Missouri citizens to be 86%, and between 79.4% and 92.5% with 95% certainty.

June 1, 2017
San Antonio, TX

_____
Charles D. Cowan, Ph.D.

**Appendix 1:** *Dr. Cowan's Resume and List of Publications*

CHARLES D. COWAN, Ph.D.
ANALYTIC FOCUS LLC



### KEY QUALIFICATIONS

Charles D. Cowan is Managing Partner of ANALYTIC FOCUS LLC. Dr. Cowan has 40 years of experience in statistical research and design. He consults for numerous public and private sector entities on the design, implementation, and evaluation of research and the synthesis of statistical and sampling techniques for measurement.

Dr. Cowan has designed some of the largest and most complex research programs conducted by the Federal Government, including the Post Enumeration Program conducted by the Bureau of the Census to evaluate the 1980 Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation in 1990-95, and many evaluation studies conducted for the Justice Department, the Department of Defense, the Department of Housing and Urban Development, and the Treasury Department. He has provided expert advice to corporations and government agencies on the incorporation of complex research designs in demographic and economic measurement problems, including:

- Development of procedures used by the Resolution Trust Corporation and the FDIC for determination of the value of all assets held by the RTC\FDIC taken from failed banks and S&Ls. Results from this research were used in quarterly reports to Congress on the loss to the American taxpayer that resulted from these failures. These estimates of anticipated recoveries on assets were also used by the RTC and FDIC for financial reporting, leading these agencies to their first clean opinions from the GAO in their annual review of agency financial statements.

- Establishment of audit and sampling methods to determine the completeness and reliability of reporting and record systems. These procedures were used to both expand and streamline bank examinations for safety and soundness and also compliance measurement for the FDIC. These sampling techniques are applied in the audit of Federal agencies concerned with regulatory review of operations and systems, and related systems for banks, regulatory agencies, and law firms;

- Application of econometric and biometric procedures for measurement of credit risk in large portfolios of loans. These models are frequently used for a variety of purposes within financial institutions, such as the pricing of loans, the management of customers long term, decision making on workouts for delinquent loans, and for establishment of economic and regulatory reserves.

- Evaluation of research conducted for the Department of Defense, for the National Institutes of Health, and for the Department of Agriculture, each in response to Congressional inquiries on the validity of published results, and also for defendants in lawsuits involving evidence proffered by plaintiffs in furtherance of their suit.

- Model fitting and development of projection methods to measure the likelihood of loss or errors in recording in loans held by banks or put up for auction; measurement of the likelihood of fraud and/or noncompliance in systems, including bank holding companies, trading activities for brokers, and systems for compliance with health department and judicial requirements;

- Incorporation of population demographic models with financial assessment models to predict risk for insurance companies and corporations in terms of number and value of potential claims in mass tort litigation.

- Development of procedures used by the Bureau of the Census for apportionment of population for revenue sharing purposes and the estimation of the undercount in the Decennial Census of Population and Housing.  These procedures include application of capture-recapture methods to measure the size of the undercount in the decennial census, use of network sampling as an alternative measure for population size, and measurement of the reliability of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including nomadic populations for the Census of Somalia, the undercount and overcount in the Census of Egypt, the number of missing children in Chicago, IL, and the number of homeless persons and families needing services in several large cities with transient populations.

Dr. Cowan teaches graduate and undergraduate courses in survey methods, statistics, and computer methods for analysis.  He is the co-author of two books, one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy.  He has written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.

Prior to cofounding ANALYTIC FOCUS LLC, Dr. Cowan was a Director with ARPC and with Price Waterhouse, where he specialized in financial research and audit sampling.  From 1991 to 1996, Dr. Cowan was the Chief Statistician for the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, where he designed research necessary to measure the loss from the Savings & Loan Crisis of the late 1980's and capitalization requirements for the RTC funds from the U.S. Treasury.  Dr. Cowan also served as the Chief Statistician for the U.S. Department of Education, where he designed large-scale surveys of educational institutions to measure resource needs and availability, and for Opinion Research Corporation, where he designed predictive models of demand for automobile manufacturers, banks, and large horizontally diverse firms like GE and AT&T.  Dr. Cowan worked for the U.S. Bureau of the Census, where he was the Chief of the Survey Design Branch and developed many of the techniques in use today for the evaluation of coverage in surveys and censuses.

