# EXHIBIT 1

## NFL FRANCHISE RELOCATION AGREEMENT

THIS NFL FRANCHISE RELOCATION AGREEMENT (the "Relocation Agreement") is entered into as of this 17th day of January, 1995, by and among THE LOS ANGELES RAMS FOOTBALL COMPANY, INC. a corporation organized and existing under the laws of the State of Delaware (hereinafter referred to as the "RAMS"), THE REGIONAL CONVENTION AND VISITORS COMMISSION, a/k/a St. Louis Convention and Visitors Commission, a public body corporate and politic of the State of Missouri (hereinafter referred to as "CVC"), THE REGIONAL CONVENTION AND SPORTS COMPLEX AUTHORITY, a public body corporate and politic of the State of Missouri (hereinafter referred to as the "Authority"), FANS, INC., a non-profit corporation organized and existing under the laws of the State of Missouri (hereinafter referred to as "FANS"), and ST. LOUIS NFL CORPORATION, a corporation organized and existing under the laws of the State of Missouri (hereinafter referred to as "SLNFL") with respect to the following:

### RECITALS

WHEREAS, the Authority has been established for the purpose of constructing, owning and operating a convention and sports facility (the "Facilities") to adjoin the Cervantes Convention Center in the City of St. Louis, Missouri (the "Convention Center"); and

WHEREAS, in accordance with the laws of the State of Missouri and the ordinances of the City of St. Louis, Missouri and St. Louis County, Missouri, respectively, and pursuant to that certain Project Agreement dated as of July 11, 1990 (the "Project Agreement") among the State of Missouri (the "State"), the City of St. Louis, Missouri (the "City"), St. Louis County, Missouri (the "County") and SLNFL (the "Project Agreement"), the State, the City and the County (together, the "Sponsors" and individually, a "Sponsor") have duly authorized and agreed to participate in the financing, construction and operation of the Facilities; and

WHEREAS, the Authority, as owner of the Facilities, and the Sponsors, as tenants in common, have entered into a certain Project Financing, Construction and Operation Agreement dated as of August 1, 1991 (the "Financing Agreement"), pursuant to which the Authority has leased and demised the Facilities to the Sponsors, and the Sponsors have in turn leased and demised the Facilities to the Authority, in accordance with the terms and conditions set forth in the Financing Agreement; and

WHEREAS, the St. Louis Municipal Finance Corporation, a Missouri not-for-profit corporation ("SLMFC"),

HYMA0A74.WP 55902 1/16/95   4:06pm

as owner, has leased and demised the Convention Center to the City pursuant to a Lease Purchase Agreement dated as of June 15, 1993 (the "Lease Purchase Agreement") and, in order to facilitate the efficient, harmonious and successful development, operation and use of the Convention Center and the Facilities, the City, pursuant to that certain Amended and Restated Convention Center Operating Lease dated as of July 29, 1993 (the "Convention Center Operating Lease"), has leased and demised the Convention Center to CVC, subject to the terms and conditions set forth in the Convention Center Operating Lease which is subordinate to the Lease Purchase Agreement and other documents as provided in such lease; and

WHEREAS, the Authority, the Sponsors, CVC and SLNFL have entered into a certain Cooperative Agreement dated as of August 1, 1991 (the "Cooperative Agreement"), relating to certain matters of interest to said parties in connection with the construction and operation of the Facilities; and

WHEREAS, the Authority, as Operating Landlord, and CVC, as tenant, have entered into a certain Operating Lease dated as of August 28, 1991 (the "Operating Lease"), pursuant to which the Authority has leased and demised the Facilities to CVC, subject to the terms and conditions of the Financing Agreement and otherwise in accordance with the terms and conditions set forth in the Operating Lease; and

WHEREAS, pursuant to the Financing Agreement and the Operating Lease (together, the "Prior Leases"), CVC entered into that certain St. Louis NFL Lease (the "Lease") as of the August 28, 1991, by and between CVC and SLNFL, to lease and demise the Facilities to SLNFL, for the uses, the rent and the term and subject to the terms and conditions set forth therein in anticipation of SLNFL obtaining a National Football League ("NFL") franchise to play NFL football in the Facilities ("NFL Games"); and

WHEREAS, SLNFL is wholly-owned by FANS, which was formed for the purpose of assisting the City and County in inducing an NFL franchise to locate in St. Louis and to play NFL Games in the Facilities; and

WHEREAS, as of the date hereof, SLNFL has not obtained an NFL franchise to play NFL Games; and

WHEREAS, the RAMS own and operate an NFL franchise (the "NFL Franchise") to play NFL Games as contemplated by Section 3(c) of the Lease and the Authority, CVC, SLNFL and FANS (collectively the "St. Louis Parties" and individually a "St. Louis Party") desire to induce the RAMS, and the RAMS desire to induce each of the St. Louis Parties, to relocate the NFL Franchise to St. Louis and to enter into certain mutually beneficial agreements and arrangements respecting the playing of NFL Games in the Facilities commencing as soon as

practicable, and the RAMS and the St. Louis Parties are willing to do so on certain terms and conditions; and

WHEREAS, the Authority, CVC and SLNFL recognize that certain of the terms and conditions of the Lease are ambiguous, inconsistent and/or require clarification, interpretation or further agreements for their implementation and each of them desires to do so by amending and restating the Lease in its entirety on the terms of that certain Amended and Restated St. Louis NFL Lease of even date (the "Amended Lease"); and

WHEREAS, SLNFL, with the consents of the Authority, the City, the County, the State, SLMFC, CVC and FANS is willing to assign to the RAMS immediately after the execution of the Amended Lease all of its rights and certain of its obligations relative to the Facilities, including all of SLNFL's rights under the Amended Lease, the Cooperative Agreement, the Project Agreement and the Operating Lease, on the terms and conditions of an Assignment and Assumption Agreement (and Consents thereto) of even date (the "Assignment"), and the RAMS are willing to accept such Assignment on such terms and conditions and pursuant to such consents; and

WHEREAS, CIVIC PROGRESS INC., a non-profit corporation organized and existing under the laws of the State of Missouri (hereinafter referred to as "CIVIC") was formed for the purpose of promoting the development of the City and County and the members of which have made certain financial commitments to the RAMS relative to the relocation of the RAMS to St. Louis and to certain revenues to be received by the RAMS from the use of the Facilities; and

WHEREAS, on the date hereof FANS on its own behalf and as agent for CVC will commence a program of selling Charter Personal Seat Licenses and Charter Club Memberships (the "PSL Program") in respect of seats in the Facilities to fund certain obligations of FANS and of CVC; and

WHEREAS, the RAMS and the St. Louis Parties desire to memorialize and provide for the terms and conditions upon which the RAMS will relocate to St. Louis, Missouri ("St. Louis");

NOW, THEREFORE, for and in consideration of the promises and the mutual covenants of the parties contained herein, and in order to induce the RAMS to enter into the Amended Lease and the Collateral Agreements (as hereinafter defined), the Authority, CVC, SLNFL and FANS, on the one hand, and the RAMS, on the other, hereby agree as follows:

## ARTICLE 1

### GENERAL PROVISIONS

1.1  <u>Certain Definitions</u>.

(a)  "Collateral Agreements" means each and every one of the agreements and instruments described in Article 5 of this Relocation Agreement.

(b)  "Relocation Payment" means a non-refundable payment to the RAMS of $13 million.

1.2.  <u>Defined Terms</u>.  All capitalized terms, if defined in the Amended Lease, shall have the meaning therein given unless the context herein requires a different or other meaning.

1.3.  <u>Priorities</u>.  In the event of a conflict between the terms and conditions of this Relocation Agreement and the terms and conditions of one or more of the Amended Lease and one or more of its Annexes, the terms and conditions of this Relocation Agreement shall control.

### ARTICLE 2

### REPRESENTATIONS AND WARRANTIES OF THE RAMS.

The RAMS represents and warrants to the St. Louis Parties as follows:

2.1  <u>Organization and Good Standing</u>.  The RAMS is a Delaware corporation duly organized, validly existing and in good standing under the laws of Delaware and has the power and authority to carry on its business as the same is now being conducted.  The RAMS is duly qualified to transact business as a foreign corporation in each of the jurisdictions where the nature of its business or ownership or leasing of the properties used by it requires such qualification, except where any such failure would not be likely to have a material adverse effect on the business and financial condition of the RAMS taken as a whole.

2.2  <u>Corporate Records</u>.  The corporate records and minute books of the RAMS accurately reflect all material action taken and authorizations made at meetings of its board of directors or any committee thereof and at any shareholder meetings of such corporation with respect to this Relocation Agreement and the transactions contemplated by this Relocation Agreement, including the Collateral Agreements.

2.3   <u>Authority and Absence of Conflict</u>.

