# EXHIBIT 2

## CHARTER PERSONAL SEAT LICENSE MASTER AGREEMENT

This Charter Personal Seat License ("CPSL") Master Agreement (the "Agreement") is entered into as of this 17th day of January, 1995 by and among THE LOS ANGELES RAMS FOOTBALL COMPANY, INC., a corporation organized and existing under the laws of the State of Delaware ("RAMS"), FANS, INC., a non-profit corporation organized and existing under the laws of the State of Missouri ("FANS") and the Regional Convention and Visitors Commission, a/k/a St. Louis Convention and Visitors Commission, a public body corporate and politic of the State of Missouri ("CVC").

### RECITALS

WHEREAS, in that certain Amended and Restated St. Louis NFL Lease of even date (the "Amended Lease"), CVC has retained its rights to sell and retain the license fee from its sale prior to September 1, 1995 of the initial CPSL (the "Initial CPSL") on each of the seats in the Facilities and from the initial Charter Club Membership (the "Initial Club Membership") for the club seats in Level 400 in the Facilities (the "Club Seats") (other than (i) seats relative to the box suites in the Facilities (the "Box Suites"), (ii) seats for the physically challenged, (iii) such other seats as are described on Schedule B hereto (collectively, "Excluded Seats") and (iv) those seats retained by the RAMS as designated on Schedule B-1 hereto ("RAMS Reserved Seats"));

WHEREAS, the sale of CPSLs will demonstrate fan interest in NFL football games in St. Louis and increase the sale by the RAMS of season tickets to RAMS Games (as defined below);

WHEREAS, in connection with such CPSL sales, CVC will use the marketing and other efforts of FANS and require certain cooperation and agreements from the RAMS to meet its obligations to the purchasers of CPSLs (and any person or entity to whom such purchaser transfers its CPSL to the extent permitted in accordance with the terms and conditions under the applicable CPSL Agreement) (individually a "Licensee" and together the "Licensees"); and

WHEREAS, in connection with sales of Initial CPSLs one or more "Qualifying Lenders" (as defined below") may loan to licensees all or part of the purchase price of the Initial CPSLs;

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the RAMS, FANS and CVC each hereby agree as follows:

FRKL03A1.WP 55892 1/16/95   5:44pm

1.   <u>OBLIGATIONS OF RAMS</u>

1.1   During the term of this Agreement, and subject to the terms and conditions of this Agreement as are more fully set forth below, the RAMS will offer each Licensee for each CPSL purchased the opportunity to purchase from the RAMS a ticket on a season-by season basis to all, but not less than all, pre-season, regular season and post-season home games (other than the NFL's Super Bowl or Pro Bowl) (the "Season Ticket(s)") played by the NFL Franchise at the Facilities ("RAMS Games"). Each Licensee will be required to purchase Season Ticket(s) for each of the RAMS Games, excluding post-season RAMS Games, for each NFL season at one time and in one block at least five (5) months prior to the first game of the applicable NFL season (including pre-season games), at the time of acquisition of the CPSL, or within 30 days after billing from the RAMS, whichever is later. Each and every other term and condition upon which the RAMS will offer a Licensee the opportunity set forth in this Section 1.1, including without limitation the price of Season Ticket(s) and other charges, the timing of payment therefor and the conduct required of the Licensee at the Facilities, is to be established from time to time by the RAMS in its sole and absolute discretion, unless otherwise expressly set forth herein. Once the RAMS obligation to offer the Season Ticket(s) terminates with respect to a CPSL, the RAMS shall not have any further obligation to offer Season Ticket(s) with respect to such CPSL and may offer tickets (season or otherwise) with respect to the applicable seat to whomever the RAMS chooses.

1.2   The RAMS will use its reasonable efforts to offer a Season Ticket(s) to the License of the CPSL in the location set forth in the CPSL Agreement entered into by the Licensee, FANS and CVC (the "License Agreement"). The Season Ticket(s) price for each RAMS Game, excluding post-season RAMS Games, for the 1995-1996 NFL season shall be as set forth on Schedule A attached hereto.

1.3   (a) It is expressly understood and agreed that in the event any Licensee does not (i) purchase the Season Ticket(s) to each and every RAMS Game in the blocks and at the times such tickets are offered to the Licensee by the RAMS and (ii) abide by all of the terms and conditions applicable to (w) any applicable Club Seat Lease Agreement (but only with respect to those Licensees who acquire Charter Club Memberships), (x) purchasing Season Ticket(s) to RAMS Games, including without limitation the timing of payment therefor, (y) attending RAMS Games and other events at the Facilities, or (z) using any of the facilities at the Facilities, the RAMS shall no longer be obligated to offer such Licensee the opportunity to purchase the Season Ticket(s) nor to honor the Season Ticket(s) in such Licensee's possession. In case a Section 1.3(y) or (z) event, but not a Section 1.3(x) event,

occurs with respect to a Licensee, the RAMS obligation to offer Season Ticket(s) on such CPSL shall continue only if such Licensee completely transfers its CPSL to an unaffiliated third party within 60 days.

(b)   In the event the RAMS intends to exercise its rights under Section 1.3.(a) hereof, the RAMS shall notify, in writing, FANS, CVC and the Qualifying Lender.  The Qualifying Lender shall have ten (10) business days following the date of the notice to pay to the RAMS an amount of money equal to the price of the Season Ticket(s) and other charges due from the Licensee (including without limitation costs and reasonable attorney's fees), cure for its own account any breach by or damage caused by the Licensee, and pay the RAMS a $25 transfer fee per License (and no transfer fee on the subsequent transfer of the License by the Qualifying Lender).  If the Qualifying Lender timely pays the RAMS all such amounts, the RAMS agree to treat the Qualifying Lender as a Licensee under the original CPSL Agreement in good standing subject to the terms and conditions of the original CPSL Agreement.  The term "Qualifying Lender" means (i) a single third-party commercial lender, or (ii) an individual Licensee's employer or an affiliate of such employer, which loaned the applicable Licensee part or all of the purchase price of the CPSL in connection with Licensee's purchase of the CPSL and which has notified the RAMS in writing of same within thirty (30) days of the Licensee's purchase of the CPSL, or pledge of the CPSL to the Qualifying Lender, whichever is later.

1.4   Except as hereinafter provided, the RAMS shall not sell any ticket on a full season basis (which means, for purposes of this Agreement, more than four regular season RAMS Games in an NFL season) to RAMS Games (other than tickets on an Excluded Seat or a RAMS Reserved Seat) without the imposition of a personal seat license fee, until such time as a personal seat license fee has at one time been paid to FANS, CVC or the RAMS relative to such seat.  It is expressly understood and agreed that the terms and conditions applicable to seat licenses sold after September 1, 1995, including without limitations the price of the personal seat license fee, are to be established from time to time by the RAMS in its sole and absolute discretion; provided, however, that the stated term of any personal seat license sold by the RAMS must be at least five years (or three years with respect to any Club Seat).

1.5   Notwithstanding anything in Section 1.4 above to the contrary, the RAMS may sell tickets to any seat without the imposition of a personal seat license fee (i) in any particular section (as listed in Schedule A) from and after the time that more than 50% of the CPSLs that were sold as of September 1, 1995 in such section have not had the Licensee thereof continue without fail to purchase the Season Ticket(s) to every RAMS Game in accordance with the terms and conditions

described or referenced in Section 1.1 and 1.3 above, and (ii) at any time and in any event, so long as the RAMS do not contractually agree with the purchaser of such ticket(s) to sell the purchaser tickets for the applicable seat for more than four (4) RAMS Games at a time. The RAMS may not knowingly engage in a scheme for the purpose of selling such a purchaser a full season without technically violating the four games at a time proscription.

1.6   Notwithstanding FANS' and CVC's right to sell CPSL's up to and including September 1, 1995, the RAMS have the right, by giving written notice to FANS and CVC, to sell tickets to RAMS Games for seats relative to all unsold CPSLs, beginning on July 1, 1995. Rights associated with CPSLs sold after July 1, 1995 shall be subject to the possible sale of tickets for some or all RAMS Games for the 1995 season pursuant to the preceding sentence, but not as Season Ticket(s) or on a full season basis.

1.7   The RAMS shall cooperate with FANS and CVC in the allocation (and location) of the Season Ticket(s) to Licensees for RAMS Games played at Busch Stadium and at any other temporary site for RAMS Games in Missouri due to the temporary unavailability of the Facilities.

1.8   The RAMS shall assist FANS and CVC in the marketing efforts by FANS and CVC of CPSLs prior to September 1, 1995, by using its reasonable efforts to provide for a limited number of personal appearances by officers and football players of the RAMS. The RAMS shall further assist the marketing efforts of FANS and CVC by using its reasonable efforts to loan FANS, until September 1, 1995, following FANS written request, a limited amount of RAMS football gear, novelties and other similar items bearing the RAMS logo or otherwise associated with or utilized by RAMS personnel.

1.9   The RAMS shall not charge a Licensee more for tickets to any RAMS Game than the RAMS charge a non-Licensee for a ticket in a substantially similar location to such RAMS Game. This does not preclude the RAMS from issuing tickets on a complimentary basis.

1.10  The RAMS shall honor all transfers permitted under the applicable CPSL Agreement so long as the terms and conditions of such transfers (including without limitation payment of the transfer fee) are met.

1.11  Provided that (i) the Qualifying Lender delivers to the RAMS, at the time of the notice set forth in Section 1.3 above, a letter from the Licensee providing that the Licensee has granted a security interest in its CPSL to the Qualifying Lender, directing the RAMS to rely on any letter from the Qualifying Lender with respect to the CPSL and the Season Ticket(s), absolving the RAMS from any action the RAMS takes

on any request by the Qualifying Lender and agreeing to hold the RAMS harmless from relying on any notice from the Qualifying Lender; (ii) the Qualifying Lender gives the RAMS written notice that the Licensee is in default on paying its CPSL loan from Qualifying Lender and Qualifying Lender signs an indemnity and hold harmless agreement (the "Indemnity Agreement") in favor of the RAMS in a form satisfactory to the RAMS agreeing to indemnify the RAMS against all liability and expenses, including attorney's fees, that the RAMS may incur as a result of the failure to deliver the Season Ticket(s) to the Licensee; and (iii) the Qualifying Lender agrees to purchase the Season Ticket(s) for the applicable seat(s) for the upcoming season; then, the RAMS will not deliver the Season Ticket(s) to the Licensee.  The RAMS are not required to hold a Licensee's Season Ticket(s) unless the loan default notice and signed Indemnity Agreement from the Qualifying Lender are received by the RAMS at least ten (10) business days prior to the date on which the Season Ticket(s) would otherwise be delivered to the Licensee.

2.   OBLIGATIONS OF FANS AND CVC

2.1  FANS agrees to use its best efforts, until September 1, 1995, to sell a CPSL for every seat in the Facilities except the Excluded Seats and the RAMS Reserved Seats which are excluded from the CPSL program.

2.2  Neither FANS nor CVC shall sell or otherwise convey, or allow any officer, director, employee, agent or representative of either to sell or otherwise convey, any CPSL other than by execution of the form of CPSL Agreement substantially in the form attached hereto as Exhibit A (except as set forth in the next sentence).  Neither FANS nor CVC shall sell or otherwise convey, or allow any officer, director, employee, agent or representative of either to sell or otherwise convey, any CPSL described on Schedule C hereto other than by execution of the form of Convertible CPSL Agreement substantially in the form attached hereto as Exhibit B.  Neither FANS nor CVC shall sell or otherwise convey, or allow any officer, director, employee, agent or representative of either to sell or otherwise convey, any CPSL on Level 400 of the Facilities other than by execution of the form of Club Seat Lease Agreement in the form attached hereto as Exhibit C.

2.3  Neither FANS nor CVC shall make, or allow any officer, director, employee, agent or representative to make, any representation or warranty about the RAMS or the NFL Franchise, except as specifically set forth in the form of Agreements attached as Exhibits A, B and C.

2.4  As a party to the Convertible CPSL Agreements, FANS, upon prior written notice from the RAMS, shall take any and all actions necessary under the Convertible CPSL Agreements to

cause the "conversion" of any and all of those certain convertible CPSLs under the Convertible CPSL Agreements, as and when the RAMS determine.  FANS and CVC each acknowledge and agree that after any such conversion, the RAMS obligations without respect to the offering of Season Ticket(s) relative to the seat referable thereto shall be governed solely by the terms and conditions of the then applicable Club Seat Lease Agreement, if any.

2.5  Neither FANS nor CVC shall, or allow any officer, director, employee, agent or representative of either to, take any action or fail to take any action which would materially detract from the rights or benefits the RAMS are to receive as third-party beneficiaries of each CPSL Agreement.

2.6  FANS and CVC agree to cooperate with the RAMS in the event the RAMS elect to exercise any of its rights as third-party beneficiaries of any of the CPSL Agreements; provided, however that the RAMS shall reimburse FANS and\or CVC for all out-of-pocket expenses reasonably incurred by FANS or CVC in connection with any such election by the RAMS.

2.7  To the extent received, FANS and CVC shall remit to the RAMS any and all transfer fees due after September 1, 1995 under any and all of the CPSL Agreements entered into by any of FANS or CVC.

2.8  FANS and CVC shall promptly forward to the RAMS such information concerning each of the Licensees as the RAMS may reasonably request, including without limitation the names, addresses and telephone numbers of each Licensee and Qualifying Lender, if any, and shall promptly forward a copy of any and all notices received from any Licensee or Qualifying Lender.

2.9  Neither FANS nor CVC shall sell or otherwise convey, or allow any officer, director, employee or agent of FANS or CVC to sell or otherwise convey, any CPSL after September 1, 1995.  It is expressly understood and agreed that, under the Amended Lease, the RAMS has the right to sell all personal seat licenses after September 1, 1995 and to retain all revenues received therefrom.

2.10  FANS and CVC shall cooperate with the RAMS in the allocation (and location) of the Season Ticket(s) to Licensees for RAMS Games at Busch Stadium and at any other temporary site of RAMS Games in Missouri due to the temporary unavailability of the Facilities.

3.  <u>MISCELLANEOUS</u>.

3.1  This Agreement shall terminate on March 31, 2025, unless earlier terminated by the termination of the Amended

FRKL03A1.WP 55892 1/16/95   5:44pm  -6-

Lease. Nothing in this Agreement shall apply to RAMS Games played at a permanent site other than the Facilities.

3.2 In connection with the licensing of CPSLs, CVC, through FANS, will sell "Charter Club Memberships" (but not CPSLs) to certain seats in Level 400 of the Facilities. The purchasers thereof ("Charter Club Members") will be required to execute a Club Seat Lease Agreement with the RAMS which will have a term of three, five or seven years, as specified therein. Each Club Seat Lease Agreement will contain a provision allowing the Charter Club Member to renew his membership on terms and conditions to be specified by the RAMS at its sole discretion. If the Charter Club Member does not timely execute its option (as provided in the Club Seat Lease Agreement), all of the Member's rights under the Charter Club Membership and Club Seat Lease Agreement shall terminate (and the RAMS shall have no obligation to offer such Charter Club Member any Season Ticket(s) and the RAMS is free to lease or license the referable Club Seat and Club Membership as it deems fit). Neither the Charter Club Membership nor the lessee's rights under the Club Seat Lease Agreement will be transferable. In all other respects, the rights and obligations of the parties hereto with respect to CPSLs and Charter Club Memberships are the same.

