# EXHIBIT 3

## AMENDED AND RESTATED
## ST. LOUIS NFL LEASE

THIS AMENDED AND RESTATED ST. LOUIS NFL LEASE (the "Amended Lease") is entered into as of this 17th day of January, 1995, by and among THE LOS ANGELES RAMS FOOTBALL COMPANY, INC., a corporation organized and existing under the laws of the State of Delaware (hereinafter referred to as the "RAMS"), THE REGIONAL CONVENTION AND VISITORS COMMISSION, a/k/a St. Louis Convention and Visitors Commission, a public body corporate and politic of the State of Missouri (hereinafter referred to as "CVC") and ST. LOUIS NFL CORPORATION, a corporation organized and existing under the laws of the State of Missouri (hereinafter referred to as "SLNFL") with respect to that certain ST. LOUIS NFL LEASE (the "Lease") entered into as of the 28th day of August, 1991, by and between CVC and SLNFL.

### RECITALS

WHEREAS, THE REGIONAL CONVENTION AND SPORTS COMPLEX AUTHORITY, a public body corporate and politic of the State of Missouri (the "Authority") has been established for the purpose of constructing, owning and operating a convention and sports facility on the real property described in Exhibit A to this Amended Lease (the "Facilities") to adjoin the Cervantes Convention Center and in the City of St. Louis, Missouri (the "Convention Center"); and

WHEREAS, in accordance with the laws of the State of Missouri and the ordinances of the City of St. Louis, Missouri and St. Louis County, Missouri, respectively, and pursuant to that certain Project Agreement dated as of July 11, 1990 (the "Project Agreement") among the State of Missouri (the "State"), the City of St. Louis, Missouri (the "City"), St. Louis County, Missouri (the "County") and SLNFL, the State, the City and the County (together, the "Sponsors" and individually, a "Sponsor") have duly authorized and agreed to participate in the financing, construction and operation of the Facilities; and

WHEREAS, the Authority, as owner of the Facilities, and the Sponsors, as tenants in common, have entered into a certain Project Financing, Construction and Operation Agreement dated as of August 1, 1991 (the "Financing Agreement"), pursuant to which the Authority has leased and demised the Facilities to the Sponsors, and the Sponsors have in turn leased and demised the Facilities to the Authority, in accordance with the terms and conditions set forth in the Financing Agreement; and

WHEREAS, the St. Louis Municipal Finance Corporation, a Missouri not-for-profit corporation ("SLMFC")

FRKL037A.WP 55909 1/16/95  4:34pm

as owner, has leased and demised the Convention Center to the City pursuant to a Lease Purchase Agreement dated as of June 15, 1993 (the "Lease Purchase Agreement"), and, in order to facilitate the efficient, harmonious and successful development, operation and use of the Convention Center and the Facilities, the City, pursuant to a certain Amended and Restated Convention Center Operating Lease dated as of July 29, 1993 (the "Convention Center Operating Lease") has leased and demised the Convention Center to CVC, subject to the terms and conditions set forth in the Convention Center Operating Lease which is subordinate to the Lease Purchase Agreement and other documents as provided in the Convention Center Operating Lease; and

WHEREAS, the Authority, the Sponsors, CVC and SLNFL have entered into a certain Cooperative Agreement dated as of August 1, 1991 (the "Cooperative Agreement"), relating to certain matters of interest to said parties in connection with the construction and operation of the Facilities; and

WHEREAS, the Authority, as Operating Landlord (the "Operating Landlord"), and CVC, as tenant, have entered into a certain Operating Lease dated as of August 28, 1991 (the "Operating Lease"), pursuant to which the Authority has leased and demised the Facilities to CVC, subject to the terms and conditions of the Financing Agreement and otherwise in accordance with the terms and conditions set forth in the Operating Lease; and

WHEREAS, pursuant to the Financing Agreement and the Operating Lease (together, the "Prior Leases"), CVC entered into the Lease, to lease and demise the Facilities to SLNFL, for the uses, the rent and the term and subject to the terms and conditions set forth therein in anticipation of SLNFL obtaining a NFL franchise to play NFL Games; and

WHEREAS, SLNFL is wholly-owned by FANS, INC., a non-profit corporation organized and existing under the laws of the State of Missouri (hereinafter referred to as "FANS") formed for the purpose of assisting the City and County in inducing an NFL franchise to locate in St. Louis and to play NFL Games in the Facilities; and

WHEREAS, as of the date hereof, SLNFL has not obtained an NFL franchise to play NFL Games; and

WHEREAS, the RAMS own and operate an NFL franchise to play NFL Games (the "NFL Franchise") as contemplated by Section 3(c) of the Lease and the CVC and SLNFL wish to induce the RAMS, to relocate the NFL Franchise to St. Louis and to enter into certain beneficial agreements and arrangements respecting the playing of NFL Games in the Facilities commencing as soon as practicable, and the RAMS wish to induce the CVC and SLNFL to enter into certain beneficial agreements

and arrangements respecting the playing of NFL Games in the Facilities and the RAMS and the CVC and SLNFL are willing to do so on certain terms and conditions; and

WHEREAS, SLNFL, with the consents of the Authority, the City, the County, the State, SLMFC, CVC and FANS, is willing to assign to the RAMS immediately after the execution of this Amended Lease all of its rights and certain of its obligations relating to the Facilities, including all of SLNFL's rights under this Amended Lease, the Cooperative Agreement, the Project Agreement and the Operating Lease, on the terms and conditions of an ASSIGNMENT AND ASSUMPTION AGREEMENT (AND CONSENTS THERETO) of even date (the "Assignment"), and the RAMS are willing to accept such Assignment; and

WHEREAS, Civic Progress Inc. is a non-profit corporation organized and existing under the laws of the State of Missouri (herein referred to as "CIVIC") formed for the purpose of promoting the development of the City and County and the members of which have made certain financial commitments to the RAMS relative to the relocation of the RAMS to St. Louis and to certain revenues to be received by the RAMS from the use of the Facilities; and

WHEREAS, the Authority, CVC and SLNFL recognize that certain of the terms and conditions of the Lease are ambiguous, inconsistent and/or require clarification, interpretation or further agreements for their implementation and each of them desires to do so by amending and restating the Lease in its entirety; and

WHEREAS, the Authority, CVC and SLNFL each recognizes that the rights and obligations of SLNFL that the RAMS will take under the Assignment would be affected by the rights and obligations of SLNFL under the Lease, that SLNFL will have no interest in the Facilities after the effective date of the Assignment (the "Assignment Effective Date"), that from and after the Assignment Effective Date the RAMS, and not SLNFL, is the appropriate party to be in a direct lessee relationship with CVC as lessor under this Amended Lease and each of the parties hereto wishes hereby to clarify, interpret and/or amend the rights and obligations of the lessee under the Lease for the purpose of clarifying, interpreting and/or amending the rights and obligations of the RAMS under this Amended Lease and to ensure the RAMS the functional and economic benefits it has been promised to relocate to St. Louis; and

WHEREAS, the Authority, the CVC, SLNFL and the RAMS desire that the Facilities remain a First Class facility for the exhibition of NFL Games during the entire term of this Amended Lease and a First Tier facility at certain dates as set forth in Annex 1--Facilities Status, Management,

FRKL037A.WP 55909 1/16/95  4:34pm    -3-

Maintenance and Repair--To Amended Lease of even date herewith ("Annex 1"), which is incorporated herein and made a part hereof by reference; and

WHEREAS, the RAMS would not enter into the Assignment, that certain RELOCATION AGREEMENT of even date (the "Relocation Agreement") or relocate to St. Louis in the absence of the execution and delivery of this Amended Lease (and all of the Annexes hereto, all of which are incorporated herein and made a part hereof by reference), and the approval of, and the consent to, this Amended Lease and the Assignment by the Authority, the CVC, the City, the County, the State, SLNFL, FANS and SLMFC.

NOW, THEREFORE, for and in consideration of the rents and the mutual covenants of the parties contained herein, and in order to induce the RAMS to enter into the Assignment and the Relocation Agreement, the CVC, SLNFL and the RAMS hereby agree that the Lease is hereby amended and restated to read in its entirety as follows:

1. **Definitions.** The following terms shall have the meanings hereinafter set forth:

a. "Amended Lease" shall mean this Amended and Restated St. Louis NFL Lease, including all Annexes hereto, which are incorporated herein and made a part hereof by reference.

b. "Annexes" shall mean Annex 1--Facilities Status, Management, Maintenance and Repair--To Amended Lease ("Annex 1"), Annex 2--Advertising--To Amended Lease ("Annex 2"), Annex 3--Concessions--To Amended Lease ("Annex 3") and Annex 4--Parking--To Amended Lease ("Annex 4").

c. "Box Suites" shall mean the box suites located on Level 300 and Level 400 of the Facilities and any other box suites hereafter constructed in the Facilities.

d. "Component" is defined in Annex 1.

e. "CVC Event" is defined in Section 1.1.6 of Annex 3.

f. "CVC Reserved Facilities" shall mean certain office, administrative and other areas reserved for the exclusive year around occupancy and use of CVC and the Authority within the Facilities. The size, configuration and location of all such offices and areas described in the immediately preceding sentence are set forth in Exhibit 1f attached hereto and incorporated herein by reference. It is understood and agreed that the foregoing areas shall be deemed to include the non-exclusive right to appurtenances and rights

FRKL037A.WP 55909 1/16/95 4:34pm    -4-

of access to the extent reasonably necessary to utilize such areas as herein permitted.

g.   "First Class" respecting the status and condition and operation of the Facilities and each Component (as defined in Annex 1) thereof at all times is defined in Section 1.3.2 of Annex 1.

h.   "First Tier" respecting the status and condition of the Facilities and each Component (as defined in Annex 1) thereof at March 1, 2005 and March 1, 2015 is defined in Section 1.3.1 of Annex 1.

i.   "Football-Related Event" means and includes the following events and activities:  (i) any charity, civic or other football game that is not an NFL Game or post-season NFL Game which involves the RAMS, past or present players of the RAMS, or past or present NFL players; and (ii) non-game events held or sponsored by the RAMS which are related to charity or civic promotions or the operation of the NFL Franchise or the marketing and promotion of NFL football, including attendance at NFL Games, to the public, including but not-limited to rallies, practice sessions, conditioning activities, autograph sessions, charity and civic events, season ticket subscriber receptions, press conferences and marketing, sales, public relations and promotional events.

j.   "Levels" - the term "Level 100, 200, 300, 400, 500, 700 or 800, respectively, means the corresponding floor level in the Facilities beginning with the stadium floor level and continuing with sequential numbering of the floors.

k.   "NFL" shall mean the National Football League and its successors and assigns.

l.   "NFL Game" or "NFL Games" shall mean a professional football game or games played by a team fielded by an NFL franchise, including exhibition, pre-season, regular season and post-season play-off games, but excluding the NFL Super Bowl and the Pro Bowl.

m.   "NFL Game Dates" shall mean those days between August 1 and January 31 of each year commencing with the RAMS Facilities Delivery Date (or between such other months of each year determined from time to time by the NFL in which the NFL shall hold its season of NFL Games) wherein the Unreserved Facilities are required for the use of the RAMS for the playing of NFL Games and such other dates as may be determined in accordance with the provisions of Section 8(b) of this Amended Lease.

n.   "Pre-Game Date" shall mean the day immediately preceding each NFL Game Date.

