# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RONALD McALLISTER,<br><br>    Plaintiff<br><br>v.<br><br>THE ST. LOUIS RAMS, L.L.C.,<br><br>    Defendant. | No. 4:16-CV-172 SNLJ<br>No. 4:16-CV-189<br>No. 4:16-CV-262<br>No. 4:16-CV-297<br>CONSOLIDATED |

## AFFIDAVIT OF ROBERT BOHM

Affiant, Robert Bohm, after first being duly sworn upon his oath, states as follows:

1.  I am over the age of 21, a resident of St. Louis County and citizen of the State of Missouri. I am of sound mind, capable of making this Affidavit, and have personal knowledge of the facts set forth herein.

2.  I, along with my wife, Sue Bohm, am a Plaintiff in the above-styled action and I make this Affidavit in support of our Motion for Class Certification.

3.  I along with my wife, Sue Bohm, brought this lawsuit on behalf of ourselves, all similarly-situated individuals and entities who purchased Personal Seat Licenses ("PSLs") from the St. Louis Rams (either the St. Louis Rams Partnership or its successor in interest, the St. Louis Rams, L.L.C.) and who maintained those PSLs through the end of the 2015 football season.

4.  I, along with my wife, Sue Bohm, originally purchased two PSLs from FANS, Inc. on or about April 21, 1995, before the Rams moved to St. Louis, and we are thereby considered to be "Charter PSL Holders." See FANS, Inc. St. Louis Regular Patron Charter Personal Seat License Agreement, signed by Robert Bohm and dated April 21, 1995, attached

hereto as Exhibit D-1 and incorporated herein by reference. We paid $500.00 for each PSL, or $1,000.00 total. At the time of our original purchase, we were provided with a copy of the FANS, Inc. Standard Terms and Conditions of Regular Patron CPSL Agreement, attached hereto as Exhibit D-2 and incorporated herein by reference.

5. We upgraded our PSLs twice, on or about March 10, 1999, and June 11, 2008. The March 10, 1999, upgrades were purchased from the St. Louis Rams Partnership, and the June 11, 2008, upgrades were purchased from the St. Louis Rams, L.L.C. (Collectively, the Rams Partnership and the St. Louis Rams, L.L.C. will be referred to herein as "the Rams"). We paid an additional $4,000.00 per PSL for these upgrades, or $8,000.00 total in additional license fees. These fees were paid directly to the Rams, as shown in the March 10, 1999, PSL Upgrade Worksheet attached hereto as Exhibit D-3, and the June 11, 2008 Relocation Form attached hereto as Exhibit D-4, both of which are incorporated herein by reference.

6. My wife, Sue Bohm, and I used our PSLs to purchase season tickets for the two seats for which we held PSLs every season the Rams played in St. Louis from 1995 through the end of the 2015 NFL football season.

7. After the Rams moved the team to Los Angeles, California following the end of the 2015 NFL season, neither I nor my wife Sue Bohm, have: (a) been paid anything by the Rams for the remaining value of our PSLs; (b) been permitted by the Rams to sell or transfer our PSLs to any other person or entity; or (c) been offered the right to purchase season tickets to Rams football games in Los Angeles, California on a priority basis.

8. Because my wife Sue Bohm and I are natural persons who bought PSLs from the St. Louis Rams, LLC or their predecessor in interest and continued to be PSL owners at the end of the 2015 NFL football season, we understand that we are members of the proposed Class and

the Upgrade and MMPA subclasses as identified in the Envision Plaintiffs' Motion for Class Certification.

9. In pursuing this case, my wife Sue Bohm and I consider the interests of the proposed Class the same as we consider our own interests.

10. My wife Sue Bohm and I are familiar with the Amended Complaint filed in this action, the pleadings and motions filed by each party, and the rulings of the Court.

11. My wife Sue Bohm and I agree to serve as Class representatives in this case and agree to actively participate in this litigation. We understand that we may be called upon to testify in depositions, at trial, answer written interrogatories, produce documents, and remain aware of the status and progress of this lawsuit. In fact, Sue Bohm and I have already responded to Defendant's Interrogatories and Request for Production, and we have been deposed by the Rams' attorneys.

