# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RONALD McALLISTER,                    )
                                      )
            Plaintiff,                )  4:16-CV-00172-SNLJ
                                      )  4:16-CV-00262
         vs.                          )  4:16-CV-00297
                                      )  4:16-CV-00189
THE ST. LOUIS RAMS, LLC,              )  CONSOLIDATED
                                      )
            Defendant.                )
_____)

DEPOSITION OF KEVIN DEMOFF

CORPORATE REPRESENTATIVE OF THE ST. LOUIS RAMS

TUESDAY, JULY 11, 2017

Reported By:  Shirley Koch, RPR
              California CSR No. 10849
              Washington CCR No. 3096
              Hawaii CSR No. 467

1      **A.     To my knowledge, no, I do not.**

2      Q.     And you made no effort, as you sit here today,

3  to determine whether the Rams had any hand in the

4  content that appears on the website?

5           MR. HEIDENREICH:  I'm going to object to the

6  form.  He's already talked to you about efforts that he

7  made.

8           But you can answer.

9           THE WITNESS:  The language appears on -- it's a

10  third-party website, so to me there was no -- I did not

11  make any effort to know -- to figure out whether that

12  came from us or whether it was a third party.

13           MR. ROSENFELD:  Okay.  Typical, out of order.

14  Can I have the website notice?  I know I'm screwing you

15  up.

16           Can we mark this as Exhibit 2, please.

17           (Exhibit No. 2 was marked for

18           identification.)

19  BY MR. ROSENFELD:

20      Q.     Mr. Demoff, I'm handing you what's been marked

21  as Plaintiff's Exhibit 2.  Have you seen this document

22  before?

23      **A.     I have.**

24      Q.     And this is the website notice produced by the

25  Rams?

1      **A.     This is the website notice that was on STR**

2   **Marketplace, yes.**

3      Q.    Okay.  But this is a document -- you can see at

4   the very bottom, dead center, in Exhibit 2, you see

5   these Bates numbers.  It says Rams-McAllister 000025.

6      **A.     Yes.**

7      Q.    Do you know what those numbers mean?

8      **A.     No.**

9      Q.    Okay.  Okay.  Now, this document was produced

10  by the Rams to the plaintiffs in this case.  Are you

11  aware of that?

12          MR. BERMUDEZ:  Can I interrupt for just one

13  second?

14          MR. ROSENFELD:  Yes, sir.

15          MR. BERMUDEZ:  Ryan, do you have more copies of

16  these exhibits, or just one for everybody?  So I can see

17  what you guys are talking about.

18          MR. ROSENFELD:  We just have -- we just have

19  for the witness, Ryan and me.

20          MR. BERMUDEZ:  Okay.

21          MR. ROSENFELD:  And I'm sorry --

22          MR. BERMUDEZ:  It's all right.  It's all right.

23          MR. ROSENFELD:  I wasn't sure you were coming.

24          MR. BERMUDEZ:  No problem.

25  BY MR. ROSENFELD:

1    Q.   Okay.  This document was produced by the Rams;

2    are you aware of that?

3    **A.   Yeah.**

4    Q.   Okay.  To us.  And it says, "On January 12th,

5    the National Football League approved the Rams for

6    relocation to Los Angeles.  Accordingly, all PSL

7    listings on the Rams PSL Marketplace have been removed

8    and transfers can no longer be processed.  If you have

9    any questions regarding your listing and PSLs, please

10   e-mail info@rams.nfl.com."

11        Do you see that?

12   **A.   Yes.**

13   Q.   Whose website is info -- whose e-mail is

14   info@rams.nfl.com?

15   **A.   It's a general ticket inquiry e-mail that we**

16   **use.**

17   Q.   When you say "we," do you mean the Rams?

18   **A.   The Rams.**

19   Q.   It's an address that belongs to the Rams?

20   **A.   An e-mail address, yes.**

21   Q.   Based on your experience as COO, would you

22   expect that STR Marketplace would be generating this

23   notice without seeking approval of the Rams?

24   **A.   I couldn't answer that based on my experience.**

25   **I had no history dealing with STR Marketplace.**

1   date was more tied to the practice facility and -- which

2   we were leaving by March 31st.

3       Q.   And when did the Rams begin actually selling

4   tickets in L.A., or for the L.A. Rams?

5       A.   We began taking deposits for the right to get

6   in line to purchase season tickets, I believe, the week

7   after the relocation announcement.  So it would have

8   been roughly January 19th or January 20th.

9       Q.   And when did the Rams actually start selling

10  those tickets?

11      A.   We actually began the conversion process of

12  selling tickets in late April, early May, I believe is

13  when we first started selling season tickets.

14      Q.   And you first started selling season tickets in

15  late April, early May of 2016?

16      A.   Yes.

17      Q.   Okay.  And that's after the St. Louis lease was

18  terminated?

19      A.   The St. Louis lease expired.

20      Q.   Yeah.  Expired, ended, terminated, whatever

21  word you want to use.  It was over?

22      A.   Yes.

23      Q.   Okay.  And the PSLs were already over, in your

24  opinion?

25      A.   Yes.

1    **A.   I couldn't speak to that certainly, but that**

2    **seems to be what happened.**

3    Q.   Okay.  And then she forwarded it over to

4    Gretchen for a response; right?

5    **A.   Yes.**

6    Q.   Any idea whether that subject matter is --

7    866699 is Mr. Laramie's PSL number?

8    **A.   I don't know the answer to that.**

9    Q.   Okay.  Fair enough.

10   Is Taylor still with the Rams?

11   **A.   No.**

12   Q.   Did she -- was she asked to come to Los

13   Angeles?

14   **A.   She was not, to my recollection.**

15   Q.   Okay.  Do you know where she's working?

16   **A.   I do not.**

17   Q.   And Gretchen then responds an hour and a half

18   later or so to Mr. Laramie, and she said -- she says:

19   "Hi, Kyle.  From the information we have been provided,

20   priority will not be given due to the relocation."

21   Do you see that?

22   **A.   Yes.**

23   Q.   First sentence.  We're going to keep going,

24   but.