**EDUCATION**
Ph.D., Mathematical Statistics, The George Washington University, 1984
M.A., Economics, The University of Michigan, 1973
B.A., English and B.A., Economics, The University of Michigan, 1972

**PROFESSIONAL EXPERIENCE**

Co-Founder, ANALYTIC FOCUS LLC, January, 2002 to present.

Director, ARPC, November, 1999 to December, 2001.

Director, PricewaterhouseCoopers LLP, January 1997 to November, 1999.

Chief Statistician, Federal Deposit Insurance Corporation / RTC, 1991 to 1996.

Chief Statistician, Opinion Research Corporation, 1989 to 1991.

Chief Statistician, National Center for Education Statistics, US Dept. of Education, 1986 to 1989.

Bureau of the Census: Assistant Division Chief, International Statistical Programs Center, 1984 to 1986; Staff Liaison for Statistical Litigation Support, 1983 to 1984; Chief, Survey Design Branch, Statistical Methods Division, 1978 to 1983; Acting Chief, Survey Analysis and Evaluation Branch, Demographic Surveys Division, 1976 to 1978; Office of the Chief, Statistical Research Division, 1975 to 1976

Survey Research Center, Oregon State University: Manager, 1974 to 1975

Institute for Social Research, U. of Michigan: Assistant Study Director, 1972 to 1974.

**PROFESSIONAL ASSOCIATIONS**

Professor, Statistics, University of Alabama – Birmingham, 2002-present.

Adjunct Professor, Harvard University, 2015 – 2016.

Associate Professor, Statistics, George Washington University, 1993 - 1998.

Visiting Research Professor, Survey Research Laboratory, U. of Illinois, 1983 - 1989.

Consultant, Dept. of Community Psychiatry, Johns Hopkins U., July 1985 - Dec 1987.

**PROFESSIONAL SOCIETIES – MEMBERSHIPS**

American Statistical Association (ASA)

American Association for Public Opinion Research (AAPOR)

International Association of Assessment Officers

Association for the Advancement of Wound Care

**PROFESSIONAL SOCIETIES - POSITIONS**

President, Research Industry Coalition, 1999-2000

Council Member, Research Industry Coalition, Representative from ASA, 1995-2000

President, Washington/Baltimore Chapter of AAPOR, 1998

Program Chair, American Association for Public Opinion Research, 1991-1992

Program Chair, Section on Survey Research Methods, ASA, 1989-90

Secretary-Treasurer, AAPOR, 1985-1986

Associate Secretary-Treasurer, AAPOR, 1984-1985

Editorial Board, Public Opinion Quarterly, 1980-1984

Editorial Board, Marketing Research, 1989-2000

Chair, Conference Committee, AAPOR, 1982-1989

Chair, Committee on Privacy and Confidentiality, ASA, 1980-1981

**PUBLICATIONS**

Strumpel, Burkhard; Cowan, Charles; Juster, F. Thomas; and Schmiedeskamp, Jay; editors, Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor: The Institute for Social Research, 1975.

Duncan, Greg, and Cowan, Charles D., "Labor Market Discrimination and Nonpecuniary Work Rewards" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor: The Institute for Social Research, 1975.

Curtin, Richard T. and Cowan, Charles D. "Public Attitudes Toward Fiscal Progress" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor: The Institute for Social Research, 1975.

Goldfield, Edwin D.; Turner, Anthony G.; Cowan, Charles D.; Scott, John C., "Privacy and Confidentiality as Factors in Survey Response" in Public Data Use, Vol. 6, No 4, July 1978.