        (a)   The RAMS has full corporate power and authority
to enter into this Relocation Agreement and the agreements and
instruments contemplated hereby and to carry out its
obligations hereunder and thereunder.  The execution and
delivery of this Relocation Agreement and the agreements and
instruments contemplated hereby and the consummation of the
transactions contemplated hereby and thereby have been duly
authorized by all necessary corporate action required on the
part of the RAMS.  This Relocation Agreement and the other
agreements and instruments to be executed by the RAMS
hereunder have been (or on or prior to the Closing Date will
have been, as applicable) duly executed by the RAMS and except
for the Constitution and Bylaws, rules and policies of the NFL
(the "NFL Policies"), to the extent, if at all, applicable,
constitute (or upon execution will constitute) the valid and
legally binding obligations of the RAMS, enforceable against
the RAMS in accordance with their respective terms except as
such other agreements and instruments may be conditional upon
the Closing (as hereinafter defined) under this Relocation
Agreement and except as may be limited by bankruptcy,
insolvency, reorganization, moratorium and other similar laws
and equitable principles relating to or limiting creditors'
rights generally.  In the event of an approval of the
Application (as hereinafter defined), the RAMS do not know of
any NFL Policies that would affect the enforceability of this
Relocation Agreement and the Collateral Agreements to which it
is a party.

        (b)   The execution and delivery of this Relocation
Agreement and the agreements and instruments contemplated
hereby, the consummation of the transactions contemplated
hereby and thereby, and compliance with the provisions hereof
and thereof do not and will not violate, or conflict with, or
result in a breach of any provisions of, or constitute a
default (or an event which, with notice or lapse of time or
both, would constitute a default), under any of the terms,
conditions or provisions of the Certificate of Incorporation
or By-laws of the RAMS.

        (c)   Except for the NFL Policies, to the extent, if
at all, applicable, the execution and delivery of this
Relocation Agreement and the agreements and instruments
contemplated hereby, the consummation of the transactions
contemplated hereby and thereby, and compliance with the
provisions hereof and thereof do not and will not (i) violate,
or conflict with, or result in a breach of any provisions of,
or constitute a default (or an event which, with notice or
lapse of time or both, would constitute a default) under, or
give rise to a right of termination, cancellation,
modification or acceleration of the performance required by or
a loss of a material benefit under, or result in the creation
of any material encumbrance, except for any encumbrance

HYMA0A74.WP 55902 1/16/95   4:06pm

created by the existence of the Amended Lease, upon any of the
material properties or assets of the RAMS under any of the
terms, conditions or provisions of any material note, bond,
mortgage, indenture, deed of trust, license, agreement, lease
(other than the Exhibition Agreement, as amended, with the
City of Anaheim, California, as contemplated by Section 7.2.12
hereof), franchise or other instrument to which the RAMS is
party or by which any of its properties are bound, or (ii) to
the knowledge of the RAMS violate any material order or law
applicable to any of the foregoing, where, in any such case or
in the aggregate, such violation, conflict, breach, default,
termination, cancellation, modification, acceleration or loss
would be likely to have a material adverse effect on the
business and financial condition of the RAMS taken as a whole
or on the transactions contemplated by this Relocation
Agreement and the Collateral Agreements.  In the event of an
Approved Application (as hereinafter defined), the RAMS do not
know of any NFL Policies that would affect the enforceability
of this Relocation Agreement and the Collateral Agreements to
which it is a party.

2.4  NFL Franchise.  Subject to the NFL Policies, the
RAMS is the owner of, and has all of the rights and benefits
to, an NFL Franchise to play NFL Games under the team name the
"Los Angeles RAMS."

2.5  Financial Statements.  True and correct copies of
the audited balance sheets of the RAMS at December 31, 1993
and 1992 and the related audited statements of income and
changes in shareholder's deficit and of cash flows for the
years then ended, including the notes thereto, have been
delivered to FANS.  The foregoing audited financial statements
(including the related notes thereto) are collectively
referred to as the "RAMS Financial Statements."  The RAMS
Financial Statements have been prepared from and are in
accordance with the books and records of the RAMS, and present
fairly the financial position, results of operations and cash
flows of the RAMS as of the date of and for the periods
reflected in such RAMS Financial Statements in conformity with
GAAP consistently applied except as noted in such RAMS
Financial Statements or the accompanying Report of Independent
Auditors.  FANS agrees to keep the RAMS Financial Statements
confidential except to the extent required by law or court
order.

2.6  Conduct of Business.  (a) Except as contemplated by
this Relocation Agreement, since December 31, 1993 to the date
hereof, the RAMS has conducted its business in the ordinary
course, and there has not been any:

(i)  adverse and material change in the financial
condition of the RAMS, except that the RAMS incurred operating
losses during 1994; or

HYMA0A74.WP 55902 1/16/95   4:06pm

6

(ii) sale, assignment, disposition, transfer, pledge, mortgage or lease of the NFL Franchise.

<u>ARTICLE 3</u>

<u>REPRESENTATIONS AND WARRANTIES OF THE ST. LOUIS PARTIES</u>.

Each of the St. Louis Parties severally represents and warrants to the RAMS as respects itself as follows:

3.1   <u>Organization and Good Standing</u>.

(a)   SLNFL and FANS represent and warrant as follows:  SLNFL is a Missouri corporation duly organized, validly existing and in good standing under the laws of Missouri and has the power and authority to carry on its business as the same is now being conducted.  SLNFL is duly qualified to transact business as a foreign corporation in each of the jurisdictions where the nature of its business or ownership or leasing of the properties used by it requires such qualification, except where any such failure to qualify would not be likely to have a material adverse effect on the business and financial condition of the SLNFL taken as a whole.  All of the issued and outstanding stock of SLNFL is owned by FANS and there are not any options, warrants or other rights outstanding to purchase any of the stock of SLNFL.

(b)   SLNFL and FANS represent and warrant as follows:  FANS is a Missouri non-profit corporation duly organized, validly existing and in good standing under the laws of Missouri and has the power and authority to carry on its business as the same is now being conducted.  FANS has received an advance determination letter from the Internal Revenue Service ("IRS") that it is an organization exempt from taxation within the meaning of Section 501(a) by reason of Section 501(c)(3) of the Internal Revenue Code.  The representations that FANS made to the IRS in connection with such determination letter were when made, and are, true and correct.  FANS is duly qualified to transact business as a foreign corporation in each of the jurisdictions where the nature of its business or ownership or leasing of the properties used by it requires such qualification, except where any such failure to qualify would not be likely to have a material adverse effect on the business and financial condition of the FANS taken as a whole.

(c)   The Authority represents and warrants as follows:  The Authority is a public body corporate and politic of the State of Missouri duly organized, validly existing and in good standing under the laws of Missouri and has the power and authority to carry on its business as the same is now being conducted.

HYMA0A74.WP 55902 1/16/95   4:06pm

(d)  The CVC represents and warrants as follows: The CVC is a public body corporate and politic of the State of Missouri duly organized, validly existing and in good standing under the laws of Missouri and has the power and authority to carry on its business as the same is now being conducted.

3.2  <u>Records</u>.  Each of the St. Louis Parties represents and warrants, as to its own books and records and minute books, that such books and records and minute books accurately reflect all material action taken and authorizations made at meetings of its respective board of directors (or commissioners, as the case may be) or any committee thereof and at any shareholder (or member, as the case may be) meetings of such corporation or entity with respect to this Relocation Agreement and the transactions contemplated by this Relocation Agreement, including the Collateral Agreements.

3.3  <u>Authority and Absence of Conflict</u>.

(a)  Each of the St. Louis Parties represents and warrants as to itself as follows:  Such St. Louis Party has full power and authority to enter into this Relocation Agreement and the agreements and instruments contemplated hereby and to carry out its obligations hereunder and thereunder.  The execution and delivery of this Relocation Agreement and the agreements and instruments contemplated hereby and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action required on the part of such St. Louis Party.  This Relocation Agreement and the other agreements and instruments to be executed by such St. Louis Party hereunder have been (or on or prior to the Closing Date will have been, as applicable) duly executed by such St. Louis Party and constitute (or upon execution will constitute) the valid and legally binding obligations of such St. Louis Party, enforceable against such St. Louis Party in accordance with their respective terms except as such other agreements and instruments may be conditional upon the Closing under this Relocation Agreement and except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws and equitable principles relating to or limiting creditors' rights generally.

(b)  Each of the St. Louis Parties represents and warrants as to itself as follows:  The execution and delivery of this Relocation Agreement and the agreements and instruments contemplated hereby, the consummation of the transactions contemplated hereby and thereby, and compliance with the provisions hereof and thereof do not and will not violate, or conflict with, or result in a breach of any provisions of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default), under any of the terms, conditions or provisions of

the Articles of Incorporation or By-laws or other charter
documents of such St. Louis Party.