3.3 All notices, demands and other communications between the parties required or appropriate hereunder shall be in writing and deemed given if sent by facsimile, or if mailed, postage prepaid, to the addresses set forth for the parties in Schedule D, or to such other address as may be designated by a party, from time to time in writing.

3.4 This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri without giving effect to principles of conflicts of laws.

3.5 This Agreement is subject to applicable provisions of the Constitution and Bylaws and rules of the NFL, whether now existing or hereinafter adopted. This Agreement, together with the Schedules and Exhibits attached hereto and the Amended Lease, contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any written instrument or oral agreement previously made or entered into by the parties hereto.

3.6 This Agreement and all the terms and provisions hereof, shall inure to the benefit of and be binding upon the parties hereto, their successors and permitted assigns. The RAMS may assign this Agreement or any of its rights and powers hereunder to the operator of the NFL Franchise without notice, and in such event the assignee shall have the same rights and remedies as well as the obligations as if originally named herein in place of the RAMS. No amendment or modification to

FRKL03A1.WP 55892 1/16/95   5:44pm  -7-

this Agreement shall be effective unless the same is in writing and signed by the party or parties to be charged.

3.7   No failure or delay on the part of any party to the Agreement in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any power, right or privilege preclude any other or further exercise of any such power, right or privilege.  All powers, rights and privileges hereunder are cumulative to, and not exclusive of, any powers, rights or privileges otherwise available.

3.8   In case any provision of this Agreement shall be invalid, illegal or unenforceable, such provisions shall be severable from the rest of this Agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

3.9   Termination of that certain Relocation Agreement of even date or termination of the Amended Lease shall constitute a termination without further obligation of this Agreement.

3.10 Headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

3.11 The Recitals to this Agreement are incorporated into this Agreement by reference.

3.12 There are no third party beneficiaries of this Agreement.

3.13 Any controversy, dispute or claim between or among any of the parties hereto related to this Agreement, including, without limitation, any claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement shall be settled by arbitration under the terms set forth in the Amended Lease.

3.14 The RAMS hereby acknowledges that it has had an opportunity to review certain of the marketing material which has been developed through the date of this Agreement proposed to be used by FANS in marketing the CPSLs because such material utilizes the RAMS logo.  FANS shall submit to the RAMS any additional advertising or marketing media material bearing the RAMS logo which is developed after the date of this Agreement that FANS proposes to use in marketing the CPSLs.  Notwithstanding the foregoing or anything to the contrary in this Agreement, it is hereby acknowledged and agreed by FANS and CVC that the RAMS has no right to approve or control the sale of the Initial CPSLs other than as expressly set forth in this Agreement.

FRKL03A1.WP 55892 1/16/95   5:44pm  -8-

IN WITNESS WHEREOF, this Agreement has been executed by the RAMS, FANS and CVC as of the date first above written.

THE LOS ANGELES RAMS FOOTBALL
COMPANY, INC.

By: _____
Its: _____PicsideNT_____


FANS, INC.

By: _____
Its: _____


THE REGIONAL CONVENTION AND
VISITORS COMMISSION

By: _____
Its: _____

IN WITNESS WHEREOF, this Agreement has been executed by the RAMS, FANS and CVC as of the date first above written.

THE LOS ANGELES RAMS FOOTBALL COMPANY, INC.

By: _____

Its: _____


FANS, INC.

By: _____

Its: _____


THE REGIONAL CONVENTION AND VISITORS COMMISSION

By: _____

Its: _____

CHARTER PSL MASTER AGREEMENT
SCHEDULES A, B, B-1, C

All seats counts are approximate                                    November 17, 1994

| Location | Schedule A 1995 Proposed Rams Ticket Prices | Number of Seats | Schedule B-1 Rams Reserved seats (excluded from CPSL Program) | Schedule B Other seats excluded from CPSL Program |
|---|---|---|---|---|
| **Field Level** | | | | |
| Between the 20 yard line to end line | $45.00 | 5,804 | 450 | |
| | $40.00 | 5,686 | 1,300 | |
| End line counter and | $35.00 | 14,974 | 650 | |
| end zone Obstructed | $30.00 | 1,277 | 100 | |
| between end lines | $ | | | |
| **Suites** | $45.00 | | | 1,700 |
| **Club Seats** | $45.00 | 6,372 | 100 | |
| **Upper Level** | | | | |
| In front of the cross aisle | | | | |
| Between the end lines | $35.00 | 1,000 | 50 | |
| End line corner and end zone | $30.00 | 2,800 | 50 | |
| Beyond the cross aisle | | | | |
| Between the 20 yard lines | $30.00 | 3,300 | | |
| 20 yard line to corner and all but 10 rows in the end zone | $25.00 | 14,700 | | |
| Last 10 rows of the corner end zone | $20.00 | | | 5,500 |
| Physically Challenged | $25.00 | | | 1,334 |

**SCHEDULE C**

**Description of Convertible Club Seats**

Approximately 4,500 seats on Level 200 from goal line to goal line in front of Level 300 Suites.

SCHEDULE D

Notice Addresses

## ST. LOUIS REGULAR PATRON
## CHARTER PERSONAL SEAT LICENSE AGREEMENT

THIS CHARTER PERSONAL SEAT LICENSE AGREEMENT ("Agreement") is entered into by and between FANS INC., a Missouri not-for-profit corporation ("Licensor"), and the individual, partnership, corporation or other entity signing this Agreement as Licensee.

For and in consideration of the payment of the License Fee and the mutual covenants and agreements described below, the receipt and sufficiency of all of which are hereby acknowledged, Licensor and Licensee hereby agree as follows regarding the Regular Patron Charter Personal Seat License ("CPSL") granted by Licensor to Licensee:

### No. of CPSL(s) & License Fee

| | | |
|---|---|---|
| 1. | Individual CPSL License Fee: | $ _____ |
| 2. | Total No. of Licensee's CPSL(s) : | _____ |
| 3. | Total CPSL License Fee: | $ _____ |
| 4. | CPSL License Fee Balance Due: _____ | $ _____ |
| 5. | Stadium Seating Area (See Exhibit A): | _____ |

THIS AGREEMENT CONSISTS OF THE TERMS AND CONDITIONS ON THIS PAGE AND THE ADDITIONAL TERMS AND CONDITIONS CONTAINED ON THE FOLLOWING PAGES, WHICH LICENSEE ACKNOWLEDGES AND AGREES TO AND WHICH ARE INCORPORATED BY REFERENCE AS A PART OF THIS AGREEMENT.  To simplify the completion and signing of this Agreement, all variables in the Agreement appear on this page, including the signature section.

IN WITNESS WHEREOF, Licensor and Licensee have duly signed this Agreement as of the dates set forth below.

LICENSEE: _____

By: _____
            Name and Address (Please Print)

_____
      Signature and Title                        Date

Check One:      ☐  Individual  ☐  Partnership ☐ Corporation
                ☐  Other (describe): _____
LICENSEE MUST ENTER ITS SOCIAL SECURITY NUMBER OR FEDERAL TAX I.D.
NUMBER: _____

Licensee should, within ten (10) days of its receipt, return the signed, dated and completed CPSL Agreement to:

          Fans Inc.
          P.O. Box 502468
          St. Louis, Missouri, 63150-2468

LICENSOR:     Fans Inc.

By:

                              Title                  Date

Account No.: _____

35880 1/16/95   5:58pm                    A-1-

ADDITIONAL TERMS AND CONDITIONS OF CPSL AGREEMENT

1.    CPSL License Fee and Stadium Area.

Licensor promises, upon full payment of the License Fee, to grant to Licensee the number of Charter Personal Seat Licenses ("CPSL(s)") stated on page 1. The CPSL(s) granted to Licensee by Licensor entitle Licensee to purchase the number of Season Ticket(s) for the designated Stadium Area shown on Exhibit A. "Season Ticket(s)" shall mean general admission ticket(s) on a season-by-season basis to all, but not less than all, pre-season, regular season and post-season home games (excluding the NFL's Super Bowl or Pro Bowl), subject to Licensee's obligation to pay a separate fee for NFL playoff games (the "Games"), played by the RAMS in the Stadium at America's Center (the "Stadium") located in the City of St. Louis, Missouri during the term and subject to the terms and conditions of this Agreement.  Licensee acknowledges and agrees that the exact location of Licensee's seats ("Licensee's Seats") within the Section of the Stadium shown on page 1 will not be determined until after Licensee has paid the full amount of the License Fee shown on page 1.

2.    Additional CPSL Terms.

A.    Licensee agrees to purchase all of the Season Ticket(s) with respect to a particular NFL season upon the terms and conditions set by the RAMS. Licensor shall have no liability for the number of Games included within a Season Ticket(s) package or for the RAMS failure to play Games in the Stadium.

B.    Licensor may limit the number of CPSL(s) licensed to any one individual or entity in its sole discretion.

C.    The rights licensed under this Agreement are rights of personal privilege and do not under any circumstance confer upon Licensee any interest or estate in real property or any leasehold interest in the Licensee's Seat or the Stadium.

3.    Transfer Terms.

A.    Until March 1, 1996, Licensee shall not sell, pledge, hypothecate or transfer in any manner a CPSL except upon the occurrence of a Special Event. A Special Event shall be as follows:

    (1)    The occurrence of a circumstance beyond the control of Licensee such as death, disability, employment relocation, or similar event;

    (2)    To a Qualifying Lender, either as a pledge by Licensee pursuant to Section 3.B. below or due to Licensee's default under the Qualifying Lender's CPSL financing documents;

    (3)    To an Immediate Family Member or Related Party;

    (4)    In conjunction with a major business transaction in which the acquisition of the CPSL is not the intent of the transaction.

Further, in no event shall a CPSL be transferred more than once each year,

except for a Special Event. All transfers, whether pursuant to a Special event or after March 1, 1996, shall be subject to a Transfer Fee.

B.    All transfers shall be in accordance with such reasonable rules and regulations as established by Licensor from time to time, including but not limited to, the transferee assuming all obligations of the transferor in a form acceptable to Licensor. Until a transfer is properly recorded on Licensor's records, the transfer of Licensee will be recognized by Licensor, the RAMS, Qualifying Lender, or any other party on the proper terms of the CPSL being transferred.

C.    "Qualifying Lender" shall mean any bank or other financial institution, or employer, or affiliate of an employer, or affiliate of a Licensee that loans funds to Licensee which are used to pay for part or all of Licensee's CPSL License Fee. Licensee hereby acknowledges and agrees that (1) no Season Ticket(s) will be delivered to Licensee if Licensee is in default under the Qualifying Lender's CPSL financing agreements and Licensor is notified of the same at least fifteen (15) business days prior to the date on which Season Ticket(s) would otherwise be delivered to Licensee; and (2) Licensee hereby waives any and all claims Licensee may have against the RAMS, Licensor and/or Qualifying Lender for any failure by the RAMS to deliver Season Ticket(s) to Licensee after receipt by the RAMS of any such notice from Licensor or a Licensee's Qualifying Lender.

D.    "Immediate Family Member" means any grandparent, parent, spouse, child, stepchild, sibling, grandchild and great-grandchild of an individual Licensee; "Related Party" means any person or entity which owns or controls, or is owned or controlled by, Licensee.

E.    The "Transfer Fee" shall be equal to the greater of $25.00 or ten percent (10%) per CPSL of the CPSL transfer price. A Transfer Fee shall be charged on a "per CPSL per transaction" and not on a "per transferee per transaction" basis.

4.    **Refunds**.

If the RAMS does not move to St. Louis by September 1, 1996, all CPSL payments made by Licensee  will be refunded to Licensee without interest.

5.    **Default**.

Failure by Licensee to make any payment when due under this Agreement or to comply with any of the other terms and conditions of this Agreement or any of the terms and conditions of the sale of the Season Ticket(s) (including without limitation the timing of payment therefor and conduct at games) imposed by the RAMS shall be a default. If Licensee defaults under this Agreement, then, at the sole option of Licensor, (a) this Agreement may be terminated, (b) Licensee shall hold no further rights to acquire the CPSL(s) or Season Ticket(s) associated therewith, (c) Licensor shall be entitled to retain all payments previously made by Licensee to Licensor hereunder, and (d) Licensee shall remain liable to Licensor for all losses suffered as a result of such default. In addition, upon default by Licensee, Licensor shall be entitled to recover all reasonable attorneys' fees and court costs incurred in connection with Licensee's default. Notwithstanding the foregoing, if Licensee's actions result in the loss of Licensee's rights to purchase or

55440 1/16/95   5:58pm                    A -3-

retain Season Ticket(s) for reasons other than Licensee's failure to timely purchase Season Ticket(s), Licensee shall be entitled to sell or transfer Licensee's CPSL in a bona fide transaction occurring within sixty (60) days of the date Licensee is notified of Licensee's loss of rights to Licensee's Season Ticket(s), subject, however, to any rights of such Licensee's Qualifying Lender, if any.

6.   Disclaimer.

Licensee covenants and acknowledges that neither Licensor, the Authority (as defined below), the Stadium Manager (as defined below), nor the RAMS have made any representations whatsoever regarding the CPSL(s) other than as may be set forth in this Agreement.

7.   Reservation of Rights by Licensor.

In addition to all rights at law or equity or under the other terms of this Agreement, Licensor hereby expressly reserves the following rights:

A.   The right to terminate this Agreement and refund part or all of Licensee's deposit, either if Licensor determines that Licensee's credit is not satisfactory for this License and the future obligation of Licensee to acquire tickets, or for any other reason satisfactory to Licensor in its sole discretion, including, but not limited to, the right to reduce the total number of CPSL(s) purchased by Licensee if necessary; and

B.   The right to assign, pledge as collateral, transfer or sell all or any part of the rights and obligations of Licensor and Licensee under this Agreement to one or more third parties who shall succeed to all or any part of the rights vested in and granted herein to Licensor.

8.   Best Efforts.

If the RAMS play any of its NFL games other than at the Stadium (e.g. at Busch Stadium if the Stadium is not completed on time), Licensor will use its best efforts to assure Licensee the right to purchase, on a pro rata priority basis, tickets for seats in the stadium where the transferred games are played.  Licensee shall be obligated to buy tickets for Games played in the Stadium in St. Louis and NFL games played at Busch Stadium for which tickets are available for purchase by Licensee.

9.   Representations of Licensee.

Licensee hereby represents, warrants and/or acknowledges as follows:
A.   Licensee has read and understands the terms of this Agreement;
B.   Licensee is not acquiring the CPSL(s) as an investment and has no expectation of profit as a licensee of the CPSL(s);
C.   Licensee is acquiring the CPSL(s) solely for the right to purchase Season Ticket(s) to NFL Games played in the Stadium;
D.   Licensee is acquiring the CPSL(s) for Licensee's own use and not with a view to the distribution of the CPSL(s) to others;
E.   Licensee will not have any equity or other ownership interest in either Licensor, the Authority, the Stadium Manager, the RAMS, or the Stadium or any of the Stadium's facilities and will not have any rights to dividends or other distribution rights from Licensor or any other party or entity described in

this Agreement as a result of being a licensee of a CPSL, and further will not have any voting rights with respect to Licensor matters as a result of being a licensee of a CPSL;

F.  The transfer of the CPSL will be restricted and the CPSL may be terminated under certain conditions, as explained in this Agreement; and

G.  Licensee has full authority to enter into and sign this Agreement and carry out its terms and conditions and when signed, this Agreement shall be a binding obligation on Licensee, enforceable in accordance with its terms.