FRKL037A.WP 55909 1/16/95  4:34pm     -5-

o.   "Project Equipment" shall mean those items of machinery, equipment or other personal property paid for in whole or in part by the Authority using the proceeds of bonds issued in connection with the financing of the Facilities as contemplated by the Financing Agreement, and all replacements thereof and substitutions therefor, and as set forth more fully in Annex 1.

p.   "RAMS" means The Los Angeles Rams Football Company Inc., or its successor, with a franchise from the NFL to play NFL Games (the "NFL Franchise").

q.   "RAMS Event" shall mean (i) an NFL Game; (ii) a Pre-Game Date; (iii) a Football-Related Event; or (iv) any other event sponsored or licensed by the RAMS in the Facilities in accordance with Section 6 of the Amended Lease.

r.   "RAMS Reserved Facilities" shall mean (i) the entirety of level 300 (the suite level) and level 400 (the club level) of the Facilities (including without limitation related club areas and concourses and undesignated areas) for the year-round benefit of the RAMS (except for certain CVC Reserved Facilities consisting of storage and mechanical spaces as shown on Exhibit 1f); (ii) the football-related office, administrative, team and other areas for the exclusive year-round occupancy and use of the RAMS, including without limitation permanent home team locker and training rooms, permanent offices, a permanent family waiting room, a permanent vault, a permanent X-Ray room, permanent rooms and areas for storage of equipment and goods, a permanent box office and ticket sale outlet, and permanent signage (exclusive of signage designated for advertising and CVC informational signage) and fixtures installed in the Facilities by or for the exclusive benefit of the RAMS for use in connection with NFL Games, Pre-Game Dates and Football-Related Events; (iii) permanent RAMS signage as described in Annex 2, in the locations described in Annex 2; and (iv) those fixtures hereafter installed in the Facilities by or for the exclusive benefit of the RAMS for use in connection with RAMS Events.  The size, configuration and location of all RAMS Reserved Facilities (and the number and location of signs designated for promotional purposes) are set forth on Exhibit 1r attached hereto and incorporated herein by reference.  It is understood and agreed that the foregoing terms shall be deemed to include the non-exclusive right to appurtenances and rights of access to the extent reasonably necessary to utilize such areas as herein permitted.

s.   "Specified Events" shall mean the Super Bowl, NCAA Basketball's "Final Four," and the Republican and Democratic National Conventions.

FRKL037A.WP 55909 1/16/95  4:34pm    -6-

t.   "Unreserved Facilities" shall mean the Facilities excluding the RAMS Reserved Facilities and the CVC Reserved Facilities.

2.   **Demise of Facilities**.

(a)   <u>Demise of RAMS Reserved Facilities; RAMS Rights of Ingress and Egress</u>.  In consideration of the rent to be paid by the RAMS to CVC as more fully described in Section 9 hereof, and in consideration of the other covenants and agreements of the RAMS hereinafter set forth, CVC hereby leases, demises and lets unto the RAMS, and the RAMS hereby leases and takes from CVC, the RAMS Reserved Facilities, for and during the term described in Section 3(a) hereof, and the Unreserved Facilities, for and during the terms described in Section 3(b) hereof, including use of mechanical systems, fixtures and equipment, and other systems, utilities and service areas essential for the maintenance and operation of the Facilities which are located on, in and under the Convention Center, all as more particularly described in that certain Master Reciprocal Easement Agreement dated July 28, 1993 by and between the Authority and the Land Clearance for Redevelopment Authority of the City of St. Louis.  The RAMS' rights hereunder shall include the right, on a non-exclusive basis, to use or to benefit from the Project Equipment to the extent the same are located in or used in connection with the RAMS Reserved Facilities or the Unreserved Facilities, as the case may be.  During such times as the RAMS shall not have access to the Unreserved Facilities (as it does, for example, on NFL Game Dates) the RAMS and its successors, assigns, agents, employees, caterers, concessionaires, vendors, contractors, licensees and invitees shall have the non-exclusive right, without any charge, to all rights of ingress and egress in and/or through the Unreserved Facilities to the extent reasonably necessary or desirable (i) to access or utilize the RAMS Reserved Facilities as permitted under the terms of this Amended Lease or any of the Annexes hereto or (ii) to perform any of the RAMS' obligations or exercise any of the RAMS' rights under this Amended Lease or any of the Annexes hereto; provided, however, that the RAMS shall not unreasonably interfere with the use by CVC and its agents, employees, contractors, licensees and invitees of the Unreserved Facilities; and further provided, however, that Box Suite and Club Seat lessees and invitees shall not be entitled to such rights of ingress and egress during a CVC Event without obtaining a ticket for the CVC Event.  Furthermore, and notwithstanding any other provision of this Amended Lease, the RAMS shall not without the CVC's prior written consent, perform any repair or maintenance upon, about, through and under the RAMS Reserved Facilities and the Unreserved Facilities during any CVC Event unless such repair or maintenance is necessitated by an emergency threatening or resulting in harm or damage to the Facilities or its occupants.  The RAMS accept the foregoing demise subject to

FRKL037A.WP 55909 1/16/95  4:34pm    -7-

the "Charter Personal Seat Licenses" and "Charter Club Memberships" (which term does not include the annual fee) granted by CVC in conformity with the terms and conditions of that certain Charter Personal Seat License Master Agreement (the "PSL Master Agreement") of even date.

(b)  CVC Rights of Ingress and Egress.  CVC hereby reserves to itself and its successors, assigns, agents, employees, caterers, concessionaires, vendors and contractors, a non-exclusive right and easement on, over, upon, about, through and under ¡the RAMS Reserved Facilities and the Unreserved Facilities (including, without limitation, interior and exterior walls, ceilings and floors of the RAMS Reserved Facilities and the Unreserved Facilities) during any and all times deemed reasonably necessary or desirable for the purpose of (i) the performance of any or all of the obligations and duties assumed by CVC under the Amended Lease; (ii) the exercise of the rights and privileges granted to, or reserved by, CVC pursuant to the Amended Lease; and (iii) the preparation of the Facilities, including the RAMS Reserved Facilities and the Unreserved Facilities, for CVC Events and RAMS Events; provided, however, that CVC shall not unreasonably interfere with the use by the RAMS and its agents, employees, contractors, licensees and invitees of the RAMS Reserved Facilities and the Unreserved Facilities during such time as the RAMS are entitled to such use.  All maintenance and repair activities shall be planned, scheduled and performed to:  (a) minimize (i) inconvenience to event patrons of RAMS Events, (ii) interference with the RAMS' use or enjoyment of the Facilities or any part thereof, including without limitation any of the Components, functionally or economically, and (b) preserve the First Class nature of the Facilities and each part thereof, including without limitation each of the Components.

3.  **Term**.

(a) RAMS Reserved Facilities.  The term of this Amended Lease for the RAMS Reserved Facilities shall commence on the Assignment Effective Date and shall end at midnight on the March 31 preceding the thirtieth (30th) anniversary of the RAMS Facilities Delivery Date (as defined in Section 5 hereof), unless earlier terminated as provided herein pursuant to Section 15 or 16; provided, however, that in no event shall the term of this Amended Lease extend beyond August 27, 2031.

(b)  Unreserved Facilities.  The term of this Amended Lease for the Unreserved Facilities shall be coextensive with the term under Section 3(a) of this Amended Lease, but only for the dates of RAMS Events during such term. Subject to CVC's rights under Section 2(b) hereof, CVC shall deliver to the RAMS exclusive possession of the Unreserved Facilities for each NFL Game in game-ready, First Class condition by 12:00 noon on each Pre-Game Date and at a

FRKL037A.WP 55909 1/16/95  4:34pm    **-8-**

reasonable time as specified in the scheduling of each other RAMS Event. The RAMS shall deliver to CVC exclusive possession, subject to the RAMS' rights under Section 2(a) hereof, of the Unreserved Facilities, free of equipment and supplies (but not related janitorial clean-up) to be provided by the RAMS pursuant to Section 3.3.5 of Annex 1, not later than 12:01 a.m. of the day next following each NFL Game Date (or at a reasonable time as specified in the scheduling of each other RAMS Event) if the NFL Game (or other RAMS Event) is scheduled to occur at or before 3:00 p.m. on an NFL Game Date (or the date of another RAMS Event), and not later than 6:01 a.m. of the day next following each NFL Game Date (or at a reasonable time as specified in the scheduling of each other RAMS Event) if the NFL Game (or other RAMS Event) is scheduled to occur after 3:00 p.m. on an NFL Game Date (or at a reasonable time as specified in the scheduling of each other RAMS Event).

(c)  <u>Playing of NFL Games in the Facilities</u>.  Other than as a result of a casualty or other disturbance or set of facts that prevents the temporary use of the Facilities, but subject to (i) any and all of the RAMS' rights to convert the term of this Amended Lease to an annual term as provided in this Amended Lease, (ii) the RAMS' rights to terminate this Amended Lease as provided in this Amended Lease and (iii) the RAMS' rights to relocate, including without limitation those rights set forth in Section 16 hereof, the RAMS shall cause the RAMS to play all its home NFL Games (other than pre-season NFL Games) at the Facilities during the portion of the term set forth in Section 3(a) hereof (i) commencing (subject to the delivery of the Facilities as set forth in Section 5 below) with the later of (x) October 22, 1995 or (y) the first home NFL Game of the NFL season commencing after the Assignment Effective Date and (ii) not extending beyond the March 31 preceding the thirtieth (30th) anniversary of the RAMS Facilities Delivery Date.

4.  <u>Termination of Operating Lease by CVC</u>. Anything herein to the contrary notwithstanding, in the event the Operating Lease shall be terminated by CVC pursuant to the provisions of Section 14 of the Operating Lease, CVC shall be released automatically from all of its obligations under this Amended Lease to be performed or accruing after the effective date of said termination, it being understood and agreed that with respect to the performance of any obligation after the effective date of said termination, the RAMS shall, in the event of any such termination, rely upon the agreement of the Authority to assume or to provide for the assumption of said duties pursuant to Section 7(c) of the Operating Lease.

5.  <u>Delivery of Facilities</u>.  The RAMS acknowledges that the Facilities are to be constructed and equipped by or at the direction of the Authority in accordance with the Project Manual (as defined in Annex 1), as more particularly

FRKL037A.WP 55909 1/16/95  4:34pm    -9-

described and updated in Annex 1 (including without limitation Exhibit 2.1 thereto and incorporated herein by reference), and delivered to CVC in accordance therewith on the Completion Date (as defined in the Financing Agreement). It is acknowledged and agreed that the rights of CVC and the RAMS with respect to such construction and equipping of the Facilities are controlled by, and subject to, the terms and conditions of Annex 1. It is further acknowledged and agreed that, subject to Section 22 hereof, the Facilities are to be delivered by CVC to the RAMS on or before 12:00 o'clock noon on October 21, 1995 in a First Class condition for playing and viewing NFL Games, constructed and equipped in accordance with the Project Manual, as more particularly described and updated in Annex 1 (subject to completion of immaterial punch list items as set forth in Annex 1 and except for items related solely to the use of the Facilities as a convention center). The "RAMS Facilities Delivery Date" is the date on which the Facilities are delivered to the RAMS in such First Class condition (so constructed and equipped) for playing and viewing NFL Games.