12. My wife Sue Bohm and I for all members of the proposed Class, seek the same type of monetary damages based upon the same PSL contracts for the same legal reasons and violations of the law. Although we have a general understanding of this lawsuit, we rely upon the expertise of our attorneys for legal guidance.

13. My interests and those of my wife Sue Bohm are not antagonistic to the other members of the proposed Class, and we are unaware of any interests we might have that would conflict with the interests of the proposed Class.

14. Since Sue Bohm and I purchased our first PSLs in 1995, the Rams have sent regular mail to our mailing address and e-mail to my e-mail address. We believe the Rams also maintained the addresses and e-mail addresses of other proposed Class members.

15. My wife Sue Bohm and I are interested in the progress of this lawsuit and we will

cooperate with our attorneys and the Court throughout the pendency of this litigation.

16. My wife Sue Bohm and I purchased the PSLs and season tickets for personal, family, and/or household purposes.

FURTHER AFFIANT SAYETH NOT.

                                                                     _/s/ Robert Bohm_
                                                                      Robert Bohm

STATE OF MISSOURI         )
                                        ) ss
COUNTY OF ST. LOUIS     )

On this 2nd day of August, 2017, before me, a notary public in and for said state, personally appeared Robert Bohm, known to me to be the person who executed the within Affidavit, and acknowledged to me that he executed the same for the purposes therein stated and that the statements contained therein were true and correct to the best of his knowledge, information and belief.



JOANNE NOEL
My Commission Expires
October 14, 2019
St. Louis County
Commission #15306988

My Commission expires: 10/14/2019

                                                       _/s/ JoAnne Noel_
                                                       Notary Public

DocID: 1769974.docx

# EXHIBIT D-1



# ST. LOUIS REGULAR PATRON CHARTER PERSONAL SEAT LICENSE AGREEMENT

THIS REGULAR PATRON CHARTER PERSONAL SEAT LICENSE AGREEMENT ("Agreement") is entered into by and between FANS, Inc., a Missouri not-for-profit corporation ("Licensor"), and the undersigned ("Licensee").

**LICENSEE:**
ROBERT BOHM
1469 CHESTERFIELD ESTS DR
CHESTERFIELD, MO 63005

**ACCOUNT NUMBER:** 16953



DEFENDANT'S EXHIBIT
Bohm 3
Dlt  5-1-17

Upon acceptance by Licensor, Licensee is hereby granted the Regular Patron Charter Personal Seat License(s) ("CPSL") indicated below upon the Standard Terms and Conditions of Regular Patron CPSL Agreement ("Standard Terms and Conditions") delivered to Licensee in conjunction herewith:

### NUMBER OF CPSL(s) AND LICENSE FEE
1. Individual CPSL Fee                              $500.00
2. Total Number of Licensee's CPSL(s)                    2
3. Total CPSL License Fee                         $1,000.00
4. Stadium Seating Area                                  F

Licensee hereby acknowledges receipt of the Standard Terms and Conditions of this Regular Patron CPSL Agreement, which are an integral part of this Agreement. To execute and accept this Agreement, Licensee must complete in full the following and return this page to Licensor within thirty (30) days after receipt of this Agreement.

**AGREED TO AND ACCEPTED BY:**
(Including all of the delivered Standard Terms and Conditions without modification)



_Robert Boh_____     4/21/95
Signature                        Date

**CHECK ONE:**   ☑ Individual      ☐ Partnership      ☐ Corporation
                 ☐ Other (describe):_____

**LICENSEE'S SOCIAL SECURITY NUMBER OR FEDERAL TAX I.D. NUMBER:**
#_█████████████_(required)

Any incomplete or altered Agreement may be rejected by Licensor.

**RETURN TO:**
FANS, Inc.
P.O. Box 502468
St. Louis, MO 63150-2468



RECEIVED
MAY - 4 1995

**ACCEPTANCE BY LICENSOR:**
This Agreement shall be accepted only when this fully completed signature page has been received by Licensor and duly recorded in its books and records.