25   Now, Kyle has asked if he can buy tickets in

Page 70

1    L.A. on January 18th at 3 o'clock, and at 4:30 Gretchen

2    is saying, "From the information we have been provided,

3    priority will not be given due to the relocation";

4    correct?

5        A.   Correct.

6        Q.   What information would Gretchen have been

7    provided as of January 18, 2016 in order to respond to

8    Kyle?

9        **A.   I presume that the ticket office had had**

10   **discussions on how to direct inquiries to -- for Rams**

11   **fans in St. Louis to purchase tickets in Los Angeles or**

12   **to get on the deposit list, and whether priority would**

13   **have been given to current season ticket holders in**

14   **St. Louis.**

15       Q.   All right.

16            MR. ROSENFELD:  Can you read that answer back.

17            (Record read.)

18            MR. ROSENFELD:  Okay.

19   BY MR. ROSENFELD:

20       Q.   Well, when you say you presume the ticket

21   office, would someone in the ticket office have made the

22   decision that the Rams PSL owners would not be given

23   priority?

24       **A.   The ticket office would not.  The PSL agreement**

25   **said that.**

1    Q.   What did the PSL agreement -- what's your

2    understanding of what the PSL agreement --

3    **A.   My agree -- my understanding of the PSL**

4    **agreement was that the PSL agreement gave the right to**

5    **purchase tickets in the Edward Jones Dome for games**

6    **played in St. Louis.  There were no rights to purchase**

7    **tickets or priority for any games outside of the Edward**

8    **Jones Dome.**

9    Q.   And -- and you presume the ticket office gave

10   this information to Gretchen?

11   **A.   This had been discussed, so I presume that they**

12   **had a meeting subsequent to going on sale for deposit,**

13   **which I believe we talked about, January 19th or January**

14   **20th, with how do you tell people -- how do you get on**

15   **the deposit list.**

16   Q.   Who discussed it?

17   **A.   My belief is it would have been Jake or Matt**

18   **would have instructed the representatives and the**

19   **coordinators.**

20   Q.   When you say your belief -- first, you say this

21   was discussed, then you say it's my belief.  Do you know

22   whether there were discussions in the ticket office or

23   with these folks like Gretchen or Taylor as to whether

24   or not PSL owners would be given priority?

25   **A.   I know the decision was made by myself in**

1    looking at the PSL agreement that there would not be

2    priority given because the PSL agreement did not allow

3    for that interpretation.  The PSL was expired at the end

4    of the Edward Jones Dome.

5         Q.   You made the decision?

6         A.   Well, theoretically, the PSL agreement -- the

7    interpretation of the PSL agreement said there -- there

8    was no rights --

9         Q.   Okay.

10        A.   -- beyond that in the Edward Jones Dome.  So

11   the club itself made the decision that -- because we

12   would enforce the terms of the PSL contract, that the

13   rights were only for the Edward Jones Dome.

14        Q.   And you imparted that decision to Matt?

15        A.   To Jake and to Matt.

16        Q.   Okay.  Who you presume imparted that down the

17   food chain to the account --

18        A.   Correct.

19        Q.   -- specialists; right?

20             When did you make that decision?

21        A.   Well, we made the decision -- we had read the

22   PSL agreement in advance of the relocation.  The

23   specific decision would have been made after the NFL

24   relocation, because there was no reason to have decided

25   that prior to January 12th.

1     Q.    So on January 11th, you had not made the

2   decision as to whether if -- if the PSLs -- if the

3   approval was given by the NFL of no priority or

4   transferability rights?

5     **A.    We hadn't discussed it.  Clearly, the PSL**

6   **language existed for 20 years, so our interpretation was**

7   **that the PSLs had no more rights beyond the Edward Jones**

8   **Dome, given that we hadn't been approved for relocation**

9   **or understand the nature of whether it would be one team**

10  **or two teams.  We hadn't discussed the specifics of**

11  **priority until subsequent to the relocation**

12  **announcement.**

13    Q.    Okay.  And now, you've got January 18th, six

14  days after relocation, and Gretchen is passing along

15  directly to a PSL holder that decision, that priority

16  will not be given to PSL holders; correct?

17    **A.    Correct.**

18    Q.    Okay.  Okay.  Now, the next sentence -- and it

19  says with -- it says "priority will not be given."  The

20  Rams have not started to sell tickets yet.

21    **A.    No.**

22    Q.    Until April, right?

23    **A.    We started taking deposits at**

24  **welcomehomerams.com in the fall, yes.**

25    Q.    But you hadn't started selling yet?

Page 79

1    can't -- I don't think Gretchen knew whether or not.  I

2    think she was referring to Kyle's agreement.

3        Q.   The Rams' -- the Rams' position was -- we

4    talked about it with the website notice.  The Rams'

5    position was that January 18, 2016, the PSLs were not

6    transferable any longer?

7        A.   There was nothing left to transfer.  The PSLs

8    were going to be no longer valid after March 31st.

9        Q.   As of -- as of -- as of January 18, they're not

10   transferable, and there's no priority because they are

11   no longer valid?

12       A.   There would be no reason to transfer a PSL that

13   was going to be no longer valid for the 2016 season.

14       Q.   Very good.  Thank you.

15            Okay.  Now, she also says they're not

16   transferable or refundable.  See that?

17       A.   Yes.

18       Q.   Okay.  Is that the -- the -- did you

19   participate in the decision that the PSLs were not

20   subject to a refund based on relocation?

21       A.   Yeah.  The PSL agreement specifically says

22   there are no rights beyond the ability to purchase

23   tickets at the Edward Jones Dome.

24       Q.   The PSL agreement does provide for refunds;

25   correct?

Page 82

1       **A.    Yes.**

2       Q.    -- that -- that the PSLs are not transferable

3  or refundable; is that correct?

4       **A.    Yes.**

5       Q.    Okay.   Thank you.

6            And does Gretchen's e-mail to Mr. Laramie on

7  January 18, 2016 accurately reflect the Rams' position

8  at that time?

9       **A.    It appears to, yes.**

10      Q.    So as of that time, from the Rams -- the Rams

11 were telling customers who were making inquiry that --

12 PSL holders who were making inquiry, that the PSL was no

13 longer valid based on the relocation; correct?