Cowan, Charles D., and Spoeri, Randall K., "Statistical Distance Measures and Test Site Selection: Some Considerations", Proceedings of the Computer Science and Statistics: Eleventh Annual Symposium on the Interface, 1978.

Bushery, John R., Cowan, Charles D., and Murphy, Linda R., "Experiments in Telephone-Personal Visit Surveys", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1978.

Spoeri, Randall K., and Cowan, Charles D., "On the Use of Distance Measures in Test Site Selection: A Practical Application Using Census Data", Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1978.

Cowan, Charles D.; Murphy, Linda R.; Wiener, Judy, US Bureau of the Census, "Effects of Supplemental Questions on Victimization Estimates from the National Crime Survey" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1978.

Bateman, David V.; Cowan, Charles D., US Bureau of the Census, "Plans for the 1980 Census Coverage Evaluation" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1979.

Hogan, Howard, and Cowan, Charles D., "Imputations, Response Errors, and Matching in Dual System Estimation", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

Schwartz, Sidney H., Cowan, Charles D., and Sausman, Kenneth R., "Optimization in the Design of a Large-Scale State Sample", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

24

Cowan, Charles D., "Modifications to Capture-Recapture Estimation in the Presence of Errors in the Data" presented at the meetings of the American Statistical Association, Biometrics Section, 1982 (no proceedings).

Fay, Robert; Cowan, Charles, US Bureau of the Census, "Missing Data Problems in Coverage Evaluation Studies" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1983.

Cowan, Charles D.; Fay, Robert E., "Estimates of Undercount in the 1980 Census" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D. "Interviews and Interviewing", The Social Science Encyclopedia, Routledge and Kegan Paul, Publishers, The Netherlands, 1984.

Wei, L. J. and Cowan, Charles D. "Selection Bias", Encyclopedia of Statistical Science, John Wiley and Sons, New York, N.Y., 1984.

Cowan, Charles D. and Malec, Donald J. "Capture-Recapture Models When Both Sources Have Clustered Observations", Journal of the American Statistical Association, June 1986, Vol. 81, # 394, pp. 347-353, and Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D., The Effects of Misclassification on Estimates from Capture-Recapture Studies. Unpublished doctoral dissertation, The George Washington University, September 1984.

Sudman, Seymour; Cowan, Charles D., "Questionnaire Design Activities in Government Statistics Offices" in Special Issue on Questionnaire Design, Journal of Official Statistics, Vol. 1, No. 2, 1985.

Cowan, Charles D. "Misclassification of Categorical Data", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1985.

Cowan, Charles D., Biemer, Paul P., Magnani, Robert J., and Turner, Anthony G., Evaluating Censuses of Population and Housing, Statistical Training Document, ISP-TR-5, U.S. Department of Commerce, Bureau of the Census, 1985.

Cowan, Charles D., Turner, Anthony G., and Stanecki, Karen "Design of the Somali Post Enumeration Survey (1986-1987)", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

25

Cowan, Charles D. and Malec, Donald J. "Sample Allocation for a Multistage, Multilevel, Multivariate Survey", Proceedings of the Fourth Annual Research Conference (ARC IV), U.S. Bureau of the Census, 1988.

Frey, Carolin M., McMillen, Marilyn M., Cowan, Charles D., Horm, John W., and Kessler, Larry G.. "Representativeness of the Surveillance, Epidemiology, and End Results Program Data: Recent Trends in Mortality Rates", Journal of the National Cancer Institute, Vol. 84, No. 11, June 3, 1992.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless, A Review" in Homelessness, Health, and Human Needs. Institute of Medicine, National Academy Press, National Academy of Sciences, Washington, D.C., 1988.

Cowan, Charles D., "Standards for Statistical Surveys in the Federal Government:  Practices in the Center for Education Statistics", Proceedings of the American Statistical Association, Section on Survey Methods Research, 1988.