(c)  Each of the St. Louis Parties represents and
warrants as to itself as follows:  The execution and delivery
of this Relocation Agreement and the agreements and
instruments contemplated hereby, the consummation of the
transactions contemplated hereby and thereby, and compliance
with the provisions hereof and thereof do not and will not
(i) violate, or conflict with, or result in a breach of any
provisions of, or constitute a default (or an event which,
with notice or lapse of time or both, would constitute a
default) under, or give rise to a right of termination,
cancellation, modification or acceleration of the performance
required by or a loss of a material benefit under, or, except
for any encumbrance created by the existence of the Amended
Lease, result in the creation of any material encumbrance upon
any of the material properties or assets of such St. Louis
Party under any of the terms, conditions or provisions of any
material note, bond, mortgage, indenture, deed of trust,
license, agreement, lease, franchise or other instrument to
which such St. Louis Party is a party or by which any of its
properties are bound, or (ii) to the knowledge of such St.
Louis Party violate any material order or law applicable to
any of the foregoing, where, in any such case or in the
aggregate, such violation, conflict, breach, default,
termination, cancellation, modification, acceleration or loss
would be likely to have a material adverse effect on the
business and financial condition of such St. Louis Party taken
as a whole or on the transactions contemplated by this
Relocation Agreement and the Collateral Agreements.

3.4  <u>Prior Leases and Other Agreements</u>.  Each of the St.
Louis Parties represents and warrants as to itself as follows:
There is no violation, or breach of any provisions of, or any
default (or an event which, with notice or lapse of time or
both, would constitute a default) under, or (except as allowed
thereby) right of termination, cancellation, modification or
acceleration of the performance required by or any loss of a
material benefit under, or the creation of any material
encumbrance upon any of the Lease, the Amended Lease, the
Cooperative Agreement, the Project Agreement, and the
Operating Lease (the "Assigned Agreements") or the Convention
Center Operating Lease and the Financing Agreement, and the
forms of each of such agreements previously delivered to the
RAMS is a true and complete copy thereof with all amendments
thereto, except that SLNFL may be in default under the
Assigned Agreements for failure to acquire an NFL Franchise
and for other reasons, and other parties to the Assigned
Agreements may be in default with respect to duties owed to
SLNFL thereunder.  Upon the Assignment Effective Date
(i) SLNFL and the RAMS shall be deemed to have expressly
waived any such prior defaults by such other parties to the
Assigned Agreements, and (ii) by their Consents and the

Assignment, each other party to an Assigned Agreement shall be deemed to have waived any such prior default by SLNFL, all such waivers pursuant to sections 3.4(i) and (ii) above being without waiver of the rights of the RAMS to insist on future compliance with each term thereof, but only to the extent not inconsistent with the terms of this Relocation Agreement and the Amended Lease.

3.5  <u>FANS Financial Statements</u>.  FANS represents and warrants, and agrees, that it will deliver to the RAMS prior to March 10, 1995, true and correct copies of the unaudited balance sheets of FANS and SLNFL as of December 31, 1994, and the related statements of income and changes in shareholder's deficit and of cash flows for the year then ended, including the notes thereto.  The foregoing unaudited financial statements (including the related notes thereto) are collectively referred to as the "FANS Financial Statements" The FANS Financial Statements will have been prepared from and be in accordance with the books and records of FANS and SLNFL, respectively, and present fairly the financial position, results of operations and cash flows of FANS and SLNFL, respectively, as of the date of and for the periods reflected in such FANS Financial Statements in conformity with GAAP consistently applied except as noted in such FANS Financial Statements or the accompanying Report of Independent Auditors.

3.6  <u>CVC Financial Statements</u>.  CVC represents and warrants that it has delivered to the RAMS a true and correct copy of the audited balance sheets of CVC at December 31, 1992 and 1993, and the related audited statements of income and changes in Funds Balances and of cash flows for the year then ended, including the notes thereto.  The foregoing audited financial statements (including the related notes thereto) are collectively referred to as the "CVC Financial Statements." The CVC Financial Statements have been prepared from and are in accordance with the books and records of the CVC, and present fairly the financial position, results of operations and cash flows of the CVC as of the date of and for the periods reflected in such CVC Financial Statements in conformity with GAAP consistently applied except as noted in such CVC Financial Statements or the accompanying Report of Independent Auditors.

3.7  <u>Conduct of Business</u>.  Except (a) as disclosed in Schedule 3.7 or (b) as contemplated by this Relocation Agreement, since December 31, 1993 to the date hereof, each of the St. Louis Parties represents and warrants as to itself that it has conducted its business in the ordinary course, and there has not been any:

(i)  adverse and material change in the financial condition of such St. Louis Party; or

HYMA0A74.WP 55902 1/16/95   4:06pm

(ii) sale, assignment, disposition, transfer, pledge, mortgage or lease of any substantial part of its assets.

3.8  <u>Delivery Date of the Facilities</u>.  Each of the St. Louis Parties represents and warrants that it has no reason to believe that the Facilities will not be delivered to the RAMS by the CVC on or before 12:00 noon on October 21, 1995 in a First Class condition (as defined in Annex 1 to the Amended Lease) for the playing and viewing of NFL Games.

<u>ARTICLE 4</u>

<u>NFL FRANCHISE RELOCATION APPLICATION</u>

4.1  <u>Filing of Application</u>.  Promptly following the date hereof, but in no event later than February 1, 1995, the RAMS shall file with the NFL a Notice and Statement of Reasons of the Los Angeles Rams Supporting Transfer of the Club to St. Louis (the "Application") to relocate the NFL Franchise to St. Louis substantially in the form previously provided to FANS. The RAMS shall request the NFL at the time of submitting the Application to approve the Application at the NFL Annual Meeting March 12-17, 1995.

4.2  <u>Action on Application</u>.

4.2.1  <u>Application Approval</u>.  Except as provided in Section 4.2.2(e), the Application shall be deemed approved by the member clubs of the NFL in the event that:  (a) the Application is approved by the requisite votes of the NFL member clubs without the imposition of any conditions on the move to St. Louis; or (b) the Application is approved by the requisite votes of the NFL member clubs, but on condition that a payment be made to the NFL or any of its member clubs, including an **expansion** opportunity fee, however designated or denominated, (**a "Fee"**) not in excess of the amount, if any, separately agreed to by the parties and memorialized in Joint Instructions to Counsel pursuant to that certain Mutual Litigation Management and Defense Agreement (the "Settlement Amount") and no other material conditions on the move to St. Louis; (collectively an "Approved Application").  The RAMS shall promptly give notice to FANS on behalf of the St. Louis Parties of any Approved Application.

4.2.2  <u>Application Disapproval</u>.  The Application shall be deemed disapproved by the member clubs of the NFL in the event that:  (a) the NFL member clubs shall fail to act on the Application by March 20, 1995 and either the RAMS or FANS on behalf of the St. Louis Parties shall thereafter by notice to the other on or before March 27, 1995, choose to treat the inaction as a disapproval of the Application; (b) the Application shall be disapproved by reason of the failure to receive the requisite affirmative votes of the NFL member

clubs; (c) the Application shall be approved by the requisite votes of the NFL member clubs, but the NFL or its member clubs shall impose any material condition on the move to St. Louis, other than a Fee less than the Settlement Amount; (d) the Application shall be approved by the requisite votes of the NFL member clubs, but the NFL or its member clubs shall impose a Fee greater than the Settlement Amount or shall propose to impose a Fee to be determined in the future; or (e) the NFL or its member clubs shall fail to acknowledge at the time action is taken by the NFL on the Application that the amounts received by FANS and/or the CVC in respect of the PSL Program are not revenues subject to revenue sharing with the visiting club playing an NFL Game under Article XIX of the NFL Constitution and Bylaws; (collectively a "Disapproved Application").  The RAMS shall promptly give notice, but not later than March 21, 1995, to FANS on behalf of the St. Louis Parties of any Disapproved Application.

### 4.3    Application Approval or Disapproval.

4.3.1    **Effect of Approved Application**.  In the event of an Approved Application, not later than April 30, 1995, a Closing shall be held at 10:00 a.m. at the law offices of Riezman & Blitz, St. Louis, Missouri, or at such other time and place as the parties shall mutually agree, pursuant to the provisions, and subject to the conditions, of Article 7.

4.3.2    **Rights of RAMS Following a Disapproved Application**.  In the event of a Disapproved Application, the RAMS may by written notice to FANS on behalf of the St. Louis Parties, not later than March 27, 1995, unconditionally terminate the obligations of the parties to this Relocation Agreement.  Termination of this Relocation Agreement shall constitute a termination without further obligations of each and every other agreement or instrument contemplated by this Relocation Agreement, including without limitation the Collateral Agreements.