## 10.  Use of Seats.

Licensee and Licensee's invitees shall at all times maintain proper decorum while using the Licensee's Seats and shall abide by all applicable governmental laws, ordinances, orders, directions, rules and regulations and by such rules and regulations as are adopted and revised from time to time regarding Licensee's Seats or for the Stadium.  Licensee shall be responsible for all damage caused to the Licensee's Seats by Licensee and Licensee's invitees, ordinary wear and tear excepted.  In addition, Licensee shall not take any action which would cause an increase in premiums of any insurance policy carried by either Licensor, the Authority, the Stadium Manager or the RAMS, by causing Licensor or any other party to fail to meet any requirement or condition of such policy or otherwise.  Without limiting the foregoing, Licensee specifically agrees that neither Licensee nor Licensee's invitees will:  (a) bring into the Stadium any alcoholic or intoxicating beverage, any illegal drugs or, except as prescribed by a physician, any controlled substance; (b) permit the Licensee's Seats to be used for any illegal, improper, immoral or objectional purpose, or in any way obstruct or interfere with the rights of any other licensees or Game attendees; or (c) film, record or transmit from the Licensee's Seats all or any portion of any NFL Football game or other event, or any description thereof, by any means (including without limitation radio or television broadcasting, whether broadcast "live" or by means of film or tape).

## 11.  Assumption of Risk; Liability; Indemnity.

Licensee, for Licensee and Licensee's invitees, assumes all risk of personal injury to, or for any damage to or any loss of property of, License or its invitees, arising out of, during or related to their attendance at events held in the Stadium.  Licensee acknowledges that alcoholic beverages may be available in the Stadium and that attendance at sporting events may expose attendees to certain risks of injury including, but not limited to, incidents involving other patrons who have consumed alcoholic beverages, injury from thrown or dropped objects, spills of food or beverages and the unruly behavior of other patrons.  Licensee hereby agrees to assume all responsibility and liability for the consumption in the Stadium of alcoholic beverages by Licensee and its invitees and for the conduct and behavior of Licensee and its invitees.  Licensee agrees to indemnify and hold harmless Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., and the RAMS, and the respective owners, officers, directors, employees and agents of each such entity, from and against any claims, damages, actions, suits and expenses, including attorneys' fees and other costs, arising out of or related to this Agreement, the use of alcohol at the Stadium by Licensee or Licensee's invitees, the conduct and behavior of Licensee and Licensee's invitees and/or the use of the Licensee's Seats by Licensee or Licensee's invitees, whether such claims are now existing or later arising, and whether or not such loss is

55880  1/16/95   5:58pm                    A-5-

alleged to be caused by the negligence of Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., or the RAMS, the respective owners of each such entity, or their respective officers, directors, employees or agents.

12.  Additional Terms.

A.    Licensee acknowledges that the Stadium will be managed, maintained and operated by The Regional Convention and Visitors Commission (the "Stadium Manager") pursuant to certain agreements between the Stadium Manager and the Authority (collectively the "Stadium Agreements"). All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the RAMS agreement to relocate to St. Louis. Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years. Licensee acknowledges that Licensee has no claim against the RAMS with respect to this CPSL and/or its termination whatsoever. Licensee understands and acknowledges the possibility that the RAMS may not play its games in the Stadium or St. Louis for the entire term contemplated by this License. Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this CPSL, including without limitation should the RAMS not play its home games in the Stadium or in St. Louis for any reason.

B.    Licensee hereby acknowledges that although the RAMS are not a party to this Agreement, the RAMS is a third party beneficiary under this Agreement and will directly and\or indirectly realize certain benefits from this Agreement. In addition, Licensee acknowledges that various other parties named in Sections 10 and 11 above, namely the Stadium Manager, the Authority, and St. Louis NFL Corp., are also third party beneficiaries of this Agreement and may directly or indirectly realize certain benefits from this Agreement.

C.    This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri without regard to the laws of conflict.  Any action, suit or other proceeding brought by or against the Licensee or Licensor, including any claim for injuries or damages relating to the license of a part of the Stadium, the Licensee, and Licensee's guests and invitees, shall be brought in the United States District Court for the Eastern District of Missouri, Eastern Division, or in the Circuit Court of the State of Missouri, Twenty-First (21st) Judicial Circuit.

D.    All notices and other communication required to be given pursuant to this License to Licensor or to Licensee shall be in writing and shall be sent to the addresses set forth on the signature page of this Agreement. Any notice given herein shall be deemed delivered when addressed as above provided, postage prepaid, certified mail, return receipt requested, and deposited in a United States General or Branch Post Office or with a nationally recognized overnight courier.

E.    This Agreement contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any representations or agreements previously made or entered into by the parties hereto.  No modification hereto shall be permitted by Licensee whatsoever.

F.    This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, and their permitted

55880 1/16/95   5:58pm                    A-6-

successors and assigns.  This Agreement may be assigned by Licensor in whole or part without any notice to Licensee; this Agreement shall <u>not</u> be assigned or transferred by Licensee except as set forth above.  This License Agreement shall not be binding and enforceable until signed by a duly authorized representative of Licensor .

[THE REST OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK]

03880 1/16/95   5:58pm

A-7-

EXHIBIT A--STADIUM DIAGRAM

35880 1/16/95   5:58pm

A -8-

## ST. LOUIS CONVERTIBLE
## CHARTER PERSONAL SEAT LICENSE AGREEMENT

THIS CONVERTIBLE CHARTER PERSONAL SEAT LICENSE AGREEMENT ("Agreement") is entered into by and between FANS INC., a Missouri not-for-profit corporation ("Licensor"), and the individual, partnership, corporation or other entity signing this Agreement as Licensee.

For and in consideration of the payment of the License Fee and the mutual covenants and agreements described below, the receipt and sufficiency of all of which are hereby acknowledged, Licensor and Licensee hereby agree as follows regarding the Convertible Charter Personal Seat License ("Convertible CPSL") granted by Licensor to Licensee:

### No. of Convertible CPSL(s) & License Fee

1. Individual CPSL License Fee:                          $_____
2. Total No. of Licensee's CPSL(s) :                     _____
3. Total CPSL License Fee:                               $_____
4. CPSL License Fee Balance Due: _____         $_____
5. Stadium Seating Area (See Exhibit A): _____

THIS AGREEMENT CONSISTS OF THE TERMS AND CONDITIONS ON THIS PAGE AND THE ADDITIONAL TERMS AND CONDITIONS CONTAINED ON THE FOLLOWING PAGES, WHICH LICENSEE ACKNOWLEDGES AND AGREES TO AND WHICH ARE INCORPORATED BY REFERENCE AS A PART OF THIS AGREEMENT.  To simplify the completion and signing of this Agreement, all variables in the Agreement appear on this page, including the signature section.

IN WITNESS WHEREOF, Licensor and Licensee have duly signed this Agreement as of the dates set forth below.

LICENSEE: _____

BY: _____
### Name and Address (Please Print)

_____
Signature and Title                          Date

Check One:    ☐ Individual  ☐ Partnership ☐ Corporation
              ☐ Other (describe):_____
LICENSEE MUST ENTER ITS SOCIAL SECURITY NUMBER OR FEDERAL TAX I.D.
NUMBER: _____

Licensee should, within ten (10) days of its receipt, return the signed, dated and completed Convertible CPSL Agreement to:

          Fans Inc.
          P.O. Box 502468
          St. Louis, Missouri, 63150-2468

LICENSOR:      Fans Inc.


                              Title                    Date

Account No.: _____

33736 1/16/95   5:43pm        β -1-

ADDITIONAL TERMS AND CONDITIONS OF CONVERTIBLE CPSL AGREEMENT

1.   Convertible CPSL License Fee and Stadium Area.

Licensor promises, upon full payment of the License Fee, to grant to Licensee the number of Convertible Charter Personal Seat Licenses ("Convertible CPSL(s)") stated on page 1.  The Convertible CPSL(s) granted to Licensee by Licensor entitle Licensee to purchase the number of Season Ticket(s) for the designated Stadium Area shown on  Exhibit A. "Season Ticket(s)" shall mean general admission ticket(s) on a season-by-season basis to all, but not less than all, pre-season, regular season and post-season home games (excluding the NFL's Super Bowl or Pro Bowl), subject to Licensee's obligation to pay a separate fee for NFL playoff games (the "Games"), played by the RAMS in the Stadium at America's Center (the "Stadium") located in the City of St. Louis, Missouri during the term and subject to the terms and conditions (including without limitation those set forth in Section 2 below) of this Agreement. Licensee acknowledges and agrees that the exact location of Licensee's seats ("Licensee's Seats") within the Section of the Stadium shown on page 1 will not be determined until after Licensee has paid the full amount of the License Fee shown on page 1.

2.   Right to Convert Licensee's Seat to Club Seat.

As of January 1, 2000, all of Licensee's Convertible CPSL Seat(s) may be converted to "Club Seat(s)" upon the terms and conditions set forth herein. To convert Licensee's Seat(s) to Club Seat(s), Licensee will be notified of the election to convert, and upon such notification, Licensee shall have sixty (60) days to notify Licensor if Licensee does not desire to keep Licensee's Seat(s) as converted (the "Conversion Effective Date").  If Licensee does not timely notify Licensor as provided above, Licensee's Seat(s) will be converted to Club Seat(s) upon all the terms and conditions then in effect with respect to Club Seats, provided, however, that Licensee will not be charged any additional charge for Club Membership at the time of conversion other than the Annual Club  Rental Fee.  Licensee may transfer his Convertible CPSL until the Conversion Effective Date.  From and after the Conversion Effective Date, the Convertible CPSL terminates and Licensee will become a Club Seat Lessee (if Licensee accepts the conversion), which rights are of limited duration and are not transferable.  If Licensee does not accept the conversion, from and after the Conversion Effective Date,  Licensee's Convertible CPSL will terminate and Licensee will forfeit the right to Season Ticket(s).

3.   Additional Convertible CPSL Terms.

A.   Licensee agrees to purchase all of the Season Ticket(s) with respect to a particular NFL season upon the terms and conditions set by the RAMS. Licensor shall have no liability for the number of Games included within a Season Ticket(s) package or for the RAMS failure to play Games in the Stadium.

B.   Licensor may limit the number of Convertible CPSL(s) licensed to any one individual or entity in its sole discretion.

C.   The rights licensed under this Agreement are rights of personal privilege and do not under any circumstance confer upon Licensee any interest or estate in real property or any leasehold interest in the Licensee's Seat or the Stadium.

A.    Until March 1, 1996, Licensee shall not sell, pledge, hypothecate or transfer in any manner a Convertible CPSL except upon the occurrence of a Special Event.  A Special Event shall be as follows:

    (1)    The occurrence of a circumstance beyond the control of Licensee such as death, disability, employment relocation, or similar event;

    (2)    To a Qualifying Lender, either as a pledge by Licensee pursuant to Section 4.B. below or due to Licensee's default under the Qualifying Lender's CPSL financing documents;

    (3)    To an Immediate Family Member or Related Party;

    (4)    In conjunction with a major business transaction in which the acquisition of the Convertible CPSL is not the intent of the transaction.

Further, in no event shall a Convertible CPSL be transferred more than once each year, except for a Special Event.  All transfers, whether pursuant to a Special event or after March 1, 1996, shall be subject to a Transfer Fee.

B.    All transfers shall be in accordance with such reasonable rules and regulations as established by Licensor from time to time, including but not limited to, the transferee assuming all obligations of the transferor in a form acceptable to Licensor.  Until a transfer is properly recorded on Licensor's records, the transfer of Licensee will be recognized by Licensor, the RAMS, Qualifying Lender, or any other party on the proper terms of the Convertible CPSL being transferred.

C.    "Qualifying Lender" shall mean any bank or other financial institution, or employer, or affiliate of an employer, of a Licensee that loans funds to Licensee which are used to pay for part or all of Licensee's Convertible CPSL License Fee.    Licensee hereby acknowledges and agrees that (1) no Season Ticket(s) will be delivered to Licensee if Licensee is in default under the Qualifying Lender's Convertible CPSL financing agreements and Licensor is notified of the same at least fifteen (15) business days prior to the date on which Season Ticket(s) would otherwise be delivered to Licensee; and (2) Licensee hereby waives any and all claims Licensee may have against the RAMS, Licensor and/or Qualifying Lender for any failure by the RAMS to deliver Season Ticket(s) to Licensee after receipt by the RAMS of any such notice from Licensor or a Licensee's Qualifying Lender.

D.    "Immediate Family Member" means any grandparent, parent, spouse, child, stepchild, sibling, grandchild and great-grandchild of an individual Licensee; "Related Party" means any person or entity which owns or controls, or is owned or controlled by, Licensee.

E.    The "Transfer Fee" shall be equal to the greater of $25.00 or ten percent (10%) per Convertible CPSL of the Convertible CPSL transfer price.  A Transfer Fee shall be charged on a "per Convertible CPSL per transaction" and not on a "per transferee per transaction" basis.

55734 1/16/95   5:43pm                     β -3-

5.   Refunds.

If the RAMS does not move to St. Louis by September 1, 1996, all Convertible CPSL payments made by Licensee will be refunded to Licensee without interest.

6.   Default.

Failure by Licensee to make any payment when due under this Agreement or to comply with any of the other terms and conditions of this Agreement or any of the terms and conditions of the sale of the Season Ticket(s) (including without limitation the timing of payment therefor and conduct at games) imposed by the RAMS shall be a default. If Licensee defaults under this Agreement, then, at the sole option of Licensor, (a) this Agreement may be terminated, (b) Licensee shall hold no further rights to acquire the Convertible CPSL(s) or Season Ticket(s) associated therewith, (c) Licensor shall be entitled to retain all payments previously made by Licensee to Licensor hereunder, and (d) Licensee shall remain liable to Licensor for all losses suffered as a result of such default.  In addition, upon default by Licensee, Licensor shall be entitled to recover all reasonable attorneys' fees and court costs incurred in connection with Licensee's default. Notwithstanding the foregoing, if Licensee's actions result in the loss of Licensee's rights to purchase or retain Season Ticket(s) for reasons other than Licensee's failure to timely purchase Season Ticket(s), Licensee shall be entitled to sell or transfer Licensee's Convertible CPSL in a bona fide transaction occurring within sixty (60) days of the date Licensee is notified of Licensee's loss of rights to Licensee's Season Ticket(s), subject, however, to any rights of such Licensee's Qualifying Lender, if any.

7.   Disclaimer.

Licensee covenants and acknowledges that neither Licensor, the Authority (as defined below), the Stadium Manager (as defined below), nor the RAMS have made any representations whatsoever regarding the Convertible CPSL(s) other than as may be set forth in this Agreement.