6. **Use of the Facilities.**

(a) **Use of Unreserved Facilities.** The RAMS (subject to the terms, conditions and provisions of this Amended Lease) shall have the exclusive right during each term of this Amended Lease for the Unreserved Facilities to use (or have operated by CVC for the RAMS' benefit under the RAMS' direction) and to lease, sublease and license the use of the Unreserved Facilities and equipment and any portion thereof, including, without limitation, the Playing Field (as defined in Annex 1), stadium seats and related common areas, entrances, concourses and amenities, all vertical transportation in the Facilities (including all event patron and VIP elevators, service elevators, escalators and ramps), all box offices, ticket printing and taking equipment, accounting and control systems, all locker rooms, all pre-function areas and meeting rooms in the Unreserved Facilities, all radio, television, computer, video and other communications media (whether presently known or unknown) facilities, all Playing Field and stadium sound and communications systems, and all scoreboards, video boards and video systems and related installations and equipment, during each NFL Game Date and each Pre-Game Date and, to the extent appropriate, during each other RAMS Event scheduled in accordance with the terms of this Amended Lease. The utilization and benefits of all signage relating to the Facilities (interior and exterior) designated or utilized for advertising purposes or promotional purposes, other than signage for interior Facilities concessions governed by Annex 3 and interior and exterior signage promoting the RAMS that are part of the RAMS Reserved Facilities, are controlled by, and subject to, the terms and conditions of Annex 2. The utilization and benefits of all concessions facilities and

equipment and service and preparation areas in the Facilities are controlled by, and subject to, the terms and conditions of Annex 3. Use of the remaining Unreserved Facilities by the RAMS for Football-Related Events and other events licensed or sponsored by the RAMS in the Facilities on dates other than on NFL Game Dates or Pre-Game Dates is subject to prior availability and to the following additional conditions: (i) CVC shall have no obligation to reserve any areas constituting Unreserved Facilities for such use more than ninety (90) days in advance of the date requested (although CVC will use its reasonable efforts to accommodate the RAMS' desires to reserve the Unreserved Facilities for use for other RAMS Events a limited number of times each year more than ninety days in advance) and (ii) the RAMS shall bear all actual incremental operating, utilities, janitorial expenses, insurance and other costs of all kinds, types or nature including materials and equipment but not rental or capital charges or losses of any kind or nature, including without limitation casualty losses incurred by CVC as a result of any such permitted use unless otherwise provided herein; provided, however, that prior to booking such other RAMS Event, the RAMS shall provide CVC with reasonably detailed requirements for the such RAMS Event and CVC shall provide the RAMS with its estimate of the costs for such RAMS Event.

(b)   The RAMS Reserved Facilities, Club Seats and PSL Licenses.

(i)   Except during Specified Events, the RAMS shall have the exclusive right, during the term of this Amended Lease for the RAMS Reserved Facilities, to use (and to control the use of) and to lease, sublease and license the use of all or any part of the RAMS Reserved Facilities and to receive and retain all income, and other consideration of whatever kind or nature realized by or from the Reserved Facilities, including, without limitation, all income and other consideration from the rental or licensing of box suites and club seats, from the sale of tickets to box suites (except as provided in subsection 6(b)(ii) below) and club seats (except with respect to admission tickets for seats to the club seats from the sale of such tickets for events other than RAMS Events and except with respect to the PSL and Charter Club Membership Fees paid prior to September 1, 1995 (which belong to CVC)) and, subject to the provisions of Annex 3 relating to concessions, from the sale of food and beverages and other goods, services or products ("concessions") in the RAMS Reserved Facilities; provided, however, that, for CVC Events utilizing the stadium seating in the Facilities on dates other than the dates of RAMS Events, the CVC shall be entitled to (x) retain, or receive from the event sponsor (other than the RAMS), the proceeds from the sale of admission tickets with respect to club seats for such CVC Events and (y) receive one-third (1/3) of any net concession income realized during such CVC Events from sales and service of food

and beverages and Non RAMS Related Merchandise (as defined in Annex 3) on Level 300 (suite level) and Level 400 (club level) (to the extent that stadium seats on Level 200 are in the future converted to club seats as provided in Section 4.1 of Annex 1, such converted club seats shall for all purposes of this Amended Lease and its Annexes continue to be treated as part of the Unreserved Facilities) for such CVC Events as provided by, and subject to, the terms and conditions of Annex 3, with the RAMS receiving the other two-thirds (2/3) of such net concession income from food and beverages and Non RAMS Related Merchandise (and all income from RAMS Related Merchandise (as defined in Annex 3)).  Subject to the provisions of clause (iii) of this Section 6(b) respecting the "Charter Personal Seat License" Fees and Charter Club Membership Fees collected by FANS as agent for CVC prior to September 1, 1995, nothing herein respecting CVC Events shall detract from the rights of the RAMS to all income from the RAMS Reserved Facilities for RAMS Events and dates other than the dates of CVC Events utilizing the stadium seating.

(ii)  CVC agrees that it will arrange with any event sponsor for a CVC Event utilizing the stadium seating (other than events for which admission is not available for acquisition by the general public and the Specified Events) to allow the RAMS to give written notice to and offer club seat lessees the written right of first refusal for a reasonable period to purchase admission tickets, at a price not to exceed the ticket price at which such seats are to be sold (and in fact being sold) to the general public by the CVC or event promoter, for the seats subject to such leases, to attend such CVC Event.  Neither CVC nor the event promoter may knowingly engage in a scheme to undercut this proscription respecting the ticket price to the general public.  If such a club seat holder elects not to purchase such admission ticket within such right of refusal period, then CVC or the event sponsor may sell an admission ticket to such club seat to the general public.  Neither CVC nor the event promotor shall have the right to sell admission tickets to utilize the box suites for any CVC Event.  CVC agrees that it will arrange with any event sponsor for such a CVC Event (other than events for which admission is not available for acquisition to the general public and the Specified Events) that the RAMS will have the exclusive right to offer the Box Suite lessees the right to purchase from the RAMS admission tickets for the Box Suites to attend such CVC Event (and the RAMS and CVC shall split (2/3 to the RAMS; 1/3 to CVC) the revenues from such ticket sales which are not payable to the promoter).  In the event its Box Suite lessee does not purchase any of such tickets, its Box Suite shall remain dark.  The CVC and the RAMS shall cooperate to release sufficient box suites for the use of the event sponsor of a Specified Event in order to meet the customary event requirements of such Specified Event sponsor.

FRKL037A.WP 55909 1/16/95  4:34pm   -12-

(iii)  It is understood and agreed that all rents, licensing fees, initiation fees, annual fees, club fees and similar rents. fees or charges received from users of box suites or club seats (including without limitation the Annual Rent (as defined in the form Club Seat Lease Agreement and Box Suite Lease Agreement)), other than the fees for "Charter Personal Seat License" and "Charter Club Memberships" sold by FANS as agent for CVC prior to September 1, 1995, in connection with the relocation of the RAMS to the Facilities and the first season of NFL Games in the Facilities, pursuant to the Master-PSL Agreement of even date, are allocable solely to NFL Games, are the property of the RAMS and are not subject to the 2/3-1/3 allocation of Section 6(b)(i) (unless otherwise expressly agreed to in writing by the RAMS).  From and after September 1, 1995, the RAMS shall have the sole right to grant and benefit from personal seat licenses ("PSLs") to the seats in the Unreserved Facilities and the Charter Club Membership Fees (at such PSL and Charter Club Membership fees as the RAMS in its sole discretion shall determine from time to time for such seats) and to retain all such fees.

(iv)  All revenues earned by or paid to CVC pursuant to this Section 6(b) (including the revenues described more particularly in Annex 2) (other than revenues attributable to the proceeds of admission tickets from CVC Events utilizing the stadium seating and revenue from the sale of PSLs prior to September 1, 1995) shall be utilized by CVC solely for payment of its costs and expenses in performing its obligations to Maintain and Repair the Facilities (as is more particularly defined in Annex 1).

(v)  As provided more particularly in Annex 3, the RAMS shall itself be required and shall require any licensee or lessee (other than event patrons) to render an accounting of any and all income and expenses subject to sharing with the CVC under this Section 6(b)(i), copies of which shall be delivered to CVC quarter-annually, together with the delivery by the RAMS to CVC of its accounting for the same for such periods, together with any and all sums due CVC pursuant to said accounting.  CVC shall have the right for a period of two years after receipt of each such report, during ordinary business hours, to inspect the books and records of such licensee or lessee and the RAMS applicable to such report; provided, that CVC cannot in any way dispute any such report, or books and records, more than two years after receipt of such report, unless disputed within such period.

(vi)  As provided more particularly in Annex 3, CVC shall itself be required and require any licensee or event sponsor of a CVC Event (other than event patrons) to render an accounting of any and all income and expenses for events or activities subject to sharing by CVC with the RAMS (or for events the income from which is restricted to a particular purpose, such as under Section 6(b)(iv) hereof), copies of

FRKL037A.WP 55909 1/16/95  4:34pm   -13-

which shall be delivered to the RAMS quarter-annually, together with the delivery by CVC to the RAMS of its accounting for the same for such periods, together with any and all sums due the RAMS pursuant to said accounting. The RAMS shall have the right for a period of two years after receipt of each such report, during ordinary business hours, to inspect the books and records of CVC, such licensee or CVC Event sponsor applicable to such report; provided, that the RAMS cannot in any way dispute any such report, or books and records, more than two years after receipt of such report, unless disputed within such period.

(c)  <u>Use of Box Suite and Club Areas</u>.  The RAMS shall make available the four box suites set forth on Exhibit 6(c)-1 attached hereto and incorporated herein by reference to the CVC, the Authority, Mr. Jerry Clinton and the law firm of Bryan Cave as set forth on the Exhibit subject to each executing the then standard Box Suite Lease Agreement. Such suites shall be provided free of the "Annual Fee" normally applicable thereto as described in the form of Box Suite Lease Agreement; <u>provided</u>, <u>however</u>, that each lessee will be responsible for the payment of all other fees and charges provided therein (at the same rates applicable to other box suite users for similar uses) (including without limitation ticket charges, except that the Authority shall receive complimentary tickets relative to its box suite for RAMS Events) and must abide by all other terms and conditions provided therein.  In the event that Mr. Clinton and/or Jerry G. Clinton Revocable Trust (jointly and severally, "Clinton") breaches its agreement dated September 15, 1994, with FANS and SLNFL, the license of Clinton shall <u>ipso</u> <u>facto</u> be revoked and terminated and the exclusive right of occupancy and use thereof shall automatically and immediately vest in the RAMS. CVC also shall be permitted to schedule use of rooms within the Level 400 club areas servicing the box suites and the club areas on dates other than NFL Game Dates, Pre-Game Dates, dates of Football-Related Events, and the dates of other RAMS Events, subject, however, to prior availability (it being understood and agreed that the RAMS, and RAMS lessees, licensees and patrons of the box suites and club seats, other than CVC (and CVC's assignee(s)), shall have priority in the use of such club areas at all times) and to the following additional terms and conditions:  (i) the RAMS shall have no obligation to reserve any such areas more than ninety (90) days prior to the requested date of use (although the RAMS shall use its reasonable efforts to accommodate CVC's desires to reserve such areas for use a limited number of times more than ninety days in advance); and (ii) CVC shall be charged therefor not more than the RAMS would charge club members for the same or any similar use, including the purchase of food, beverages and services.