-- Signature Page --

Rams-Envision000010

# EXHIBIT D-2

# FANS, Inc., 10 S. BROADWAY, SUITE 425, ST. LOUIS, MO 63102
## STANDARD TERMS AND CONDITIONS OF REGULAR PATRON CPSL AGREEMENT

1. **CPSL License Fee and Stadium Area.**
   Licensor promises, upon full payment of the License Fee, to grant to Licensee the number of Regular Patron Charter Personal Seat Licenses ("CPSL(s)") stated on the Signature Page. The CPSL(s) granted to Licensee by Licensor entitle Licensee to purchase the number of Season Ticket(s) for the designated Stadium Area shown on Exhibit A. "Season Ticket(s)" shall mean general admission ticket(s) on a season-by-season basis to all, but not less than all, pre-season, regular season and post-season home games (excluding the NFL's Super Bowl or Pro Bowl), subject to Licensee's obligation to pay a separate fee for NFL playoff games (the "Games"), played by the RAMS in the Stadium at America's Center (the "Stadium") located in the City of St. Louis, Missouri, during the term and subject to the terms and conditions of this Agreement. Licensee acknowledges and agrees that the exact location of Licensee's seats ("Licensee's Seats") within the Section of the Stadium shown on the Signature Page which are subject to Licensee's CPSL(s) will not be determined until after Licensee has paid the full amount of the License Fee shown on the Signature Page. Once Licensee's Seats have been determined, Licensee will be entitled to the opportunity to purchase Season Ticket(s) to Licensee's Seats for all Games at the Stadium until March 1, 2025, subject to Licensee complying with all of the terms and conditions of this Agreement.

2. **Additional CPSL Conditions.**
   A. Licensee agrees to purchase all of the Season Tickets(s) with respect to a particular NFL season upon the terms and conditions set by the RAMS. Licensor shall have no liability for the number of Games included within a Season Ticket(s) package or for the RAMS failure to play Games in the Stadium.
   B. Licensor may limit the number of CPSL(s) licensed to any one individual or entity in its sole discretion.
   C. The rights licensed under this Agreement are rights of personal privilege and do not under any circumstance confer upon Licensee any interest or estate in real property or any leasehold interest in the Licensee's Seat or the Stadium.

3. **Transfer Terms.**
   A. Until March 1, 1996, Licensee shall not sell, pledge, hypothecate or transfer in any manner a CPSL except upon the occurrence of a Special Event. A Special Event shall be as follows:
      (1) The occurrence of a circumstance beyond the control of Licensee such as death, disability, employment relocation, or similar event;
      (2) The transfer to a Qualifying Lender, either as a pledge or other encumbrance by Licensee pursuant to, or due to Licensee's default under, the Qualifying Lender's CPSL financing documents;
      (3) The transfer to an Immediate Family Member or Related Party;
      (4) The transfer in conjunction with a major business transaction in which the acquisition of the CPSL is not the intent of the transaction.
      Further, in no event shall a CPSL be transferred more than once each year, except for a Special Event. All transfers, whether pursuant to a Special Event or after March 1, 1996, shall be subject to a Transfer Fee.
   B. All transfers shall be in accordance with such reasonable rules and regulations and in such form as established by Licensor from time to time, including but not limited to the transferee assuming all obligations of the transferor in a form acceptable to Licensor, provided that a Qualifying Lender shall not be required to assume Licensee's obligations, nor shall such Qualifying Lender have any of Licensee's rights, until the transfer of a CPSL to the Qualifying Lender due to Licensee's default. Until a transfer is properly recorded on Licensor's records, the transfer of a CPSL by Licensee will not be recognized by Licensor or the RAMS under the terms of the CPSL being transferred.
   C. "Qualifying Lender" shall mean any bank or other financial institution, or employer, or affiliate of an employer, of a Licensee that loans funds to Licensee which are used to pay for part or all of Licensee's CPSL License Fee. Licensee hereby acknowledges and agrees that (1) the RAMS shall be under no obligation to deliver Season Ticket(s) to Licensee if Licensee is in default under the Qualifying Lender's CPSL financing agreements and the RAMS are notified of the same at least fifteen (15) business days prior to the date on which Season Ticket(s) would otherwise be delivered to Licensee; and (2) Licensee hereby waives any and all claims Licensee may have against the RAMS, Licensor and/or any Qualifying Lender for any failure by the RAMS to deliver Season Ticket(s) to Licensee after receipt by the RAMS of any such notice from Licensor or Licensee's Qualifying Lender.
   D. "Immediate Family Member" means any grandparent, parent, spouse, child, stepchild, sibling, grandchild and great-grandchild of an individual Licensee; "Related Party" means any person or entity which owns or controls, or is owned or controlled by, Licensee.
   E. The "Transfer Fee" shall be equal to the greater of $25.00 or ten percent (10%) per CPSL of the CPSL transfer price. A Transfer Fee shall be charged on a "per CPSL per transaction" and <u>not</u> on a "per transferee per transaction" basis.