14      **A.    Correct.**

15      Q.    That there would be no priority rights because

16 the PSL was no longer valid; correct?

17      **A.    The PSL did not give any rights beyond the PSL.**

18      Q.    Okay.   Is the answer that no priority rights

19 would be given because the PSL was no longer valid?

20      **A.    Correct.   There were no priority rights because**

21 **there were no priority rights conferred in the PSL.**

22      Q.    And there would -- they -- there would be no

23 transfer -- the transferability rights were also gone

24 because the PSL was no longer valid; right?

25      **A.    Correct.**



On January 12th, the National Football League approved the Rams for relocation to Los Angeles. Accordingly, all PSL listings on the Rams PSL Marketplace have been removed and transfers can no longer be processed. If you have questions regarding your listing and PSLs, please email info@rams.nfl.com.

**EXHIBIT**
2
Demoff 7-11-17

Copyright © 2015 STR Marketplace, LLC. All Rights Reserved. Use of the St. Louis Rams PSL Marketplace signifies your agreement to the User Agreement and Privacy Policy.

Rams-McAllister000025

INTERNET ARCHIVE
WayBackMachine

https://rams.seasonticketrights.com/    Go

208 captures
3 Jun 2008 - 10 Jun 2017

SEP  JAN  MAR
◀  17  ▶
2015 2016 2017

About this capture

PSLs FOR SALE        PRIVATE TRANSFERS        CREATE ACCOUNT                SIGN IN



On January 12th, the National Football League approved the Rams for relocation to Los Angeles. Accordingly, all PSL listings on the Rams PSL Marketplace have been removed and transfers can no longer be processed. If you have questions regarding your listing and PSLs, please email info@rams.nfl.com.

FREQUENTLY ASKED QUESTIONS (FAQs)                    CONTACT US



EXHIBIT
3
Demoff 7-6-17

INTERNET ARCHIVE TR Marketplace, LLC. https://rams.seasonticketrights.com/ St. Louis Rams PSL Marketplace signifies your agreement to the User acy Policy

WayBackMachine
209 captures
3 Jun 2008 - 10 Jun 2017

SEP JAN MAR
◀ 17 ▶
2015 2016 2017

CONTACT

About this capture

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| RONALD McALLISTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | 4:16-CV-00172 SNLJ |
| | ) | 4:16-CV-00262 |
| v. | ) | 4:16-CV-00297 |
| | ) | 4:16-CV-00189 |
| THE ST. LOUIS RAMS, LLC, *et al.*, | ) | CONSOLIDATED |
| | ) | |
| Defendants. | ) | |

### RESPONSES AND OBJECTIONS TO PLAINTIFFS ENVISION, LLC, ROBERT BOHM, SUE BOHM, AND EDWARD MOCK'S FIRST SET OF REQUESTS FOR ADMISSION DIRECTED TO THE ST. LOUIS RAMS, LLC

The St. Louis Rams, LLC ("Defendant" or the "Rams") responds and objects to Plaintiffs

Envision, LLC, Robert Bohm, Sue Bohm, and Edward Mock's (collectively, "Plaintiffs") First

Set of Requests for Admission directed to Defendant.

### PRELIMINARY STATEMENT

1.        Defendant makes these responses solely for the purpose of this action.  Each

response is made subject to all objections to competence, materiality, relevance, attorney-client

privilege, work product protection, or other objection as to the admissibility that may apply in

the event that any such response, or the information contained therein, is sought to be used in

court.  Defendant expressly reserves all such objections.

2.        Defendant has not yet completed investigation of the facts relating to this action

and has not completed preparation for trial.  Defendant may discover information, facts,

evidence, documents, and things that are not set forth in these responses but which may be

responsive.  The following responses are based on Defendant's present knowledge, information,

and belief after a reasonable investigation and are complete as to Defendant's best knowledge at



EXHIBIT

9

DEMOFF 7-11-17

this time.   Furthermore, Defendant has prepared these responses based on its good faith interpretation and understanding of the individual requests, but Defendant reserves its right to correct any inadvertent errors or omissions.   Defendant also reserves the right to conduct discovery with reference to, or to offer into evidence at the time of trial, any and all facts, evidence, documents, and things developed during the course of discovery and trial preparation, notwithstanding the reference to certain facts, evidence, documents, and things in these responses.

## GENERAL OBJECTIONS

1.      Defendant objects to Plaintiffs' definition of "The Rams" as including Defendant's "subsidiaries, divisions, predecessors, parent corporations, affiliates, officers, directors, agents, representatives and employees" as overbroad, unduly burdensome, oppressive, and irrelevant.   The only defendant in this case is The St. Louis Rams, LLC.   As made clear in its corporate disclosure statement, Defendant is wholly owned by its members, ITB Football Company, L.L.C., and KSE Football, LLC.   Requiring Defendant to respond for entities that are not parties to this suit and provide information not within its possession, custody, or control is improper.   In responding to Plaintiffs' discovery, Defendant will respond only on behalf of itself, that is, The St. Louis Rams, LLC, and not on behalf of separate legal entities or individuals.

2.      Defendant objects to each Request for Admission ("RFA") to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the self-investigation privilege, the joint defense or common interest privileges, or any other applicable law.   Nothing contained in these responses is intended as, nor shall in any way be deemed, a waiver of any attorney-client privilege, work-product protection, or any other

2

applicable privilege or doctrine. Responding to each RFA, Defendant will not undertake to provide privileged or otherwise protected information.

3.     Defendant objects to the "Definitions" section and each RFA to the extent they purport to impose obligations upon Defendant other than or beyond those required by the Federal Rules of Civil Procedure or any local rule. Defendant will follow the applicable rules in responding to Plaintiffs' discovery requests.

4.     Defendant objects to each RFA to the extent the response sought is overbroad, unduly burdensome, oppressive, and irrelevant, and/or compliance with the request would be cost-prohibitive, impractical, and/or impossible, particularly those RFAs that seek a response that is already in the possession of Plaintiffs, already known by Plaintiffs, or is generally obtainable by Plaintiffs from public documents.