Sudman, Seymour, Sirken, Monroe G., and Cowan, Charles D., "Sampling Rare and Elusive Populations", Science, Vol. 240, pp. 991-996, May 20, 1988.

Cowan, Charles D., "Mall Intercepts and Clinical Trials:  The Philosophy of Inference from Different Types of Research Designs" in Marketing Research: A Magazine of Management & Applications, Vol. 1, No. 1, March 1989.

Cowan, Charles D., "Mall Intercepts:  Principles of Design for Research" in Proceedings of the Seventh Annual Advertising Research Foundation Research Quality Workshop, September 1989.

Cowan, Charles D., "Estimating Census and Survey Undercounts Through Multiple Service Contacts" in Housing Policy Debate:  Counting the Homeless: The Methodologies, Policies, and Social Significance Behind the Numbers, Volume 2, Issue 3, pp. 869-882, 1991.

Cowan, Charles D., "Ratio vs. Regression Estimators in a Large Scale Survey of S&L's" in Proceedings of the Section on Survey Research Methods, American Statistical Association, 1992.

Cowan, Charles D., "A Longitudinal Survey and Reality Check for the Value of Financial Assets" in Proceedings of Statistics Canada Symposium 92: Design and Analysis of Longitudinal Surveys, November 1992.

Cowan, Charles D., and Wittes, Janet, "Intercept Studies, Clinical Trials, and Cluster Experiments: To Whom Can We Extrapolate?" in Controlled Clinical Trials, Vol.15, pp.24-29, 1994.

Cowan, Charles D.; Klena, Mathew J., Resolution Trust Corp, "Allocation of Proceeds from Bulk Auctions to Individual Assets" in Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1995.

26

Cowan, Charles D. "Statistical Sampling as a Management Tool in Banking" in FDIC Banking Review, 1997, Vol. 10, No. 1.

Cowan, Charles D., "Coverage, Sample Design, and Weighting in Three Federal Surveys" in Journal of Drug Issues, October 2001.

Cowan, Charles D., "Use of Mass Appraisals in Toxic Tort Litigation Involving Loss of Value" in Proceedings of the International Association of Assessment Officers, October 2002.

Cowan, Adrian M. and Cowan, Charles D., "Default Correlation: An Empirical Investigation of a Subprime Lender", The Journal of Banking and Finance, March 2004.

Cowan, Charles D. and Cowan, Adrian M., "A Survey Based Assessment of Financial Institution Use of Credit Scoring for Small Business Lending", SBA Report 283, Nov. 2006

Keith, Scott W., Wang, Chenxi, Fontaine, Kevin R., Cowan, Charles D. and Allison, David B. "Body Mass Index and Headache Among Women: Results From 11 Epidemiologic Datasets", Obesity, Volume 16, Issue 2 (February 2008) 16: 377-383; doi:10.1038/oby.2007.32

Cowan, Adrian M. and Cowan, Charles D., "The Dynamics of Credit Quality and Implications for the Pricing of Small Business Loans", The International Journal of Banking and Finance, 2007/08 (March) Vol. 5. Number 2:2008: 31-60

Brock, David W., Thomas, Olivia, Cowan, Charles D., Hunter, Gary R., Gaesser, Glenn A., and Allison, David B., Association between Physical Inactivity and Prevalence of Obesity in the United States, Journal of Physical Activity and Health, January, 2009

Cowan, Charles D., "Use of Statistical Analysis to Measure Damages", in Comprehensive Guide to Economic Damages, Fourth Edition, Business Valuation Resources, LLC, Portland, OR, April, 2016.

## Appendix 2:  *Dr. Cowan's List of Past Testimony*

**Financial:**

Dexia v. J. P. Morgan.  Worked for plaintiffs.  Deposed in February 2013.

AIG v. Bank of New York - Mellon. Worked for plaintiffs.  Deposed in May 2013, testimony at hearing in September 2013.