4.3.3    **Rights of St. Louis Parties Following a Disapproved Application**.  In the event of a Disapproved Application, FANS on behalf of the St. Louis Parties may by written notice to the RAMS, not later than March 27, 1995, unconditionally terminate the obligations of the parties to this Relocation Agreement.  Termination of this Relocation Agreement shall constitute a termination without further obligations of each and every other agreement or instrument contemplated by this Relocation Agreement, including without limitation the Collateral Agreements.

4.3.4    **Obligations of RAMS and St. Louis Parties Following Disapproved Application in the Absence of Termination**.  In the event of a Disapproved Application, following which neither the RAMS nor FANS on behalf of the St. Louis Parties gives such notice of termination on a timely

HYMA0A74.WP 55902 1/16/95   4:06pm

basis as provided in Sections 4.3.2 and 4.3.3, the following shall control:

(a)  Not later than March 27, 1995, CVC shall pay the Relocation Payment to the RAMS (in immediately available funds into such account as the RAMS shall have designated by notice to FANS on behalf of the St. Louis Parties);

(b)  the RAMS, the Authority, CVC and SLNFL prior to March 31, 1995, shall commence legal action against the NFL and its constituent members pursuant to that certain Mutual Litigation Management and Defense Agreement, including defense of any counter claims or cross complaints or other actions arising out of the same subject matter (the "Action") until such time as (i) a court of competent jurisdiction shall have rendered a final, nonappealable judgment in respect of the Action or (ii) the Action has been terminated by the parties on terms, if any, as set forth in Joint Instructions to Counsel pursuant to the Mutual Litigation and Management and Defense Agreement;

(c)  on or before June 30, 1995, FANS shall make arrangements as contemplated by Section 26 of the Amended Lease satisfactory to the RAMS to defease the obligation of the RAMS to make a lump sum payment of the unpaid principal indebtedness under the 1979 Stadium Expansion Bonds (or any refunding thereof) and all accrued but then unpaid interest thereon under Section 29(a) of the Fourth Amendment to Exhibition Agreement dated November 21, 1978, as amended by the Fifth Amendment to Exhibition Agreement, including without limitation the posting by FANS of an irrevocable standby letter of credit in the form of Attachment "2" to such Fourth Amendment; and

(d)  in the event of the entry of a non-appealable final judgment in the Action in favor of one or more of the plaintiffs in the Action and permitting the RAMS to move to St. Louis, then upon ten (10) days' prior notice from either the RAMS or FANS on behalf of the St. Louis Parties, a Closing shall be held at 10:00 a.m. at the law offices of Riezman & Blitz, St. Louis, Missouri, or at such other time and place as the parties shall mutually agree, pursuant to the provisions, and subject to the conditions, of Article 7.

<u>**ARTICLE 5**</u>

<u>**COLLATERAL AGREEMENTS**</u>

Contemporaneously with the execution and delivery of this Relocation Agreement by the RAMS and the St. Louis Parties, the following Collateral Agreements have been executed and delivered by the parties thereto (in certain instances into an

escrow pursuant to a letter of instruction to be held and delivered in accordance therewith (the "Escrow")) as hereinafter described and the RAMS and the St. Louis Parties following the date hereof agree to use their respective best efforts to cause such agreements as have not been fully executed and delivered and consented to, as therein provided, to be executed and delivered and consented to, as the case may be, by the parties therein provided on or before March 10, 1995:

5.1  <u>Amended Lease</u>.  The CVC, SLNFL and the RAMS have each executed and delivered the Amended Lease and each of the Annexes to the Amended Lease (numbered Annexes 1 through 4), dated as of the date hereof, in the forms of the Amended Lease and Annexes attached hereto, into Escrow.

5.2  <u>Annex 1</u>.  The Authority shall have executed and delivered Annex 1 to the Amended Lease, dated as of the date hereof, in the form of the Annex 1 attached hereto as Exhibit 5.1, into Escrow.

5.3  <u>Annex 2</u>.  The Authority shall have executed and delivered Annex 2 to the Amended Lease, dated as of the date hereof, in the form of the Annex 2 attached hereto as Exhibit 5.1, into Escrow.

5.4  <u>Annex 4</u>.  The Authority and FANS shall have executed and delivered into Escrow and the City and LCRA shall execute and deliver Annex 4 to the Amended Lease, dated as of the date hereof, in the form of the Annex 4 attached hereto as Exhibit 5.1, into Escrow.

5.5  <u>Assignment</u>.  SLNFL and the RAMS each have executed and delivered, and the Authority, CVC and FANS have each executed and delivered their consent to, and the City, County, State and SLMFC shall each execute and deliver, their consent to, as therein provided, the Assignment, as of the date hereof in the form of the Assignment attached hereto as Exhibit 5.5, into Escrow.

5.6  <u>Master Parking Provider Agreement</u>.  The RAMS and the parking vendors shall execute and deliver the Master Parking Provider Agreement, substantially in the form of the Master Parking Provider Agreement attached hereto as Exhibit 5.6.

5.7  <u>Training Facility Lease</u>.  The RAMS shall execute and deliver a Training Facility Lease on terms and conditions acceptable to the RAMS in the good faith exercise of its discretion and on substantially the terms and conditions described on Schedule 5.7.

5.8  <u>Temporary Training Facility Lease</u>.  The RAMS shall execute and deliver a Temporary Training Facility Lease on terms and conditions acceptable to the RAMS in the good faith

exercise of its discretion and on substantially the terms and conditions described on Schedule 5.8.

5.9 <u>Charter Personal Seat License Master Agreement</u>. FANS, CVC and the RAMS each have executed and delivered the Charter Personal Seat License Master Agreement (the "PSL Master Agreement"), as of the date hereof in the form of the PSL Master Agreement attached hereto as Exhibit 5.9.

5.10 <u>Non-disturbance and Attornment Agreement</u>. The Authority, SLNFL and CVC, has each executed and delivered, and the RAMS, the City, County, the State, SLMFC and Land Clearance For Redevelopment Authority of the City of St. Louis, a body corporate and politic and a public instrumentality organized and existing under the laws of the State of Missouri ("LCRA") shall each execute and deliver the Non-Disturbance and Attornment Agreement, as of the date hereof (the "Non-Disturbance Agreement") in the form of the Non-Disturbance Agreement attached hereto as Exhibit 5.10, into Escrow.

5.11 <u>Hold Harmless Agreement</u>. A Hold Harmless Agreement shall be executed and delivered by a financially responsible party or parties reasonably acceptable to the RAMS substantially in the form of the Hold Harmless Agreement attached hereto as Exhibit 5.11.

5.12 <u>Agreement Re Minimum Return</u>. The RAMS and certain CIVIC and certain of CIVIC's members shall each have executed and delivered, and each of CIVIC's other members shall execute and deliver, an Agreement Re Minimum Return (Box Suites and Club Seats), on terms and conditions satisfactory to the RAMS, in the good faith exercise of its discretion.

5.13 <u>Joint Marketing Agreement (Box Suites and Club Seats)</u>. FANS, CIVIC and the RAMS shall each have executed and delivered a Joint Marketing Agreement (Box Suites and Clubs Seats), on terms and conditions satisfactory to the RAMS in the good faith exercise of its discretion.

5.14 <u>Busch Stadium NFL Lease Agreement</u>. The RAMS and Civic Center Corporation shall execute and deliver a Busch Stadium NFL Lease (the "Busch Lease") on terms and conditions satisfactory to the RAMS in the good faith exercise of its discretion.

5.15 <u>RAMS Store Lease</u>. CVC and the RAMS each agree to execute and deliver a RAMS Store Lease on terms and conditions satisfactory to the RAMS in the good faith exercise of its discretion.

5.16 <u>Mutual Litigation Management and Joint Defense Agreement</u>.  The RAMS, the CVC, FANS and SLNFL each have executed and delivered that certain Mutual Litigation Management and Joint Defense Agreement dated as of January 12, 1995.

5.17 <u>Sanwa Consent</u>.  Sanwa Bank Limited shall have executed and delivered a consent to the Amended Lease (the "Sanwa Consent") on terms and conditions reasonably satisfactory to the RAMS, the City and CVC in the good faith exercise of their respective its discretions.

ARTICLE 6

<u>APPLICATION TO NFL: TERMINATION.</u>

6.1 <u>Conditions Precedent to the Obligations of RAMS</u>. The obligation and right of the RAMS to request the NFL to vote on the Application shall be subject to the satisfaction on or prior to March 10, 1995 of each of the following conditions precedent, any of which may be waived by the RAMS (other than the condition that the City and County have executed and delivered their respective Consent to Assignment) and in the event any such condition is not so satisfied and waived by the RAMS, the RAMS may withdraw the Application and its request for a vote of the NFL on the Application:

6.1.1 <u>Convention Center or Facilities Adverse Changes</u>. There shall not have occurred after the date hereof any material adverse change to, or in the condition of, either of the Convention Center or the Facilities or any of CVC, FANS, SLNFL or CIVIC.