8.   Reservation of Rights by Licensor.

In addition to all rights at law or equity or under the other terms of this Agreement, Licensor hereby expressly reserves the following rights:

A.   The right to terminate this Agreement and refund part or all of Licensee's deposit, either if Licensor determines that Licensee's credit is not satisfactory for this License and the future obligation of Licensee to acquire tickets, or for any other reason satisfactory to Licensor in its sole discretion, including, but not limited to, the right to reduce the total number of Convertible CPSL(s) purchased by Licensee if necessary; and

B.   The right to assign, pledge as collateral, transfer or sell all or any part of the rights and obligations of Licensor and Licensee under this Agreement to one or more third parties who shall succeed to all or any part of the rights vested in and granted herein to Licensor.

9.   Best Efforts.

55734 1/16/95   5:43pm                    β -4-

If the RAMS play any of its NFL games other than at the Stadium (e.g. at Busch Stadium if the Stadium is not completed on time), Licensor will use its best efforts to assure Licensee the right to purchase, on a pro rata priority basis, tickets for seats in the stadium where the transferred games are played. Licensee shall be obligated to buy tickets for Games played in the Stadium in St. Louis and NFL games played at Busch Stadium for which tickets are available for purchase by Licensee.

10). <u>Representations of Licensee</u>.

Licensee hereby represents, warrants and/or acknowledges as follows:
A. Licensee has read and understands the terms of this Agreement;
B. Licensee is not acquiring the Convertible CPSL(s) as an investment and has no expectation of profit as a licensee of the Convertible CPSL(s);
C. Licensee is acquiring the Convertible CPSL(s) solely for the right to purchase Season Ticket(s) to NFL Games played in the Stadium;
D. Licensee is acquiring the Convertible CPSL(s) for Licensee's own use and not with a view to the distribution of the Convertible CPSL(s) to others;
E. Licensee will not have any equity or other ownership interest in either Licensor, the Authority, the Stadium Manager, the RAMS, or the Stadium or any of the Stadium's facilities and will not have any rights to dividends or other distribution rights from Licensor or any other party or entity described in this Agreement as a result of being a licensee of a Convertible CPSL, and further will not have any voting rights with respect to Licensor matters as a result of being a licensee of a Convertible CPSL;
F. The transfer of the Convertible CPSL will be restricted and the Convertible CPSL may be terminated under certain conditions, as explained in this Agreement; and
G. Licensee has full authority to enter into and sign this Agreement and carry out its terms and conditions and when signed, this Agreement shall be a binding obligation on Licensee, enforceable in accordance with its terms.

11. <u>Use of Seats</u>.

Licensee and Licensee's invitees shall at all times maintain proper decorum while using the Licensee's Seats and shall abide by all applicable governmental laws, ordinances, orders, directions, rules and regulations and by such rules and regulations as are adopted and revised from time to time regarding Licensee's Seats or for the Stadium. Licensee shall be responsible for all damage caused to the Licensee's Seats by Licensee and Licensee's invitees, ordinary wear and tear excepted. In addition, Licensee shall not take any action which would cause an increase in premiums of any insurance policy carried by either Licensor, the Authority, the Stadium Manager or the RAMS, by causing Licensor or any other party to fail to meet any requirement or condition of such policy or otherwise. Without limiting the foregoing, Licensee specifically agrees that neither Licensee nor Licensee's invitees will: (a) bring into the Stadium any alcoholic or intoxicating beverage, any illegal drugs or, except as prescribed by a physician, any controlled substance; (b) permit the Licensee's Seats to be used for any illegal, improper, immoral or objectional purpose, or in any way obstruct or interfere with the rights of any other licensees or Game attendees; or (c) film, record or transmit from the Licensee's Seats all or any portion of any NFL Football game or other event, or any description thereof, by any means (including without limitation radio or television broadcasting, whether broadcast "live" or by means of film or tape).

33734 1/16/95   5:43pm                  β -5-

12.   Assumption of Risk; Liability; Indemnity.

Licensee, for Licensee and Licensee's invitees, assumes all risk of personal injury to, or for any damage to or any loss of property of, License or its invitees, arising out of, during or related to their attendance at events held in the Stadium.  Licensee acknowledges that alcoholic beverages will be available in the Stadium and that attendance at sporting events may expose attendees to certain risks of injury including, but not limited to, incidents involving other patrons who have consumed alcoholic beverages, injury from thrown or dropped objects, spills of food or beverages and the unruly behavior of other patrons.  Licensee hereby agrees to assume all responsibility and liability for the consumption in the Stadium of alcoholic beverages by Licensee and its invitees and for the conduct and behavior of Licensee and its invitees.  Licensee agrees to indemnify and hold harmless Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., and the RAMS, and the respective owners, officers, directors, employees and agents of each such entity, from and against any claims, damages, actions, suits and expenses, including attorneys' fees and other costs, arising out of or related to this Agreement, the use of alcohol at the Stadium by Licensee or Licensee's invitees, the conduct and behavior of Licensee and Licensee's invitees and/or the use of the Licensee's Seats by Licensee or Licensee's invitees, whether such claims are now existing or later arising, and whether or not such loss is alleged to be caused by the negligence of Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., or the RAMS, the respective owners of each such entity, or their respective officers, directors, employees or agents.

13.   Additional Terms.

A.   Licensee acknowledges that the Stadium will be managed, maintained and operated by The Regional Convention and Visitors Commission (the "Stadium Manager") pursuant to certain agreements between the Stadium Manager and the Authority (collectively the "Stadium Agreements").  All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the RAMS agreement to relocate to St. Louis.  Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years.  Licensee acknowledges that Licensee has no claim against the RAMS with respect to this Convertible CPSL and/or its termination whatsoever.  Licensee understands and acknowledges the possibility that the RAMS may not play its games in the Stadium or St. Louis for the entire term contemplated by this License.  Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this CPSL, including without limitation (i) for the conversion of the kind described in Section 2 hereof and (ii) should the RAMS not play its home games in the Stadium or in St. Louis for any reason.

B.   Licensee hereby acknowledges that although the RAMS are not a party to this Agreement, the RAMS is a third party beneficiary under this Agreement and will directly and\or indirectly realize certain benefits from this Agreement.  In addition, Licensee acknowledges that various other parties named in Sections 10 and 11 above, namely the Stadium Manager, the Authority, and St. Louis NFL Corp., are also third party beneficiaries of this Agreement and may directly or indirectly realize certain benefits from this Agreement.

C.   This Agreement shall be construed and enforced in accordance with the

law of the State of Missouri without regard to the laws of conflict.  Any action, suit or other proceeding brought by or against the Licensee or Licensor, including any claim for injuries or damages relating to the license of a part of the Stadium, the Licensee, and Licensee's guests and invitees, shall be brought in the United States District Court for the Eastern District of Missouri, Eastern Division, or in the Circuit Court of the State of Missouri, Twenty-First (21st) Judicial Circuit.

D.     All notices and other communication required to be given pursuant to this License to Licensor or to Licensee shall be in writing and shall be sent to the addresses set forth on the signature page of this Agreement.  Any notice given herein shall be deemed delivered when addressed as above provided, postage prepaid, certified mail, return receipt requested, and deposited in a United States General or Branch Post Office or with a nationally recognized overnight courier.

E.     This Agreement contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any representations or agreements previously made or entered into by the parties hereto.  No modification hereto shall be permitted by Licensee whatsoever.

F.     This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, and their permitted successors and assigns.  This Agreement may be assigned by Licensor in whole or part without any notice to Licensee; this Agreement shall **not** be assigned or transferred by Licensee except as set forth above.  This License Agreement shall not be binding and enforceable until signed by a duly authorized representative of Licensor .

[**THE REST OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK**]

EXHIBIT A--STADIUM DIAGRAM

$\beta$ -8-

## AMENDMENT TO CHARTER PERSONAL SEAT LICENSE MASTER AGREEMENT

This Amendment ("Amendment") shall amend and modify that certain Charter Personal Seat License Master Agreement (the "Agreement") entered into as of the 17th day of January, 1995 by and among THE RAMS FOOTBALL COMPANY, INC. F/K/A THE LOS ANGELES RAMS FOOTBALL COMPANY, INC. ("RAMS"), FANS, INC. ("FANS"), and the REGIONAL CONVENTION AND VISITORS COMMISSION A/K/A ST. LOUIS CONVENTION AND VISITORS COMMISSION ("CVC").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, RAMS, FANS, and CVC agree to amend the Agreement as follows:

1.      Exhibit A to the Agreement shall be deleted in its entirety and shall be replaced with the attached Exhibit A which shall henceforth be read as Exhibit A to the Agreement.

2.      Exhibit B to the Agreement shall be deleted in its entirety and shall be replaced with the attached Exhibit B which shall henceforth be read as Exhibit B to the Agreement.

3.      Exhibit C which was referred to in the Agreement was never attached to the Agreement. The attached Exhibit C shall be added to the Agreement and shall henceforth be read as Exhibit C to the Agreement.

4.      RAMS, CVC, and FANS agree and acknowledge that except as modified by this Amendment, the Agreement remains in full force and effect. In the event of a conflict between the terms and conditions of this Amendment and the terms and conditions of the Agreement, the terms and conditions of this Amendment shall control. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all such counterparts taken together shall constitute but one and the same instrument. This Amendment shall be binding on all parties only after being signed by all parties.

IN WITNESS WHEREOF, the parties have signed this Amendment effective as of June 23, 1995.

THE RAMS FOOTBALL COMPANY, INC.
F/K/A THE LOS ANGELES RAMS
FOOTBALL COMPANY, INC.
("RAMS")

By: _____

Its: _____President_____

FANS, INC. ("FANS")

By: _____

Its: _____

THE REGIONAL CONVENTION AND
VISITORS COMMISSION A/K/A ST. LOUIS
CONVENTION AND VISITORS COMMISSION ("CVC")

By: _____

Its: _____

62298

-2-

IN WITNESS WHEREOF, the parties have signed this Amendment effective as of June 23, 1995.

THE RAMS FOOTBALL COMPANY, INC.
F/K/A THE LOS ANGELES RAMS
FOOTBALL COMPANY, INC.
("RAMS")

By:_____

Its:_____


FANS, INC. ("FANS")

By: *[signature]*

Its: *President*


THE REGIONAL CONVENTION AND
VISITORS COMMISSION A/K/A ST. LOUIS
CONVENTION AND VISITORS COMMISSION ("CVC")

By: *[signature]*

Its: *President and CEO*


62298

-2-

EXHIBIT A-1

# FANS, Inc., 10 S. BROADWAY, SUITE 425, ST. LOUIS, MO 63102

## STANDARD TERMS AND CONDITIONS OF REGULAR PATRON CPSL AGREEMENT

### 1. CPSL License Fee and Stadium Area.

Licensor promises, upon full payment of the License Fee, to grant to Licensee the number of Regular Patron Charter Personal Seat Licenses ("CPSL(s)") stated on the Signature Page. The CPSL(s) granted to Licensee by Licensor entitle Licensee to purchase the number of Season Ticket(s) for the designated Stadium Area shown on Exhibit A. "Season Ticket(s)" shall mean general admission ticket(s) on a season-by-season basis to all, but not less than all, pre-season, regular season and post-season home games (excluding the NFL's Super Bowl or Pro Bowl), subject to Licensee's obligation to pay a separate fee for NFL playoff games (the "Games"), played by the RAMS in the Stadium at America's Center (the "Stadium") located in the City of St. Louis, Missouri, during the term and subject to the terms and conditions of this Agreement. Licensee acknowledges and agrees that the exact location of Licensee's seats ("Licensee's Seats") within the Section of the Stadium shown on the Signature Page which are subject to Licensee's CPSL(s) will not be determined until after Licensee has paid the full amount of the License Fee shown on the Signature Page. Once Licensee's Seats have been determined, Licensee will be entitled to the opportunity to purchase Season Ticket(s) to Licensee's Seats for all Games at the Stadium until March 1, 2025, subject to Licensee complying with all of the terms and conditions of this Agreement.

### 2. Additional CPSL Conditions.

A  Licensee agrees to purchase all of the Season Tickets(s) with respect to a particular NFL season upon the terms and conditions set by the RAMS. Licensor shall have no liability for the number of Season Tickets(s) included within a Season Ticket(s) package or for the RAMS failure to play Games in the Stadium.

B  Licensor may limit the number of CPSL(s) licensed to any one individual or entity in its sole discretion.

C  The rights licensed under this Agreement are rights of personal privilege and do not under any circumstance confer upon Licensee any interest or estate in real property or any leasehold interest in the Licensee's Seat or the Stadium.

### 3. Transfer Terms.

A  Until March 1, 1996, Licensee shall not sell, pledge, hypothecate or transfer in any manner a CPSL except upon the occurrence of a Special Event. A Special Event shall be as follows:

(1) The occurrence of a circumstance beyond the control of Licensee such as death, disability, employment relocation, or similar event;

(2) The transfer to a Qualifying Lender, either as a pledge or other encumbrance by Licensee pursuant to, or due to Licensee's default under, the Qualifying Lender's CPSL financing documents;

(3) The transfer to an Immediate Family Member or Related Party;

(4) The transfer in conjunction with a major business transaction in which the acquisition of the CPSL is not the intent of the transaction.

Further, in no event shall a CPSL be transferred more than once each year, except for a Special Event. All transfers, whether pursuant to a Special Event or after March 1, 1996, shall be subject to a Transfer Fee.

B  All transfers shall be in accordance with such reasonable rules and regulations and in such form as established by Licensor from time to time, including but not limited to the transferee assuming all obligations of the transferor in a form acceptable to Licensor, provided that a Qualifying Lender shall not be required to assume Licensee's obligations, nor shall such Qualifying Lender have any of Licensee's rights, until the transfer of a CPSL to the Qualifying Lender due to Licensee's default. Until a transfer is properly recorded on Licensor's records, the transfer of a CPSL by Licensee will not be recognized by Licensor or the RAMS under the terms of the CPSL being transferred.

C  "Qualifying Lender" shall mean any bank or other financial institution, or employer, or affiliate of an employer, of a Licensee that loans funds to Licensee which are used to pay for part or all of Licensee's CPSL License Fee. Licensee hereby acknowledges and agrees that (1) the RAMS shall be under no obligation to deliver Season Ticket(s) to Licensee if Licensee is in default under the Qualifying Lender's CPSL financing agreements and the RAMS are notified of the same at least fifteen (15) business days prior to the date on which Season Ticket(s) would otherwise be delivered to Licensee; and (2) Licensee hereby waives any and all claims Licensee may have against the RAMS, Licensor and/or any Qualifying Lender for any failure by the RAMS to deliver Season Ticket(s) to Licensee after receipt by the RAMS of any such notice from Licensor or Licensee's Qualifying Lender

D  "Immediate Family Member" means any grandparent, p    t spouse, child, stepchild, sibling, grandchild and great-grand      d of an individual Licensee; "Related Party" means any person, or entity which owns or controls, or is owned or controlled by, Licensee.

E  The "Transfer Fee" shall be equal to the greater of $25.00 or ten percent (10%) per CPSL of the CPSL transfer price. A Transfer Fee shall be charged on a "per CPSL per transaction" and not on a "per transferee per transaction" basis.