(d)  <u>Income from Facilities on Dates of RAMS Events</u>. The RAMS or any licensee or lessee of the RAMS shall be

FRKL037A.WP 55909 1/16/95  4:34pm   -14-

entitled to contract for and, pursuant to such contracts, to collect, receive and, subject to the provisions of Section 6(e) hereof, to retain, all gross income and other consideration of whatever kind or nature realized by, from or in connection with any NFL Game played on an NFL Game Date or any other RAMS Event, including, without limitation, all gross income and other consideration from the sale or distribution of tickets or passes to any NFL Game, Pre-Game Date event, Football-Related Event (including, without limitation, tickets to club seats) or other RAMS Event, and from concessions sold or provided in the Unreserved Facilities on an NFL Game Date or date of another RAMS Event (except that matters respecting concessions are controlled by, and subject to, the terms and conditions of Annex 3), and from the sale, leasing, licensing or concession of advertising (except that matters respecting advertising are controlled by, and subject to, the terms and conditions of Annex 2) or promotional rights for any RAMS Event whether such advertising or promotion is in the nature of signage (interior or exterior), printed material (including publications, tickets, programs photographs, score cards, media guides, year books, or flyers), radio, television, video, audio tapes, computer service or device or other communications media, presently known or unknown, and all proceeds and receipts from the broadcast, telecast, transmittal or other reproduction (by means of radio, television, video, computer service or device, motion picture or other communications media, presently known or unknown) of a RAMS Event (or portion thereof). In addition, the RAMS shall be entitled to contract for and to collect, receive and retain all gross income and other consideration of whatever kind or nature realized by, from or in connection with the sale, lease or licensing or other use of any RAMS Reserved Facilities.

(e) <u>Costs and Expenses of the RAMS and CVC Operations</u>. Nothing contained in this Amended Lease shall make or be construed as creating a relationship of partners or joint venturers between the parties hereto. CVC is operator of the Facilities and lessor of the Facilities to the RAMS and CVC will generate certain revenues. The RAMS is a lessee, generally, to play NFL Games, to conduct certain related and administrative functions and to generate and to obtain revenues. The functions and obligations of each of CVC and the RAMS are particular and several. Accordingly, subject to the provisions of Section 11 hereof, each of the RAMS and CVC, respectively, does hereby indemnify and hold the other harmless from and against, any and all claims, actions, causes of action, loss, cost and expense (including reasonable attorney's fees and expenses) claimed against and/or sustained by CVC and the RAMS, respectively, on account of any such cost and expense which is the responsibility of the RAMS or CVC, respectively.

FRKL037A.WP 55909 1/16/95  4:34pm   -15-

(f)  <u>Assignment, Subletting, Licensing and Permitted Encumbrances</u>.  The RAMS shall be entitled to assign all of its rights and delegate all of its obligations under this Amended Lease to a general partnership of which the RAMS is the majority general partner and which assumes the obligations of the RAMS under this Amended Lease and the Annexes without the prior consent of CVC; <u>provided</u>, <u>however</u>, that no such assignment shall release the RAMS from any obligation under this Amended Lease.  Prior to any such assignment, the RAMS shall inform CVC and the Authority of the names of the partners in such general partnership (which information shall be held confidential by CVC and the Authority to the extent allowed by law).  The RAMS also shall be entitled to enter into one or more subleases and licenses for all or any portion of the Reserved Facilities and the Unreserved Facilities without the prior consent of CVC; <u>provided</u>, <u>however</u>, that no such sublease or license shall release the RAMS from any obligation under this Amended Lease, and such subleases and licenses shall be subject to this Amended Lease.  The RAMS shall be entitled also to mortgage, pledge or collaterally assign its interest in this Amended Lease, including the Annexes, as security for any loan, the majority of the proceeds of which shall be utilized for or in connection with the ownership, operation or use of the Facilities or the RAMS, or the performance of the RAMS' obligations hereunder, and, in connection therewith, CVC agrees to execute and deliver such waivers and consents as may be reasonably and customarily required by any lender to the RAMS.  The lien of the Prior Leases shall nonetheless remain prior and paramount to the lien of any such mortgage, pledge or collateral assignment and the parties to the Prior Leases by their consents to this Amended Lease and to the Assignment consent to such mortgage, pledge or collateral assignment, and agree to provide the mortgagee or secured party pursuant thereto with a non-disturbance agreement substantially in the form of the Non-Disturbance Agreement as defined in the Relocation Agreement.  Such agreement shall also extend to providing for the right of the mortgagee or secured party to receive all notices given to the RAMS under this Amended Lease and the right to cure any and all defaults by the RAMS hereunder and to succeed to the RAMS rights under this Amended Lease upon the exercise of its remedies under such mortgage, pledge or collateral assignment.

(g)  Not used.

(h)  The cost of certain of CVC's obligations under this Amended Lease, and Annex 1, may be a "Preservation Cost" (as defined in the Operating Lease and Annex 1).  The exclusive source of funds for the payment of such obligations shall be (i) the Preservation Fund (as defined in the Financing Agreement), (ii) to the extent the RAMS choose to exercise such rights, the RAMS' rights of offset and abatement, and (iii) insurance proceeds and/or proceeds received from any other third party who is liable for damage

FRKL037A.WP 55909 1/16/95  4:34pm   -16-

to the Facilities.  The limitation to exclusive source of funds for such CVC obligations in the preceding sentence does not and shall not in any manner excuse or prevent CVC from being in default of its obligations under this Amended Lease (or Annex 1) even though the RAMS would have no other source of recovery of monetary damages for failure of CVC to perform solely on account of such limitation to exclusive source of funds.

(i)  In the event that the entry into this Amended Lease by the CVC, the continuation of this Amended Lease and/or the activities of the RAMS under and pursuant to this Amended Lease, result in all or any part of the Facilities to be subject to taxation, assessments or charges lawfully made by any governmental body, the amount of all such taxes, assessments and governmental charges shall be deemed and shall become additional rent payable hereunder, the same to be paid by the RAMS to CVC or directly to the taxing authority, in such manner and at such times before the same become delinquent or in all events prior to such time as CVC may be required to pay the same under the Operating Lease.  In the event that the RAMS pays the amounts directly to the taxing authority, the RAMS shall notify CVC in writing that it has elected this course and shall furnish CVC with copies of all correspondence, together with evidence of payment to the taxing authority when paid and copies of paid receipts with respect to the payment thereof within ten (10) days of the RAMS' receipt of such paid receipts.  CVC represents and warrants that it has no reason to believe that as of the date hereof that there are any conditions or facts, with the passage of time or otherwise, that would result in any such taxation, assessments or charges described in the preceding sentence.

(j)  CVC shall maintain a master record of the scheduling of CVC Events and RAMS Events.  With respect to all or any portion of the Unreserved Facilities or Levels 300 or 400 of the Facilities, once a RAMS Event (other than an NFL Game Date or Pre-Game Date) or a CVC Event is booked on a particular date in accordance with this Amended Lease, CVC or the RAMS, as the case may be, may book a CVC Event or RAMS Event, as the case may be, on that date so long as such booking does not materially interfere with the use and enjoyment of the applicable portion of the Facilities for the event first booked (where booked).

7.    The RAMS take this Amended Lease subject to that certain Venue Compatibility Agreement dated October 27, 1991.

8.    <u>Scheduling of NFL Games</u>.

(a)  <u>Priority of NFL Games</u>.  The RAMS shall be responsible for scheduling all NFL Games.  In order to

FRKL037A.WP 55909 1/16/95  4:34pm    -17-

coordinate the scheduling of CVC Events and NFL Games, CVC and the RAMS shall comply with the procedures set forth in this Section 8. Scheduling of NFL Games (the exclusive professional football use of the Facilities during the term of this Amended Lease) as herein provided, as well as Pre-Game Dates, shall have absolute and unconditional first priority over the scheduling by CVC of any CVC Event. To satisfy this requirement, CVC must reserve for the priority use by the RAMS, pending release by the RAMS as hereinafter provided, the entire Facilities at all times during the months of August through January (or between such other months as the NFL shall then hold or propose to hold its season of NFL Games) ("Possible Game Dates"), except for a one week period in each calendar month (plus such additional days as will still afford RAMS three-weeks) (except, in either case, those calendar months in which play-off games may occur) beginning 12:01 a.m. on a Wednesday through 12:00 midnight on the following Tuesday (the "CVC Period"). In the event that the CVC Period falls within two months, such period shall be deemed a part of the calendar month in which the Sunday of such period falls. In addition, the CVC shall not hold two consecutive weeks as CVC Periods. Not later than three (3) years in advance, CVC shall inform the RAMS in writing of the CVC Periods. The RAMS shall promptly confirm and advise CVC within ten (10) business days regarding the tentative scheduling of pre-season and regular season NFL Games and shall advise CVC within ten (10) business days of confirmation of pre-season games and of official confirmation of regular season NFL Games by the NFL to the RAMS, and the CVC's obligation to reserve Possible Game Dates during such pre-season and regular season periods shall thereupon be terminated, but CVC shall be responsible for requesting information from the RAMS regarding the release of any Possible NFL Game Date prior to making any binding commitments to other parties for use of the Facilities on such Possible Game Dates. In reserving actual Game Dates, the RAMS also shall have reserved the exclusive use of the Unreserved Facilities as provided in Section 6(a) on the day prior to each NFL Game Date for team practices and other promotional or football-related purposes. Possible NFL Game Dates for the post-season play-off period shall be released automatically only upon either the RAMS being mathematically eliminated during the regular season or the RAMS losing a post-season play-off game. Notwithstanding the foregoing, upon CVC's request, the RAMS shall consider, in its good faith sole discretion, releasing Possible NFL Game Dates to permit the CVC's use of the Unreserved Facilities on days in addition to CVC Periods.