4. **Refunds.**
   If the RAMS do not move to St. Louis by September 1, 1996, all CPSL payments made by Licensee will be refunded to Licensee without interest.

5. **Default.**
   Failure by Licensee to make any payment when due under this Agreement or to comply with any of the other terms and conditions of this Agreement or any of the terms and conditions of the sale of the Season Ticket(s) (including without limitation the timing of payment therefor and conduct at games) imposed by the RAMS shall be a default. If Licensee defaults under this Agreement, then, at the sole option of Licensor, (a) this Agreement may be terminated, (b) Licensee shall hold no further rights to acquire the CPSL(s) or Season Ticket(s) associated therewith, (c) Licensor shall be entitled to retain all payments previously made by Licensee to Licensor hereunder, and (d) Licensee shall remain liable to Licensor for all losses suffered as a result of such default. In addition, upon default by Licensee, Licensor shall be entitled to recover all reasonable attorneys' fees and court costs incurred in connection with Licensee's default. Notwithstanding the foregoing, if Licensee's actions result in the loss of Licensee's rights to purchase or retain Season Ticket(s) for reasons other than Licensee's failure to timely purchase Season Ticket(s), Licensee shall be entitled to sell or transfer Licensee's CPSL in a bona fide transaction occurring within sixty (60) days of the date Licensee is notified of Licensee's loss of rights to Licensee's Season Ticket(s), subject, however, to the rights of such Licensee's Qualifying Lender, if any.

6. **Disclaimer.**
   Licensee covenants and acknowledges that neither Licensor, the Authority (as defined below), the Stadium Manager (as defined below), nor the RAMS have made any representations whatsoever regarding the CPSL(s) other than as may be set forth in this Agreement.

7. **Reservation of Rights by Licensor.**
   In addition to all rights at law or equity or under the other terms of this Agreement, Licensor hereby expressly reserves the following rights:
   A. The right to terminate this Agreement and refund part or all of Licensee's deposit, either if Licensor determines that Licensee's credit is not satisfactory for this License and the future obligation of Licensee to acquire tickets, or for any other reason satisfactory to Licensor in its sole discretion, including, but not limited to, the right to reduce the total number of CPSL(s) purchased by Licensee if necessary; and
   B. The right to assign, pledge as collateral, transfer or sell all or any part of the rights and obligations of Licensor and Licensee under this Agreement to one or more third parties who shall succeed to all or any part of the rights vested in and granted herein to Licensor.

8. **Best Efforts.**
   If the RAMS play any of their NFL games other than at the Stadium (e.g. at Busch Stadium if the Stadium is not completed on time), Licensor will use its best efforts to assure Licensee the right to purchase, on a pro rata priority basis, tickets for seats in the stadium where the transferred games are played. Licensee shall be obligated to buy tickets for Games played in the Stadium in St. Louis and NFL games played at Busch Stadium for which tickets are available for purchase by Licensee.

9. **Representations of Licensee.**
   Licensee hereby represents, warrants and/or acknowledges as follows:
   A. Licensee has read and understands the terms of this Agreement;
   B. Licensee is not acquiring the CPSL(s) as an investment and has no expectation of profit as a licensee of the CPSL(s);
   C. Licensee is acquiring the CPSL(s) solely for the right to purchase Season Ticket(s) to NFL Games played in the Stadium;
   D. Licensee is acquiring the CPSL(s) for Licensee's own use and not with a view to the distribution of the CPSL(s) to others;

E. Licensee will not have any equity or other ownership interest in either Licensor, the Authority, the Stadium Manager, the RAMS, or the Stadium or any of the Stadium's facilities and will not have any rights to dividends or other distribution rights from Licensor or any other party or entity described in this Agreement as a result of being a licensee of a CPSL, and further will not have any voting rights with respect to Licensor matters as a result of being a licensee of a CPSL;

F. The transfer of the CPSL(s) will be restricted and the CPSL(s) may be terminated under certain conditions, as explained in this Agreement; and

G. Licensee has full authority to enter into and sign this Agreement and carry out its terms and conditions and when signed, this Agreement shall be a binding obligation on Licensee, enforceable in accordance with its terms.