5.     Defendant objects to each RFA to the extent it seeks information that is not within Defendant's possession, custody, or control. Defendant objects to each RFA to the extent it prematurely seeks disclosure of (a) information relating to its contentions, opinions, and allegations, or (b) information concerning facts that have yet to be disclosed during the discovery process and that are not presently in its possession, custody, or control.

6.     These General Objections are applicable to and incorporated in each of Defendant's responses below as if specifically set forth herein. The stating of specific objections to a particular RFA shall not be construed as a waiver of Defendant's General Objections nor does the restatement of, or specific reference to, a General Objection in the response to a particular RFA waive any other General Objection. Additionally, unless otherwise specifically stated, Defendant's objections to each RFA apply to the entire RFA.

3

7.     Defendant's responses to these RFAs are made subject to, and without waiving or intending to waive, any of the objections noted above, as well as:

    a.  all questions as to competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose of any of the documents referred to or responses given, or the subject matter thereof in any subsequent proceeding in, or any trial of, this action or any other action or proceeding;

    b.  the right to object to other discovery procedures involving or related to the subject matter of the RFA herein responded to; and

    c.  the right at any time to revise, correct, add to, or clarify any of the responses set forth herein.

## REQUESTS FOR ADMISSION

1.     Admit the interests of the St. Louis Rams General Partnership in PSLs which were "sold" or conveyed to PSL holders were transferred to The St. Louis Rams, LLC.

**RESPONSE:**  Defendant objects to this RFA as vague and ambiguous, and as failing to describe the admission sought with reasonable particularity.  This RFA is not clear as to by whom the referenced PSLs "were 'sold' or conveyed."  Information pertaining to interests in PSLs sold by entities other than the Rams is also overbroad and irrelevant due to the Court's September 21, 2016 Memorandum and Order (ECF No. 44) granting Defendant's Motion for Judgment on the Pleadings as to the PSL agreement entered into by FANS, Inc.

Subject to and without waiving the foregoing objections or the General Objections, Defendant denies this RFA because Defendant is unaware of any entity named "The St. Louis Rams General Partnership."

4

2.      Admit Exhibit 1, attached hereto, titled "Regular Patron CPSL Agreement", is a true and accurate copy of the agreement entered into between the Rams and at least some PSL Holders in or about 1995.

**RESPONSE:** Defendant objects to this RFA as vague and ambiguous, because it fails to request an admission relating to any particular person or entity at any particular time. Defendant cannot determine from an examination of Exhibit 1 to Plaintiffs' Requests for Admission whether or not it is a true and accurate copy of any particular PSL agreement entered into between the Rams and a particular PSL holder at any particular time. Moreover, Defendant objects to the use of the phrase "in or about 1995" as vague and ambiguous, and as failing to describe the admission requested with reasonable particularity. To attempt to ascertain the information requested by RFA No. 2 would require a file-by-file review of each of the thousands of hard copy files created for individual PSL holders.

Subject to and without waiving the foregoing objections and the General Objections, Defendant admits that Exhibit 1 to Plaintiffs' Requests for Admission is a true and accurate copy of a form of agreement entered into between the Rams and at least some PSL holders during the time that the Rams were playing their home games in St. Louis. Defendant further states that it has made a reasonable inquiry and, without conducting an unduly burdensome file-by-file review of each of the thousands of hard copy files created for individual PSL holders, Defendant lacks sufficient knowledge or information to admit or deny whether the form of agreement attached as Exhibit 1 to Plaintiffs' Requests for Admission was entered into between the Rams and at least some PSL holders "in or about 1995."

3.       Admit that the Rams received all of the money paid by PSL holders who entered into a PSL Agreement in the form attached hereto as Exhibit 1.

**RESPONSE:** Defendant objects to this RFA as overbroad, irrelevant, and not proportional to the needs of this case.  The request for admission regarding money paid by all PSL holders encompasses overbroad and irrelevant information because: (1) the class that Plaintiffs seek to represent is limited to persons and entities that still held PSLs at the time the Rams relocated from St. Louis to Los Angeles; and (2) Plaintiffs have not prayed for damages, restitution, or any other form of monetary relief in this declaratory judgment action.

Subject to and without waiving the foregoing objections or the General Objections, Defendant denies RFA No. 3.

4.       Admit there have never been any amendments to the agreement attached hereto as Exhibit 1.

**RESPONSE:**  Subject to and without waiving the General Objections, Defendant admits RFA No. 4.

5.       Admit Gretchen Schmidt is or was an employee of the Rams.

**RESPONSE:** Defendant objects to this RFA as irrelevant and not proportional to the needs of this case.  Gretchen Schmidt has nothing whatsoever to do with whether putative class members have contractual rights to purchase season tickets or transfer PSLs subsequent to the Rams' 2016 relocation to the Los Angeles, California, area.  Subject to and without waiving the

6

foregoing objections or the General Objections, Defendant admits that Gretchen Schmidt was an employee of the Rams.

6.     Admit Exhibit 2, attached hereto, is a true and accurate copy of e-mails exchanged between Kyle Laramie and Gretchen Schmidt, an account services coordinator for the Rams.

**RESPONSE:** Defendant objects to this RFA as irrelevant and not proportional to the needs of this case. Communications between Gretchen Schmidt and purported PSL holders have nothing whatsoever to do with whether putative class members have contractual rights to purchase season tickets or transfer PSLs subsequent to the Rams' 2016 relocation to the Los Angeles, California, area.

Subject to and without waiving the foregoing objections or the General Objections, Defendant admits that Gretchen Schmidt was an account services coordinator for the Rams. Defendant further states that it has made a reasonable inquiry and lacks sufficient knowledge or information to admit or deny whether Exhibit 2 to Plaintiffs' Requests for Admission is a true and accurate copy of e-mails exchanged between Kyle Laramie and Gretchen Schmidt, as Gretchen Schmidt is no longer employed by the Rams.

7.     Admit Gretchen Schmidt was authorized by the Rams to respond to inquiries made by PSL holders concerning their rights following the Rams being authorized to move to Los Angeles.