Mass Mutual v. numerous Underwriters of RMBS - 15 combined actions. Worked for plaintiffs. Deposed in May 2013, testimony at hearings, October 2013.

CUNA Mutual v. RBS Securities.  Worked for plaintiffs.  Deposed in January 2014.

Western Southern Life Insurance Company v. DLJ Mortgage Capital et al. Worked for plaintiffs. Deposed in March 2014.

Policeman's Annuity and Benefit Fund of the City of Chicago et al. v. Bank of America and U.S. Bank National Association. Worked for plaintiffs.  Hearing on Motion re Sampling in May 2014.

New Jersey Carpenters Health Fund et al. v. Residential Capital LLC et al.  Worked for plaintiffs. Deposed in May 2014.  Deposed regarding rebuttal Reports in June 2014.

Assured Guaranty Municipal Corp v DB Structured Products and ACE Securities Corp. Worked for plaintiffs.  Deposed in July 2014.

Mass Mutual v. Countrywide. Worked for plaintiffs.  Deposed in August 2014.

Prudential v. Morgan Stanley. Worked for plaintiff.  Deposed in September 2014. Hearing on Sampling in July 2015.

FDIC as Receiver for First Franklin v. Morgan Stanley. Worked for plaintiff.  Deposed in October 2014.

Mass Mutual v. Deutsche Bank Structured Products and Mass Mutual v. Countrywide Financial Corporation.  Worked for plaintiff.  Deposed twice in October 2014, deposed again, April 2015.

Federal Housing Finance Agency, as conservator for the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation v. Nomura Holding America Inc. et al. Worked for plaintiff.  Deposed in November 2014. Trial testimony in March 2015.

Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities and Credit Suisse Securities. Worked for plaintiff.  Deposed in December 2014. Deposed a second time in December 2015.  Deposed a third time, June 2016.

Homeward Residential as Master Servicer for Option One Mortgage Loan Trust 2006-2 v. Sand Canyon Corporation, f/k/a Option One Mortgage Corporation. Worked for plaintiff. Deposed in January 2015; deposed again in September 2015; deposed third time, October 2015.

New Jersey Carpenters Health Fund v DLJ Mortgage Capital, Inc. Worked for plaintiff. Deposed in February 2015.

AMBAC Assurance Corporation et al v. Countrywide Home Loans et al. Worked for plaintiff. Deposed in April 2015.

Federal Home Loan Bank of Seattle v. Bear Stearns & Co.; v. Banc of America Securities LLC; v. Barclays Capital Inc.; v. Countrywide Securities Corp.; v. RBS Securities Inc.; v. Morgan Stanley & Co., Inc.; v. Goldman Sachs & Co.; v. UBS Securities, LLC; v. Deutsche Bank Securities, Inc.; v. Merrill Lynch, Pierce, Fenner & Smith, Inc.; v. Credit Suisse Securities LLC; (consolidated action). Worked for plaintiff. Deposed in April 2015.

FDIC as Receiver for Colonial Bank v. Countrywide Securities et al; FDIC as Receiver for United Western Bank v. Countrywide Financial Corporation et al. Worked for plaintiff. Deposed in May 2015.

AMBAC Assurance Corporation et al v. EMC et al. Worked for plaintiff. Deposed in December 2015.

MBIA v Credit Suisse. Worked for plaintiff. Deposed in January 2016.

NCUA v. Goldman Sachs; v. Morgan Stanley; v. UBS et al. Worked for plaintiff. Deposed in January 2016.

NCUA v. RBS; v. Nomura et al. Worked for plaintiff. Deposed in February 2016.

MASTR Adjustable Rate Mortgages Trusts v. UBS Real Estate Securities Inc. Worked for plaintiff. No depositions. Testified at trial in May 2016.

FHFA v. RBS. Worked for plaintiff. Deposed in October 2016.

Mass Mutual v. Credit Suisse First Boston Mortgage Securities Corp. et al.. Worked for plaintiff. Deposed in November 2016.