6.1.2 <u>Initial PSL Program</u>. Pursuant to the PSL Program contemplated by the PSL Master Agreement, (i) PSL Patron Regular Agreements, (ii) PSL Patron Convertible Agreements and Charter Club Agreements in the respective forms previously approved by the RAMS shall have been duly executed and delivered, and to the extent required by the terms thereof performed through March 10, 1995, by the parties thereto, and shall be effective in accordance with their respective terms and conditions, in the numbers and for the sections of the Facilities described on Schedule 6.1.2.

6.1.3 <u>Effectiveness of Collateral Agreements</u>. Each of the following Collateral Agreements shall have been duly executed and delivered and consented to, as therein provided, and to the extent required by the terms thereof performed through March 10, 1995, by the parties thereto, and shall be effective in accordance with their terms and conditions:

      (a)  the Amended Lease and each of the Annexes thereto;

    (b)   the Assignment and (Consents thereto);

    (c)   the Master Parking Provider Agreement (for not less than 15,000 parking spaces);

    (d)   the Training Facility Lease;

    (e)   the Temporary Training Facility Lease;

    (f)   the PSL-Master Agreement;

    (g)   the Non-Disturbance Agreement;

    (h)   the Hold Harmless Agreement;

    (i)   the Agreement Re Minimum Return (Box Suites and Club Seats);

    (j)   the Joint Marketing Agreement (Box Suites and Club Seats);

    (k)   the Busch Lease;

    (l)   the RAMS Store Lease;

    (m)   the Mutual Litigation Management and Joint Defense Agreement; and

    (n)   the Sanwa Consent.

      6.1.4  **City Property Tax**.  The letters of the City Assessor and the City Counselor dated January 6, 1995, respecting any taxation of the Amended Lease shall not have been modified.

      6.1.5  **County Property Tax**.  The letter of the County Counselor dated January 12, 1995, respecting assessment of leasehold interest in publicly owned property respecting the Amended Lease (and training facility) shall not have been modified.

      6.1.6  **City Signage Authorization**.  The RAMS and CVC, on the one hand, and the City, on the other, shall have reached an agreement, or appropriate governmental action shall have been taken, acceptable to the RAMS in the reasonable good faith exercise of its discretion, respecting a variance or exemption from any applicable City codes, ordinances or regulations (including zoning or similar regulations, conditions and restrictions on the use of real property) limiting or controlling the nature, type or size of any exterior advertising, including without limitation for three exterior marquees, respecting the Facilities and the Convention Center, and such agreement shall have been duly executed and delivered, and to the extent required by the

HYMA0A74.WP 55902 1/16/95   4:06pm

terms thereof performed through March 10, 1995, by the parties thereto, and shall be effective in accordance with its terms and conditions.

6.1.7   <u>Governmental Advertising Permit or Variance</u>. The CVC shall have obtained (a) a permit, acceptable to the RAMS in the reasonable exercise of its discretion, respecting a use under the Missouri Outdoor Advertising Act, § 226.500 <u>et. seq.</u>  Mo. Rev. Stat. (1993 Supp.) and/or (b) an agreement or other appropriate governmental action shall have been taken acceptable to the RAMS in the reasonable good faith exercise of its discretion, respecting a variance or exemption from any other State or Federal statutes, codes, regulations, ordinances or zoning regulations (or similar regulations, conditions and restrictions on the use of real property of any other governmental authority) limiting or controlling the nature, type or size of any exterior advertising, including without limitation for three exterior marquees and exterior advertising panels as contemplated by Annex 2 to the Amended Lease, respecting the Facilities and the Convention Center, and such agreement shall have been duly executed and delivered, or appropriate governmental action shall have been duly taken, and to the extent required by the terms thereof performed through March 10, 1995, by the parties thereto, or required thereby, and shall be effective in accordance with its terms and conditions.

6.1.8   <u>City Vending Variance</u>.  The RAMS and CVC, on the one hand, and the City, on the other, shall have reached an agreement, or appropriate governmental action shall have been taken, acceptable to the RAMS in the reasonable good faith exercise of its discretion, respecting a variance or exemption from any applicable City codes, ordinances or regulations (including zoning or similar regulations, conditions and restrictions on the use of real property), limiting or controlling the nature, type or size of any outside vending or concessions in the immediate vicinity of the Facilities by the RAMS, the CVC, or the licensees or concessionaires of either of them, and such agreement shall have been duly executed and delivered, and to the extent required by the terms thereof performed through March 10, 1995, by the parties thereto, and shall be effective in accordance with its terms and conditions.

6.1.9   <u>The CVC's Promotion Commitment.</u>  The RAMS and the CVC shall have reached an agreement acceptable to the RAMS in the reasonable good faith exercise of its discretion, respecting promotion of NFL Games in the Facilities, and such agreement shall have been duly executed and delivered, and to the extent required by the terms thereof performed through March 10, 1995, by the parties thereto, and shall be effective in accordance with its terms and conditions.

6.1.10 <u>Box Suites and Club Seat Program</u>.  Box Suite Lease Agreements in the form previously approved by the RAMS for the sideline box suites available for lease to the public (estimated at 93 to 95 box suites) and Club Seat Lease Agreements in the form previously approved by the RAMS for 6,200 club seats as contemplated by the Joint Marketing Agreement (Box Suites and Club Seats), shall have been duly executed and delivered, and to the extent required by the terms thereof performed through March 10, 1995, by the parties thereto, and shall be effective in accordance with their respective terms and conditions.

6.1.11 <u>Box Suites and Club Seat Busch Stadium Acknowledgements</u>.  FANS shall have delivered to the RAMS acknowledgements from substantially all (95% or more) of the persons entering into the Box Suite Lease Agreements and Club Seat Lease Agreements contemplated by Section 6.1.10 that there will be no abatement or reduction of the rental fees under such agreements on account of the playing of NFL Games at Busch Stadium during the 1995 NFL football season.

6.1.12 <u>Accuracy of St. Louis Parties' Representations and Performance of Obligations</u>.

(a)  All representations and warranties made by any of the St. Louis Parties in this Relocation Agreement, or any agreement, certificate or instrument to be executed by any of the St. Louis Parties pursuant hereto, concurrently herewith or as a condition of the Closing, shall be true and correct in all material respects on and as of March 10, 1995, as if made at that time.

(b)  The St. Louis Parties shall have performed or complied in all material respects with all covenants and conditions contained in this Relocation Agreement, or any agreement, certificate or instrument to be executed by any of the St. Louis Parties pursuant hereto, concurrently herewith or as a condition of the Closing, required to be performed or complied with by any of the St. Louis Parties at or prior to March 10, 1995.

(c)  On March 10, 1995, each St. Louis Party shall deliver to the RAMS a certificate to the foregoing effect of the president (or chairman) or any vice president (or vice chairman) and secretary or any assistant secretary of each of the St. Louis Parties as to each such party.

6.1.13 <u>St. Louis Parties' Deliveries</u>.  FANS shall have delivered, or shall have caused each of the respective St. Louis Parties to have delivered, to the RAMS at or prior to March 10, 1995, the following:

(a)  a certified copy of the resolutions duly adopted by the governing boards of each of the St. Louis

HYMA0A74.WP 55902 1/16/95   4:06pm

Parties, or an appropriate committee thereof, authorizing this Relocation Agreement and the other agreements and instruments contemplated hereby or as a condition of the Closing and the transactions contemplated hereby and thereby;

(b)  the Articles of Incorporation or Charter Documents, certified by the respective Secretary of State, and a good standing certificate from such Secretary of State, dated as of a date not more than thirty (30) days' prior to March 10, 1995, for each of the St. Louis Parties that is a corporation;

(c)  the By-laws of each of the St. Louis Parties that is a corporation, certified as of the Closing Date by a secretary or assistant secretary of such corporation;

(d)  one or more certificates of the City's Clerk of the Board of Aldermen as to the due adoption of the City ordinance or ordinances, (i) authorizing the City consents to the Assignment, Non-Disturbance Agreement, Amended Lease and the Annexes to the Amended Lease, (ii) relative to the Training Facility, and (iii) pertaining to the subjects of sections 6.1.6 and 6.1.8 hereof, in each case reasonably satisfactory to the RAMS;

(e)  one or more certificates of the City's Register as to the effective date or dates of the ordinance or ordinances referenced in subparagraph (d), above, and that such ordinances are in full force and effect as of the date of Closing; (ii) a certificate of the City Register as to the incumbency of any officer of the City executing or signing any document called for by this Relocation Agreement to be executed on behalf of the City;