### 4. Refunds.

If the RAMS do not move to St. Louis by September 1, 1996, all CPSL payments made by Licensee will be refunded to Licensee without interest

### 5. Default.

Failure by Licensee to make any payment when due under this Agreement or to comply with any of the other terms and conditions of this Agreement or any of the terms and conditions of the sale of the Season Ticket(s) (including without limitation the timing of payment therefor and conduct at games) imposed by the RAMS shall be a default. If Licensee defaults under this Agreement, then, at the sole option of Licensor, (a) this Agreement may be terminated, (b) Licensee shall hold no further rights to acquire the CPSL(s) or Season Ticket(s) associated therewith, (c) Licensor shall be entitled to retain all payments previously made by Licensee to Licensor hereunder, and (d) Licensee shall remain liable to Licensor for all losses suffered as a result of such default. In addition, upon default by Licensee, Licensor shall be entitled to recover all reasonable attorneys' fees and court costs incurred in connection with Licensee's default. Notwithstanding the foregoing, if Licensee's actions result in the loss of Licensee's rights to purchase or retain Season Ticket(s) for reasons other than Licensee's failure to timely purchase Season Ticket(s), Licensee shall be entitled to sell or transfer Licensee's CPSL in a bona fide transaction occurring within sixty (60) days of the date Licensee is notified of Licensee's loss of rights to Licensee's Season Ticket(s), subject, however, to the rights of such Licensee's Qualifying Lender, if any.

### 6. Disclaimer.

Licensee covenants and acknowledges that neither Licensor, the Authority (as defined below), the Stadium Manager (as defined below), nor the RAMS have made any representations whatsoever regarding the CPSL(s) other than as may be set forth in this Agreement.

### 7. Reservation of Rights by Licensor.

In addition to all rights at law or equity or under the other terms of this Agreement, Licensor hereby expressly reserves the following rights:

A  The right to terminate this Agreement and refund part or all of Licensee's deposit, either if Licensor determines that Licensee's credit is not satisfactory to this License and the future obligation of Licensee to acquire tickets, or for any other reason satisfactory to Licensor in its sole discretion, including, but not limited to, the right to reduce the total number of CPSL(s) purchased by Licensee if necessary; and

B  The right to assign, pledge as collateral, transfer or sell all or any part of the rights and obligations of Licensor and Licensee under this Agreement to one or more third parties who shall succeed to all or any part of the rights vested in and granted herein to Licensor.

### 8. Best Efforts.

If the RAMS play any of their NFL games other than at the Stadium (e.g. at Busch Stadium if the Stadium is not completed on time), Licensor will use its best efforts to assure Licensee the right to purchase, on a pro rata priority basis, tickets for seats in the stadium where the transferred games are played. Licensee shall be obligated to buy tickets for Games played in the Stadium in St. Louis and NFL games played at Busch Stadium for which tickets are available for purchase by Licensee.

### 9. Representations of Licensee.

Licensee hereby represents, warrants and/or acknowledges as follows:

A  Licensee has read and understands the terms of this Agreement;

B  Licensee is not acquiring the CPSL(s) as an investment and has no expectation of profit as a licensee of the CPSL(s);

C  Licensee is acquiring the CPSL(s) solely for the right to purchase Season Ticket(s) to NFL Games played in the Stadium;

D  Licensee is acquiring the CPSL(s) for Licensee's own use and not with a view to the distribution of the CPSL(s) to others;

A-1

E. Licensee will not have any equity or other ownership interest in either Licensor, the Authority, the Stadium Manager, the RAMS, or the Stadium or any of the Stadium's facilities and will not have any rights to dividends or other distribution rights from Licensor or any other party or entity described in this Agreement as a result of being a licensee of a CPSL; and further will not have any voting rights with respect to Licensor matters as a result of being a licensee of a CPSL;

F. The transfer of the CPSL(s) will be restricted and the CPSL(s) may be terminated under certain conditions, as explained in this Agreement; and

G. Licensee has full authority to enter into and sign this Agreement and carry out its terms and conditions and when signed, this Agreement shall be a binding obligation on Licensee, enforceable in accordance with its terms.

10. **Use of Seats.**

Licensee and Licensee's invitees shall at all times maintain proper decorum while using the Licensee's Seats and shall abide by all applicable governmental laws, ordinances, orders, directions, rules and regulations and by such rules and regulations as are adopted and revised from time to time regarding Licensee's Seats or for the Stadium. Licensee shall be responsible for all damages caused to the Licensee's Seats by Licensee and Licensee's invitees, ordinary wear and tear excepted. In addition, Licensee shall not take any action which would cause an increase in premiums of any insurance policy carried by either Licensor, the Authority, the Stadium Manager or the RAMS, by causing Licensor or any other party to fail to meet any requirement or condition of such policy or otherwise. Without limiting the foregoing, Licensee specifically agrees that neither Licensee nor Licensee's invitees will: (a) bring into the Stadium any alcoholic or intoxicating beverage, any illegal drugs or, except as prescribed by a physician, any controlled substance; (b) permit the Licensee's Seats to be used for any illegal, improper, immoral or objectional purpose, or in any way obstruct or interfere with the rights of any other licensees or Game attendees; or (c) film, record or transmit from the Licensee's Seats all or any portion of any NFL Football game or other event, or any description thereof, by any means (including without limitation radio or television broadcasting, whether broadcast "live" or by means of film or tape).

11. **Assumption of Risk; Liability; Indemnity.**

Licensee, for Licensee and Licensee's invitees, assumes all risk of personal injury to, or for any damage to or any loss of property of, Licensee or its invitees, arising out of, during or related to their attendance at events held in the Stadium. Licensee acknowledges that alcoholic beverages will be available in the Stadium and that attendance at sporting events may expose attendees to certain risks of injury including, but not limited to, incidents involving other patrons who have consumed alcoholic beverages, injury from thrown or dropped objects, spills of food or beverages and the unruly behavior of other patrons. Licensee hereby agrees to assume all responsibility and liability for the consumption in the Stadium of alcoholic beverages by Licensee and its invitees and for the conduct and behavior of Licensee and its invitees. Licensee agrees to indemnify and hold harmless Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., and the RAMS, and the respective owners, officers, directors, employees and agents of each such entity, from and against any claims, damages, actions, suits and expenses, including attorneys' fees and other costs, arising out of or related to this Agreement, the use of alcohol at the Stadium by Licensee or Licensee's invitees, the conduct and behavior of Licensee and Licensee's invitees and/or the use of the Licensee's Seats by Licensee or Licensee's invitees, whether such claims are now existing or later arising, and whether or not such loss is alleged to be caused by the negligence of Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., or the RAMS, the respective owners of each such entity, or their respective officers, directors, employees or agents.

12. **Additional Terms.**

A. Licensee acknowledges that the Stadium will be managed, maintained and operated by The Regional Convention and Visitors Commission (the "Stadium Manager") pursuant to certain agreements between the Stadium Manager and The Regional Convention and Sports Complex Authority (the "Authority") (collectively the "Stadium Agreements"). All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the RAMS agreement to relocate to St. Louis. Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years. Licensee acknowledges that Licensee has no claim against the RAMS with respect to this CPSL and/or its termination whatsoever. Licensee understands and acknowledges the possibility that the RAMS may not play its games in the Stadium or St. Louis for the entire term contemplated by this License. Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this CPSL, including without limitation should the RAMS not play its home games in the Stadium or in St. Louis for any reason.

B. Licensee hereby acknowledges that although the RAMS are not a party to this Agreement, the RAMS are a third party beneficiary under this Agreement and will directly and/or indirectly realize certain benefits from this Agreement. In addition, Licensee acknowledges that various other parties named in Sections 10 and 11 above, namely the Stadium Manager, the Authority, and St. Louis NFL Corp., are also third party beneficiaries of this Agreement and may directly or indirectly realize certain benefits from this Agreement. There are no other third party beneficiaries to this Agreement.

C. This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri without regard to the laws of conflict. Any action, suit or other proceeding brought by or against the Licensee or Licensor, including any claim for injuries or damages relating to the license of a part of the Stadium, the Licensee, and Licensee's guests and invitees, shall be brought in the United States District Court for the Eastern District of Missouri, Eastern Division, or in the Circuit Court of the State of Missouri, Twenty-First (21st) Judicial Circuit.

D. All notices and other communication required to be given pursuant to this License to Licensor or to Licensee shall be in writing and shall be sent to the addresses set forth on the Signature Page of this Agreement. Any notice given herein shall be deemed delivered when addressed as above provided, postage prepaid, certified mail, return receipt requested, and deposited in a United States General or Branch Post Office or with a nationally recognized overnight courier. Licensee hereby authorizes Licensor to provide Licensee's Qualifying Lender with a copy of any notice or other communication which Licensor may give to Licensee hereunder.

E. This Agreement contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any representations or agreements previously made or entered into by the parties hereto. No modification hereto shall be permitted by Licensee whatsoever.

F. This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, and their permitted successors and assigns. This Agreement may be assigned by Licensor in whole or part without any notice to Licensee; this Agreement shall not be assigned or transferred by Licensee except as set forth above. This License Agreement shall not be binding and enforceable until completed as stated on the Signature Page.

G. Notwithstanding the foregoing, neither Licensor nor the RAMS shall have any liability to Licensee or a Qualifying Lender for any failure to comply with the provisions of Sections 3.B or 12.D above.

**EXHIBIT A — STADIUM DIAGRAM**

Lower Level



Upper Level

**FANS, Inc.,** 10 S. BROADWAY, SUITE 425, ST. LOUIS, MO 63102

## STANDARD TERMS AND CONDITIONS OF CONVERTIBLE CPSL AGREEMENT

**1. Convertible CPSL License Fee and Stadium Area.**

Licensor promises, upon full payment of the License Fee, to grant to Licensee the number of Convertible Charter Personal Seat Licenses ("Convertible CPSL(s)") stated on the Signature Page. The Convertible CPSL(s) granted to Licensee by Licensor entitle Licensee to purchase the number of Season Ticket(s) for the designated Stadium Area shown on Exhibit A. "Season Ticket(s)" shall mean general admission ticket(s) on a season-by-season basis to all, but not less than all, pre-season, regular season and post-season home games (excluding the NFL's Super Bowl or Pro Bowl), subject to Licensee's obligation to pay a separate fee for NFL playoff games (the "Games") played by the RAMS in the Stadium at America's Center (the "Stadium") located in the City of St. Louis, Missouri, during the term and subject to the terms and conditions of this Agreement. Licensee acknowledges and agrees that the exact location of Licensee's seats ("Licensee's Seats") within the Section of the Stadium shown on the Signature Page which are subject to Licensee's Convertible CPSL(s) will not be determined until after Licensee has paid the full amount of the License Fee shown on the Signature Page. Once Licensee's Seats have been determined, Licensee will be entitled to the opportunity to purchase Season Ticket(s) to Licensee's Seats for all Games at the Stadium until March 1, 2025, subject to Licensee complying with all of the terms and conditions of this Agreement.

**2. Right to Convert Licensee's Seat to Club Seat.**

At any time after January 1, 2000, all of Licensee's Seat(s) may be converted to "Club Seat(s)" by the Rams upon the terms and conditions set forth herein. Licensee will be notified of the election to convert Licensee's Seat(s) to Club Seat(s) and upon such notification, Licensee shall have sixty (60) days to notify Licensor if Licensee does not desire to keep Licensee's Seat(s) as converted (the "Conversion Effective Date"). Licensee's Seat(s) will be converted to Club Seat(s) upon all the terms and conditions then in effect with respect to Club Seats, and if Licensee does not timely notify Licensor as provided above, and except as provided below, Licensee shall become a member of the Rams Club and pursuant thereto shall be obligated to sign and be bound by the then current form of the "Rams Club Membership, NFL Ticket, and Ticket Option Agreement" and shall become entitled to the same benefits as those persons or entities which have the right to use similarly situated non-converted Club Seats. Licensee, however, will not be charged any type of "charter" fee for becoming a member of the Rams Club at the time of conversion provided that Licensee shall be obligated to pay the then current annual Rams Club Membership fee. It is expressly acknowledged that in connection with the conversion of Licensee's Seats, Licensee's Seats shall be replaced with seats substantially similar to the seats then being used on the Club Level at the Stadium which may reduce the number of seats in the section of the Stadium in which Licensee's Seats are located and therefore even if Licensee desires to retain the converted Licensee's Seats, Licensee may not be awarded converted Club Seat(s). Licensor agrees to try to provide Licensee with converted Club Seats or other Club Seats if Licensee's Seats are converted and Licensee has not elected not to keep the Licensee's Seats but is under no obligation or liability to Licensee if Licensee is not given Club Seats. Licensee may transfer Licensee's Convertible CPSL(s) until the Conversion Effective Date. From and after the Conversion Effective Date, Licensee's Convertible CPSL(s) will terminate and Licensee will become a Rams Club Member (if Licensee accepts the conversion). The Rams Club membership rights are of limited duration and are not transferable except to an Immediate Family Member. If Licensee does not accept the conversion, from and after the Conversion Effective Date, Licensee's Convertible CPSL will terminate and Licensee will no longer have the right to Season Ticket(s).

**3. Additional Convertible CPSL Conditions.**

A. Licensee agrees to purchase all of the Season Tickets(s) with respect to a particular NFL season upon the terms and conditions set by the RAMS. Licensor shall have no liability for the number of Games included within a Season Ticket(s) package or for the RAMS failure to play Games in the Stadium.

B. Licensor may limit the number of Convertible CPSL(s) licensed to any one individual or entity in its sole discretion.

C. The rights licensed under this Agreement are rights of personal privilege and do not under any circumstance confer upon Licensee any interest or estate in real property or any leasehold interest in the Licensee's Seat or the Stadium.

**4. Transfer Terms.**

A. Until March 1, 1996, Licensee shall not sell, pledge, hypothecate or transfer in any manner a Convertible CPSL except upon the occurrence of a Special Event. A Special Event shall be as follows:

(1) The occurrence of a circumstance beyond the control of Licensee such as death, disability, employment relocation, or similar event;

(2) The transfer to a Qualifying Lender, either as a pledge or other encumbrance by Licensee pursuant to, or due to Licensee's default under, the Qualifying Lender's Convertible CPSL financing documents;

(3) The transfer to an Immediate Family Member or Related Party;

(4) The transfer in conjunction with a major business transaction in which the acquisition of the Convertible CPSL is not the intent of the transaction.

Further, in no event shall a Convertible CPSL be transferred more than once each year except for a Special Event. All transfers, whether pursuant to a Special Event or after March 1, 1996, shall be subject to a Transfer Fee.

B. All transfers shall be in accordance with such reasonable rules and regulations and in such form as established by Licensor from time to time, including but not limited to the transferee assuming all obligations of the transferor in a form acceptable to Licensor, provided that a Qualifying Lender shall not be required to assume Licensee's obligations, nor shall such Qualifying Lender have any of Licensee's rights, until the transfer of a Convertible CPSL to the Qualifying Lender due to Licensee's default. Until a transfer is properly recorded on Licensor's records, the transfer of a Convertible CPSL by Licensee will not be recognized by Licensor or the RAMS under the terms of the Convertible CPSL being transferred.

C. "Qualifying Lender" shall mean any bank or other financial institution or employer, or an affiliate of an employer, of a Licensee that loans funds to Licensee which are used to pay for part or all of Licensee's Convertible CPSL License Fee. Licensee hereby acknowledges and agrees that (1) the RAMS shall be under no obligation to deliver Season Ticket(s) to Licensee if Licensee is in default under the Qualifying Lender's Convertible CPSL financing agreements and the RAMS are notified of the same at least fifteen (15) business days prior to the date on which Season Ticket(s) would otherwise be delivered to Licensee, and (2) Licensee hereby waives any and all claims Licensee may have against the RAMS, Licensor and/or any Qualifying Lender for any failure by the RAMS to deliver Season Ticket(s) to Licensee after receipt by the RAMS of any such notice from Licensor or Licensee's Qualifying Lender.