          (b)  <u>Scheduling Changes and Long-Range Planning</u>.  In the event the NFL shall schedule any NFL Game other than between August 1 and January 31 in any year, such date may be an NFL Game Date only if at the time of scheduling by the NFL such date has not been booked for a CVC Event; provided, however, that if from time to time during the term of this

FRKL037A.WP 55909 1/16/95  4:34pm   -18-

Amended Lease, the NFL shall customarily schedule any NFL Game other than between August 1 and January 31, the RAMS shall also have absolute and unconditional first priority during such new or extended period over the scheduling of any CVC Event not already scheduled to be held during such new or extended period in the Facilities (to the extent necessary to assure the RAMS the benefits set forth in Section 8(a) above). The RAMS acknowledges and agrees that it will pay CVC the sum of $25,000 for each and every NFL Game played by the RAMS at the Facilities in excess of the Season Game Limit, plus the RAMS' share of game-day expenses as provided in Annex 1, which sum shall be in full satisfaction of any and all obligations of the RAMS of any kind (including without limitation rent) for playing any NFL Game at the Facilities (and use of the Facilities on the extra Pre-Game Date(s)) in excess of the Season Game Limit.   For purposes of this Section 8(b), the term "Season Game Limit" shall mean ten (10) NFL Games conducted during any single NFL season, plus all play-off NFL Games occurring immediately thereafter.   Subject to the provisions of Section 8(a) hereof, the RAMS agrees to cooperate with CVC in connection with long-term (up to ten (10) years) planning by CVC for scheduling of possible CVC Events during the period of August through January (or such earlier and/or later months as may be included in the regular schedule of NFL Games) of each year during the term of this Amended Lease and to use reasonable efforts to secure confirmation from the NFL as to the availability of Possible NFL Game Dates for CVC Events, so as to enable the RAMS to release Possible NFL Game Dates to CVC at the earliest practical opportunity.   Similarly, CVC agrees to cooperate with the RAMS in connection with the scheduling of NFL Games in the event the NFL schedules or contemplates scheduling NFL Games in earlier or later months, on days other than Saturdays, Sundays, Mondays and Thursday, or lengthens its NFL season.   Inasmuch as CVC's obligation for Facilities Management as defined in and pursuant to Annex 1 shall extend to preparation of the Facilities for NFL Games (including Pre-Game Dates) and other RAMS Events, CVC agrees that all CVC Events permitted herein and all events at the Convention Center shall be scheduled so as to avoid interference with or disruption of NFL Games (including Pre-Game Dates) and minimize interference with or disruption of other RAMS Events or any of the preparations or other arrangements necessary therefor or incidental thereto.

(c)   **Other Professional Football Games**.   Other than the NFL's Super Bowl and the NFL's Pro Bowl, no football game to be played by professional football players may be scheduled or played at the Facilities without the prior written consent of the RAMS, which may withhold its consent in its sole discretion.

9.   **Rent**.   In consideration of the exclusive rights, benefits, privileges and uses granted the RAMS herein,

FRKL037A.WP 55909 1/16/95  4:34pm   -19-

the RAMS covenants and agrees to pay rent throughout the term of this Amended Lease as follows:

(a)  Base Rent.  Subject to possible adjustment pursuant to Section 8(b), the RAMS shall pay as rent to CVC the sum of $250,000.00 per year, in twelve equal monthly installments, said installments to be due and payable on the first day of each consecutive month commencing with the RAMS' Facilities Delivery Date (although in the month in which the RAMS Facilities Delivery Date occurs the payment shall be due the day after the RAMS Facilities Delivery Date and shall be prorated per game based upon a 10-game season).

(b)  Bonds.  CVC has advised the RAMS that the bonds issued by the Authority in connection with the Project (the "Project Bonds") were issued as "governmental bonds" for federal income tax purposes, and, as a result, the obligations of the RAMS in connection with this Amended Lease and the Annexes hereto and any amounts otherwise payable by the RAMS in satisfaction of such obligations, may be limited to assure that payments made by the RAMS, when aggregated with any other payments made by persons other than state or local governmental units, will be less than the amounts which would cause any issue of the Project Bonds to meet the private security or payment test set forth in the Internal Revenue Code of 1986, as amended.  In this regard, the CVC may obtain from time to time opinions of bond counsel selected or approved by the Authority ("Bond Counsel") which address the obligations of the RAMS hereunder.  The RAMS agree to comply with any written direction from CVC in reliance on an opinion of Bond Counsel which direction relates to any payment or amount otherwise owing by the RAMS.  In addition, the RAMS agree to use their best efforts to cooperate with the CVC to modify the timing or amount of payments otherwise owing by the RAMS pursuant to this Amended Lease and the Annexes hereto so as to comply with the opinion of Bond Counsel.

(c)  All sums due CVC under this Amended Lease which do not constitute rent hereunder shall be deemed to constitute additional rent; provided, however, that amounts due CVC under Section 6(b), Annex 2, Annex 3 or Annex 4 shall not constitute rent but rather shall be considered a division of the gross revenues to which they relate in accordance with the interests of the RAMS and the CVC under this Amended Lease.

10.  Quiet Enjoyment.

(a)  CVC Covenants.  CVC, by its execution and delivery of this Amended Lease, covenants and warrants to the RAMS, that it has full right and lawful authority to enter into this Amended Lease for the full term hereof, that all necessary action has been taken by it to authorize the execution and delivery of this Amended Lease, that this Amended Lease is the legal, valid and binding obligation of

CVC and, provided that the RAMS shall not be in default in the payment of rent or in the performance of any of its obligations hereunder, but subject to the provisions of Section 8.2 and Section 8.3 of the Financing Agreement, that the RAMS shall peacefully and quietly have, hold and enjoy the Facilities throughout the term of this Amended Lease and any extension thereof, free from any hindrance or molestation by CVC, or by anyone claiming by, through or under CVC.   The RAMS, by its execution and delivery of this Amended Lease, covenants and warrants to CVC that, except for the NFL Constitution and Bylaws, rules and policies of the NFL, (collectively, the "NFL Policies") to the extent, if at all, applicable (in the event of an approval of the Application (as defined in the Relocation Agreement) the RAMS waive the exception relative to NFL Policies) and subject to Section 26: (i) the RAMS has full right and lawful authority to enter into this Amended Lease for the full term hereof; (ii) all necessary corporate action has been taken to authorize the execution and delivery of this Amended Lease; and (iii) subject to the occurrence of the Assignment Effective Date, this Amended Lease is the legal, valid and binding obligation of the RAMS.

(b)  <u>Attornment to the Authority</u>.  This Amended Lease shall be subordinate to the Prior Leases; provided, however, that the Authority has agreed pursuant to the Operating Lease, and the City, the County, the State, SLMFC, CVC and FANS by their respective execution and delivery of the Consents to Assignment also agree, that upon any termination of the Operating Lease, this Amended Lease shall automatically become a direct obligation of the Authority such that, subject only to the provisions of Section 8.2 and Section 8.3 of the Financing Agreement, the RAMS shall be entitled to continue to enjoy the benefits of the leasehold estate granted and conveyed herein without hindrance or interference by any party, provided the RAMS attorns to the Authority, and continues to perform the obligations of the RAMS hereunder, subject to the terms and conditions of this Amended Lease.

(c)  <u>Financing Agreement</u>.  The RAMS acknowledges that this Amended Lease and its rights hereunder are subject and subordinate to the provisions of Section 8.2 and Section 8.3 of the Financing Agreement, and to the right of the Indenture Trustee (as defined in the Project Indentures) (as defined in the Financing Agreement), upon the written request of Holders (as defined in the Project Indentures) of not less than 25% in aggregate principal amount of the respective Project Bonds then outstanding as set forth in Section 903 of the Project Indentures, to direct the Authority to terminate all convention and football uses of the Facilities and, thereafter, to terminate all leases, subleases, and other agreements providing for or authorizing said uses, including this Amended Lease, and the RAMS agrees to comply with the provisions of Sections 8.2 and Section 8.3

FRKL037A.WP 55909 1/16/95  4:34pm   -21-

of the Financing Agreement, and to deliver appropriate notices to its sublessees, and to other contracting parties, as directed by the Authority in accordance with said Sections 8.2 and 8.3 and the terms of that certain Non-Disturbance and Attornment Agreement of even date.  The RAMS shall further (i) include within each lease, sublease, license and other agreement to which it is a party (other than tickets and other short-term agreements with event patrons), a provision restating the foregoing requirements of this Section 10(c) and (ii) require each of its sublessees and licensees having rights to utilize the Unreserved Facilities, and its and their respective contractors, to include the same provision in every sublease, license and other agreement relating to the Unreserved Facilities to which any of them is a party.  The provisions of this Section 10(c) shall in no respect limit, restrict or be in derogation of the RAMS' rights under Section 16 hereof.

11.  **Indemnification.**

(a)  **Indemnification by CVC.**  CVC shall, at all times during the term of this Amended Lease, protect, indemnify and save harmless the RAMS and the Authority, the City, and the County (the "CVC indemnified parties") from and against all liabilities, obligations, claims, damages, penalties, causes of action, contests and expenses (including, without limitation, all attorneys' fees and expenses) imposed upon or incurred by or asserted against the CVC indemnified parties, and not covered by insurance, as a result of any negligent act or omission on the part of CVC which results in (a) a death or injury occurring in the Facilities, (b) a loss of or damage to the Facilities or any portion thereof, or (c) a loss of or damage to any equipment or property within the Facilities, and against any breach of any term, covenant or condition of this Amended Lease by CVC; provided, however that CVC's indemnity shall not extend to any occurrence resulting from the gross negligence or intentional misconduct of the CVC indemnified parties or their employees, agents, contractors or invitees (other than event patrons).

(b)  **Indemnification by the RAMS.**  The RAMS shall, at all times during the term of this Amended Lease, protect, indemnify and save harmless CVC and the Authority, the City, and the County (the "RAMS indemnified parties") from and against all liabilities, obligations, claims, damages, penalties, causes of action, contests and expenses (including, without limitation, all attorneys' fees and expenses) imposed upon or incurred by or asserted against the RAMS indemnified parties, and not covered by insurance, as a result of any negligent act or omission on the part of the RAMS resulting in (a) a death or injury occurring in the Facilities, (b) a loss of or damage to the Facilities or any portion thereof, or (c) a loss of or damage to any equipment or property within the Facilities, and against any breach of any term, covenant

FRKL037A.WP 55909 1/16/95  4:34pm   -22-

or condition of this Amended Lease by the RAMS; provided, however that the RAMS' indemnity shall not extend to any occurrence resulting from the gross negligence or intentional misconduct of RAMS indemnified parties or their employees, agents, contractors or invitees.

12.  <u>Insurance and Casualty</u>.  CVC shall carry, or cause to be carried by CVC's tenants, licensees, contractors and other occupants or users of the Facilities (other than the RAMS), such policies of casualty and public liability insurance in respect of the Facilities and the uses made thereof as are required to be carried under Article V of the Financing Agreement, as the same may be amended from time to time, as well as such policies and insurance (with such dollar amounts of coverage) as are set forth on Exhibit 12 hereto. The RAMS shall be named as additional insureds on the policies described in the preceding two sentences at no cost to the RAMS.  All policies of casualty insurance maintained or secured by the RAMS and CVC shall contain appropriate mutual waivers of the right of recovery against the RAMS or CVC, as the case may be.  Annex 1 to this Amended Lease and Section 16 hereof govern the rights, obligations and remedies of the parties in the event of any damage to or destruction of the Facilities.