**10. Use of Seats.**

Licensee and Licensee's invitees shall at all times maintain proper decorum while using the Licensee's Seats and shall abide by all applicable governmental laws, ordinances, orders, directions, rules and regulations and by such rules and regulations as are adopted and revised from time to time regarding Licensee's Seats or for the Stadium. Licensee shall be responsible for all damages caused to the Licensee's Seats by Licensee and Licensee's invitees, ordinary wear and tear excepted. In addition, Licensee shall not take any action which would cause an increase in premiums of any insurance policy carried by either Licensor, the Authority, the Stadium Manager or the RAMS, by causing Licensor or any other party to fail to meet any requirement or condition of such policy or otherwise. Without limiting the foregoing, Licensee specifically agrees that neither Licensee nor Licensee's invitees will: (a) bring into the Stadium any alcoholic or intoxicating beverage, any illegal drugs or, except as prescribed by a physician, any controlled substance; (b) permit the Licensee's Seats to be used for any illegal, improper, immoral or objectional purpose, or in any way obstruct or interfere with the rights of any other licensees or Game attendees; or (c) film, record or transmit from the Licensee's Seats all or any portion of any NFL Football game or other event, or any description thereof, by any means (including without limitation radio or television broadcasting, whether broadcast "live" or by means of film or tape).

**11. Assumption of Risk; Liability; Indemnity.**

Licensee, for Licensee and Licensee's invitees, assumes all risk of personal injury to, or for any damage to or any loss of property of, Licensee or its invitees, arising out of, during or related to their attendance at events held in the Stadium. Licensee acknowledges that alcoholic beverages will be available in the Stadium and that attendance at sporting events may expose attendees to certain risks of injury including, but not limited to, incidents involving other patrons who have consumed alcoholic beverages, injury from thrown or dropped objects, spills of food or beverages and the unruly behavior of other patrons. Licensee hereby agrees to assume all responsibility and liability for the consumption in the Stadium of alcoholic beverages by Licensee and its invitees and for the conduct and behavior of Licensee and its invitees. Licensee agrees to indemnify and hold harmless Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., and the RAMS, and the respective owners, officers, directors, employees and agents of each such entity, from and against any claims, damages, actions, suits and expenses, including attorneys' fees and other costs, arising out of or related to this Agreement, the use of alcohol at the Stadium by Licensee or Licensee's invitees, the conduct and behavior of Licensee and Licensee's invitees and/or the use of the Licensee's Seats by Licensee or Licensee's invitees, whether such claims are now existing or later arising, and whether or not such loss is alleged to be caused by the negligence of Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., or the RAMS, the respective owners of each such entity, or their respective officers, directors, employees or agents.

**12. Additional Terms.**

A. Licensee acknowledges that the Stadium will be managed, maintained and operated by The Regional Convention and Visitors Commission (the "Stadium Manager") pursuant to certain agreements between the Stadium Manager and The Regional Convention and Sports Complex Authority (the "Authority") (collectively the "Stadium Agreements"). All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the RAMS agreement to relocate to St. Louis. Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years. Licensee acknowledges that Licensee has no claim against the RAMS with respect to this CPSL and/or its termination whatsoever. Licensee understands and acknowledges the possibility that the RAMS may not play its games in the Stadium or St. Louis for the entire term contemplated by this License. Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this CPSL, including without limitation should the RAMS not play its home games in the Stadium or in St. Louis for any reason.

B. Licensee hereby acknowledges that although the RAMS are not a party to this Agreement, the RAMS are a third party beneficiary under this Agreement and will directly and/or indirectly realize certain benefits from this Agreement. In addition, Licensee acknowledges that various other parties named in Sections 10 and 11 above, namely the Stadium Manager, the Authority, and St. Louis NFL Corp., are also third party beneficiaries of this Agreement and may directly or indirectly realize certain benefits from this Agreement. There are no other third party beneficiaries to this Agreement.