**RESPONSE:** Defendant objects to this RFA as irrelevant and not proportional to the needs of this case. Communications between Gretchen Schmidt and PSL holders have nothing

7

whatsoever to do with whether putative class members have contractual rights to purchase season tickets or transfer PSLs subsequent to the Rams' 2016 relocation to the Los Angeles, California, area. Defendant further objects to the undefined term "rights," which is vague, ambiguous, and fails to describe the requested admission with reasonable particularity.

Subject to and without waiving the foregoing objections or the General Objections, Defendant admits that Gretchen Schmidt was authorized by the Rams to respond to inquiries made by PSL holders about PSLs following the Rams' approval to relocate to the Los Angeles, California, area.


8.      Admit that it is the Rams' position that PSL holders are not entitled to any priority to purchase tickets for Rams home games to be played in Los Angeles.

**RESPONSE**: Defendant objects to this RFA because the undefined term "priority" is vague and ambiguous, and fails to describe the requested admission with reasonable particularity, including over whom the referenced "priority" would or would not be given. Additionally, Defendant objects to this RFA as unlimited in temporal scope.

Subject to and without waiving the foregoing objections or the General Objections, Defendant admits that it is the Rams' position that holders of PSLs to the stadium formerly known as the Edward Jones Dome (the "Stadium") are not entitled to priority to purchase tickets for Rams home games played in Los Angeles over other potential ticket purchasers.


9.      Admit that it is the Rams' position that the PSL agreement attached as Exhibit 1 does not provide any rights to purchase tickets for Rams games played in Los Angeles.

**RESPONSE:** Subject to and without waiving the General Objections, Defendant admits that it is the Rams' position that the PSL agreement attached as Exhibit 1 to Plaintiffs' Requests for Admission does not provide any rights to purchase tickets for Rams home games played in Los Angeles.

10.   Admit that the Rams did not offer to sell season tickets to any PSL holders for Rams games played in Los Angeles during the 2016 season comparable to the tickets such PSL holders were entitled to purchase in the Stadium during the time the Rams played their home games in St. Louis.

**RESPONSE:** Subject to and without waiving the General Objections, Defendant denies RFA No. 10.

11.   Admit that it is the Rams' position that PSLs purchased pursuant to the Agreement attached as Exhibit 1 are no longer transferrable.

**RESPONSE:** Subject to and without waiving the General Objections, Defendant denies RFA No. 11. It is the Rams' position that agreements entered into using the form of agreement attached as Exhibit 1 to Plaintiffs' Requests for Admission are no longer in force.

12.   Admit that it is the Rams' position that PSLs purchased pursuant to the Agreement attached hereto as Exhibit 1 are not refundable.

**RESPONSE:** Subject to and without waiving the General Objections, Defendant denies RFA No. 11. It is the Rams' position that agreements entered into using the form of agreement attached as Exhibit 1 to Plaintiffs' Requests for Admission are no longer in force.

9

13.     Admit Envision, LLC purchased six charter PSLs, and executed the form of the Agreement attached hereto as Exhibit "1."

**RESPONSE:** Defendant objects to this RFA because the term "charter" PSL is not defined and fails to describe the information requested to be admitted with sufficient particularity.

Subject to and without waiving the foregoing objections or the General Objections, Defendant denies RFA No. 13.

14.     Admit Robert Bohm and Sue Bohm purchased two Charter PSLs.

**RESPONSE:** Defendant objects to this RFA because the term "Charter" PSL is not defined and fails to describe the information requested to be admitted with sufficient particularity.

Subject to and without waiving the foregoing objections or the General Objections, Defendant denies RFA No. 14.

15.     Admit Robert Bohm and Sue Bohm upgraded PSLs on two occasions since their purchase of Charter PSLs.

**RESPONSE:** Defendant objects to this RFA because the term "Charter" PSL is not defined and fails to describe the information requested to be admitted with sufficient particularity.

Subject to and without waiving the foregoing objections or the General Objections, Defendant denies RFA No. 15.

10

16.     Admit Robert Bohm and Sue Bohm paid fees to the Rams each time they upgraded their PSLs.

**RESPONSE:** Defendant objects to this RFA because the term "Charter" PSL is not defined and fails to describe the information requested to be admitted with sufficient particularity.

Subject to and without waiving the foregoing objections or the General Objections, Defendant denies RFA No. 16.


17.     Admit Robert Messmer was a charter PSL holder of two PSLs.

**RESPONSE:** Defendant objects to this RFA because the term "charter" PSL holder is not defined and fails to describe the information requested to be admitted with sufficient particularity.

Subject to and without waiving the foregoing objections or the General Objections, Defendant states that it has made a reasonable inquiry and lacks sufficient knowledge or information to admit or deny RFA No. 17 as Defendant has been unable to locate a PSL agreement executed by Robert Messmer.


18.     Admit that Robert Messmer transferred his two PSLs to Edward Mock in or about 2010.

**RESPONSE:** Defendant objects to the use of the phrase "in or about 2010" as vague and ambiguous, and as failing to describe the admission requested with reasonable particularity.

11

Subject to and without waiving the foregoing objections or the General Objections, Defendant denies RFA No. 18.

19.     Admit that, since the effective date of the transfer from Robert Messmer, Edward Mock has been considered by the Rams to be the PSL holder of record for the PSLs originally purchased by Mr. Messmer.

**RESPONSE:** Subject to and without waiving the General objections, Defendant admits that Edward Mock has been the PSL holder of record in Defendant's electronic systems since, at latest, the end of 2011, and that Edward Mock's hard copy file contains a PSL transfer form between him and Robert Messmer. Defendant states that it has made a reasonable inquiry and lacks sufficient knowledge or information to admit or deny information about any PSLs "originally purchased" by Robert Messmer, as Defendant has been unable to locate a PSL agreement executed by him.

20.     Admit the Rams received all of the funds generated from PSL sold by the Rams.

**RESPONSE:** Defendant objects to this RFA as overbroad, irrelevant, and not proportional to the needs of this case. The request for admission regarding funds generated from PSLs sold by the Rams encompasses overbroad and irrelevant information because: (1) the class that Plaintiffs seek to represent is limited to persons and entities that still held PSLs at the time the Rams relocated from St. Louis to Los Angeles; and (2) Plaintiffs have not prayed for damages, restitution, or any other form of monetary relief in this declaratory judgment action.