**Financial - non RMBS**
Lucarelli Pizza and Deli et al v. Teco Energy, Peoples Gas System, and Posen Construction. Business Interruption case. Worked for the defendant. Deposition in January 2013; class certification hearing in January 2013.

United States of America v. Bank of America, Countrywide, et al. (HSSL). Worked for the plaintiff. Deposed in June 2013, testimony in September 2013.

29

Dennis Walter Bond, Sr. et al, v. Marriott International, Inc., et al. Worked for plaintiffs.  Deposed in August 2014.

**Construction Defects:**

Bongalos v. D.R. Horton, Rancho Cordova, CA. Worked for defense. Deposition, January 2013.

Turnberry Towers East Unit-Owners Association v. Turnberry Towers L.P. et al., Worked for defense.  Deposition, July 2013.

Horizon v. Shapell. Worked for defense.  Deposition, September 2013.

Newport Lofts Homeowners Association v. Newport Lofts et al, Worked for defense.  Deposition, September 2013.

Laurelwood v. Shapell. Worked for defense.  Deposition, December 2013.

Lexington Insurance Company v. Illinois Union Insurance Company, Turnberry Towers, L.P. et al. Worked for defense.  Deposition, April 2015.

Sundance HOA v. D.R. Horton, Inc.-Sacramento. Worked for defense.  Deposition, June 2015.

Ash et al. v. D.R. Horton, Inc.. Worked for defense.  Deposition, October 2015.

Paradise Court v. D.R. Horton, Inc., Worked for defense.  Deposition, January 2016.

The Seasons Homeowners Association Inc. v. Richmond American Homes of Nevada Inc. Worked for defense.  Deposition, March 2016.

Southeast Loft District Association, et al, v. Familian Development Group.  Worked for defense. Deposition, March 2016.

Abad v. Western Pacific Housing.  Worked for defense.  Deposition, October 2016.

Stanton v. Richmond American Homes of Nevada Inc.  Worked for defense.  Deposition, October 2016.

**Disparate Impact \ Discrimination:**

Webb Bridge LLC v. City of Alpharetta et al. Worked for defendant.  Deposed, November 2013.

Causeway Landings LTD et al v. City of New Smyrna Beach. Worked for plaintiff.  Deposition, December 2013.  Trial, July 2014.

Denton Cove, Ltd. et al v. City of Apalachicola, FL and School Board of Franklin Co., FL. Worked for plaintiff. Deposition, October 2015.

BBC Baymeadows, LLC v. City of Ridgeland, MS. Worked for defendant. Deposition, December 2015.


**Toxic Tort:**

Bawtinhimer v. D.R. Horton, Inc. Worked for the defense. Deposed, February 2013.

Parko et al v. Shell Oil et al. Worked for plaintiffs. Deposed, March 2013.


**Other Cases:**

Special Education Students in New Orleans v. State Superintendent of Education. Class Action. Worked for the plaintiffs. Deposition in July 2013.

Cable Providers (Cox, Comcast, Metrocast, Charter, and Cablevision) v. Connecticut Light and Power. Rate Dispute. Worked for plaintiffs. Testified at hearing in September 2014.

Packgen v. Berry Plastics Corporation and Covalence Specialty Coatings, LLC. Product Defect. Worked for the defendants. Testified at hearing in February 2014. Trial testimony, November 2015.

CMI Integrated Technologies, Inc. v. Xzeres Corporation. Product Defect. Worked for the plaintiff. Testified at deposition, February 2016. Trial testimony, February 2016.

North Jackson Pharmacy, Inc. et al v. Caremark Pharmacies. Antitrust. Worked for plaintiffs. Deposed in May, 2006; class certification pending, case moved to Multi-District Consolidation. Deposed again in September 2015.

Stone Creek v. Omnia. Trademark infringement. Worked for Defendant. No deposition; trial October 2015.