(f)  one or more certificates of the Administrative Director of the County Council (the "Administrative Director") as to the due adoption of the County ordinance or ordinances, authorizing the County consents to the Assignment, Non-Disturbance Agreement, Amended Lease and the Annexes to the Amended Lease, in each case reasonably satisfactory to the RAMS;

(g)  one or more certificates of the Administrative Director as to the effective date or dates of the ordinance or ordinances referenced in subparagraph (f), above, and that such ordinances are in full force and effect as of the date of Closing; (ii) a certificate of the Administrative Director as to the incumbency of any officer of the County executing or signing any document called for by this Relocation Agreement to be executed on behalf of the County;

(h)   a certificate of an officer of each of the St. Louis Parties in form customary for transactions of the type contemplated by this Relocation Agreement and in form reasonably acceptable to the RAMS as the RAMS shall reasonably request;

(i)   representations of counsel for the St. Louis Parties, addressed to the RAMS and dated as of March 10, that they have no reason to believe that such counsel will not be in a position to deliver opinions in forms customary for transactions of the type contemplated by this Relocation Agreement and in forms reasonably acceptable to the RAMS; and

(j)   such other documents, instruments or certificates in form customary for transactions of the type contemplated by this Relocation Agreement and in form reasonably acceptable to the RAMS as shall be reasonably requested by the RAMS or its counsel on or prior to March 10, 1995.

6.2   <u>Termination of the Agreement</u>.  Failure of the St. Louis Parties to satisfy any of the conditions enumerated in this Article 6 on or before March 10, 1995, shall give the RAMS the right by notice to FANS on behalf of the St. Louis Parties on or before March 31, 1995, to terminate this Relocation Agreement.  Termination of this Relocation Agreement shall constitute a termination without further obligation of each and every other agreement or instrument contemplated by this Relocation Agreement, including without limitation the Collateral Agreements.

<u>ARTICLE 7</u>

<u>CLOSING</u>

7.1   <u>General Conditions</u>.  The obligations of the parties to effect the closing of the transactions contemplated by this Relocation Agreement (the "Closing") on the date herein provided (the "Closing Date") shall be subject to the following conditions unless waived in writing by all parties:

7.1.1   <u>No Law or Orders</u>.  No law or order shall have been enacted, entered, issued or promulgated by any court, regulatory body or other governmental entity (and be in effect) which prohibits or materially restricts or conditions the relocation of the RAMS' NFL Franchise to St. Louis.

7.2   <u>Conditions Precedent to the Obligations of RAMS</u>. The obligation of the RAMS to effect the Closing pursuant to this Relocation Agreement shall be subject to the satisfaction on or prior to the Closing of each of the following conditions precedent, any of which may be waived by the RAMS:

HYMA0A74.WP 55902 1/16/95   4:06pm

7.2.1  <u>Convention Center or Facilities Adverse Changes</u>.  There shall not have occurred after the date hereof any material adverse change to, or in the condition of, either of the Convention Center or the Facilities or any of CVC, FANS, SLNFL or CIVIC.

7.2.2  <u>PSL Program</u>.  Pursuant to the PSL Program contemplated by the PSL Master Agreement, (i) PSL Patron Regular Agreements, (ii) PSL Patron Convertible Agreements and (iii) Charter Club Memberships in the respective forms previously approved by the RAMS shall have been duly executed and delivered, and to the extent required by the terms thereof performed through such date, by the parties thereto, and shall be effective in accordance with their respective terms and conditions, in the numbers and for the sections of the Facilities described on Schedule 7.2.2.

7.2.3  <u>Effectiveness of Collateral Agreements</u>.  Each of the following Collateral Agreements shall have been duly executed and delivered and consented to, as therein provided, and to the extent required by the terms thereof performed through the Closing Date, by the parties thereto, and shall be effective in accordance with their terms and conditions:

(a)  the Amended Lease and each of the Annexes thereto;

(b)  the Assignment (and Consents thereto);

(c)  the Master Parking Provider Agreement (with respect to not less than 17,000 parking spaces);

(d)  the Training Facility Lease;

(e)  the Temporary Training Facility Lease;

(f)  the PSL-Master Agreement;

(g)  the Non-Disturbance Agreement;

(h)  the Hold Harmless Agreement;

(i)  the Agreement Re Minimum Return (Box Suites and Club Seats);

(j)  the Joint Marketing Agreement (Box Suites and Club Seats);

(k)  the Busch Lease;

(l)  the RAMS Store Lease;

    (m)   the Mutual Litigation Management and Joint Defense Agreement; and

    (n)   the Sanwa Consent.

7.2.4  <u>City Property Tax</u>.  The letters of the City Assessor and the City Counselor dated January 6, 1995, respecting any taxation of the Amended Lease shall not have been modified.

7.2.5  <u>County Property Tax</u>.  The letter of the County Counselor dated January 12, 1995, respecting Assessment of leasehold interest in publicly owned property respecting the Amended Lease shall not have been modified.

7.2.6  <u>City Signage Authorization</u>.  The RAMS and CVC, on the one hand, and the City, on the other, shall have reached an agreement, or appropriate governmental action shall have been taken, acceptable to the RAMS in the reasonable good faith exercise of its discretion, respecting a variance or exemption from any applicable City codes, ordinances or regulations (including zoning or similar regulations, conditions and restrictions on the use of real property) limiting or controlling the nature, type or size of any exterior advertising, including without limitation for three exterior marquees, respecting the Facilities and the Convention Center, and such agreement shall have been duly executed and delivered, and to the extent required by the terms thereof performed through the Closing Date, by the parties thereto, and shall be effective in accordance with its terms and conditions.

7.2.7  <u>Governmental Advertising Permit or Variance</u>. The CVC shall have obtained (a) a permit, acceptable to the RAMS in the reasonable exercise of its discretion, respecting a use under the Missouri Outdoor Advertising Act, § 226.500 <u>et. seq.</u>  Mo. Rev. Stat. (1993 Supp.) and/or (b) an agreement or other appropriate governmental action shall have been taken acceptable to the RAMS in the reasonable good faith exercise of its discretion, respecting a variance or exemption from any other State or Federal statutes, codes, regulations, ordinances or zoning regulations (or similar regulations, conditions and restrictions on the use of real property of any other governmental authority) limiting or controlling the nature, type or size of any exterior advertising, including without limitation for three exterior marquees and exterior advertising panels as contemplated by Annex 2 to the Amended Lease, respecting the Facilities and the Convention Center, and such agreement shall have been duly executed and delivered, or appropriate governmental action shall have been duly taken, and to the extent required by the terms thereof performed through the Closing Date, by the parties thereto, or required thereby, and shall be effective in accordance with its terms and conditions.

HYMA0A74.WP 55902 1/16/95   4:06pm

7.2.8  <u>City Vending Variance</u>.  The RAMS and CVC, on the one hand, and the City, on the other, shall have reached an agreement, or appropriate governmental action shall have been taken, acceptable to the RAMS in the reasonable good faith exercise of its discretion, respecting a variance or exemption from any applicable City codes, ordinances or regulations (including zoning or similar regulations, conditions and restrictions on the use of real property), limiting or controlling the nature, type or size of any outside vending or concessions in the immediate vicinity of the Facilities by the RAMS, the CVC, or the licensees or concessionaires of either of them, and such agreement shall have been duly executed and delivered, and to the extent required by the terms thereof performed through the Closing Date, by the parties thereto, and shall be effective in accordance with its terms and conditions.

7.2.9  <u>The CVC's Promotion Commitment.</u>  The RAMS and the CVC shall have reached an agreement acceptable to the RAMS in the reasonable good faith exercise of its discretion, respecting promotion of NFL Games in the Facilities, and such agreement shall have been duly executed and delivered, and to the extent required by the terms thereof performed through the Closing Date, by the parties thereto, and shall be effective in accordance with its terms and conditions.

7.2.10  <u>Box Suites and Club Seat Program</u>.  Box Suite Lease Agreements in the form previously approved by the RAMS for the sideline box suites available for lease to the public (estimated at 93 to 95 box suites) and Club Seat Lease Agreements in the form previously approved by the RAMS for 6,200 club seats as contemplated by the Joint Marketing Agreement (Box Suites and Club Seats), shall have been duly executed and delivered, and to the extent required by the terms thereof performed through the Closing Date, by the parties thereto, and shall be effective in accordance with their respective terms and conditions.

7.2.11  <u>Box Suites and Club Seat Busch Stadium Acknowledgements</u>.  FANS shall have delivered to the RAMS acknowledgements from substantially all (95% or more) of the persons entering into the Box Suite Lease Agreements and Club Seat Lease Agreements contemplated by Section 7.2.10 that there will be no abatement or reduction of the rental fees under such agreements on account of the playing of NFL Games at Busch Stadium during the 1995 NFL football season.