D. "Immediate Family Member" means any grandparent, parent, spouse, child, stepchild, sibling, grandchild and great-grandchild of an individual Licensee; "Related Party" means any person or entity which owns or controls, or is owned or controlled by, Licensee.

E. The "Transfer Fee" shall be equal to the greater of $25.00 or ten percent (10%) per Convertible CPSL of the Convertible CPSL transfer price. A Transfer Fee shall be charged on a "per Convertible CPSL per transaction" and not on a "per transferee per transaction" basis.

**5. Refunds.**

If the RAMS do not move to St. Louis by September 1, 1996, all Convertible CPSL payments made by Licensee will be refunded to Licensee without interest.

**6. Default.**

Failure by Licensee to make any payment when due under this Agreement or to comply with any of the other terms and conditions of this Agreement or any of the terms and conditions of the sale of the Season Ticket(s) (including without limitation the timing of payment therefor and conduct at games) imposed by the RAMS shall be a default. If Licensee defaults under this Agreement, then, at the sole option of Licensor, (a) this Agreement may be terminated, (b) Licensee shall hold no further rights to acquire the Convertible CPSL(s) or Season Ticket(s) associated therewith, (c) Licensor shall be entitled to retain all payments previously made by Licensee to Licensor hereunder, and (d) Licensee shall remain liable to Licensor for all losses suffered as a result of such default. In addition, upon default by Licensee, Licensor shall be entitled to recover all reasonable attorneys' fees and court costs incurred in connection with Licensee's default. Notwithstanding the foregoing, if Licensee's actions result in the loss of Licensee's rights to purchase or retain Season Ticket(s) for reasons other than Licensee's failure to timely purchase Season Ticket(s), Licensee shall be entitled to sell or transfer Licensee's Convertible CPSL in a bona fide transaction occurring within sixty (60) days of the date Licensee is notified of Licensee's loss of rights to Licensee's Season Ticket(s), subject, however, to the rights of such Licensee's Qualifying Lender, if any.

**7. Disclaimer.**

Licensee covenants and acknowledges that neither Licensor, the Authority (as defined below), the Stadium Manager (as defined below), nor the RAMS have made any representations whatsoever regarding the Convertible CPSL(s) other than as may be set forth in this Agreement.

**8. Reservation of Rights by Licensor.**

In addition to all rights at law or equity or under the other terms of this Agreement, Licensor hereby expressly reserves the following rights:

A. The right to terminate this Agreement and refund part or all of Licensee's deposit, either if Licensor determines that Licensee's credit is not satisfactory for this License and the future obligation of Licensee to acquire tickets, or for any other reason satisfactory to Licensor in its sole discretion, including, but not limited to, the right to reduce the total number of Convertible CPSL(s) purchased by Licensee if necessary; and

B. The right to assign, pledge as collateral, transfer or sell all or any part of the rights and obligations of Licensor and Licensee under this Agreement to one or more third parties who shall succeed to all or any part of the rights vested in and granted herein to Licensor.

**9. Best Efforts.**

If the RAMS play any of their NFL games other than at the Stadium (e.g. at Busch Stadium if the Stadium is not completed on time), Licensor will use its best efforts to assure Licensee the right to purchase, on a pro rata priority basis, tickets for seats in the stadium where the transferred games are played. Licensee shall be obligated to buy tickets for Games played in the Stadium in St. Louis and NFL games played at Busch Stadium for which tickets are available for purchase by Licensee.

## 10.  Representations of Licensee.

Licensee hereby represents, warrants and/or acknowledges as follows:

A  Licensee has read and understands the terms of this Agreement.

B  Licensee is not acquiring the Convertible CPSL(s) as an investment and has no expectation of profit as a licensee of the Convertible CPSL(s).

C  Licensee is acquiring the Convertible CPSL(s) solely for the right to purchase Season Ticket(s) to NFL Games played in the Stadium.

D  Licensee is acquiring the Convertible CPSL(s) for Licensee's own use and not with a view to the distribution of the Convertible CPSL(s) to others

E  Licensee will not have any equity or other ownership interest in either Licensor, the Authority, the Stadium Manager, the RAMS, or the Stadium or any of the Stadiums facilities and will not have any rights to dividends or other distribution rights from Licensor or any other party or entity described in this Agreement as a result of being a licensee of a Convertible CPSL, and further will not have any voting rights with respect to Licensor matters as a result of being a licensee of a Convertible CPSL.

F  The transfer of the Convertible CPSL(s) may be terminated under certain conditions, as explained in this Agreement, and

G  Licensee has full authority to enter into and sign this Agreement and carry out its terms and conditions and when signed, this Agreement shall be a binding obligation on Licensee, enforceable in accordance with its terms

## 11  Use of Seats.

Licensee and Licensee's invitees shall at all times maintain proper decorum while using the Licensee's Seats and shall abide by all applicable governmental laws, ordinances, orders, directions, rules and regulations and by such rules and regulations as are adopted and revised from time to time regarding Licensee's Seats or for the Stadium  Licensee shall be responsible for all damages caused to the Licensee's Seats by Licensee and Licensee's invitees, ordinary wear and tear excepted. In addition, Licensee shall not take any action which would cause an increase in premiums of any insurance policy carried by either Licensor, the Authority, the Stadium Manager or the RAMS, by causing Licensor or any other party to fail to meet any requirement or condition of such policy or otherwise. Without limiting the foregoing, Licensee specifically agrees that neither Licensee nor Licensee's invitees will: (a) bring into the Stadium any alcoholic or intoxicating beverage, any illegal drugs or, except as prescribed by a physician, any controlled substance, (b) permit the Licensee's Seats to be used for any illegal, improper, immoral or objectionable purpose, or in any way obstruct or interfere with the rights of any other licensees or Game attendees; or (c) film, record or transmit from the Licensee's Seats all or any portion of any NFL Football game or other event, or any description thereof, by any means (including without limitation radio or television broadcasting, whether broadcast "live" or by means of film or tape).

## 12.  Assumption of Risk; Liability; Indemnity.

Licensee, for Licensee and Licensee's invitees, assumes all risk of personal injury to, or for any damage to or any loss of property of, Licensee or its invitees, arising out of, during or related to their attendance at events held in the Stadium. Licensee acknowledges that alcoholic beverages will be available in the Stadium and that attendance at sporting events may expose attendees to certain risks of injury including, but not limited to, incidents involving other patrons who have consumed alcoholic beverages, injury from thrown or dropped objects, spills of food or beverages and the unruly behavior of other patrons. Licensee hereby agrees to assume all responsibility and liability for the consumption in the Stadium of alcoholic beverages by Licensee and its invitees and for the conduct and behavior of Licensee and its invitees. Licensee agrees to indemnify and hold harmless Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., and the RAMS, and the respective owners, officers, directors, employees and agents of each such entity, from and against any claims, damages, actions, suits and expenses, including attorneys' fees and other costs, arising out of or related to this Agreement, the use of alcohol at the Stadium by Licensee or Licensee's invitees, the conduct and behavior of Licensee and Licensee's invitees and/or the use of the Licensee's Seats by Licensee or Licensee's invitees, whether such claims are now existing or later arising, and whether or not such loss is alleged to be caused by the negligence of Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., or the RAMS, the respective owners of each such entity, or their respective officers, directors, employees or agents.

## 13.  Additional Terms.

A  Licensee acknowledges that the Stadium will be managed, maintained and operated by The Regional Convention and Visitors Commission (the "Stadium Manager") pursuant to certain agreements between the Stadium Manager and The Regional Convention and Sports Complex Authority (the "Authority") (collectively the "Stadium Agreements"). All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the RAMS agreement to relocate to St. Louis. Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years  Licensee acknowledges that Licensee has no claim against the RAMS with respect to this Convertible CPSL and/or its termination whatsoever Licensee

understands and acknowledges the possibility that the RAMS may not play its games in the Stadium or St. Louis for the entire term contemplated by this License. Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this Convertible CPSL including without limitation should the RAMS not play its home games in the Stadium or in St. Louis for any reason

B  Licensee hereby acknowledges that although the RAMS are not a party to this Agreement, the RAMS are a third party beneficiary under this Agreement and will directly and/or indirectly realize certain benefits from this Agreement  In addition, Licensee acknowledges that various other parties named in Sections 11 and 12 above, namely the Stadium Manager, the Authority, and St. Louis NFL Corp. are also third party beneficiaries of this Agreement and may directly or indirectly realize certain benefits from this Agreement  There are no other third party beneficiaries to this Agreement

C  This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri without regard to the laws of conflict Any action, suit or other proceeding brought by or against the Licensee or Licensor, including any claim for injuries or damages relating to the license of a part of the Stadium, the Licensee, and Licensee's guests and invitees, shall be brought in the United States District Court for the Eastern District of Missouri, Eastern Division, or in the Circuit Court of the State of Missouri, Twenty-First (21st) Judicial Circuit

D  All notices and other communication required to be given pursuant to this License to Licensor or to Licensee shall be in writing and shall be sent to the addresses set forth on the Signature Page of this Agreement. Any notice given herein shall be deemed delivered when addressed as above provided, postage prepaid, certified mail, return receipt requested, and deposited in a United States General or Branch Post Office or with a nationally recognized overnight courier. Licensee hereby authorizes Licensor to provide Licensee's Qualifying Lender with a copy of any notice or other communication which Licensor may give to Licensee hereunder.

E  This Agreement contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any representations or agreements previously made or entered into by the parties hereto. No modification hereto shall be permitted by Licensee whatsoever.

F  This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, and their permitted successors and assigns. This Agreement may be assigned by Licensor in whole or part without any notice to Licensee; this Agreement shall not be assigned or transferred by Licensee except as set forth above. This License Agreement shall not be binding and enforceable until completed as stated on the Signature Page

G  Notwithstanding the foregoing, neither Licensor nor the RAMS shall have any liability to Licensee or a Qualifying Lender for any failure to comply with the provisions of Sections 4.B or 13.D above.

**STADIUM DIAGRAM**

**Lower Level**



# RAMS CLUB MEMBERSHIP, NFL TICKET, AND TICKET OPTION AGREEMENT

COPY

SAMPLE

## RAMS CLUB MEMBERSHIP, NFL TICKET, AND TICKET OPTION AGREEMENT

This Rams Club Membership, NFL Ticket And Ticket Option Agreement (collectively the "Agreement") is made and entered into as of the date set forth on Schedule I by and among The Rams Football Company, Inc., a Delaware corporation (the "Team" or "Rams Football Club"), the Regional Convention and Visitors Commission ("Stadium Manager"), and the Patron identified on Schedule I (the "Patron").

A.      Patron desires to purchase one or more memberships ("Membership(s)") in the Rams Club, as more specifically defined herein.

B.      Team is willing to sell to Patron NFL Tickets (as defined below) to NFL Games (as defined below) and a Ticket Option (as defined below) to purchase Stadium Event Tickets (as defined below) to the seats more fully identified on the attached Schedule I (the "Club Seat(s)") to be located within the Stadium at America's Center (the "Stadium") upon the terms and conditions hereinafter set forth. The Stadium is presently under construction in downtown St. Louis, Missouri.

C.      The Stadium, the Rams Club and the Club Seat(s) are being constructed and will be owned by the Regional Convention and Sports Complex Authority (the "Authority"). It is possible that the Stadium, the Rams Club and the Club Seat(s) will be completed and available for use before or during the 1995-1996 National Football League ("NFL") season, but there is no assurance that any of them will be. There will be no pre-season NFL Games played in St. Louis by the Rams (as defined below) in 1995.

D.      The Stadium will be managed, maintained and operated by the Regional Convention and Visitors Commission ("Stadium Manager").

E.      Team has entered into various agreements with the Authority, the Stadium Manager and others, including, but not limited to, that certain Amended and Restated St. Louis NFL Lease (the "Stadium Lease"), pursuant to which the Team leases the Stadium, provides for the NFL franchise owned by Team (or its successors or assigns) (the "Rams") to play its NFL Games at the Stadium, beginning with the 1995-1996 NFL season, and gives Team the right to enter into agreements with respect to certain areas in the Stadium, which include but are not limited to the Rams Club and the Club Seats.

F.      Stadium Manager retained the right to sell Charter Rams Club Memberships, the purchase of which is a condition, among others, of Patron entering into this Agreement for Rams Club Memberships, NFL Tickets and the Ticket Option.

G.      Patron acknowledges (i) the Stadium may not be completed by the 1995-1996 NFL season and the Rams may play NFL Games at Busch Stadium in St. Louis ("Busch") instead, (ii) the Rams may otherwise be precluded from playing NFL Games in St. Louis, and (iii) under certain circumstances the agreements under which the Rams are to play NFL Games in St. Louis may be terminated, and if any such event occurs this Agreement may be affected as set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, Team, Stadium Manager and Patron hereby agree as follows:

COPY

1.   Rams Club Membership.

 A. For each of Patron's Memberships in the Rams Club Patron shall pay:

  (i) A one-time Charter Rams Club Membership fee per Membership, payable to FANS, Inc. ("FANS") acting as agent for the Stadium Manager upon execution of this Agreement in the amount set forth in Schedule I;

  (ii) An Annual Combined Rams Club Fee per Membership, each Membership Year, payable to Team in the amount and at the times set forth on Schedule I, for (a) each Rams Club Membership, (b) NFL Tickets (as hereinafter defined in subsection 2.A, other than tickets for post-season NFL Games as provided in subsection 2.B) for the applicable Club Seat and (c) the Ticket Option for each Club Seat, (Patron acknowledges the Annual Combined Rams Club Fee is subject to increase as set forth in subsection 1.E); and

  (iii) Any and all other charges due hereunder.

 B. Patron's Memberships shall be evidenced by Rams Club Membership Passes with one pass issued for each membership purchased. Each Rams Club Membership Pass will grant the holder thereof access to the Rams Club. Each Rams Club Membership Pass is subject to termination as provided herein.

 C. Patron shall also be responsible for payment of any and all taxes (including interest and penalties arising with respect thereto) arising with respect to Patron's Rams Club Memberships, the use of the Rams Club or related Stadium amenities, the Ticket Option and other Membership rights and privileges (together, "Membership Taxes"). If the Team and/or the Stadium Manager shall pay or become obligated to pay any Membership Taxes, during or allocable to the Term, Patron shall reimburse the Team and/or the Stadium Manager, as the case may be, in full for such payment within ten (10) days after delivery of the Team's and/or the Stadium Manager's statement therefor.

 D. Rams Club Membership entitles Patron to the benefits described in Section 5 hereof. Patron acknowledges and agrees that the Rams Club Membership does not entitle Patron access into the Stadium. Access to the Stadium is subject to presentation of an appropriate pass or ticket as the case may be.

 E. The Annual Combined Rams Club Fee may be increased by Team from the immediately preceding year's Annual Combined Rams Club Fee, but not in excess of the maximum percentages hereinafter set forth. For an Agreement with an original term of five or more years, the Annual Combined Rams Club Fee may be increased by a cumulative maximum of six percent (6%) per annum since the last such increase and for an Agreement with an original term of less than five years, the Annual Combined Rams Club Fee may be increased by a cumulative maximum of eight percent (8%) per annum since the last such increase.