13.  <u>Successors in Interest</u>.  Subject to the provisions of Section 6(f) hereof, this Amended Lease may not be assigned by either party without the express written consent of the other hereto, which consent may not be unreasonably withheld.  Once such consent is given, this Amended Lease shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

14.  <u>Notices</u>.  All demands, requests, consents, and approvals required to be given hereunder, and all notices delivered by any party to the other hereunder, shall be in writing and shall be delivered to the addresses set forth below.  Such notices shall be deemed given upon receipt if by personal delivery, upon receipt if by express courier promising over night delivery (with delivery confirmed the next business day), upon receipt if by facsimile transmission (receipt of which is confirmed) and three (3) business days after deposit in the U.S. Mail, if by registered or certified mail, first class, postage prepaid.

   To the RAMS:  Mr. John J. Shaw
            President
            LOS ANGELES RAMS
            10271 West Pico Blvd.
            Los Angeles, CA  90064
            Facsimile:  (310) 277-4341

```
With a copy to:        Irell & Manella
                       1800 Avenue of the Stars, Suite 900
                       Los Angeles, California 90067
                       Attention: Milton B. Hyman, Esq.
                       Facsimile: (310) 203-7199

    To the CVC:        St. Louis Convention and Visitors
                       Commission
                       10 South Broadway
                       St. Louis, Missouri  63102
                       Attn:  President
                       Facsimile:  (314)
```

With a copy to the parties to the Prior Leases:

```
                       Regional Convention and Sports
                       Complex Authority
                       c/o Mr. Robert J. Baer, Chairman
                       814 North Broadway, Room 100
                       St. Louis, Missouri  63102
                       Facsimile: (314) 231-2284

                       The State of Missouri
                       State Capitol
                       Jefferson City, Missouri  65101
                       Attn:  Commissioner of Administration
                       Facsimile:

                       The City of St. Louis, Missouri
                       1200 Market Street
                       St. Louis, Missouri  63103
                       Attn:  Mayor, Room 200
                       Comptroller, Room 212
                       Facsimile:

                       St. Louis County, Missouri
                       St. Louis County Government Center
                       41 South Central
                       St. Louis, Missouri  63105
                       Attn:  County Counselor's Office
                       Facsimile:  (314) 889-3732
```

The addresses, facsimile numbers and persons provided hereinabove may be changed by delivery of written notice of such change to each of the parties hereto.

15. **Defaults by the RAMS**.

(a) **RAMS Defaults**.  In the event the RAMS shall fail to pay any sum of rent or additional rent due hereunder or otherwise fails to perform any of its obligations under this Amended Lease, and such failure shall continue for sixty (60) days after delivery to the RAMS of written notice of such failure to pay or perform, as the case may be, (or, if such

FRKL037A.WP 55909 1/16/95  4:34pm    -24-

default is not reasonably susceptible to cure within a sixty (60) day period, if the RAMS fails to commence the cure thereof within such sixty (60) day period or thereafter fails to proceed with diligence to effect a cure), then, in any such event, but subject to the provisions of Section 15(c), CVC shall be entitled to declare this Amended Lease terminated and/or to exercise any and all rights and remedies it may have at law as well as a right to specific performance of the RAMS's obligations under Section 3(c) hereof.  It is hereby acknowledged and agreed that, notwithstanding any such default by the RAMS, (i) CVC shall not be entitled to consequential damages, (ii) the Relocation Payment (as defined in the Relocation Agreement) is earned by the RAMS when paid, and (iii) the payments described in Section 26 hereof are earned when paid.  Notwithstanding the foregoing provisions of this Section 15, upon any termination of this Amended Lease resulting from a default by the RAMS pursuant to the provisions of Section 15(a), the RAMS shall be released from any and all liability accruing after the date of such termination (including, without limitation, any liability for payment of rent or additional monies or for the performance of any obligation under Section 9 hereof).

(b)  <u>Delivery of Unreserved Facilities and RAMS Reserved Facilities</u>.  In addition to the rights and remedies provided for in Section 15(a) above, in the event the RAMS shall fail to deliver exclusive possession of all or any portion of the Unreserved Facilities to CVC on the date and at the time such delivery is due hereunder, the RAMS shall pay to CVC, as additional rent the sum of $5,000.00 for each day or portion thereof such holdover continues.  Said sum shall be due within ten (10) days of CVC's demand therefor.  Nothing contained in this subsection (b) shall be deemed to constitute permission on the part of CVC to any holdover by the RAMS.  In the further event CVC is unable, as a result of such holdover, to perform any obligation to a third party scheduled to utilize such portion of the Unreserved Facilities (or any portion of the RAMS Reserved Facilities, to the extent it has a right to utilize such RAMS Reserved Facilities), CVC shall be entitled to recover actual (including consequential) damages sustained by CVC on account thereof.

(c)  <u>Exercise of Remedies</u>.  Exercise by CVC of the remedies set forth in Section 15(a) shall be subject to the requirement that CVC deliver to the RAMS and up to two (2) additional entities specified by the RAMS, a copy of any notice delivered to the RAMS pursuant to Section 15(a) advising or claiming that the RAMS is in default in the performance of any obligation to be performed by the RAMS hereunder, and giving such designees a reasonable period of time, and in no event less than sixty (60) days from the date of such notice, within which to cure said default on behalf of the RAMS should they, or any of them, elect to cure said default.  Payments of any charges or impositions shall be made

FRKL037A.WP 55909 1/16/95  4:34pm   **-25-**

without prejudice to the RAMS' right to contest the lawfulness thereof (including taxes, mechanic's lien claims, and the like), and to secure same by bond or other security reasonably acceptable to CVC pending resolution of the claim.  Upon any termination of this Amended Lease by the CVC upon a default of the RAMS under Section 15(a), CVC shall immediately be released from any further obligation to pay or perform the obligations respecting the RAMS under Paragraph 29 of the Anaheim Lease (as hereinafter defined) as provided in Section 26 of this Amended Lease.

16.   <u>Defaults by CVC and Other Occurrences</u>.

(a)  <u>CVC Defaults</u>.  Each of the following occurrences shall constitute a default on the part of CVC hereunder:  (i) if CVC shall fail to pay any sum due and payable to the RAMS hereunder or fail to perform any other covenant or obligation on its part to be performed hereunder and such failure shall remain uncured for sixty (60) days after delivery to CVC of written notice thereof (or, if such default (other than a failure resulting from a lack of funds in the Preservation Fund) is not reasonably susceptible to cure within a sixty (60) day period, if CVC fails to commence the cure thereof within such sixty (60) day period or thereafter fails to proceed with diligence to effect a cure). Notwithstanding the foregoing provisions of this Section 16(a), it shall be a default on the part of CVC hereunder, which default shall not be subject to cure by CVC, if (x) CVC shall fail to perform any obligation to be performed by CVC and (y) such failure shall result in the cancellation or postponement of any NFL Game.

(b)  <u>Occurrences Giving Rise to RAMS Remedies</u>.  Each of the following occurrences shall have the results specified in Section 16(c):  (i) if the Authority, or any of the Sponsors shall refuse or fail to recognize the rights of the RAMS under this Amended Lease as provided in Section 10 hereof; (ii) if there is an uncured Event of Default under any of the Project Indentures (as defined in the Financing Agreement) or if there is an Event of Non-Appropriation (as defined in the Financing Agreement) on the part of any of the Sponsors (as defined in the Financing Agreement) which is not cured within 90 days thereof; (iii) if the RAMS shall receive from Authority at the direction of the Trustee under any of the Project Indentures pursuant to Section 8.3 of the Financing Agreement or from the Authority under Section 8.2 of the Financing Agreement any notice of intention to terminate the RAMS' right to use the Facilities for the playing of professional football games; (iv) if at March 31, 2005, the Facilities and each Component thereof does not meet the First Tier standard, (v) if at March 31, 2015, the Facilities and each Component thereof does not meet the First Tier standard; (vi) subject to Section 22, the Facilities, including without limitation, the RAMS Reserved Facilities and the Unreserved

Facilities, are not delivered to the RAMS in a First Class condition by 12:00 noon on October 21, 1995; (vii) if taxes of the kind specified in Section 6(i) are levied and not paid by a third party at substantially no cost or expense to the RAMS, state or local taxes which are discriminatory against the RAMS, or discriminatory against an owner or operator of a sports franchise, or there is a finding that there is a "bonus" value to the RAMS' leasehold interest for real property tax assessment purposes such that there is an imposition of real property taxes with respect to the leasehold interest without the taxes so imposed being paid by a third party at substantially no cost or expense to the RAMS; (viii) in any calendar year there is a "Net Increase", as hereinafter defined, if not paid by a third party at substantially no cost or expense to the RAMS, in the Amusement Tax of 5% presently imposed by the City of St. Louis (the "Amusement Tax") applicable to any of the RAMS' revenues or (ix) at any time during the term of the Amended Lease there is a "Cumulative Net Increase", as hereinafter defined, if not paid by a third party at substantially no cost or expense to the RAMS, in the Amusement Tax by the City of St. Louis applicable to any of the RAMS' revenue.  There is a "Net Increase" when the rate of the Amusement Tax is increased by a percentage in any calendar year that is in excess of the "Adjusted CPI-U", as hereinafter defined.  The "Adjusted CPI-U" is equal to the percentage increase in the "CPI-U", as hereinafter defined, from the prior calendar year (but in no event more than 4%) reduced by the "Average Percentage Increase In Ticket Prices", as hereafter defined, for NFL Games from the prior calendar year.  In no event shall the Adjusted CPI-U be less than zero.  The term "CPI-U" as used herein is defined to be the Consumer Price Index - Seasonally Adjusted U.S. City Average for all Items for All Urban Consumers (1982-84=100), issued and published monthly by the Bureau of Labor Statistics of the United States Department of Labor.  If the terms or numbers of items contained in the CPI-U are changed, the CPI-U shall be adjusted to the figure that would have been arrived at had the manner of computing the CPI-U in effect on the date of this Amended Lease not been altered.  If the CPI-U is discontinued, then the parties hereto shall mutually agree to use a substitute index which shall be a successor index to the CPI-U, appropriately adjusted, or if such successor index is not available, a reliable governmental or other nonpartisan publication evaluating the information theretofore used in determining the CPI-U.  The "Average Percentage Increase In Ticket Prices" is defined as the average percentage increase from year to year in ticket prices for regular season single game ticket sales published or announced by the RAMS.  There is a "Cumulative Net Increase" where the cumulative rate of the Amusement Tax is increased by a cumulative percentage during the term of the Amended Lease in excess of the "Cumulative Adjusted CPI-U". The "Cumulative Adjusted CPI-U" is equal to the percentage increase in the CPI-U at any point in time during the term of

the Amended Lease using 1995 as the initial base year (but in no event greater than 4% times the number of full calendar years during the term of this Amended then elapsed Lease) reduced by the sum of the Average Percentage Increase In Ticket Prices for NFL Games for all years during the term of this Amended Lease then having elapsed. In no event shall the Cumulative Adjusted CPI-U be less than zero.