C. This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri without regard to the laws of conflict. Any action, suit or other proceeding brought by or against the Licensee or Licensor, including any claim for injuries or damages relating to the license of a part of the Stadium, the Licensee, and Licensee's guests and invitees, shall be brought in the United States District Court for the Eastern District of Missouri, Eastern Division, or in the Circuit Court of the State of Missouri, Twenty-First (21st) Judicial Circuit.

D. All notices and other communication required to be given pursuant to this License to Licensor or to Licensee shall be in writing and shall be sent to the addresses set forth on the Signature Page of this Agreement. Any notice given herein shall be deemed delivered when addressed as above provided, postage prepaid, certified mail, return receipt requested, and deposited in a United States General or Branch Post Office or with a nationally recognized overnight courier. Licensee hereby authorizes Licensor to provide Licensee's Qualifying Lender with a copy of any notice or other communication which Licensor may give to Licensee hereunder.

E. This Agreement contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any representations or agreements previously made or entered into by the parties hereto. No modification hereto shall be permitted by Licensee whatsoever.

F. This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, and their permitted successors and assigns. This Agreement may be assigned by Licensor in whole or part without any notice to Licensee; this Agreement shall not be assigned or transferred by Licensee except as set forth above. This License Agreement shall not be binding and enforceable until completed as stated on the Signature Page.

G. Notwithstanding the foregoing, neither Licensor nor the RAMS shall have any liability to Licensee or a Qualifying Lender for any failure to comply with the provisions of Sections 3.B or 12.D above.

**EXHIBIT A — STADIUM DIAGRAM**





BOHM 0003

# EXHIBIT D-3

178

16953

0.00
0.00

Robert Bohm
1469 Chesterfield Ests Dr
Chesterfield MO 63005

3/31 145L 19-20
110NN 7-8

00169530000000

16953                                                                                   03/10/99

PSL UPGRADE WORKSHEET

437        II        20 - 21        2        0.00                    0.00
F Season Tickets (1:4:F-R)

CC RECEIPT
ATTACHED

Previous Pay                    0.00

0.00

8/02
$5200

MTW

NEW LOCATION - PSL TYPE  CB   SECT  110   ROW  NN   SEATS  7-8
ORIG TYPE  F   PRICE  500  # SEATS  2   TOTAL PAID  1000
UPGRD TYPE  CB   PRICE  3000  # SEATS  2   TOTAL  6000   BAL DUE - PSL  5000
F99  ✓    PSL  ✓    CONTACTS  ✓   LICENSE AGREEMENT _____

Rams-Envision000011

# EXHIBIT D-4

# RELOCATION FORM

DATE: 6/11/08

ACCOUNT #: 165545  #16953

ACCOUNT NAME: Robert Bohm

CONTACT NAME: Robert Bohm

DAY PHONE: (636) 530-7389     EMAIL: _____

**CURRENT INFORMATION:**

SEC: 116     ROW: D     SEAT: 9-10

SEAT QTY: 2     PSL/CLUB MEMBERSHIP PRICE: $ 3000     TOTAL: $ 6000

SEASON TICKET PRICE: $ 880     TOTAL: $ 1760

**NEW INFORMATION:**

SEC: 115     ROW: R (crossed out N)     SEAT: 11-12

SEAT QTY: 2     PSL/CLUB MEMBERSHIP PRICE: $ 4500     TOTAL: $ 9000

SEASON TICKET PRICE: $ 1000     TOTAL: $ 2000

WILL THE SEASON TICKETS BE PRO-RATED? ___ YES  X NO

WILL THE PSL/CLUB MEMBERSHIP BE PRO-RATED? ___ YES  X NO

IF YES, TERMS/COMMENTS? _____

TOTAL PSL/CLUB MEMBERSHIP DUE: $ 3000

TOTAL SEASON TICKET DUE: $ 240

TOTAL AMOUNT DUE: $ 3240

**PAYMENT/BILLING INFORMATION:**

AMOUNT TO CHARGE/BILL FOR PSL/CLUB MEMBERSHIP: $ 3000

AMOUNT TO CHARGE/BILL FOR TICKETS: $ 240

TOTAL AMOUNT TO CHARGE/BILL: $ 3240 + 5 = 3245

PLEASE SELECT THE FOLLOWING THAT APPLY:

___ CASH/CHECK INCLUDED   X CHARGE CREDIT CARD   ___ INVOICE PSL   ___ INVOICE TICKETS

CREDIT CARD: Mastercard ▓▓▓▓▓▓▓▓▓▓▓▓▓▓     EXP: 9/09

SIGNATURE/NAME ON CARD: Robert Bohm

**OFFICE USE ONLY:**

SALES REP INITIALS: EHS     SALES SOURCE: _____

PSL ✓   F ✓   MEMO ___   INV ✓   CTRCT ___   FIN ✓

Rams-Envision000013

10953

# ST. LOUIS RAMS CHANGE FORM

ACCOUNT #: 165545

ACCOUNT NAME: Robert Bohm

CONTACT NAME: Same

DAY PHONE: 636-530-7389    EVENING PHONE: _____

**CURRENT INFORMATION:**

SEC: 110    ROW: NN    SEAT: 7-8

PSL TYPE: B1    PRICE: $3000    # SEATS: 2    TOTAL: $ 6000

TOTAL SEASON TICKETS: $ 1760

6-11-05

**NEW INFORMATION:**

SEC: 116    ROW: D    SEAT: 9-10

PSL TYPE: B1    PRICE: $3000    # SEATS: 2    TOTAL: $ 6000

TOTAL SEASON TICKETS: $ 1760

**TOTAL PSL/CLUB DUE:**    $ —

**TOTAL SEASON TICKET DUE:**    $ —

**TOTAL AMOUNT TO CHARGE:**    $ —

METHOD OF PAYMENT:

_____ INVOICE  _____ CASH/CHECK

_____ MASTERCARD  _____ VISA  _____ DISCOVER  _____ AMEX

CREDIT CARD: _____    EXP: _____

NAME ON CARD: _____

SIGNATURE: _____

OFFICE USE ONLY

PSL ✓    F ✓    MEMOS ✓    INV ____    CTRCT ____    FIN ____

6/2005

Rams-Envision000014

# RELOCATION FORM

16953

DATE: 6/11/09

ACCOUNT #: 165545

ACCOUNT NAME: Robert Bohm

CONTACT NAME: _____

DAY PHONE: 636 530-7389    EMAIL: _____

**CURRENT INFORMATION:**

SEC: 115    ROW: R    SEAT: 11-12

SEAT QTY 2    PSL/CLUB MEMBERSHIP PRICE: $ 4,500    TOTAL: $ 9,000

SEASON TICKET PRICE: $ 1,000    TOTAL: $ 2,000

**NEW INFORMATION:**

SEC: 141    ROW: I    SEAT: 23-24

SEAT QTY 2    PSL/CLUB MEMBERSHIP PRICE: $ 4,500    TOTAL: $ 9,000

SEASON TICKET PRICE: $ 1,200    TOTAL: $ 2,400

WILL THE SEASON TICKETS BE PRO-RATED? ___YES ___NO

WILL THE PSL/CLUB MEMBERSHIP BE PRO-RATED? ___YES ___NO

IF YES, TERMS/COMMENTS? _____

TOTAL PSL/CLUB MEMBERSHIP DUE: $ —

TOTAL SEASON TICKET DUE: $ 400

TOTAL AMOUNT DUE: $ 400

**PAYMENT/BILLING INFORMATION:**

AMOUNT TO CHARGE/BILL FOR PSL/CLUB MEMBERSHIP: $ —

AMOUNT TO CHARGE/BILL FOR TICKETS: $ 400

TOTAL AMOUNT TO CHARGE/BILL: $ 400

PLEASE SELECT THE FOLLOWING THAT APPLY:

___CASH/CHECK INCLUDED  ✓ CHARGE CREDIT CARD  ___INVOICE PSL  ___INVOICE TICKETS

CREDIT CARD: Master Card ████████    EXP: 9/2010

SIGNATURE/NAME ON CARD: Robert Bohm

**OFFICE USE ONLY:**

SALES REP INITIALS _____    SALES SOURCE _____

PSL ___  F ___  MEMO ___  INV ___  CTRCT ___  FIN ___