Subject to and without waiving the foregoing objections or the General Objections, Defendant denies RFA No. 20.

21.    Admit that the individuals that purchased season tickets for games played by the Rams in 2016 at the Los Angeles Memorial Coliseum have been promised priority to buy PSLs for games to be played at the new stadium under construction in Inglewood, California.

**RESPONSE:** Defendant objects to this RFA as overbroad, irrelevant, and not proportional to the needs of this case. Whether individuals that do not fall within the putative class have been promised priority to buy PSLs for games played at a venue other than the Stadium is irrelevant to the issues in this lawsuit, which concerns PSLs sold by the Rams during the time the Rams were playing their home games in St. Louis at the Stadium. Promises made to independent third parties, or contractual rights of independent third parties governed by unrelated agreements, are irrelevant to this case. Additionally, this RFA is vague and ambiguous, in that it fails to specify by whom the referenced "promise[]" was made, and the undefined term "priority" is vague and ambiguous because it fails to specify over whom the referenced "priority" would or would not be given. Defendant objects to this RFA to the extent it seeks a legal conclusion about the contractual terms between individuals and some unspecified party thereto.

Subject to and without waiving the foregoing objections or the General Objections, Defendant admits that the individuals that purchased season tickets for games played by the Rams in 2016 at the Los Angeles Memorial Coliseum have entered into certain contracts that pertain, in part, to certain rights to buy PSLs for games to be played at the new stadium to be constructed in Inglewood, California.


22.    Admit that the Rams intend to sell PSLs for games to be played at the new stadium under construction in Inglewood, California.

**RESPONSE:** Defendant objects to this RFA as overbroad, irrelevant, and not proportional to the needs of this case.  Whether the Rams intend to sell PSLs for games to be played at a venue other than the Stadium is irrelevant to the issues in this lawsuit, which concerns PSLs sold by the Rams during the time the Rams were playing their home games in St. Louis at the Stadium.  Whether the Rams intend to sell separate PSLs to be governed by separate contracts providing rights pertaining to a separate venue is wholly unrelated to this case.

Subject to and without waiving the foregoing objections or the General Objections, Defendant states that it has made a reasonable inquiry and lacks sufficient knowledge or information to admit or deny RFA No. 22 because no determination has yet been made in this regard.

## VERIFICATION

I, _Steven Moore_____, for The St. Louis Rams, LLC (the "Rams"),
state that the foregoing answers to Plaintiffs' Requests for Admission were compiled by
employees of the Rams in the State of California and are based on the personal knowledge of
those employees and a review of documents maintained by the Rams in the ordinary course of
business.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and
correct.

Dated: _3-16_____, 2017

_____

15

Dated: March 16, 2017

DENTONS US LLP

By:     /s/ Roger K. Heidenreich
           Roger K. Heidenreich, #40898MO
           Elizabeth T. Ferrick, #52241MO
           Amy E. Sestric, #66219MO
           One Metropolitan Square, Suite 3000
           St. Louis, Missouri 63102
           Telephone: (314) 241-1800
           Facsimile:  (314) 259-5959
           roger.heidenreich@dentons.com
           elizabeth.ferrick@dentons.com
           amy.sestric@dentons.com

           *and*

           James A. Klenk, *admitted pro hac vice*
           Anders C. Wick, *admitted pro hac vice*
           233 South Wacker Drive, Suite 5900
           Chicago, Illinois 60606
           Telephone: (312) 876-8000
           Facsimile: (312) 876-7934
           james.klenk@dentons.com
           anders.wick@dentons.com

           *Attorneys for Defendants The St. Louis Rams, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2017 the foregoing document was served via electronic

and U.S. Mail, postage prepaid, upon the following:

David R. Bohm
DANNA MCKITRICK, P.C.
7701 Forsyth Boulevard, Suite 800
St. Louis, Missouri 63105
Telephone: (314) 726-1000
Facsimile: (314) 725-6592
dbohm@dmfirm.com

*Attorney for Plaintiffs Envision, LLC,*
*Robert D. Bohm, Sue Bohm, and Edward E. Mock*

                                          /s/ Amy E. Sestric

17

**ST. LOUIS**

901 North Broadway • St. Louis, MO 63101-2800 • 314-425-8830 • FAX: 314-342-5399

## REGULAR PATRON CPSL AGREEMENT

This Regular Patron CPSL Agreement (the "Agreement") is made by the undersigned licensee (the "Licensee") in favor of The St. Louis Rams Partnership, a Delaware general partnership (the "Team"), as of the date indicated below.

A. Licensee desires to purchase one or more Regular Patron Charter Personal Seat Licenses ("CPSL(s)"), as more specifically defined herein.

B. The Team is willing to sell to Licensee CPSL(s) upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the covenants and agreements set forth in this Agreement, Licensee hereby agree as follows:

**1. CPSL License Fee and Stadium Area.**

The Team promises, upon full payment of the License Fee shown on Schedule 1, to grant to the undersigned licensee (the "Licensee") the number of CPSL(s) stated on Schedule 1. The CPSL(s) granted to Licensee by the Team entitle Licensee to purchase the number of Season Ticket(s) for the designated Stadium Area described on Schedule 1. "Season Ticket(s)" shall mean general admission ticket(s) on a season-by-season basis to all, but not less than all, pre-season, regular season, and post-season home games (excluding the NFL's Super Bowl and Pro Bowl), subject to Licensee's obligation to pay a separate fee for NFL playoff games (the "Games"), played by the Team in the Stadium at America's Center (the "Stadium") located in the City of St. Louis, Missouri, during the term and subject to the terms and conditions of this Agreement. Licensee acknowledges and agrees that the exact location of Licensee's seats ("Licensee's Seats") within the Section of the Stadium described on Schedule 1 which are subject to Licensee's CPSL(s) will not be determined until after Licensee has paid the full amount of the License Fee shown on Schedule 1. Once Licensee's Seats have been determined, Licensee will be entitled to the opportunity to purchase Season Ticket(s) to Licensee's Seats for all the Games at the Stadium until March 1, 2025, subject to Licensee complying with all of the terms and conditions of this Agreement.