7.2.12  <u>Anaheim Exhibition Agreement Defeasance</u>. Arrangements satisfactory to the RAMS as more particularly set forth in Section 26 of the Amended Lease shall have been made to defease the obligation of the RAMS to make a lump sum payment in the amount of the unpaid principal indebtedness under the 1979 Stadium Expansion Bonds (or any refunding thereof) and all accrued but then unpaid interest thereon

under Section 29(a) of the Fourth Amendment to Exhibition Agreement dated November 21, 1978, as amended by the Fifth Amendment to Exhibition Agreement, shall have been taken on or before June 30, 1995, including without limitation the posting by CVC of an irrevocable standby letter of credit in the form of Attachment "2" to such Fourth Amendment.

7.2.13  <u>PSL Payments to CVC</u>.  The NFL shall have acknowledged to the RAMS that the amounts received by FANS on behalf of the CVC in respect of the PSL Program are not revenues subject to revenue sharing with the visiting club playing an NFL Game under Article XIX of the NFL Constitution and Bylaws.

7.2.14  <u>Settlement Amount</u>.  Arrangements satisfactory to the RAMS in the reasonable good faith exercise of its discretion for the payment of the Settlement Amount shall have been made as contemplated by that certain Mutual Litigation Management and Defense Agreement.

7.2.15  <u>H-S-R</u>.  Any applicable waiting period under the Hart-Scott-Rodino Act shall have expired or have been terminated with respect to the sale and transfer of an undivided interest in the RAMS and the formation of a partnership with the purchaser for the operation of the RAMS NFL Franchise.

7.2.16  <u>Accuracy of St. Louis Parties' Representations and Performance of Obligations</u>.

(a)  All representations and warranties made by any of the St. Louis Parties in this Relocation Agreement, or any agreement, certificate or instrument to be executed by any of the St. Louis Parties pursuant hereto, concurrently herewith or as a condition of the Closing, shall be true and correct in all material respects on and as of the Closing Date as if made at that time.

(b)  The St. Louis Parties shall have performed or complied in all material respects with all covenants and conditions contained in this Relocation Agreement, or any agreement, certificate or instrument to be executed by any of the St. Louis Parties pursuant hereto, concurrently herewith or as a condition of the Closing, required to be performed or complied with by any of the St. Louis Parties at or prior to the Closing.

(c)  At the Closing, each St. Louis Party shall deliver to the RAMS a certificate to the foregoing effect of the president (or chairman) or any vice president (or vice chairman) and secretary or any assistant secretary of each of the St. Louis Parties as to each such party.

7.2.17  <u>St. Louis Parties' Deliveries</u>.  FANS shall have delivered, or shall have caused each of the respective St. Louis Parties to have delivered, to the RAMS at or prior to the Closing the following:

(a)  the Relocation Payment (which the parties acknowledge may have been paid previously in accordance with Section 4.3.4(a) in the event of a Disapproved Application);

(b)  a Certificate of Insurance evidencing that the insurance required by the Amended Lease is in effect and that the RAMS have been named as additional insureds in respect of such insurance;

(c)  a certified copy of the resolutions duly adopted by the governing boards of each of the St. Louis Parties, or an appropriate committee thereof, authorizing this Relocation Agreement and the other agreements and instruments contemplated hereby or as a condition of the Closing and the transactions contemplated hereby and thereby;

(d)  the Articles of Incorporation or Charter Documents, certified by the respective Secretary of State, and a good standing certificate from such Secretary of State, dated as of a date not more than thirty (30) days' prior to the Closing Date for each of the St. Louis Parties that is a corporation;

(e)  the By-laws of each of the St. Louis Parties that is a corporation, certified as of the Closing Date by a secretary or assistant secretary of such corporation;

(f)  one or more certificates of the City's Clerk of the Board of Aldermen as to the due adoption of the City ordinance or ordinances, (i) authorizing the City consents to the Assignment, Non-Disturbance Agreement, Amended Lease and the Annexes to the Amended Lease, (ii) relative to the Training Facility, and (iii) pertaining to the subjects of sections 7.2.6 and 7.2.8 hereof, in each case reasonably satisfactory to the RAMS;

(g)  one or more certificates of the City's Register as to the effective date or dates of the ordinance or ordinances referenced in subparagraph (f), above, and that such ordinances are in full force and effect as of the date of Closing; (ii) a certificate of the City Register as to the incumbency of any officer of the City executing or signing any document called for by this Relocation Agreement to be executed on behalf of the City;

(h)  one or more certificates of the Administrative Director as to the due adoption of the County ordinance or ordinances, authorizing the County consents to the Assignment, Non-Disturbance Agreement, Amended Lease and

the Annexes to the Amended Lease, in each case reasonably satisfactory to the RAMS;

(i) one or more certificates of the Administrative Director as to the effective date or dates of the ordinance or ordinances referenced in subparagraph (h), above, and that such ordinances are in full force and effect as of the date of Closing; a certificate of the Administrative Director as to the incumbency of any officer of the County executing or signing any document called for by this Relocation Agreement to be executed on behalf of the County;

(j) a certificate of an officer of each of the St. Louis Parties in form customary for transactions of the type contemplated by this Relocation Agreement and in form reasonably acceptable to the RAMS as the RAMS shall reasonably request;

(k) opinions of counsel for the St. Louis Parties, addressed to the RAMS and dated as of the Closing Date, in forms customary for transactions of the type contemplated by this Relocation Agreement and in forms reasonably acceptable to the RAMS; and

(l) such other documents, instruments or certificates in form customary for transactions of the type contemplated by this Relocation Agreement and in form reasonably acceptable to the RAMS as shall be reasonably requested by the RAMS or its counsel.

7.2.18 <u>Title Insurance</u>. A policy of title insurance insuring the RAMS' interest in the Amended Lease reasonably acceptable to the RAMS shall be issuable at the RAMS cost.

7.3 <u>Conditions Precedent to Obligations of St. Louis Parties</u>. The obligations of the St. Louis Parties to Close pursuant to this Relocation Agreement shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions precedent, any of which may be waived by FANS:

7.3.1   <u>Convention Center or Facilities Adverse Changes</u>.  There shall not have occurred after the date hereof any material adverse change to, or in the condition of, either of the Convention Center or the Facilities caused by any of the St. Louis Parties, or of the RAMS, or of an Act of God.

7.3.2   <u>PSL Program</u>.  Pursuant to the PSL Program contemplated by the PSL Master Agreement, (i) PSL Patron Regular Agreements, (ii) PSL Patron Convertible Agreements and (iii) Charter Club Memberships in the respective forms previously approved by the RAMS shall have been duly executed and delivered, and to the extent required by the terms thereof performed through such date, by the parties thereto, and shall be effective in accordance with their respective terms and conditions, in the numbers and for the sections of the Facilities described on Schedule 7.3.2.

7.3.3   <u>Accuracy of RAMS's Representations and Performance of Obligations</u>.

(a)   All representations and warranties made by the RAMS in this Relocation Agreement, or any agreement, certificate or instrument to be executed by the RAMS pursuant hereto shall be true and correct in all material respects on and as of the Closing Date as if made at that time, except that conditions respecting NFL Policies shall be waived by the RAMS after an Approved Application.

(b)   The RAMS shall have performed or complied in all material respects with all covenants and conditions contained in this the Relocation Agreement or any agreement, certificate or instrument to be executed by the RAMS pursuant hereto, concurrently herewith or as a condition of the Closing, required to be performed or complied with by the RAMS either at or prior to the Closing.

(c)   At the Closing, the RAMS shall deliver to the St. Louis Parties a certificate to the foregoing effect of the president or any vice president and secretary or any assistant secretary of RAMS.

7.3.4   <u>RAMS' Deliveries</u>.  The RAMS shall have delivered to FANS at or prior to the Closing the following:

(a)   a certified copy of the resolutions duly adopted by the board of directors of the RAMS, or an appropriate committee thereof, authorizing this Relocation Agreement and the other agreements and instruments contemplated hereby, concurrently herewith or as a condition of the Closing, and the transactions contemplated hereby and thereby;

(b)   the Certificate of Incorporation, certified by the Delaware Secretary of State, and a good

HYMA0A74.WP 55902 1/16/95   4:06pm

standing certificate from such Secretary of State, dated as of a date not more than thirty (30) days' prior to the Closing Date for the RAMS;

     (c)   the By-laws of the RAMS, certified as of the Closing Date by a secretary or assistant secretary of such corporation;

     (d)   a certificate of an officer of the RAMS in form customary for transactions of the type contemplated by this Relocation Agreement and in form reasonably acceptable to FANS as shall be reasonably requested by the FANS;

     (e)   an opinion of counsel for the RAMS addressed to FANS, CVC and the Authority, and dated as of the Closing Date, in form customary for transactions of the type contemplated by this Relocation Agreement and in form reasonably acceptable to FANS; and

     (f)   such other documents, instruments or certificates in form customary for transactions of the type contemplated by this Relocation Agreement and in form reasonably acceptable to FANS as shall be reasonably requested by FANS or its counsel.