 F. The phrase "Membership Year" shall mean the twelve consecutive months commencing with July 1 and ending with the next June 30. Notwithstanding the foregoing, the twelve month period of time of a Membership Year shall be adjusted or changed to the minimum extent possible from time to time in the event that the season of NFL Games is changed such that the NFL Game season would, absent this adjustment, overlap into two Membership Years in order that each NFL Game season shall fall only within a single Membership Year. In such event, (i) the Membership Year which encompasses all or any portion of two NFL seasons shall terminate on the day prior to the commencement of the second NFL season so encompassed and (ii) there shall be no abatement of Annual Combined Rams Club Fee or any other fee or charge due from Patron, provided that each Membership Year includes the normal number of regular season NFL Games.

C-4

COPY

2.    <u>Club Seat Tickets.</u>

A.    Patron's purchase of each Rams Club Membership under this Agreement shall, by virtue of the payment of that portion of the Annual Combined Rams Club Fee applicable to the NFL Tickets, entitle Patron to tickets for the applicable Club Seat for each and every pre-season and regular season NFL Game played at the Stadium by Team during such Membership Year of this Agreement ("NFL Tickets").

B.    Patron's purchase of each Rams Club Membership under this Agreement shall, by virtue of the payment of that portion of the Annual Combined Rams Club Fee applicable to the Rams Club Membership, create a right of, and an obligation on, Patron to purchase all tickets for each and every post-season NFL Game played at the Stadium by Team (which right excludes the Super Bowl and the Pro-Bowl) for such additional prices and on such additional terms and conditions as established from time to time by Team or the NFL, as the case may be.  For purposes of this Agreement, such tickets to the Club Seats to such post-season NFL Games, when made available by Team for purchase by Patron, shall be included within the meaning of the term NFL Tickets unless the context clearly provides otherwise.

C.    Patron's purchase of the Rams Club Memberships under this Agreement shall, by virtue of the payment of that portion of the Annual Combined Rams Club Fee applicable to the Ticket Option, also grant Patron the first right, if timely and properly exercised by Patron, but not the obligation, for each Stadium Event (as defined below) other than Specified Events (as defined below) during the Membership Year with respect to which the Ticket Option is granted, to purchase all of the tickets referable to the Club Seats subject to this Agreement for such Stadium Event ("Club Event Tickets"), at the prices and upon such terms and conditions as established from time to time by the Stadium Event's sponsor (the "Ticket Option"). The timely and proper exercise of the Ticket Option under this Agreement to purchase the Club Event Tickets with respect to a Stadium Event creates a binding obligation upon Patron to purchase all, and not less than all, of the Club Event Tickets for such particular Stadium Event.  Patron agrees and acknowledges that Patron must affirmatively exercise the option to purchase Club Event Tickets on a Stadium Event by Stadium Event basis.

D.    For purposes of this Agreement, the phrase "NFL Games" means all exhibition, pre-season, regular and post-season home NFL games (other than the Super Bowl and the Pro Bowl) played by the Rams at the Stadium.  The phrase "Stadium Events" means such other sports and entertainment events, if any, held in the Stadium other than "Specified Events," which are open to the general public and for which tickets to the Club Seats are made available to Team by the event sponsor for sale to Patron pursuant to the Ticket Option pursuant to Subsection 2.C. above.  It is acknowledged that there may not be any Stadium Events, and that Team has no obligation or ability to cause any events held at the Stadium (whether open to the general public or otherwise) to be Stadium Events.  The term "Specified Events" means the Super Bowl, NCAA Final Four and the Republican and Democratic National Conventions.

E.    The furnishing of NFL Tickets and Club Event Tickets to Patron shall be subject to such notification, order and payment procedures and requirements as the Team or applicable Stadium Event sponsor shall establish.  This Agreement obligates Patron to pay the Annual Combined Rams Club Fee referable to all, and not less than all, Rams Club Memberships, NFL Tickets and Ticket Options which Patron has purchased, or agreed to purchase, hereunder notwithstanding that the amounts referred to herein or in Schedule I are stated for each individual Rams Club Membership.

F.    Patron acknowledges that if Patron fails to timely purchase Club Event Tickets pursuant to Patron's Ticket Option for any given Stadium Event, Team or Stadium Manager, as the case may be, shall be free to offer and to sell said Club Event Tickets to any and all other individuals or entities Team or Stadium Manager, as the case may be, chooses in Team's or Stadium Manager's, as the case may be, sole discretion for such Stadium Events.

G.    Any and all taxes (including interest or penalties with respect thereto) arising with respect to the purchase of NFL Tickets and/or Club Event Tickets, or the use of the Club Seat(s) or related Stadium

amenities by Patron or Patron's invitee(s) (together, "Ticket Taxes") shall be the responsibility of Patron to the extent such Ticket Taxes are not already paid by Patron because they are explicitly included in the price of the tickets.  If the Team or Stadium Manager shall pay or become obligated to pay any Ticket Taxes, during or allocable to the Term, Patron shall reimburse the Team or the Stadium Manager, as the case may be, in full for such payment within ten (10) days after delivery of the Team's or the Stadium Manager's statement therefor.

3.      <u>Parking.</u>

So long as Patron is a member in good standing of the Rams Club, for all NFL Games held in the Stadium, Team will use its reasonable efforts to provide Patron with the opportunity to purchase from a garage operator (at prices to be established by such garage operator) one parking pass for each complete group of four NFL Tickets purchased by Patron hereunder enabling Patron or Patron's invitee(s) to park passenger vehicles of standard size (i.e. not motorhomes, buses, trailers, etc.) during specified hours.  It is understood and agreed that Team does not own or operate any parking garages or lots and shall have no liability to Patron for any loss or damage arising from the use of any such garage or lot.

4.      <u>Use of the Club Seat.</u>

Upon presentation of the appropriate NFL Ticket(s) or Club Event Ticket(s), Patron and Patron's invitee(s) shall be permitted to use the Club Seat(s), but only in accordance with such rules and regulations as may be implemented from time to time by the Team and/or Stadium Manager with respect to the use of Club Seats generally.  Patron agrees to comply, and shall cause Patron's invitee(s) to comply, with all present and future laws, ordinances, orders, rules and regulations of all governmental authorities applicable to the Club Seat(s) and patronage of the Stadium and will not suffer or permit to remain any use or manner of use in violation thereof or for any illegal or immoral purpose.

5.      <u>Club Level Services and Privileges.</u>

A.      Each Rams Club Membership of Patron shall entitle the holder thereof, during NFL Games and Stadium Events for which Patron has purchased a Club Event Ticket, to utilize at Patron's sole cost and expense the Rams Club Level lounges and amenities and to purchase food and beverages at the Rams Club Level concession services.  Patron covenants and agrees that Patron shall not, nor permit Patron's invitee(s) to, carry or bring into the Rams Club and/or Club Seat(s) food or beverages of any kind, it being understood that such items shall be available exclusively from the Rams Club.  Rams Club Level lounges will be open for a reasonable period of time following each NFL Game played at the Stadium for post-game service to Rams Club members.  Rams Club Level lounges, food and beverage services and amenities shall be available generally only to Rams Club members and box suite lessees, and their respective guests or invitees.  Nothing in this Agreement shall entitle Patron to use any of the box suites in the Stadium.

B.      If Team establishes accounts for Rams Club members, Patron shall be responsible for payment of all charges for food and beverages ordered by Patron or any invitee of Patron.

C.      Team hereby reserves the right to change the name of the Rams Club in its sole discretion.

6.      <u>Rams Club Membership Renewal Option.</u>

If not in default in the performance of any of Patron's obligations under this Agreement, Patron shall, prior to the expiration of the term of this Agreement, have the option to renew the Rams Club Memberships and accompanying NFL Ticket and Ticket Option rights for all, but not less than all, of the Club Seats subject to this Agreement on such terms and conditions as the Team may, in its sole discretion, determine ("Rams Club Membership Renewal Option").  In connection therewith, Team agrees that the

-4-

Rams Club Membership Renewal Option procedure shall be as follows: On or about the thirteenth month prior to the expiration of this Agreement, the Team shall submit to the Patron a new Rams Club Membership, NFL Ticket and Ticket Option Agreement which sets forth the fees and other terms and conditions established by the Team for Rams Club Membership, NFL Tickets and the Ticket Option to purchase Club Event Tickets. Patron may exercise Patron's Rams Club Membership Renewal Option hereunder by executing and returning to the Team, such new Rams Club Membership, NFL Ticket and Ticket Option Agreement, together with any deposit or other payment which may be required thereunder, within thirty (30) days after the new Rams Club Membership, NFL Ticket and Ticket Option Agreement is sent to Patron by Team.

7.   Term of Agreement.

    A.   This Agreement shall be effective on the last to occur of the following: (i) execution by Patron, (ii) execution by Team, (iii) execution by FANS as agent for Stadium Manager, (iv) payment by Patron of the Charter Rams Club Membership Fee to FANS as agent for Stadium Manager, and (v) payment by Patron of the first Membership Year's Annual Combined Rams Club Fee.

    B.   Unless terminated sooner, the term of this Agreement shall expire as set forth on the attached Schedule I (the "Term"). Patron acknowledges that Patron is entering into this Agreement as an inducement for Team to move the Los Angeles Rams to St. Louis, Missouri and, therefore, even if the Club Seat(s) is (are) not available for Patron's use during the whole or any part of the 1995-1996 NFL regular season, the expiration date set forth on Schedule I shall not be extended and Patron shall not receive any credit or reduction with respect to the Charter Rams Club Membership Fee or the Annual Combined Rams Club Fee, unless Team does not make available for Patron, that number of "Premium Location Seat(s)" in Busch Stadium for NFL football games played at Busch Stadium which corresponds to the number of NFL Tickets purchased by Patron. If Club Seat(s) is (are) not available, Team will use Team's best efforts to provide Patron, and Patron will accept in place of the Club Seat(s), replacement "Premium Location Seat(s)" at Busch. For purposes of this Agreement the term "Premium Location Seats" shall mean well located, non-Club Seat substitute seating at Busch Stadium which Team, using its reasonable efforts, procures for Patron as replacements for the Club Seat(s).

    C.   Notwithstanding anything to the contrary contained in this Agreement, either Patron or Team may cancel this Agreement if Patron is advised by Team at any time in writing that (i) the Stadium will not ever be completed, (ii) the Club Level will not ever be completed and be made available for Patron's use, (iii) the Rams will not play NFL Games at the Stadium or Busch prior to the end of the 1996-1997 NFL season, or (iv) the Rams will no longer play any NFL Games in St. Louis. Team shall use its reasonable efforts to notify Patron promptly after the occurrence of any of (i)-(iv) above.

    D.   In order to cancel this Agreement upon any of the occurrences described in subsection 7.C. above, the party desiring cancellation shall deliver to the other party written notice of such election following the applicable occurrence. In the event this Agreement is cancelled before any NFL Game is played at the Stadium or Busch, Patron shall promptly receive a full refund (i) from Stadium Manager of any prepaid Charter Rams Club Membership Fee, and (ii) from the Team of any unearned Annual Combined Rams Club Fee. In the event this Agreement is cancelled after an NFL Game is played at the Stadium or Busch, Patron shall receive as a refund the "Unamortized Portion" (as defined below in subsection 7.F.) of the Annual Combined Rams Club Fee. Notwithstanding the foregoing, however, in order for a party to cancel this Agreement upon the occurrence of an event described in subsection 7.C.(iii) above, such party must notify the other of the same not more than sixty (60) days after Patron's receipt of Team's notice and, if neither party timely elects to cancel this Agreement after notice of the occurrence of the event described in subsection 7.C.(iii), this Agreement shall remain in full force and effect, but the mutual option to cancel this Agreement shall again be effective for an additional period of sixty (60) days from the end of the then current NFL season through the date which is sixty (60) days thereafter.

E.      The effectiveness of this Agreement is contingent on the availability of Club Seating to Patron after recognition of all prior commitments made by Team therefor.  In the event no Club Seating is available for Patron, this Agreement shall be canceled and the Charter Rams Club Membership Fee shall be promptly refunded to Patron from Stadium Manager and any and all other amounts paid by Patron hereunder shall be promptly refunded to Patron by Team.  In the event said commitments result in the unavailability of a sufficient number of Club Seats in the section identified in the attached Schedule I hereto, Patron may cancel this Agreement and receive a complete refund of the Charter Rams Club Membership Fee from Stadium Manager and any and all other amounts paid by Patron hereunder from Team, unless Patron, Stadium Manager and the Team promptly execute a replacement Schedule I for alternate Club Seats satisfactory to Patron.

F.      For purposes of this Agreement, the term "Unamortized Portion" shall mean and be calculated as follows:  the number corresponding to the total number of regular season NFL Games scheduled but not played in the Stadium or Busch during the applicable Membership Year as the numerator shall be divided by the number corresponding to the total number of regular season NFL Games scheduled to be played in the Stadium or Busch during the applicable Membership Year.  The resulting fraction shall be multiplied by the Annual Combined Rams Club Fee, as the case may be, paid by Patron and the resulting sum shall be the Unamortized Portion.

8.      Default.

A.      In the event Patron fails to pay any fees, Membership Taxes, Ticket Taxes or other charges as and when due hereunder, or in the event Patron otherwise defaults in the performance or observance of Patron's duties and obligations under this Agreement, Team may, at its option, immediately suspend all rights of Patron to all benefits and privileges of Membership in the Rams Club, and/or the use and possession of the NFL Tickets and/or Club Event Tickets, and/or all benefits of the Ticket Option rights granted Patron hereunder, and if such default is not cured after fifteen (15) days' written notice (five (5) days during the NFL season), then (in addition to and not as an alternative to all other legal remedies) Team shall have the right to (i) terminate this Agreement and (a) Patron's benefits and privileges of Membership in the Rams Club, and (b) Patron's right to use the NFL Tickets and/or Club Event Tickets, the Ticket Option and Patron's right to the use and enjoyment of the Club Seat(s) or (ii) terminate only Patron's right to use the NFL Tickets and Club Event Tickets, the Ticket Option and Patron's right to the use and enjoyment of the Club Seat(s). In the event this Agreement is terminated, the entire unpaid balance of the Annual Combined Rams Club Fee for the remainder of the Term shall be immediately due and payable, whereupon the Team shall have no further obligation of any kind to Patron.  Upon any suspension or termination of this Agreement, all Rams Club Memberships and/or passes belonging to Patron, all NFL Tickets and/or Club Event Tickets belonging to Patron and parking passes made available to Patron shall be immediately cancelled.  Team and/or the Stadium Manager, as the case may be, shall be entitled to recover from the Patron, in addition to the fees, Membership Taxes, Ticket Taxes, and other charges, all expenses incurred in connection with any default by Patron or in enforcing this Agreement, including costs, legal expenses and attorney's fees (whether or not suit is filed), and all expenses incurred in such efforts to resell Patron's Rams Club Membership and resell Patron's NFL Ticket(s).  Except as specifically required by law, Team shall have no obligation to resell the NFL Tickets, and in no event shall Team be obligated to resell the Rams Club Memberships and/or NFL Tickets prior to Team selling other available Rams Club Memberships and/or tickets referable to Rams Club Level seating in the Stadium.  Notwithstanding anything in this Agreement, Patron shall remain liable for any and all of Patron's obligations which arise or relate back to the period of time prior to termination.