(c) <u>Remedies</u>. Any default under Section 16(a) or any occurrence under Section 16(b) shall entitle the RAMS to exercise any and all rights and remedies it may have at law or in equity or hereunder. The enforcement of the RAMS rights and remedies shall include the right to enforce termination of this Amended Lease if such default is not cured within the period of time provided in Section 16(a) for the cure thereof. The RAMS' right to terminate this Amended Lease under the preceding sentence may be exercised at any time, but must be noticed not later than that date which is 90 days following the end of the NFL's season of NFL Games, during which the default occurred. In addition to exercising any of the foregoing rights or remedies, the RAMS shall have the option, at any time upon an occurrence under Section 16(b) and thereafter until the cure of such occurrence, by delivery of written notice to CVC, to terminate this Amended Lease without any obligation or liability on the part of either party to the other hereunder, from and after the date of such termination, except as provided in the next sentence. Upon any termination of this Amended Lease by the RAMS upon a default under Section 16(a) or an occurrence under Section 16(b), CVC shall cause all remaining obligations of the RAMS under Paragraph 29 of the Anaheim Lease (as hereinafter defined) to be irrevocably defeased and cause the irrevocable defeasance of all remaining obligations of the RAMS respecting the Anaheim Lease as provided in Section 26 of this Amended Lease. Upon any termination of this Amended Lease pursuant to the provisions of Sections 16(a), (b) or (c), CVC shall be deemed to have assigned to the RAMS whatever rights it may have under the Operating Lease to recover by way of a refund any rent or additional rent prepaid by the RAMS and properly allocable on a pro-rata basis to any NFL Game Date occurring after the effective date of the termination of this Amended Lease. Upon any termination of this Amended Lease pursuant to the provisions of Sections 16(a), (b) or(c) other than a termination pursuant to Sections 8.2 or 8.3 of the Financing Agreement, in lieu of an immediate termination of this Amended Lease, the RAMS shall be entitled to elect to continue use of the Facilities under the terms of this Amended Lease for a period of one year from the date of termination of this Amended Lease plus such additional months as necessary to have the RAMS remain in possession in the Facilities through the end of the current NFL season, including play-off games. Upon any termination of use of the Facilities or of this Amended Lease pursuant to Sections 8.2 or 8.3 of the Financing Agreement, the RAMS shall be entitled to elect to continue use

of the Facilities under the terms of this Amended Lease for up to the end of the second full NFL season, including play-off games, following the date of such termination as provided in Section 10(c).

(d) <u>Setoff Rights</u>. In addition to the rights and remedies provided for in Section 16(c), the RAMS shall have the right: (i) to offset against any monetary obligations the RAMS may have to CVC under this Amended Lease (including, without limitation, any obligation to pay rent or additional rent or any other monetary obligations owing to CVC by the RAMS under this Amended Lease) if CVC shall be in default in the payment of any monetary obligation under the terms hereof or if such monetary obligation shall be the obligation of CVC to pay damages to the RAMS pursuant hereto; (ii) to remedy any default under this Amended Lease by CVC and to charge CVC thereafter (including without limitation by way of offsetting any obligation of the RAMS to CVC under this Amended Lease (including without limitation under any of the Annexes to this Amended Lease) and (iii) to recover its actual (including consequential) damages if the RAMS is deprived of the use of the Facilities for any NFL Game (or other RAMS Event) as a result of a default by CVC under Section 16(a), or upon and during the continuation of any occurrence pursuant to items (i) through (vi) of Section 16(b), and provided further that if the RAMS is deprived (or reasonably can expect in addition to be deprived) of the use of the Facilities for any NFL Game, in addition to the other rights and remedies of the RAMS, the obligation of the RAMS to pay any sum of rent and additional rent and all obligations of the RAMS under Sections 3(c) and 9 hereof shall fully cease, suspend and abate until the first to occur of (x) the cure of the applicable occurrence or resumption of use of the Facilities, or (y) the termination of this Amended Lease by the RAMS in accordance with the option provided for in Section 16(c).

(e) <u>Failure to Meet First Tier and First Class Standards</u>.

(i) Notwithstanding anything set forth in any other paragraph of Section 16 to the contrary, Section 16(e)(i) shall govern the following:  In the event the Facilities and each Component thereof is not First Tier at either March 1, 2005 or March 1, 2015, the RAMS may by written notice to CVC convert the term of this Amended Lease to a annual tenancy from the date of the notice (plus such additional months as are necessary to have the tenancy run through the last day of the current NFL season (including play-off games) with the RAMS having successive unilateral annual renewal options thereafter until the end of the original term of this Amended Lease.  The RAMS will then be entitled to negotiate and execute a lease with any person or entity and to relocate from the Facilities as of the end of any year of the lease period.  In such event, this Amended

Lease shall terminate as of the end of such annual period and each party hereto shall be released from any and all liability accruing after the date of such termination, except that CVC shall be obligated to immediately cause the irrevocable defeasance of all remaining obligations of the RAMS under Paragraph 29 of the Anaheim Lease and irrevocably defease all remaining obligations of the RAMS respecting the Anaheim Lease as provided in Section 26 of this Amended Lease. Provided, however, that if CVC causes the Facilities and each Component thereof to be First Tier after the RAMS' notice, but prior to the time the RAMS executes a lease with another person or entity, the term of this Amended Lease will reinstate to that set forth in Section 3 hereof. If the Amended Lease is so reinstated, it cannot be terminated for failure to meet that condition unless the Facilities or any Component thereof shall fail to meet the First Tier standard on March 1, 2015. The RAMS' remedies in this Section 16(e)(i) are to the exclusion of a right to other remedies provided in this Amended Lease for the failure to meet the First Tier standard.

(ii) Separate and apart from the matters set forth in Section 16(e)(i) hereof, in the event all or any part of the Facilities is not operated, managed, Maintained or Repaired to the First Class standard (as set forth in Annex 1) and such condition remains in effect sixty days following written notice by the RAMS (or five days during the RAMS' NFL season, including during exhibition NFL Games and play off NFL Games), the RAMS shall be entitled to (and must prior to having the right to terminate this Amended Lease for such condition) attempt to remedy such condition and to charge CVC thereafter by way of offsetting any obligation of the RAMS to CVC under this Amended Lease or any of the Annexes hereto (plus the RAMS cost of enforcing this Amended Lease and the Annexes hereto, including without limitation reasonable attorney's fees, plus interest on all costs and charges at the prime rate of interest then charged by Boatmen's Bank plus 3% per annum). If the RAMS reasonably believes, based upon the written opinion of a reputable engineer (architect or contractor), repair service or maintenance service that the cost to operate, manage, Maintain or Repair to a First Class standard, as applicable, will be greater than or equal to 80% of the reasonably projected dollar amount of the RAMS' remaining (after prior offsets, if any, applicable to such period) obligations to CVC under this Amended Lease and the Annexes hereto for the twelve months following the date of the RAMS' written notice, the RAMS shall have the rights to convert the term of this Amended Lease to an annual term (with the RAMS having successive unilateral annual renewal options thereafter as provided in Section 16(e)(i) above), to execute a lease with another party and relocate, and to terminate the Amended Lease, all as more particularly set forth in Section 16(e)(i) above (including CVC's obligations with respect to the Anaheim Lease as set forth in Section 16(e)(i)). This obligations of the RAMS under this

Section 16(e)(ii) shall not apply to a condition which results in the cancellation or postponement of an NFL Game, in which event the RAMS shall have the right to convert the term of this Amended Lease, to execute a lease with another party and relocate, and to terminate this Amended Lease as are set forth in Section 16(e)(i) hereof.

(iii)   In the event that CVC contests any actions of the RAMS taken in reliance on this Section 16(e) and an arbitration (or judicial) decision is rendered in favor of CVC on any or all grounds, the RAMS will not be in default of its obligations under this Amended Lease or under any of the Annexes hereto, if, within thirty days after such decision becomes final and nonappealable, the RAMS pays to CVC the dollar amount which it was found the RAMS had no right to offset and the RAMS continue to play (or return to playing) its home NFL Games at the Facilities.

(f)   CIVIC Guarantee.   Notwithstanding anything set forth in any other paragraph of Section 16 to the contrary, this Section 16(f) shall govern the following matters:   By written notice to CVC, the RAMS shall have the right (i) to convert the term of this Amended Lease to an annual term (with the RAMS having successive unilateral annual renewal options thereafter as provided in Section 16(e)(i) above), and (ii) to execute a lease with another party and relocate upon the failure of any or all of the Obligors under that certain Agreement re Minimum Return by and among CIVIC, the members of CIVIC and the RAMS (the Agreement re Minimum Return") to pay, if then accrued, the RAMS within five (5) calendar days after a written demand is delivered to CIVIC by the RAMS to do so, the Excess Guaranty Payment Amount (as defined therein).

(g)   Public Officials.   No public official or commissioner and no shareholder, partner, officer or employee of the Authority, CVC, any Sponsor or the RAMS shall have any personal liability for payment of any claim or the performance of any obligation arising from the obligations set forth in this Amended Lease.

17.   Not Used.

18.   Reporting and Accounting.   Each party shall deliver or cause to be delivered to the other party, such reports and accountings in respect of the Facilities and the operations conducted therein or the uses made thereof as may be reasonably required from time to time by such other party or as may be required by the Authority, the State, the City or the County.

19.   Non-Discrimination.   In the performance of their obligations hereunder, the parties shall not unlawfully discriminate on the basis of race, religion, sex, color, national origin, veteran status, age or physical handicap, and

the parties shall take such affirmative action as may be appropriate to afford opportunities to everyone in all operations of the Facilities, including enforcement, contracting, operating, maintenance and purchasing. The parties shall comply with all applicable mandatory federal, state and local laws, ordinances, executive orders and regulations of general applicability to businesses regarding equal employment, nondiscrimination and affirmative action.

20. **Governing Law**. This Amended Lease shall be governed by and construed in accordance with the laws of the State of Missouri, without giving effect to principles of conflicts of laws.

21. **Amendments**. This Amended Lease (along with the Annexes and agreements attached hereto and identified on Exhibit 21) contain the entire agreement of the parties hereto relative to the subject matter hereof. This Amended Lease may not be amended in any respect, and CVC agrees not to enter into any modification of or amendment to the Operating Lease or the Convention Center Operating Lease (as defined in the Operating Lease) materially affecting the rights or obligations of the RAMS hereunder, including without limitation changing in a materially adverse manner any aspect of the Facilities relating to the functional or economic use of the Facilities by the RAMS, or any of its licensees, sublessees and assignees, in respect of the RAMS Reserved Facilities, NFL Games, NFL Game Dates or Pre-Game Dates, without the prior written consent of the RAMS.

22. **Unavoidable Delays**. The Authority, CVC and the RAMS, respectively, shall each be excused for any failure to perform any obligation under this Amended Lease, to the extent such failure to perform is due solely to any of the following occurrences: fire, flood, tornado, severe weather or other Act of God; war, civil riot or insurrection; or strike, lock-out or labor disturbance.