**2. Additional CPSL Conditions.**

A. Licensee agrees to purchase all of the Season Ticket(s) with respect to a particular NFL season upon the terms and conditions set by the Team. The Team shall have no liability for the number of Games included within a Season Ticket(s) package or for the Team's failure to play Games in the Stadium.

B. The Team may limit the number of CPSL(s) licensed to any one individual or entity in its sole discretion.

C. The rights licensed under this Agreement are rights of personal privilege and do not under any circumstance confer upon Licensee any interest or estate in real property or any leasehold interest in the Licensee's Seat or the Stadium.

**3. Transfer Terms.**

A. For one year following the purchase of the CPSL, Licensee shall not sell, pledge, hypothecate or transfer in any manner a CPSL except upon the occurrence of a Special Event. A Special Event shall be as follows:

(1) The occurrence of a circumstance beyond the control of Licensee such as death, disability, employment relocation, or similar event;

(2) The transfer to an Immediate Family Member or Related Party;

(3) The transfer in conjunction with a major business transaction in which the acquisition of the CPSL is not the intent of the transaction.

Further, in no event shall a CPSL be transferred more than once each year, except for a Special Event. All transfers, whether pursuant to a Special Event or after the first year of ownership, shall be subject to a Transfer Fee.

B. All transfers shall be in accordance with such reasonable rules and regulations and in such form as established by the Team from time to time, including but not limited to the transferee assuming all obligations of the transfer or in a form acceptable to the Team. Until a transfer is properly recorded on the Team's records, the transfer of a CPSL by Licensee will not be recognized by the Team under the terms of the CPSL being transferred.

C. "Immediate Family Member" means any grandparent, parent, spouse, child, stepchild, sibling, grandchild and great-grandchild of an individual Licensee; "Related Party" means any person or entity which owns or controls, or is owned or controlled by, Licensee.

D. Transfer Terms. The transfer fee is based on how many accounts (new or existing) are receiving PSL's during a transaction. The transfer fee is $25.00 per PSL account if your PSL is located in Section F ($500) or G ($250), or $100.00 per PSL account for seats located in any other section of the stadium.

**4. Default.**

Failure by Licensee to make any payment when due under this Agreement or to comply with any of the other terms and conditions of this Agreement or any of the terms and conditions of the sale of the Season Ticket(s) (including without limitation the timing of payment thereof and conduct at the Games) imposed by the Team shall be a default. If Licensee defaults under this Agreement, then, at the sole option of the Team, (a) this Agreement may be terminated, (b) Licensee shall hold no further rights to acquire the CPSL(s) or Season Ticket(s) associated therewith, (c) the Team shall be entitled to retain all payments previously made by Licensee to the Team hereunder, and (d) Licensee shall remain liable to the Team for all losses suffered as a result of such default. In addition, upon default by Licensee, the Team shall be entitled to recover all reasonable attorney's fees and court costs incurred in connection with Licensee's default. Notwithstanding the foregoing, if Licensee's actions result in the loss of Licensee's rights to purchase or retain Season Ticket(s) for reasons other than Licensee's failure to timely purchase Season Ticket(s), Licensee shall be entitled to sell or transfer Licensee's CPSL in a bona fide transaction occurring within sixty (60) days of the date Licensee is notified of Licensee's loss of rights to Licensee's Season Ticket(s).

**5. Disclaimer.**

Licensee covenants and acknowledges that neither the Team nor the Authority (as defined below) have made any representations whatsoever regarding the CPSL(s) other than as may be set forth in this Agreement.

**6. Reservation of Rights by the Team.**

In addition to all rights at law or equity or under the terms of this Agreement, the Team hereby expressly reserves the following rights:

A. The right to terminate this Agreement and refund part or all of Licensee's deposit, either if the Team determines that Licensee's credit is not satisfactory for this License and future obligations of Licensee to acquire tickets, or for any other reason satisfactory for this the Team in its sole discretion, including, but not limited to, the right to reduce the total number of CPSL(s) purchased by Licensee if necessary; and

B. The right to assign, pledge as collateral, transfer or sell all or any part of the rights and obligations of the Team and Licensee under this Agreement to one or more third parties who shall succeed to all or any part of the rights vested in and granted herein to the Team.

**7. Best Efforts.**

If the Team plays any of their NFL games other than at the Stadium (e.g. at Busch Stadium), the Team will use its best efforts to assure Licensee the right to purchase, on a pro rata priority basis, tickets for seats in the stadium where the transferred games are played. Licensee shall be obligated to buy tickets for Games played in the Stadium in St. Louis and NFL games played at Busch Stadium for which tickets are available for purchase by Licensee.

**8. Representations of Licensee.**

Licensee hereby represents, warrants and/or acknowledges as follows:

A. Licensee has read and understands the terms of this Agreement;

B. Licensee is not acquiring the CPSL(s) as an investment and has no expectation of profit as licensee of the CPSL(s);



C. Licensee is acquiring the CPSL(s) solely for the right to purchase Season Ticket(s) to NFL Games played in the Stadium;

D. Licensee is acquiring the CPSL(s) for Licensee's own use and not with a view to the distribution of the CPSL(s) to others;

E. Licensee will not have any equity or other ownership interest in either the Team, the Authority, the Stadium or any of the Stadium's facilities and will not have any rights to dividends or other distribution rights from the Team or any other party or entity described in this Agreement as a result of being a licensee of a CPSL, and further will not have any voting rights with respect to the Team matters as a result of being a licensee of a CPSL;

F. The transfer of the CPSL(s) will be terminated under certain conditions, as explained in this Agreement; and

G. Licensee has full authority to enter into and sign this Agreement and carry out its terms and conditions and when signed, this Agreement shall be a binding obligation on Licensee, enforceable in accordance with its terms.