## ARTICLE 8

### MISCELLANEOUS PROVISIONS.

8.1   <u>Preclosing Contacts</u>.   The parties acknowledge that the relocation of the RAMS NFL Franchise is a matter of significant public interest in St. Louis, in other cities and localities and in Southern California.   None of the parties to this Relocation Agreement, or any person acting on behalf of any such party, shall initiate any material substantive discussions with any person respecting (i) the relocation of any NFL Franchise other than the NFL Franchise of the RAMS to St. Louis or (ii) the relocation of the RAMS NFL Franchise to any city or locality outside the RAMS' home territory, as defined in the NFL Constitution and Bylaws, other than St. Louis.

8.2   <u>Further Assurances</u>.   If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Relocation Agreement, the parties hereto shall take or cause to be taken all such necessary action, including, without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by another party for such purposes or otherwise to consummate and make effective the transactions contemplated hereby.

8.3   <u>Expenses</u>.  Each party shall pay all of its costs and expenses (including, without limitation, attorneys', accountants' and consultants' fees) incurred in connection with this Relocation Agreement and the transactions contemplated hereby.

8.4   <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed given upon receipt if delivered personally or sent by facsimile transmission (receipt of which is confirmed) or by courier service promising overnight delivery (with delivery confirmed the next day) or three (3) Business Days after deposit in the U.S. Mails, first class postage prepaid.  Notices shall be addressed as follows:

To the RAMS:        Mr. John J. Shaw
                    President
                    LOS ANGELES RAMS
                    10271 West Pico Blvd.
                    Los Angeles, CA  90064
                    Facsimile:  (310) 277-4341


With a copy to:     Irell & Manella
                    1800 Avenue of the Stars, Suite 900
                    Los Angeles, California 90067
                    Attention:  Milton B. Hyman, Esq.
                    Facsimile:  (310) 203-7199


To the St. Louis Parties:

                    Fans, Inc.
                    c/o Riezman & Blitz, P.C.
                    Attn:  Richard M. Riezman, Esq.
                    120 South Central, 10th Floor
                    St. Louis, Missouri 63105
                    Facsimile:  (314) 727-6458

                    St. Louis NFL Corporatión
                    c/o Riezman & Blitz, P.C.
                    Attn:  Richard M. Riezman, Esq.
                    120 South Central, 10th Floor
                    St. Louis, Missouri 63105
                    Facsimile:  (314) 727-6458

                    St. Louis Convention and Visitors
                    Commission
                    10 South Broadway
                    St. Louis, Missouri  63102
                    Attn:  President
                    Facsimile:  (314) _____

HYMA0A74.WP 55902 1/16/95   4:06pm

Regional Convention and Sports
Complex Authority
c/o Mr. Robert J. Baer, Chairman
814 North Broadway, Room 100
St. Louis, Missouri 63102
Facsimile:  (314) 231-2284

with copies to their counsel at the addresses that are
hereinafter provided to each of the parties to this
Relocation Agreement.

With a copy to:       Riezman & Blitz
                      120 South Central Avenue
                      St. Louis, Missouri 63105
                      Attention:  Richard M. Riezman, Esq.
                      Facsimile:  (314) 727-6458

any party may from time to time change its address for the
purpose of notices by a similar notice specifying the new
address but no such change shall be effective as against any
person until such person shall have actually received it.

   8.5  <u>Entire Agreement</u>.  This Relocation Agreement
(including the Schedules and Exhibits hereto, and the other
agreements and instruments referenced herein) contains the
entire agreement between the parties with respect to the
transactions contemplated hereby and supersedes all written or
verbal representations, warranties, commitments and other
understandings prior to the date hereof.  No reference shall
be made to any draft of this Relocation Agreement or of any
Schedule or Exhibit hereto for purposes of interpretation or
resolution of ambiguity or otherwise.

   8.6  <u>Counterparts</u>.  This Relocation Agreement may be
executed in one or more counterparts, each of which shall be
deemed an original but all of which together shall constitute
one and the same instrument.

   8.7  <u>Severability</u>.  If any provision hereof shall be held
to be unenforceable or invalid by any court of competent
jurisdiction or as a result of future legislative action, such
holding or action shall be strictly construed and shall not
alter the enforceability, validity or effect of any other
provision hereof.

   8.8  <u>Assignability</u>.  This Relocation Agreement shall be
binding upon and shall inure to the benefit of the successors
and assigns of the parties hereto; <u>provided, however</u>, that
neither this Relocation Agreement nor any right or obligation
hereunder may be assigned by either the RAMS, on the one hand,
or any of the St. Louis Parties, on the other hand, without
the prior written consent of the RAMS or FANS on behalf of the
St. Louis Parties, respectively; <u>provided further, however</u>,
that in connection with respect the sale and transfer of an

HYMA0A74.WP 55902 1/16/95   4:06pm

undivided interest in certain assets of the RAMS and the formation of a partnership with the purchaser for the operation of the RAMS NFL Franchise in which the RAMS will be the managing partner, the RAMS may assign the benefits of this Relocation Agreement to such partnership and the partnership shall assume the obligations of the RAMS under this Relocation Agreement in connection with the transaction.

8.9  <u>Captions and Headings</u>.  The captions and headings used throughout this Relocation Agreement are for convenience of reference only, and the words contained therein shall not be deemed to affect the meaning of any provision or the scope or intent of this Relocation Agreement, nor in any way affect this Relocation Agreement.

8.10  <u>Arbitration</u>.  Any controversy, dispute or claim between or among any of the parties hereto related to this Relocation Agreement, including without limitation, any claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Relocation Agreement shall be settled by arbitration as set forth or as otherwise provided in Section 25 of the Amended Lease.

8.11  <u>Governing Law</u>.  This Relocation Agreement shall be governed by and construed in accordance with the laws of the State of Missouri without regard to any principles of conflict of laws.

8.12  <u>Amendment and Waiver</u>.  This Relocation Agreement may be amended, modified or supplemented only by an instrument in writing signed by the RAMS and by FANS on behalf of the St. Louis Parties.  No waiver by any party of any of the provisions hereof shall be effective unless set forth in writing and executed by the party so waiving.

8.13  <u>Agency of FANS For St. Louis Parties</u>.  Each of the St. Louis Parties hereby appoints FANS as its agent to receive and give notices and to take action under this Relocation Agreement.  The RAMS shall be entitled to receive and rely on any such notice from, or action taken by, FANS and may treat any notice given by the RAMS to FANS as given to each and everyone of the St. Louis Parties.

HYMA0A74.WP 55902 1/17/95   8:01am

IN WITNESS WHEREOF, the parties hereto have caused this Relocation Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

           "Authority"
           REGIONAL CONVENTION AND SPORTS
           COMPLEX AUTHORITY

           By:_____

           "CVC"
           REGIONAL CONVENTION AND VISITORS
           COMMISSION

           By:_____

           "FANS"
           FANS, INC.

           By:_____

           "SLNFL"
           ST. LOUIS NFL CORPORATION

           By:_____

           "RAMS"
           THE LOS ANGELES RAMS FOOTBALL
           COMPANY, INC.

           By:_____

"RAMS"
THE LOS ANGELES RAMS FOOTBALL
COMPANY, INC.

By: _____

IN WITNESS WHEREOF, the parties hereto have caused this Relocation Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

"Authority"
REGIONAL CONVENTION AND SPORTS
COMPLEX AUTHORITY

By: _Robert J Baer_____

"CVC"
REGIONAL CONVENTION AND VISITORS
COMMISSION

By:_____

"FANS"
FANS, INC.

By:_____

"SLNFL"
ST. LOUIS NFL CORPORATION

By:_____

HYMA0A74.WP 55902 1/16/95   4:06pm

33

IN WITNESS WHEREOF, the parties hereto have caused this Relocation Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

"Authority"
REGIONAL CONVENTION AND SPORTS
COMPLEX AUTHORITY

By: _____

"CVC"
REGIONAL CONVENTION AND VISITORS
COMMISSION

By: _____

"FANS"
FANS, INC.

By: _____

"SLNFL"
ST. LOUIS NFL CORPORATION

By: _____

"RAMS"
THE LOS ANGELES RAMS FOOTBALL
COMPANY, INC.

By: _____

HYMA0A74.WP