Patron shall remain obligated to make all payments due or becoming due under this Agreement, but if the Team resells Patron's Rams Club Memberships and/or NFL Tickets to another party, then all amounts received from such other party applicable to any remaining period of this Agreement shall be applied first to the costs and expenses of enforcing this Agreement, then to the costs and expenses of reselling, then to the reduction of any obligations of Patron to the Team under this Agreement, then to Patron to the extent of monies paid by Patron to Team pursuant to this section 8, and any balance shall belong to Team.  If the

-6-

COPY

consideration collected by the Team upon any such resale is not sufficient to pay the full amount of all such obligations of Patron, Patron shall pay any such deficiency upon demand.

B.   The foregoing remedies of Team and/or the Stadium Manager shall not be to the exclusion of any other right or remedy set forth herein or otherwise available to the Team and/or the Stadium Manager in law or in equity, all of which are hereby granted to Team and/or the Stadium Manager, as the case may be, and any remedy Team and/or the Stadium Manager may have with respect to a default may be exercised independently of or concurrently with any other remedy Team and/or the Stadium Manager, as the case may be, may have.

C.   Patron hereby waives trial by jury.

D.   No waiver by Team of any default or breach by Patron of its obligations hereunder shall be construed to be a waiver or release of any other or subsequent default or breach by Patron hereunder, and no failure or delay by the Team in the exercise of any remedy provided for herein shall be construed to constitute a forfeiture or waiver thereof or of any other right or remedy available to Team.

9.   Casualty.

If the Stadium, the Club Level and/or the Club Seat(s) shall be destroyed or damaged so as to render the Club Seat(s) unusable, and Team advises Patron that the same will be repaired or restored, this Agreement shall remain in full force and effect, but, unless Team is able to provide to Patron a reasonably comparable substitute Club Seat at the Stadium (or substitute Premium Location Seat at Busch) until the Club Seat is again available for Patron's use, Patron shall receive a credit against the next succeeding installments of the Annual Combined Rams Club Fee, equal to the Annual Combined Rams Club Fees for the Membership Year(s) in which the Club Seat is rendered unusable multiplied by a fraction, the numerator of which is the number of regular-season NFL Games scheduled but not held in the Stadium (or held but during which the Club Seat(s) or a substitute club seat(s) or Premium Location Seat at the Stadium or Busch is unavailable to Patron) on account of the damage or destruction and the denominator of which is the total number of regular season NFL Games scheduled to be held during such Membership Year(s).  In the Event such damage or destruction occurs during the last Membership Year of the term of this Agreement and in the further event Patron has not exercised Patron's Rams Club Membership Renewal Option to enter into a new Rams Club Membership, NFL Ticket and Ticket Option Agreement pursuant to Section 6 hereof, Patron shall receive a refund of any abated portion of the Annual Combined Rams Club Fee not subject to credit. No abatement of or credit against NFL Ticket prices shall occur as a result of any damage or destruction which renders the Club Seat(s) unusable for pre- or post-season NFL Games or for any Stadium Event.  If, in the event of any damage to or destruction of the Stadium, the Club Level and/or the Club Seat(s) (and notwithstanding any earlier notification to the contrary), Team advises Patron that the Club Seat(s) will not be repaired or restored, this Agreement shall terminate as of the date of such damage or destruction, and the entire amount of the abatement shall be promptly paid to Patron.  Team shall have no obligation to Patron to cause the Stadium and/or Club Level and/or Club Seat(s) to be repaired as contemplated herein.  Except as otherwise provided in this Section 9, Patron shall not be entitled to any abatement of or credit against the Annual Combined Rams Club Fee on account of the postponement or cancellation of any Stadium Event, or the interruption of any services provided to the Stadium or the Club Seat.  Notwithstanding anything to the contrary contained in this Section 9, this Agreement shall remain in full force and effect, and Patron shall receive no abatement of or credit against Annual Combined Rams Club Fee on account of any damage or destruction which does not render the Club Level unusable, provided Team shall provide reasonably comparable Club Seating or Premium Location Seating to Patron during the repair of such damage or destruction.  If a regular season NFL Game is cancelled and not rescheduled during the Membership Year, such event shall be treated in the same manner under this Section 9 as a destruction or damage of the Club Level and/or the Club Seat(s).

COPY

10. __Repairs to Club Seating.__

Except for damage caused by Patron or Patron's invitee(s), it is acknowledged that the Stadium Manager shall be responsible for the repair and replacement of any damaged or defective Club Seat, and in the event the Club Seat is unavailable to Patron during any NFL Games on account of the need for such repair or replacement, Team shall have the right to provide temporary Club Seating or premium seating elsewhere on the Rams Club Level, but not the obligation, until the completion of such repairs or replacement, without any abatement of or credit against Annual Combined Rams Club Fees. Patron shall be responsible for all damage caused by Patron or Patron's invitees.

11. __Disclaimer of Liability.__

A. None of Team, its affiliated entities, the NFL, or its member clubs, the Authority, the Stadium Manager or FANS, Inc. shall be liable or responsible for any loss, damage or injury to any person or property in or around the Rams Club, the Club Seat or the Stadium resulting from any cause whatsoever, including theft and vandalism, unless due to the gross negligence or willful misconduct of the Team or such affiliated entity, or the NFL or its member clubs, or the Authority, the Stadium Manager or FANS, Inc. as the case may be. Patron shall indemnify and hold Team and its affiliated entities, the NFL and its member clubs, the Authority, the Stadium Manager and FANS, Inc. and their respective directors, shareholders, officers, partners and employees and directors, shareholders, officers and employees of partners (collectively, the "Indemnified Parties") harmless from and against any and all liabilities, losses, claims, demands, costs and expenses, including reasonable attorneys' fees and expenses to which any of the Indemnified Parties may become subject by reason of possession or use of the Rams Club and/or the Club Seat by Patron or Patron's invitees in contravention of any provision of this Agreement, or the negligent or wrongful act or failure to act on the part of Patron or Patron's invitees.

B. Patron shall be subject to the ticket-refund policies of the sponsor of each Stadium Event regarding cancellation or postponement of any Stadium Event with respect to any Club Event Tickets for which Patron has exercised Patron's Ticket Option. Further, Patron shall be entitled to a credit with respect to the Annual Combined Rams Club Fee if any NFL Game scheduled at the Stadium is cancelled. No credit shall be given with respect to the Annual Combined Rams Club Fee for the cancellation or postponement of any Stadium Event. Subject only to the provisions of Section 9 hereof and this Section 11 relating to obligations of Team, neither Team, nor in any event the remaining Indemnified Parties, shall have any liability to Patron on account of any such cancellation or postponement. Performance of any obligation of the Team hereunder shall be further subject to extension or subject to abatement under the terms and conditions set forth in Section 9 hereof applicable to casualty on account of any damage, destruction, disruption of utility services, strike, lock-out or other labor disturbance, civil disturbance, Act of God, or other occurrence beyond the reasonable control of Team.

12. __Miscellaneous.__

A. This Agreement establishes a Membership in the Rams Club, governs the purchase of NFL Tickets and establishes, under certain circumstances, the option to purchase Club Event Tickets, and a revocable license to use and enjoy the Club Seats for NFL Games for which Patron has purchased NFL Tickets and such Stadium Events that Patron properly exercises Patron's Ticket Option to purchase Club Event Tickets for Stadium Events.

B. Patron shall pay any and all fees, Membership Taxes, Ticket Taxes and other charges due pursuant to any provision of this Agreement without set off, deduction, withholding or abatement for any reason whatsoever except as expressly to the contrary provided herein. Patron's obligation to pay any such sums accruing during the Term hereof shall survive any expiration or earlier termination of this Agreement.

-8-

Interest shall accrue on charges which remain unpaid for more than five (5) days past the due date at the rate of one and one-half percent (1.5%) per month or the highest rate permitted by law, whichever is less.

C.    Patron shall not sublease, assign, sell, lease, pledge or otherwise transfer this Agreement, or any of Patron's interest, rights and obligations hereunder, except pursuant to testamentary disposition or bequest or pursuant to a transfer to an "Immediate Family Member" of Patron's (i.e. to any grandparent, parent, spouse, child, stepchild, sibling, grandchild or great-grandchild of Patron's). Any transfer of a majority of the capital stock or controlling interest in Patron (or a merger involving Patron) shall also be deemed an unpermitted transfer, unless a purpose of such transaction was not the transfer of the Agreement. Any attempted sublease, assignment, sale, license, pledge or other transfer shall be null and void and shall constitute a default on the part of Patron hereunder, which, if not timely cured by Patron, shall, among the remedies available to Team under Section 8 hereof, entitle Team, at its option, to cancel this Agreement. Team and/or the Stadium Manager may transfer or assign all or any part of this Agreement including the right to transfer or assign any right to enforce Team's or Stadium Manager's, as the case may be, obligations hereunder.

D.    Patron agrees, within ten (10) days after its receipt of the Team's request therefor, to execute and deliver an estoppel certificate, addressed to any current or prospective purchaser of any interest in, Team, the Rams, or any prospective assignee of Team's interest in this Agreement, providing information as to (i) whether this Agreement is in full force and effect, (ii) whether Team or Patron is in default in the performance of any obligation hereunder, (iii) the status of all Annual Combined Rams Club Fees and other charges due hereunder, and (iv) any other matters of interest which the addressee may reasonably request, within the scope of this Agreement.

E.    This Agreement is subject and subordinate to the agreements generally referenced in Recital E hereto, which provide, among other things, that a default on the part of the State of Missouri, St. Louis County or the City of St. Louis in the performance of their obligations under their respective series of Convention Center and Sports Facility Project Bonds may result in suspension, or, if such default remains uncured as provided therein, in termination of professional football and convention activities within the Stadium. Patron hereby acknowledges that this Agreement and its rights hereunder are subject to and subordinate to the provisions of Section 8.2 of the Financing Agreement (as defined in the Stadium Lease), and to the right of the Indenture Trustee (as defined in the Project Indentures) (as defined in the Financing Agreement), upon the written request of Holders (as defined in the Financing Agreement) of not less than twenty-five percent (25%) in aggregate principal amount of the respective Project Bonds then outstanding as set forth in Section 903 of the Project Indentures, to direct the Authority to terminate all convention and football uses of the Facilities (as defined in the Stadium Lease) and, thereafter, to terminate all leases, subleases, and other agreements providing for or authorizing said uses, including this Agreement. This Agreement shall remain in full force and effect during any such period of suspension of home games, but Patron shall be entitled to abatement of Annual Combined Rams Club Fees to the same extent as in the event of a casualty under Section 9 hereof. Any termination of this Agreement resulting from a termination of professional football in the Stadium or of the Team's Stadium Lease shall be treated in the same manner as a termination of this Agreement incident to the provisions of Section 9 hereof. Termination of Team's Stadium Lease shall cause a termination of this Agreement.

F.    Patron expressly agrees not to sue the Team or Stadium Manager for damages or injunctive relief in any action at law or in equity arising under this Agreement should the Team not play NFL Games in the Stadium or St. Louis for any reason, other than for the recovery of any portion of any Annual Combined Rams Club Fee which Patron is entitled to receive back pursuant to this Agreement.

G.    All notices, demands and other communications between the parties required or appropriate hereunder shall be in writing and deemed given if mailed, postage prepaid, to the addresses set forth for the parties in the Schedule I, or to such other address as may be designated by either party, from time to time in writing.



This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri without giving effect to principles of conflicts of laws.

I.        This Agreement, together with Schedule I annexed hereto, contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any written instrument or oral agreement previously made or entered into by the parties hereto. This Agreement may, however, be supplemented from time to time by additional rules and regulations enacted by Team and/or the Stadium Manager provided the same are of general applicability to all NFL Ticket and Stadium Event Ticket holders.

J.        This Agreement and all the terms and provisions hereof, shall inure to the benefit of and be binding upon the parties hereto, their respective heirs, executors, administrators, personal representatives, successors and permitted assigns, provided that this subsection 12.J. shall not be interpreted as permitting any assignment or transfer not otherwise permitted by law. No amendment or modification to this Agreement shall be effective unless the same is in writing and signed by both Team and Patron.

IN WITNESS WHEREOF, this Agreement has been executed by Patron, FANS, Inc. as agent for Stadium Manager, and Team as of the Execution Date set forth on Schedule I.

"TEAM"
The Rams Football Company, Inc.

"PATRON"

By: _____
    John J. Shaw, President

By:_____

Name:_____

Title:_____

"STADIUM MANAGER"
Regional Convention and Visitors Commission
By:  FANS, INC., its agent

By: _____

Thomas F. Eagleton,
President and Chairman of
  the Board

-10-

COPY

To Rams Club Membership, NFL Ticket
and Ticket Option Agreement

The following Schedule I is hereby incorporated as part of the Agreement:

Patron:

Number of Rams Club Memberships:

Description of Club Seat(s) (must correspond to the number of Rams Club Memberships indicated above):

seat(s) in a(n) $
See Exhibit A
[Stadium Diagram]

Lease Term Options (Please indicate one)

_____     3 years - Initial membership year of July 1, 1995 - June 30, 1996;
            Last membership year of July 1, 1997 - June 30, 1998.

_____     5 years - Initial membership year of July 1, 1995 - June 30, 1996;
            Last membership year of July 1, 1999 - June 30, 2000.

_____     7 years - Initial membership year of July 1, 1995 - June 30, 1996;
            Last membership year of July 1, 2001 - June 30, 2002.

Charter Rams Club Membership Fee referable to each Rams Club Membership purchased under the Agreement:  $      .00,


Annual Combined Rams Club Fee referable to each Rams Club Membership purchased under the Agreement for the Initial Membership Year:  $      .00.


Annual Combined Rams Club Fee referable to each Rams Club Membership for subsequent Membership Years is due and payable in two equal installments on or before February 1 and April 1 of each Membership Year.  For each Membership Year after the first Membership Year, the Annual Combined Rams Club Fee referable to each Rams Club Membership may be increased by Team as provided in the Agreement.  The Annual Combined Rams Club Fees referable to all, and not less than all, Rams Club Memberships purchased under the Agreement are due and payable at the same times under this Agreement for each Membership Year.

-11-

Execution Date of the Agreement: _____, 1995.

"TEAM"
The Rams Football Company, Inc.                "PATRON"

By:_____
Name:  John J. Shaw                            By:_____
Title:   President
                                               Name:_____

                                               Title:_____



Notice Address:
10271 West Pico Boulevard                      Notice Address:
Los Angeles, CA 90064
Attn:  John J. Shaw, President
                                               Attn:


"STADIUM MANAGER"
Regional Convention and Visitors Commission
By:  FANS, INC., its agent

By:

_____

Name:  Thomas F. Eagleton
Title:   President and Chairman
          of the Board


Notice Address:

-12-

EXHIBIT A



CLUB LEVEL
LEVEL 400

CLUB SEAT PRICE CODE

- $2,200
- $2,000
- $1,800
- $1,600
- $1,200
- $1,000
- $900
- $800
- $700

*Club seat prices include season ticket.*