23. **Severability**. If any one or more of the terms, provisions, promises, covenants or conditions of this Amended Lease, or the application thereof to any person or circumstance, shall to any extent be adjudged invalid, unenforceable, void or voidable for any reason whatsoever by a court of competent jurisdiction, each and all of the remaining terms, provisions, promises, covenants and conditions of this Amended Lease, and the application thereof to other persons or circumstances, shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law, provided that so enforcing this Amended Lease would not materially affect the rights or obligations of the RAMS or CVC hereunder, including changing in a materially adverse manner any aspect of the Facilities relating to the functional or economic use of the Facilities by the RAMS in respect of the RAMS Reserved Facilities, NFL Games, NFL Game Dates, Pre-Game

Dates or other RAMS Events, or by CVC in respect of the CVC
Reserved Facilities, Unreserved Facilities, or CVC Events.

24. **Captions and Headings.** The captions and
headings used throughout this Amended Lease are for
convenience of reference only, and the words contained therein
shall not be deemed to affect the meaning of any provision or
the scope or intent of this Amended Lease, nor in any way
affect this Amended Lease.

25. **Arbitration.** Any controversy, dispute or claim
between or among any of the parties hereto (and/or any of
those consenting hereto pursuant to the Consents to Assignment
(other than the City, County or SLMFC, which may only bring
an action or against which an action may only be brought in
United States Federal District Court for the Eastern District
of Missouri, with the right to jury waived)) to this Amended
Lease, related to this Amended Lease, including, without
limitation, any claim arising out of, in connection with, or
in relation to the interpretation, performance or breach of
this Amended Lease (including any determination of whether the
"First Tier" or "First Class" standard provided in Section 1.3
of Annex 1 to this Amended Lease has been met) shall be
settled by arbitration conducted before three arbitrators in
St. Louis, Missouri, in accordance with the most applicable
then existing rules of the American Arbitration Association
(or its successor or in the absence of a successor, an
institution or organization offering similar services), and
judgment upon any award rendered by the arbitrator may be
entered by any federal or state court having jurisdiction
thereof. Such arbitration shall be the exclusive dispute
resolution mechanism. In the event the event the parties
(and/or those consenting hereto) are unable to agree on the
three arbitrators, the parties (and/or those consenting
hereto) shall select the three arbitrators by striking
alternatively (the first to strike being chosen by lot) from a
list of thirteen arbitrators designated by the American
Arbitration Association (or its successor or in the absence of
a successor, an institution or organization offering similar
services); seven shall be retired judges or trial or appellate
courts resident in states other than Missouri or California,
selected from the "Independent List" of retired judges (or its
then equivalent) and six shall be members of the National
Academy of Arbitrators (or its successor or in the absence of
a successor, an institution or organization having a similar
purpose) resident in states other than Missouri or California.
In the event of any such arbitration, the prevailing party
shall be awarded its costs and reasonable attorney's fees as
part of the award. Each of the parties to the arbitration
shall bear the costs of the arbitration on such equitable
basis as the arbitrator of the matter shall determine.
Notwithstanding the foregoing, where a dispute presents issues
which are within the exclusive jurisdiction of the National
Labor Relations Board, the decision of the National Labor

Relations Board (or any Court of Appeals or Supreme Court enforcing or otherwise reviewing the decision of the National Labor Relations Board) shall be final and binding. Provided, however, that this shall not interfere with respect to dispute resolution procedures identified in Section 33, which shall be initially exhausted with respect to the work assignment or jurisdictional dispute procedures identified therein.

26.   **Defeasance of Anaheim Lease**.  The parties acknowledge that under Paragraph 29 of the Fourth Amendment to Exhibition Agreement dated November 21, 1978, as amended by the Fifth Amendment to Exhibition Agreement, (the "Anaheim Lease") upon the termination of the Anaheim Lease, the RAMS is obligated, among other payments, either (i) under Paragraph 29(a) of the Anaheim Lease to make a lump sum payment to the City of Anaheim equal to the unpaid principal indebtedness under the 1979 Stadium Expansion Bonds (or any refunding thereof) and all accrued but then unpaid interest or (ii) under Paragraph 29(b) of the Anaheim Lease to make payments over time to the City of Anaheim equal to such principal and accrued interest.  CVC agrees to assist the RAMS to meet the RAMS' obligations to the City of Anaheim under the Anaheim Lease, but nothing hereunder shall constitute a direct assumption by CVC of the RAMS' obligations under the Anaheim Lease to the City of Anaheim.  On or before the Assignment Effective Date, CVC, shall cause the defeasance of the obligation of the RAMS to make a lump sum payment under Paragraph 29(a) of the Anaheim Lease by making arrangements, satisfactory to the RAMS, under the alternative payment schedule, as provided in Paragraph 29(b) of the Anaheim Lease. The CVC shall arrange for the posting, on behalf of the RAMS pursuant to Paragraph 29(b) of the Anaheim Lease, of an irrevocable standby letter of credit in the form of Attachment "2" to such Fourth Amendment to the Anaheim Lease so as to cause the release to the RAMS of the $2 million Notice Payment (as defined in the Anaheim Lease) previously paid by the RAMS to the City of Anaheim.  Thereafter, on behalf of the RAMS, CVC promptly: (i) shall cause payment to be made for the account of the RAMS, but at the cost of CVC, for payment to the City of Anaheim, as and when due, of all amounts required to be paid to the City of Anaheim under Paragraph 29(b) of the Anaheim Lease; and (ii) shall cause for the account of the RAMS, but at the cost of CVC, the performance at the times required, of all of the obligations of the RAMS under Paragraph 29(b) of the Anaheim Lease, including the timely posting of the required irrevocable standby letter of credit.  CVC shall grant the RAMS a security interest in collateral consisting of Treasury obligations of the United States having aggregate principal amounts equal to the amounts necessary to defease the obligation as of the Assignment Effective Date to secure CVC's obligations under the preceding sentences of this Section 26.  In the event of the termination of this Lease as provided by Section 15(c) as a result of a default by the RAMS, CVC shall immediately be

released from any further obligation to pay or perform under this Section 26 as herein provided and the RAMS shall promptly release its security interest in the collateral.

27. **Effective Date**.   This Amended Lease shall become effective from the Assignment Effective Date.

28. **SLNFL Status as Party**.   SLNFL is a party to the Amended Lease solely as a result of its status as the lessee of CVC under the Lease.   From and after the Assignment Effective Date, the Lease shall have no further force and effect.   From and after the Assignment Effective Date, SLNFL shall have no rights or obligations under this Amended Lease or any of the Assigned Agreements.

29. **Termination**.   Termination of this Amended Lease shall cause a termination of each of the Annexes hereto.

30. **Estoppel**.   Upon the written request of either party to this Amended Lease ("Requesting Party"), the other party ("Responding Party") shall execute, acknowledge and deliver to the Requesting Party, a written statement certifying:   (i) whether or not any of the terms or provisions of this Amended Lease or any of the Annexes hereto have been changed (or if they have been changed, stating how they have been changed); (ii) whether or not this Amended Lease or any of the Annexes has not been cancelled or terminated, (iii) the last date of payment of rent and additional rent and time period covered by such payment; and (iv) whether or not the Requesting Party may be in default under this Amended Lease or any of the Annexes hereto (and if it is claimed that the Requesting Party may be in default, generally stating why).   Such statement shall be delivered to the Requesting Party within twenty (20) business days after the date of request by the Requesting Party.   The Requesting Party may give any such statement by the Responding Party to the Authority, the Sponsors, FANS, Civic or any prospective subtenant, assignee or encumbrancer of the Facilities or creditor of the Requesting Party.   The Authority, the Sponsors (or any Sponsor), FANS, Civic or any such subtenant, assignee or encumbrancer may rely conclusively upon such statement as true and correct.

31. **Laws**.   Nothing in this Amended Lease shall be construed as providing the RAMS an exemption from any applicable ordinances, regulations or taxes of the City or County.

32. **Time**.   All time references in this Amended Lease shall refer to the official civil time for the Central Time Zone.   Time is of the essence in this Amended Lease.

33. **Labor Conditions**.   All maintenance and construction operations at the Facilities and the Convention

FRKL037A.WP 55909 1/16/95  4:48pm   -35-

Center, including those related to Events shall be performed by employees represented by AFL-CIO unions in accordance with the jurisdictional rules and under wages, benefits and working conditions established by the contracting party with unions having jurisdiction over such work regardless of whether the contracting party is CVC or the RAMS or a contractor or subcontractor for one of them. All other work, excluding football and media operations, involving maintenance, construction or operations of the Facilities and the Convention Center performed by the RAMS or its contractors, subcontractors and concessionaires shall be performed subject to the applicable, lawful jurisdictional rules and regulations established by CVC for the Facilities and the Convention Center in effect from time to time (including any jurisdictional dispute resolution procedures) and in the absence of such regulations, in accordance with the jurisdictional provisions of the incompletely executed Event Labor Agreement. Nothing in this paragraph shall override the provisions of any collective bargaining agreement or preclude the RAMS or any contractor, subcontractor or concession operator of the RAMS from negotiating the wages, benefits and working conditions applicable to its employees; provided further that the RAMS shall use its best efforts to include acceptance of any CVC-sponsored jurisdictional dispute resolution procedure in any such labor agreement entered into by the RAMS or any of its contractors, subcontractors or concession operators.

34. **Third Party Beneficiaries**. There are no third party beneficiaries to this Amended Lease or the Annexes hereto.

35. **Counterparts**. This Amended Lease and any of the Annexes may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

36. **Confidentiality**. Unless required by law, or in accordance with NFL Policies, or as necessary in the ordinary course of business, or with the consent of the other parties hereto (which shall not be unreasonably withheld), the parties hereto shall keep all financial information shared, all accountings and the terms and conditions of all agreements or contracts to be entered into pursuant to or in accordance with this Amended Lease or any of the Annexes, confidential (unless such information has become public other than by a violation hereof by a party hereto).

IN WITNESS WHEREOF, the RAMS, CVC and SLNFL have executed this Amended and Restated ST. LOUIS NFL Lease, as of the day of the year first above written:

THIS AMENDED AND RESTATED ST. LOUIS NFL LEASE CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES

"CVC"

THE REGIONAL CONVENTION AND VISITORS COMMISSION

By:_____

Its:_____

"SLNFL"
ST. LOUIS NFL CORPORATION

By: _____

Its:_____

"RAMS"
THE LOS ANGELES RAMS FOOTBALL COMPANY, INC.

By: _____

Its:_____

FRKL037A.WP                    -37-

IN WITNESS WHEREOF, the RAMS, CVC and SLNFL have executed this Amended and Restated ST. LOUIS NFL Lease, as of the day of the year first above written:

THIS AMENDED AND RESTATED ST. LOUIS NFL LEASE CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES

"CVC"

THE REGIONAL CONVENTION AND VISITORS COMMISSION

By: _____

Its: _____

"SLNFL"
ST. LOUIS NFL CORPORATION

By: _____

Its: _____

"RAMS"
THE LOS ANGELES RAMS FOOTBALL COMPANY, INC.

By: _____

Its: _____