### 9. Use of Seats.

Licensee and Licensee's invitees shall at all times maintain proper decorum while using the Licensee's Seats and shall abide by all applicable governmental laws, ordinances, orders, directions, rules and regulations and such rules and regulations as are adopted and revised from time to time regarding Licensee's Seats by Licensee and Licensee's invitees, ordinary wear and tear excepted. In addition, Licensee shall not take any action which would cause an increase in premiums of any insurance policy carried by the Team, the Authority or the Stadium Manager, by causing the Team or any other party to fail to meet any requirement or condition of such policy or otherwise. Without limiting the foregoing, Licensee specifically agrees that neither Licensee nor Licensee's invitees will: (a) bring into the Stadium any alcoholic or intoxicating beverage, any illegal drugs or, except as prescribed by a physician, any controlled substance; (b) permit the Licensee's Seats to be used for any illegal, improper, immoral or objectionable purpose or in any way obstruct or interfere with the rights of any other licensees or Game attendees; or (c) film, record, or transmit from the Licensee's Seats all or any portion of any NFL Football game or other event, or any description thereof, by any means (including without limitation radio or television broadcasting, whether broadcast "live" or by means of film or tape).

### 10. Assumption or Risk; Liability; Indemnity.

Licensee, for Licensee and Licensee's invitees, assumes all risk of personal injury to, or for any damage to or any loss of property of, Licensee or its invitees, arising out of, during or related to their attendance at events held in the Stadium. Licensee acknowledges that alcoholic beverages will be available in the Stadium and that attendance at sporting events may expose attendees to certain risks of injury including, but not limited to, incidents involving other patrons who have consumed alcoholic beverages, injury from thrown or dropped objects, spills of food or beverages and the unruly behavior of other patrons. Licensee hereby agrees to assume all responsibility and liability for the consumption in the Stadium of alcoholic beverages by Licensee and its invitees and for the conduct and behavior of Licensee and Licensee's invitees, the conduct and behavior of Licensee and Licensee's invitees and/or the use of the Licensee's Seats by Licensee or Licensee's invitees, whether such claims are now existing or later arising, and whether or not such loss is alleged to be caused by the negligence of the Team, the Authority or the Stadium Manager, the respective owners of each such entity, or their respective officers, directors, employees or agents.

### 11. Additional Terms.

A. Licensee acknowledges that the Stadium will be managed, maintained and operated by The Regional Convention and Visitors Commission (the "Stadium Manager") pursuant to certain agreements between the Stadium Manager and The Regional Convention and Sports Complex Authority (the "Authority") (collectively the "Stadium Agreements"). All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the Team's agreement to relocate to St. Louis. Licensee understands and acknowledges the possibility that the Team may not play its games in the Stadium or St. Louis for the entire term contemplated by this License. Licensee expressly agrees not to sue the Team for damages or injunctive relief related to this CPSL, including without limitation should the Team not play its home games in the Stadium or in St. Louis for any reason.

B. Licensee hereby acknowledges that various parties named in Sections 9 and 10 above, namely the Stadium Manager and the Authority, are third party beneficiaries of this Agreement and may directly or indirectly realize certain benefits from this Agreement. There are no other third party beneficiaries to this Agreement.

C. This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri without regard to the laws of conflict. Any action, suit or other proceeding brought by or against the Licensee or the Team, including any claim for injuries or damages relating to the license of a part of the Stadium, the Licensee, and Licensee's guests and invitees, shall be brought in the United States District Court for the Eastern District of Missouri, Eastern Division, or in the Circuit Court of the State of Missouri, Twenty-First (21st) Judicial Circuit.

D. All notices and other communication required to be given pursuant to this Agreement to Licensee or to the Team shall be in writing and shall be sent to Licensee at the addresses set forth below and to the Team at 901 N. Broadway, St. Louis, Missouri 63101. Any notice given herein shall be deemed delivered when addressed as above provided, postage prepaid, certified mail, return receipt requested, and deposited in a United States General or Branch Post Office or with a nationally recognized overnight courier.

E. This Agreement contains the entire agreement of the parties with respect to the matters provided herein, and shall supersede any representations or agreements previously made or entered into by the parties hereto. No modification hereto shall be permitted by Licensee whatsoever.

F. This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, and their permitted successors and assigns. This Agreement may be assigned by the Team in whole or part without any notice to Licensee; this Agreement shall not be assigned or transferred by Licensee except as set forth above.

G. Notwithstanding the foregoing, the Team shall not have any liability to Licensee for any failure to comply with the provisions of Sections 3.B or 11.D above.

### EXHIBIT A – STADIUM DIAGRAM
#### Lower Level







**From:** Schmidt, Gretchen [mailto:gschmidt@rams.nfl.com]
**Sent:** Monday, January 18, 2016 4:33 PM
**To:** Kyle Laramie <kyle@veteranscarecoordination.com>
**Subject:** RE: 866699

Hi Kyle,

From the information we have been provided, priority will not be given due to the relocation. More information for tickets in LA can be found at welcomehomerams.com. Additionally, the original PSL agreement is specifically for the Rams at the

1

Edward Jones Dome, so they would not be transferable or refundable. I have attached a copy of this agreement for your reference.

Thank you,

**Gretchen Schmidt | Account Services Coordinator | St. Louis Rams**

901 N. Broadway | St. Louis, MO 63101 | P: 314-425-0523 | F: 314-342-5399

gschmidt@rams.nfl.com | For tickets: 314-RAMS-TIX | www.StLouisRams.com

---

**From:** Deckard, Taylor
**Sent:** Monday, January 18, 2016 3:10 PM
**To:** Schmidt, Gretchen
**Subject:** 866699

kyle@veteranscarecoordination.com

I am a Rams fan and PSL owner for 2 seats.  I understand I can buy tickets in Los Angeles.  Can you clarify?
Thank you,
Kyle Laramie

Sent from my iPhone

---

Total Control Panel                                                                                    Login

| To: kyle@veteranscarecoordination.com | Message Score: 1 | High (60): Pass |
| From: gschmidt@rams.nfl.com | My Spam Blocking Level: Low | Medium (75): Pass |
| | | Low (90): Pass |
| | Block this sender | |
| | Block rams.nfl.com | |

*This message was delivered because the content filter score did not exceed your filter level.*

2