# EXHIBIT I

## CHARTER PERSONAL SEAT LICENSE MASTER AGREEMENT

This Charter Personal Seat License ("CPSL") Master Agreement (the "Agreement") is entered into as of this 17th day of January, 1995 by and among THE LOS ANGELES RAMS FOOTBALL COMPANY, INC., a corporation organized and existing under the laws of the State of Delaware ("RAMS"), FANS, INC., a non-profit corporation organized and existing under the laws of the State of Missouri ("FANS") and the Regional Convention and Visitors Commission, a/k/a St. Louis Convention and Visitors Commission, a public body corporate and politic of the State of Missouri ("CVC").

### RECITALS

WHEREAS, in that certain Amended and Restated St. Louis NFL Lease of even date (the "Amended Lease"), CVC has retained its rights to sell and retain the license fee from its sale prior to September 1, 1995 of the initial CPSL (the "Initial CPSL") on each of the seats in the Facilities and from the initial Charter Club Membership (the "Initial Club Membership") for the club seats in Level 400 in the Facilities (the "Club Seats") (other than (i) seats relative to the box suites in the Facilities (the "Box Suites"), (ii) seats for the physically challenged, (iii) such other seats as are described on Schedule B hereto (collectively, "Excluded Seats") and (iv) those seats retained by the RAMS as designated on Schedule B-1 hereto ("RAMS Reserved Seats"));

WHEREAS, the sale of CPSLs will demonstrate fan interest in NFL football games in St. Louis and increase the sale by the RAMS of season tickets to RAMS Games (as defined below);

WHEREAS, in connection with such CPSL sales, CVC will use the marketing and other efforts of FANS and require certain cooperation and agreements from the RAMS to meet its obligations to the purchasers of CPSLs (and any person or entity to whom such purchaser transfers its CPSL to the extent permitted in accordance with the terms and conditions under the applicable CPSL Agreement) (individually a "Licensee" and together the "Licensees"); and

WHEREAS, in connection with sales of Initial CPSLs one or more "Qualifying Lenders" (as defined below) may loan to licensees all or part of the purchase price of the Initial CPSLs;

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the RAMS, FANS and CVC each hereby agree as follows:

PRKL03A1.WP 55892 1/16/95   5:44pm



1.    OBLIGATIONS OF RAMS

1.1  During the term of this Agreement, and subject to the terms and conditions of this Agreement as are more fully set forth below, the RAMS will offer each Licensee for each CPSL purchased the opportunity to purchase from the RAMS a ticket on a season-by season basis to all, but not less than all, pre-season, regular season and post-season home games (other than the NFL's Super Bowl or Pro Bowl) (the "Season Ticket(s)") played by the NFL Franchise at the Facilities ("RAMS Games"). Each Licensee will be required to purchase Season Ticket(s) for each of the RAMS Games, excluding post-season RAMS Games, for each NFL season at one time and in one block at least five (5) months prior to the first game of the applicable NFL season (including pre-season games), at the time of acquisition of the CPSL, or within 30 days after billing from the RAMS, whichever is later. Each and every other term and condition upon which the RAMS will offer a Licensee the opportunity set forth in this Section 1.1, including without limitation the price of Season Ticket(s) and other charges, the timing of payment therefor and the conduct required of the Licensee at the Facilities, is to be established from time to time by the RAMS in its sole and absolute discretion, unless otherwise expressly set forth herein. Once the RAMS obligation to offer the Season Ticket(s) terminates with respect to a CPSL, the RAMS shall not have any further obligation to offer Season Ticket(s) with respect to such CPSL and may offer tickets (season or otherwise) with respect to the applicable seat to whomever the RAMS chooses.

1.2  The RAMS will use its reasonable efforts to offer a Season Ticket(s) to the License of the CPSL in the location set forth in the CPSL Agreement entered into by the Licensee, FANS and CVC (the "License Agreement"). The Season Ticket(s) price for each RAMS Game, excluding post-season RAMS Games, for the 1995-1996 NFL season shall be as set forth on Schedule A attached hereto.

1.3  (a) It is expressly understood and agreed that in the event any Licensee does not (i) purchase the Season Ticket(s) to each and every RAMS Game in the blocks and at the times such tickets are offered to the Licensee by the RAMS and (ii) abide by all of the terms and conditions applicable to (w) any applicable Club Seat Lease Agreement (but only with respect to those Licensees who acquire Charter Club Memberships), (x) purchasing Season Ticket(s) to RAMS Games, including without limitation the timing of payment therefor, (y) attending RAMS Games and other events at the Facilities, or (z) using any of the facilities at the Facilities, the RAMS shall no longer be obligated to offer such Licensee the opportunity to purchase the Season Ticket(s) nor to honor the Season Ticket(s) in such Licensee's possession. In case a Section 1.3(y) or (z) event, but not a Section 1.3(x) event,

RKL03A1.WP 55892 1/16/95   5:44pm  -2-

Rams-McAllister000458

occurs with respect to a Licensee, the RAMS obligation to offer Season Ticket(s) on such CPSL shall continue only if such Licensee completely transfers its CPSL to an unaffiliated third party within 60 days.

(b)  In the event the RAMS intends to exercise its rights under Section 1.3.(a) hereof, the RAMS shall notify, in writing, FANS, CVC and the Qualifying Lender.  The Qualifying Lender shall have ten (10) business days following the date of the notice to pay to the RAMS an amount of money equal to the price of the Season Ticket(s) and other charges due from the Licensee (including without limitation costs and reasonable attorney's fees), cure for its own account any breach by or damage caused by the Licensee, and pay the RAMS a $25 transfer fee per License (and no transfer fee on the subsequent transfer of the License by the Qualifying Lender).  If the Qualifying Lender timely pays the RAMS all such amounts, the RAMS agree to treat the Qualifying Lender as a Licensee under the original CPSL Agreement in good standing subject to the terms and conditions of the original CPSL Agreement.  The term "Qualifying Lender" means (i) a single third-party commercial lender, or (ii) an individual Licensee's employer or an affiliate of such employer, which loaned the applicable Licensee part or all of the purchase price of the CPSL in connection with Licensee's purchase of the CPSL and which has notified the RAMS in writing of same within thirty (30) days of the Licensee's purchase of the CPSL, or pledge of the CPSL to the Qualifying Lender, whichever is later.

1.4  Except as hereinafter provided, the RAMS shall not sell any ticket on a full season basis (which means, for purposes of this Agreement, more than four regular season RAMS Games in an NFL season) to RAMS Games (other than tickets on an Excluded Seat or a RAMS Reserved Seat) without the imposition of a personal seat license fee, until such time as a personal seat license fee has at one time been paid to FANS, CVC or the RAMS relative to such seat.  It is expressly understood and agreed that the terms and conditions applicable to seat licenses sold after September 1, 1995, including without limitations the price of the personal seat license fee, are to be established from time to time by the RAMS in its sole and absolute discretion; provided, however, that the stated term of any personal seat license sold by the RAMS must be at least five years (or three years with respect to any Club Seat).

1.5  Notwithstanding anything in Section 1.4 above to the contrary, the RAMS may sell tickets to any seat without the imposition of a personal seat license fee (i) in any particular section (as listed in Schedule A) from and after the time that more than 50% of the CPSLs that were sold as of September 1, 1995 in such section have not had the Licensee thereof continue without fail to purchase the Season Ticket(s) to every RAMS Game in accordance with the terms and conditions

FRKL03A1.WP 55892 1/16/93   5:44pm  -3-

Rams-McAllister000459

described or referenced in Section 1.1 and 1.3 above, and (ii) at any time and in any event, so long as the RAMS do not contractually agree with the purchaser of such ticket(s) to sell the purchaser tickets for the applicable seat for more than four (4) RAMS Games at a time.  The RAMS may not knowingly engage in a scheme for the purpose of selling such a purchaser a full season without technically violating the four games at a time proscription.

1.6   Notwithstanding FANS' and CVC's right to sell CPSL's up to and including September 1, 1995, the RAMS have the right, by giving written notice to FANS and CVC, to sell tickets to RAMS Games for seats relative to all unsold CPSLs, beginning on July 1, 1995.  Rights associated with CPSLs sold after July 1, 1995 shall be subject to the possible sale of tickets for some or all RAMS Games for the 1995 season pursuant to the preceding sentence, but not as Season Ticket(s) or on a full season basis.

1.7   The RAMS shall cooperate with FANS and CVC in the allocation (and location) of the Season Ticket(s) to Licensees for RAMS Games played at Busch Stadium and at any other temporary site for RAMS Games in Missouri due to the temporary unavailability of the Facilities.

1.8   The RAMS shall assist FANS and CVC in the marketing efforts by FANS and CVC of CPSLs prior to September 1, 1995, by using its reasonable efforts to provide for a limited number of personal appearances by officers and football players of the RAMS.  The RAMS shall further assist the marketing efforts of FANS and CVC by using its reasonable efforts to loan FANS, until September 1, 1995, following FANS written request, a limited amount of RAMS football gear, novelties and other similar items bearing the RAMS logo or otherwise associated with or utilized by RAMS personnel.

1.9   The RAMS shall not charge a Licensee more for tickets to any RAMS Game than the RAMS charge a non-Licensee for a ticket in a substantially similar location to such RAMS Game.  This does not preclude the RAMS from issuing tickets on a complimentary basis.

1.10  The RAMS shall honor all transfers permitted under the applicable CPSL Agreement so long as the terms and conditions of such transfers (including without limitation payment of the transfer fee) are met.

1.11  Provided that (i) the Qualifying Lender delivers to the RAMS, at the time of the notice set forth in Section 1.3 above, a letter from the Licensee providing that the Licensee has granted a security interest in its CPSL to the Qualifying Lender, directing the RAMS to rely on any letter from the Qualifying Lender with respect to the CPSL and the Season Ticket(s), absolving the RAMS from any action the RAMS takes

FRKL03A1.WP 55892 1/16/95   5:44pm  -4-

Rams-McAllister000460

on any request by the Qualifying Lender and agreeing to hold the RAMS harmless from relying on any notice from the Qualifying Lender; (ii) the Qualifying Lender gives the RAMS written notice that the Licensee is in default on paying its CPSL loan from Qualifying Lender and Qualifying Lender signs an indemnity and hold harmless agreement (the "Indemnity Agreement") in favor of the RAMS in a form satisfactory to the RAMS agreeing to indemnify the RAMS against all liability and expenses, including attorney's fees, that the RAMS may incur as a result of the failure to deliver the Season Ticket(s) to the Licensee; and (iii) the Qualifying Lender agrees to purchase the Season Ticket(s) for the applicable seat(s) for the upcoming season; then, the RAMS will not deliver the Season Ticket(s) to the Licensee.  The RAMS are not required to hold a Licensee's Season Ticket(s) unless the loan default notice and signed Indemnity Agreement from the Qualifying Lender are received by the RAMS at least ten (10) business days prior to the date on which the Season Ticket(s) would otherwise be delivered to the Licensee.

2. <u>OBLIGATIONS OF FANS AND CVC</u>

2.1   FANS agrees to use its best efforts, until September 1, 1995, to sell a CPSL for every seat in the Facilities except the Excluded Seats and the RAMS Reserved Seats which are excluded from the CPSL program.

2.2   Neither FANS nor CVC shall sell or otherwise convey, or allow any officer, director, employee, agent or representative of either to sell or otherwise convey, any CPSL other than by execution of the form of CPSL Agreement substantially in the form attached hereto as Exhibit A (except as set forth in the next sentence).  Neither FANS nor CVC shall sell or otherwise convey, or allow any officer, director, employee, agent or representative of either to sell or otherwise convey, any CPSL described on Schedule C hereto other than by execution of the form of Convertible CPSL Agreement substantially in the form attached hereto as Exhibit B.  Neither FANS nor CVC shall sell or otherwise convey, or allow any officer, director, employee, agent or representative of either to sell or otherwise convey, any CPSL on Level 400 of the Facilities other than by execution of the form of Club Seat Lease Agreement in the form attached hereto as Exhibit C.

2.3   Neither FANS nor CVC shall make, or allow any officer, director, employee, agent or representative to make, any representation or warranty about the RAMS or the NFL Franchise, except as specifically set forth in the form of Agreements attached as Exhibits A, B and C.

2.4   As a party to the Convertible CPSL Agreements, FANS, upon prior written notice from the RAMS, shall take any and all actions necessary under the Convertible CPSL Agreements to

FRRL03A1.WP 55892 1/16/95   5:44pm  -5-

Rams-McAllister000461

cause the "conversion" of any and all of those certain convertible CPSLs under the Convertible CPSL Agreements, as and when the RAMS determine.  FANS and CVC each acknowledge and agree that after any such conversion, the RAMS obligations without respect to the offering of Season Ticket(s) relative to the seat referable thereto shall be governed solely by the terms and conditions of the then applicable Club Seat Lease Agreement, if any.

2.5  Neither FANS nor CVC shall, or allow any officer, director, employee, agent or representative of either to, take any action or fail to take any action which would materially detract from the rights or benefits the RAMS are to receive as third-party beneficiaries of each CPSL Agreement.

2.6  FANS and CVC agree to cooperate with the RAMS in the event the RAMS elect to exercise any of its rights as third-party beneficiaries of any of the CPSL Agreements; provided, however that the RAMS shall reimburse FANS and\or CVC for all out-of-pocket expenses reasonably incurred by FANS or CVC in connection with any such election by the RAMS.

2.7  To the extent received, FANS and CVC shall remit to the RAMS any and all transfer fees due after September 1, 1995 under any and all of the CPSL Agreements entered into by any of FANS or CVC.

2.8  FANS and CVC shall promptly forward to the RAMS such information concerning each of the Licensees as the RAMS may reasonably request, including without limitation the names, addresses and telephone numbers of each Licensee and Qualifying Lender, if any, and shall promptly forward a copy of any and all notices received from any Licensee or Qualifying Lender.

2.9  Neither FANS nor CVC shall sell or otherwise convey, or allow any officer, director, employee or agent of FANS or CVC to sell or otherwise convey, any CPSL after September 1, 1995.  It is expressly understood and agreed that, under the Amended Lease, the RAMS has the right to sell all personal seat licenses after September 1, 1995 and to retain all revenues received therefrom.

2.10  FANS and CVC shall cooperate with the RAMS in the allocation (and location) of the Season Ticket(s) to Licensees for RAMS Games at Busch Stadium and at any other temporary site of RAMS Games in Missouri due to the temporary unavailability of the Facilities.

3.  MISCELLANEOUS.

3.1  This Agreement shall terminate on March 31, 2025, unless earlier terminated by the termination of the Amended

FRKL03A1.WP 55892 1/16/95   5:44pm  —6—

Lease.  Nothing in this Agreement shall apply to RAMS Games played at a permanent site other than the Facilities.

3.2  In connection with the licensing of CPSLs, CVC, through FANS, will sell "Charter Club Memberships" (but not CPSLs) to certain seats in Level 400 of the Facilities.  The purchasers thereof ("Charter Club Members") will be required to execute a Club Seat Lease Agreement with the RAMS which will have a term of three, five or seven years, as specified therein.  Each Club Seat Lease Agreement will contain a provision allowing the Charter Club Member to renew his membership on terms and conditions to be specified by the RAMS at its sole discretion.  If the Charter Club Member does not timely execute its option (as provided in the Club Seat Lease Agreement), all of the Member's rights under the Charter Club Membership and Club Seat Lease Agreement shall terminate (and the RAMS shall have no obligation to offer such Charter Club Member any Season Ticket(s) and the RAMS is free to lease or license the referable Club Seat and Club Membership as it deems fit).  Neither the Charter Club Membership nor the lessee's rights under the Club Seat Lease Agreement will be transferable.  In all other respects, the rights and obligations of the parties hereto with respect to CPSLs and Charter Club Memberships are the same.

3.3  All notices, demands and other communications between the parties required or appropriate hereunder shall be in writing and deemed given if sent by facsimile, or if mailed, postage prepaid, to the addresses set forth for the parties in Schedule D, or to such other address as may be designated by a party, from time to time in writing.

3.4  This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri without giving effect to principles of conflicts of laws.

3.5  This Agreement is subject to applicable provisions of the Constitution and Bylaws and rules of the NFL, whether now existing or hereinafter adopted.  This Agreement, together with the Schedules and Exhibits attached hereto and the Amended Lease, contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any written instrument or oral agreement previously made or entered into by the parties hereto.

3.6  This Agreement and all the terms and provisions hereof, shall inure to the benefit of and be binding upon the parties hereto, their successors and permitted assigns.  The RAMS may assign this Agreement or any of its rights and powers hereunder to the operator of the NFL Franchise without notice, and in such event the assignee shall have the same rights and remedies as well as the obligations as if originally named herein in place of the RAMS.  No amendment or modification to

RRKL03A1.WP 55892 1/16/95   5:44pm  -7-

Rams-McAllister000463

this Agreement shall be effective unless the same is in writing and signed by the party or parties to be charged.

3.7   No failure or delay on the part of any party to the Agreement in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any power, right or privilege preclude any other or further exercise of any such power, right or privilege.  All powers, rights and privileges hereunder are cumulative to, and not exclusive of, any powers, rights or privileges otherwise available.

3.8   In case any provision of this Agreement shall be invalid, illegal or unenforceable, such provisions shall be severable from the rest of this Agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

3.9   Termination of that certain Relocation Agreement of even date or termination of the Amended Lease shall constitute a termination without further obligation of this Agreement.

3.10 Headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

3.11 The Recitals to this Agreement are incorporated into this Agreement by reference.

3.12 There are no third party beneficiaries of this Agreement.

3.13 Any controversy, dispute or claim between or among any of the parties hereto related to this Agreement, including, without limitation, any claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement shall be settled by arbitration under the terms set forth in the Amended Lease.

3.14 The RAMS hereby acknowledges that it has had an opportunity to review certain of the marketing material which has been developed through the date of this Agreement proposed to be used by FANS in marketing the CPSLs because such material utilizes the RAMS logo.  FANS shall submit to the RAMS any additional advertising or marketing media material bearing the RAMS logo which is developed after the date of this Agreement that FANS proposes to use in marketing the CPSLs.  Notwithstanding the foregoing or anything to the contrary in this Agreement, it is hereby acknowledged and agreed by FANS and CVC that the RAMS has no right to approve or control the sale of the Initial CPSLs other than as expressly set forth in this Agreement.

FRKL03A1.WP 55892 1/16/95   5:44pm  -8-

Rams-McAllister000464

IN WITNESS WHEREOF, this Agreement has been executed by the RAMS, FANS and CVC as of the date first above written.

THE LOS ANGELES RAMS FOOTBALL COMPANY, INC.

By: _____

Its: _____
        President

FANS, INC.

By: _____

Its: _____

THE REGIONAL CONVENTION AND VISITORS COMMISSION

By: _____

Its: _____

FRKL03A1.WP 55892 1/16/95   5:27pm  -9-

IN WITNESS WHEREOF, this Agreement has been executed by the RAMS, FANS and CVC as of the date first above written.

THE LOS ANGELES RAMS FOOTBALL
COMPANY, INC.

By: _____
Its: _____


FANS, INC.

By: _Thomas F Taylor_____
Its: _____


THE REGIONAL CONVENTION AND
VISITORS COMMISSION

By: _Robert J. Bedell_____
Its: _President and CEO_____


FRRL03A1.WP 55892 1/16/95   5:27pm  —9—

Rams-McAllister000466

CHARTER PSL MASTER AGREEMENT
SCHEDULES A, B, B-1, C

ll seats counts are approximate                          November 17, 1994

| Location | Schedule A 1995 Proposed Rams Ticket Prices | Number of Seats | Schedule B-1 Rams Reserved seats (excluded from CPSL Program) | Schedule B Other seats excluded from CPSL Program |
|---|---|---|---|---|
| **eld Level** | | | | |
| tween the 20 yard | $45.00 | 5,804 | 450 | |
| ine to end line | $40.00 | 5,686 | 1,300 | |
| d line counter and | $35.00 | 14,974 | 650 | |
| d zone Obstructed | $30.00 | 1,277 | 100 | |
| tween end lines | $ | | | |
| **uites** | $45.00 | | | 1,700 |
| **ub Seats** | $45.00 | 6,372 | 100 | |
| **er Level** | | | | |
| In front of the ross aisle | | | | |
| Between the end lines | $35.00 | 1,000 | 50 | |
| End line corner and end zone | $30.00 | 2,800 | 50 | |
| Beyond the cross isle | | | | |
| Between the 20 yard lines | $30.00 | 3,300 | | |
| 0 yard line to orner and all but 0 rows in the end one | $25.00 | 14,700 | | |
| st 10 rows of the rner end zone | $20.00 | | | 5,500 |
| ically Challenged | $25.00 | | | 1,334 |

## SCHEDULE C

## Description of Convertible Club Seats

ximately 4,500 seats on Level 200 from goal line to goal line in front of evel 300 Suites.

SCHEDULE D

Notice Addresses

FRXL03A1.WP 55892 1/16/95    5:44pm -13-

Rams-McAllister000468

## ST. LOUIS REGULAR PATRON
## CHARTER PERSONAL SEAT LICENSE AGREEMENT

THIS CHARTER PERSONAL SEAT LICENSE AGREEMENT ("Agreement") is entered into by and between FANS INC., a Missouri not-for-profit corporation ("Licensor"), and the individual, partnership, corporation or other entity signing this Agreement as Licensee.

For and in consideration of the payment of the License Fee and the mutual covenants and agreements described below, the receipt and sufficiency of all of which are hereby acknowledged, Licensor and Licensee hereby agree as follows regarding the Regular Patron Charter Personal Seat License ("CPSL") granted by Licensor to Licensee:

### No. of CPSL(s) & License Fee

| | |
|---|---|
| Individual CPSL License Fee: | $_____ |
| Total No. of Licensee's CPSL(s) : | _____ |
| Total CPSL License Fee: | $_____ |
| CPSL License Fee Balance Due: _____ | $_____ |
| Stadium Seating Area (See Exhibit A): | _____ |

THIS AGREEMENT CONSISTS OF THE TERMS AND CONDITIONS ON THIS PAGE AND ADDITIONAL TERMS AND CONDITIONS CONTAINED ON THE FOLLOWING PAGES, WHICH LICENSEE ACKNOWLEDGES AND AGREES TO AND WHICH ARE INCORPORATED BY REFERENCE AS A PART OF THIS AGREEMENT. To simplify the completion and signing of this Agreement, all variables in the Agreement appear on this page, including the signature section.

IN WITNESS WHEREOF, Licensor and Licensee have duly signed this Agreement as of the dates set forth below.

LICENSEE: _____
               **Name and Address (Please Print)**

_____
     **Signature and Title**                          **Date**

Check One:    ☐ Individual  ☐ Partnership ☐ Corporation
              ☐ Other (describe): _____
LICENSEE MUST ENTER ITS SOCIAL SECURITY NUMBER OR FEDERAL TAX I.D.
NUMBER: _____

Licensee should, within ten (10) days of its receipt, return the signed, dated and completed CPSL Agreement to:

        Fans Inc.
        P.O. Box 502468
        St. Louis, Missouri, 63150-2468

LICENSOR:    Fans Inc.


                              **Title**              **Date**

Seat No.: _____

33880 1/16/95   3:58pm                    A-1-

Rams-McAllister000469

ADDITIONAL TERMS AND CONDITIONS OF CPSL AGREEMENT

1.  **CPSL License Fee and Stadium Area.**

Licensor promises, upon full payment of the License Fee, to grant to Licensee the number of Charter Personal Seat Licenses ("CPSL(s)") stated on page 1. The CPSL(s) granted to Licensee by Licensor entitle Licensee to purchase the number of Season Ticket(s) for the designated Stadium Area shown on Exhibit A. "Season Ticket(s)" shall mean general admission ticket(s) on a season-by-season basis to all, but not less than all, pre-season, regular season and post-season home games (excluding the NFL's Super Bowl or Pro Bowl), subject to Licensee's obligation to pay a separate fee for NFL playoff games (the "Games"), played by the RAMS in the Stadium at America's Center (the "Stadium") located in the City of St. Louis, Missouri during the term and subject to the terms and conditions of this Agreement.  Licensee acknowledges and agrees that the exact location of Licensee's seats ("Licensee's Seats") within the Section of the Stadium shown on page 1 will not be determined until after Licensee has paid the full amount of the License Fee shown on page 1.

2.  **Additional CPSL Terms.**

A.    Licensee agrees to purchase all of the Season Ticket(s) with respect to a particular NFL season upon the terms and conditions set by the RAMS. Licensor shall have no liability for the number of Games included within a Season Ticket(s) package or for the RAMS failure to play Games in the Stadium.

B.    Licensor may limit the number of CPSL(s) licensed to any one individual or entity in its sole discretion.

C.    The rights licensed under this Agreement are rights of personal privilege and do not under any circumstance confer upon Licensee any interest or estate in real property or any leasehold interest in the Licensee's Seat or the Stadium.

3.  **Transfer Terms.**

A.    Until March 1, 1996, Licensee shall not sell, pledge, hypothecate or transfer in any manner a CPSL except upon the occurrence of a Special Event. A Special Event shall be as follows:

    (1)    The occurrence of a circumstance beyond the control of Licensee such as death, disability, employment relocation, or similar event;

    (2)    To a Qualifying Lender, either as a pledge by Licensee pursuant to Section 3.B. below or due to Licensee's default under the Qualifying Lender's CPSL financing documents;

    (3)    To an Immediate Family Member or Related Party;

    (4)    In conjunction with a major business transaction in which the acquisition of the CPSL is not the intent of the transaction.

Further, in no event shall a CPSL be transferred more than once each year,

1/16/95   5:58pm                    A -2-

Rams-McAllister000470

except for a Special Event. All transfers, whether pursuant to a Special event or after March 1, 1996, shall be subject to a Transfer Fee.

B.    All transfers shall be in accordance with such reasonable rules and regulations as established by Licensor from time to time, including but not limited to, the transferee assuming all obligations of the transferor in a form acceptable to Licensor. Until a transfer is properly recorded on Licensor's records, the transfer of Licensee will be recognized by Licensor, the RAMS, Qualifying Lender, or any other party on the proper terms of the CPSL being transferred.

C.    "Qualifying Lender" shall mean any bank or other financial institution, or employer, or affiliate of an employer, of a Licensee that loans funds to Licensee which are used to pay for part or all of Licensee's CPSL License Fee. Licensee hereby acknowledges and agrees that (1) no Season Ticket(s) will be delivered to Licensee if Licensee is in default under the Qualifying Lender's CPSL financing agreements and Licensor is notified of the same at least fifteen (15) business days prior to the date on which Season Ticket(s) would otherwise be delivered to Licensee; and (2) Licensee hereby waives any and all claims Licensee may have against the RAMS, Licensor and/or Qualifying Lender for any failure by the RAMS to deliver Season Ticket(s) to Licensee after receipt by the RAMS of any such notice from Licensor or a Licensee's Qualifying Lender.

D.    "Immediate Family Member" means any grandparent, parent, spouse, child, stepchild, sibling, grandchild and great-grandchild of an individual Licensee; "Related Party" means any person or entity which owns or controls, or is owned or controlled by, Licensee.

E.    The "Transfer Fee" shall be equal to the greater of $25.00 or ten percent (10%) per CPSL of the CPSL transfer price. A Transfer Fee shall be charged on a "per CPSL per transaction" and not on a "per transferee per transaction" basis.

4.    Refunds.

If the RAMS does not move to St. Louis by September 1, 1996, all CPSL payments made by Licensee will be refunded to Licensee without interest.

5.    Default.

Failure by Licensee to make any payment when due under this Agreement or to comply with any of the other terms and conditions of this Agreement or any of the terms and conditions of the sale of the Season Ticket(s) (including without limitation the timing of payment therefor and conduct at games) imposed by the RAMS shall be a default. If Licensee defaults under this Agreement, then, at the sole option of Licensor, (a) this Agreement may be terminated, (b) Licensee shall hold no further rights to acquire the CPSL(s) or Season Ticket(s) associated therewith, (c) Licensor shall be entitled to retain all payments previously made by Licensee to Licensor hereunder, and (d) Licensee shall remain liable to Licensor for all losses suffered as a result of such default. In addition, upon default by Licensee, Licensor shall be entitled to recover all reasonable attorneys' fees and court costs incurred in connection with Licensee's default. Notwithstanding the foregoing, if Licensee's actions result in the loss of Licensee's rights to purchase or

1/16/95   5:58pm                    A -3-

retain Season Ticket(s) for reasons other than Licensee's failure to timely purchase Season Ticket(s), Licensee shall be entitled to sell or transfer Licensee's CPSL in a bona fide transaction occurring within sixty (60) days of the date Licensee is notified of Licensee's loss of rights to Licensee's Season Ticket(s), subject, however, to any rights of such Licensee s Qualifying Lender, if any.

6.   Disclaimer.

Licensee covenants and acknowledges that neither Licensor, the Authority (as defined below), the Stadium Manager (as defined below), nor the RAMS have made any representations whatsoever regarding the CPSL(s) other than as may be set forth in this Agreement.

7.   Reservation of Rights by Licensor.

In addition to all rights at law or equity or under the other terms of this Agreement, Licensor hereby expressly reserves the following rights:

A.   The right to terminate this Agreement and refund part or all of Licensee's deposit, either if Licensor determines that Licensee's credit is not satisfactory for this License and the future obligation of Licensee to acquire tickets, or for any other reason satisfactory to Licensor in its sole discretion, including, but not limited to, the right to reduce the total number of CPSL(s) purchased by Licensee if necessary; and

B.   The right to assign, pledge as collateral, transfer or sell all or any part of the rights and obligations of Licensor and Licensee under this Agreement to one or more third parties who shall succeed to all or any part of the rights vested in and granted herein to Licensor.

8.   Best Efforts.

If the RAMS play any of its NFL games other than at the Stadium (e.g. at Busch Stadium if the Stadium is not completed on time), Licensor will use its best efforts to assure Licensee the right to purchase, on a pro rata priority basis, tickets for seats in the stadium where the transferred games are played.  Licensee shall be obligated to buy tickets for Games played in the Stadium in St. Louis and NFL games played at Busch Stadium for which tickets are available for purchase by Licensee.

9.   Representations of Licensee.

Licensee hereby represents, warrants and/or acknowledges as follows:
A.  Licensee has read and understands the terms of this Agreement;
B.  Licensee is not acquiring the CPSL(s) as an investment and has no expectation of profit as a licensee of the CPSL(s);
C.  Licensee is acquiring the CPSL(s) solely for the right to purchase Season Ticket(s) to NFL Games played in the Stadium;
D.  Licensee is acquiring the CPSL(s) for Licensee's own use and not with a view to the distribution of the CPSL(s) to others;
E.  Licensee will not have any equity or other ownership interest in either Licensor, the Authority, the Stadium Manager, the RAMS, or the Stadium or any of the Stadium's facilities and will not have any rights to dividends or other distribution rights from Licensor or any other party or entity described in

1/16/95   3:58pm                    A -4-

Rams-McAllister000472

this Agreement as a result of being a licensee of a CPSL, and further will not have any voting rights with respect to Licensor matters as a result of being a licensee of a CPSL;

F.  The transfer of the CPSL will be restricted and the CPSL may be terminated under certain conditions, as explained in this Agreement; and

G.  Licensee has full authority to enter into and sign this Agreement and carry out its terms and conditions and when signed, this Agreement shall be a binding obligation on Licensee, enforceable in accordance with its terms.

## 10.  Use of Seats.

Licensee and Licensee's invitees shall at all times maintain proper decorum while using the Licensee's Seats and shall abide by all applicable governmental laws, ordinances, orders, directions, rules and regulations and by such rules and regulations as are adopted and revised from time to time regarding Licensee's Seats or for the Stadium.  Licensee shall be responsible for all damage caused to the Licensee's Seats by Licensee and Licensee's invitees, ordinary wear and tear excepted.  In addition, Licensee shall not take any action which would cause an increase in premiums of any insurance policy carried by either Licensor, the Authority, the Stadium Manager or the RAMS, by causing Licensor or any other party to fail to meet any requirement or condition of such policy or otherwise.  Without limiting the foregoing, Licensee specifically agrees that neither Licensee nor Licensee's invitees will:  (a) bring into the Stadium any alcoholic or intoxicating beverage, any illegal drugs or, except as prescribed by a physician, any controlled substance; (b) permit the Licensee's Seats to be used for any illegal, improper, immoral or objectional purpose, or in any way obstruct or interfere with the rights of any other licensees or Game attendees; or (c) film, record or transmit from the Licensee's Seats all or any portion of any NFL Football game or other event, or any description thereof, by any means (including without limitation radio or television broadcasting, whether broadcast "live" or by means of film or tape).

## 11.  Assumption of Risk; Liability; Indemnity.

Licensee, for Licensee and Licensee's invitees, assumes all risk of personal injury to, or for any damage to or any loss of property of, License or its invitees, arising out of, during or related to their attendance at events held in the Stadium.  Licensee acknowledges that alcoholic beverages will be available in the Stadium and that attendance at sporting events may expose attendees to certain risks of injury including, but not limited to, incidents involving other patrons who have consumed alcoholic beverages, injury from thrown or dropped objects, spills of food or beverages and the unruly behavior of other patrons.  Licensee hereby agrees to assume all responsibility and liability for the consumption in the Stadium of alcoholic beverages by Licensee and its invitees and for the conduct and behavior of Licensee and its invitees.  Licensee agrees to indemnify and hold harmless Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., and the RAMS, and the respective owners, officers, directors, employees and agents of each such entity, from and against any claims, damages, actions, suits and expenses, including attorneys' fees and other costs, arising out of or related to this Agreement, the use of alcohol at the Stadium by Licensee or Licensee's invitees, the conduct and behavior of Licensee and Licensee's invitees and/or the use of the Licensee's Seats by Licensee or Licensee's invitees, whether such claims are now existing or later arising, and whether or not such loss is

31880 1/16/95   5:58pm             $A$-5-

Rams-McAllister000473

alleged to be caused by the negligence of Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., or the RAMS, the respective owners of each such entity, or their respective officers, directors, employees or agents.

12. Additional Terms.

A.     Licensee acknowledges that the Stadium will be managed, maintained and operated by The Regional Convention and Visitors Commission (the "Stadium Manager") pursuant to certain agreements between the Stadium Manager and the Authority (collectively the "Stadium Agreements"). All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the RAMS agreement to relocate to St. Louis. Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years. Licensee acknowledges that Licensee has no claim against the RAMS with respect to this CPSL and/or its termination whatsoever. Licensee understands and acknowledges the possibility that the RAMS may not play its games in the Stadium or St. Louis for the entire term contemplated by this License. Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this CPSL, including without limitation should the RAMS not play its home games in the Stadium or in St. Louis for any reason.

B.     Licensee hereby acknowledges that although the RAMS are not a party to this Agreement, the RAMS is a third party beneficiary under this Agreement and will directly and\or indirectly realize certain benefits from this Agreement. In addition, Licensee acknowledges that various other parties named in Sections 10 and 11 above, namely the Stadium Manager, the Authority, and St. Louis NFL Corp., are also third party beneficiaries of this Agreement and may directly or indirectly realize certain benefits from this Agreement.

C.     This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri without regard to the laws of conflict. Any action, suit or other proceeding brought by or against the Licensee or Licensor, including any claim for injuries or damages relating to the license of a part of the Stadium, the Licensee, and Licensee's guests and invitees, shall be brought in the United States District Court for the Eastern District of Missouri, Eastern Division, or in the Circuit Court of the State of Missouri, Twenty-First (21st) Judicial Circuit.

D.     All notices and other communication required to be given pursuant to this License to Licensor or to Licensee shall be in writing and shall be sent to the addresses set forth on the signature page of this Agreement. Any notice given herein shall be deemed delivered when addressed as above provided, postage prepaid, certified mail, return receipt requested, and deposited in a United States General or Branch Post Office or with a nationally recognized overnight courier.

E.     This Agreement contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any representations or agreements previously made or entered into by the parties hereto. No modification hereto shall be permitted by Licensee whatsoever.

F.     This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, and their permitted

1/16/95   3:58pm

A-6-

successors and assigns.  This Agreement may be assigned by Licensor in whole or part without any notice to Licensee; this Agreement shall not be assigned or transferred by Licensee except as set forth above.  This License Agreement shall not be binding and enforceable until signed by a duly authorized representative of Licensor .

[THE REST OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK]

1/16/95    5:58pm

A -7-

Rams-McAllister000475

EXHIBIT A--STADIUM DIAGRAM

1/16/95   5:58pm

$A$ -8-

Rams-McAllister000476

## ST. LOUIS CONVERTIBLE
## CHARTER PERSONAL SEAT LICENSE AGREEMENT

THIS CONVERTIBLE CHARTER PERSONAL SEAT LICENSE AGREEMENT ("Agreement") is entered into by and between FANS INC., a Missouri not-for-profit corporation ("Licensor"), and the individual, partnership, corporation or other entity signing this Agreement as Licensee.

For and in consideration of the payment of the License Fee and the mutual covenants and agreements described below, the receipt and sufficiency of all of which are hereby acknowledged, Licensor and Licensee hereby agree as follows regarding the Convertible Charter Personal Seat License ("Convertible CPSL") granted by Licensor to Licensee:

### No. of Convertible CPSL(s) & License Fee

Individual CPSL License Fee:                    $ _____

Total No. of Licensee's CPSL(s) :                 _____

Total CPSL License Fee:                         $ _____

CPSL License Fee Balance Due: _____       $ _____

Stadium Seating Area (See Exhibit A):             _____

THIS AGREEMENT CONSISTS OF THE TERMS AND CONDITIONS ON THIS PAGE AND ADDITIONAL TERMS AND CONDITIONS CONTAINED ON THE FOLLOWING PAGES, WHICH LICENSEE ACKNOWLEDGES AND AGREES TO AND WHICH ARE INCORPORATED BY REFERENCE AS PART OF THIS AGREEMENT.  To simplify the completion and signing of this Agreement, all variables in the Agreement appear on this page, including the signature section.

IN WITNESS WHEREOF, Licensor and Licensee have duly signed this Agreement as of the dates set forth below.

LICENSEE: _____
                    **Name and Address (Please Print)**

_____
     Signature and Title                     Date

Check One:    ☐  Individual  ☐  Partnership ☐ Corporation
              ☐  Other (describe): _____
LICENSEE MUST ENTER ITS **SOCIAL SECURITY NUMBER OR FEDERAL TAX I.D.**
NO.: _____

Licensee should, within ten (10) days of its receipt, return the signed, dated and completed Convertible CPSL Agreement to:

           Fans Inc.
           P.O. Box 502468
           St. Louis, Missouri, 63150-2468

OR:        Fans Inc.


                              Title                    Date

CPSL No.: _____


4/16/95   5:43pm                 β -1-

ADDITIONAL TERMS AND CONDITIONS OF CONVERTIBLE CPSL AGREEMENT

1.   **Convertible CPSL License Fee and Stadium Area.**

Licensor promises, upon full payment of the License Fee, to grant to Licensee the number of Convertible Charter Personal Seat Licenses ("Convertible CPSL(s)") stated on page 1.  The Convertible CPSL(s) granted to Licensee by Licensor entitle Licensee to purchase the number of Season Ticket(s) for the designated Stadium Area shown on  Exhibit A. "Season Ticket(s)" shall mean general admission ticket(s) on a season-by-season basis to all, but not less than all, pre-season, regular season and post-season home games (excluding the NFL's Super Bowl or Pro Bowl), subject to Licensee's obligation to pay a separate fee for NFL playoff games (the "Games"), played by the RAMS in the Stadium at America's Center (the "Stadium") located in the City of St. Louis, Missouri during the term and subject to the terms and conditions (including without limitation those set forth in Section 2 below) of this Agreement. Licensee acknowledges and agrees that the exact location of Licensee's seats ("Licensee's Seats") within the Section of the Stadium shown on page 1 will not be determined until after Licensee has paid the full amount of the License Fee shown on page 1.

2.   **Right to Convert Licensee's Seat to Club Seat.**

As of January 1, 2000, all of Licensee's Convertible CPSL Seat(s) may be converted to "Club Seat(s)" upon the terms and conditions set forth herein. To convert Licensee's Seat(s) to Club Seat(s), Licensee will be notified of the election to convert, and upon such notification, Licensee shall have sixty (60) days to notify Licensor if Licensee does not desire to keep Licensee's Seat(s) as converted (the "Conversion Effective Date").  If Licensee does not timely notify Licensor as provided above, Licensee's Seat(s) will be converted to Club Seat(s) upon all the terms and conditions then in effect with respect to Club Seats, provided, however, that Licensee will not be charged any additional charge for Club Membership at the time of conversion other than the Annual Club  Rental Fee.  Licensee may transfer his Convertible CPSL until the Conversion Effective Date.  From and after the Conversion Effective Date, the Convertible CPSL terminates and Licensee will become a Club Seat Lessee (if Licensee accepts the conversion), which rights are of limited duration and are not transferable.  If Licensee does not accept the conversion, from and after the Conversion Effective Date,  Licensee's Convertible CPSL will terminate and Licensee will forfeit the right to Season Ticket(s).

3.   **Additional Convertible CPSL Terms.**

A.   Licensee agrees to purchase all of the Season Ticket(s) with respect to a particular NFL season upon the terms and conditions set by the RAMS. Licensor shall have no liability for the number of Games included within a Season Ticket(s) package or for the RAMS failure to play Games in the Stadium.

B.   Licensor may limit the number of Convertible CPSL(s) licensed to any one individual or entity in its sole discretion.

C.   The rights licensed under this Agreement are rights of personal privilege and do not under any circumstance confer upon Licensee any interest of estate in real property or any leasehold interest in the Licensee's Seat or the Stadium.

RMA 1/16/95    5:03pm                    β -2-

Rams-McAllister000478

4.   <u>Transfer Terms</u>.

A.   Until March 1, 1996, Licensee shall not sell, pledge, hypothecate or transfer in any manner a Convertible CPSL except upon the occurrence of a Special Event.  A Special Event shall be as follows:

    (1)   The occurrence of a circumstance beyond the control of Licensee such as death, disability, employment relocation, or similar event;

    (2)   To a Qualifying Lender, either as a pledge by Licensee pursuant to Section 4.B. below or due to Licensee's default under the Qualifying Lender's CPSL financing documents;

    (3)   To an Immediate Family Member or Related Party;

    (4)   In conjunction with a major business transaction in which the acquisition of the Convertible CPSL is not the intent of the transaction.

Further, in no event shall a Convertible CPSL be transferred more than once each year, except for a Special Event.  All transfers, whether pursuant to a Special event or after March 1, 1996, shall be subject to a Transfer Fee.

B.   All transfers shall be in accordance with such reasonable rules and regulations as established by Licensor from time to time, including but not limited to, the transferee assuming all obligations of the transferor in a form acceptable to Licensor.  Until a transfer is properly recorded on Licensor's records, the transfer of Licensee will be recognized by Licensor, the RAMS, Qualifying Lender, or any other party on the proper terms of the Convertible CPSL being transferred.

C.   'Qualifying Lender' shall mean any bank or other financial institution, or employer, or affiliate of an employer, of a Licensee that loans funds to Licensee which are used to pay for part or all of Licensee's Convertible CPSL License Fee.   Licensee hereby acknowledges and agrees that (1) no Season Ticket(s) will be delivered to Licensee if Licensee is in default under the Qualifying Lender's Convertible CPSL financing agreements and Licensor is notified of the same at least fifteen (15) business days prior to the date on which Season Ticket(s) would otherwise be delivered to Licensee; and (2) Licensee hereby waives any and all claims Licensee may have against the RAMS, Licensor and/or Qualifying Lender for any failure by the RAMS to deliver Season Ticket(s) to Licensee after receipt by the RAMS of any such notice from Licensor or a Licensee's Qualifying Lender.

D.   'Immediate Family Member' means any grandparent, parent, spouse, child, stepchild, sibling, grandchild and great-grandchild of an individual Licensee; 'Related Party' means any person or entity which owns or controls, or is owned or controlled by, Licensee.

E.   The 'Transfer Fee' shall be equal to the greater of $25.00 or ten percent (10%) per Convertible CPSL of the Convertible CPSL transfer price.  A Transfer Fee shall be charged on a 'per Convertible CPSL per transaction' and not on a 'per transferee per transaction' basis.

15724 1/16/95   5:43pm                    $B$ -3-

Rams-McAllister000479

5.   Refunds.

If the RAMS does not move to St. Louis by September 1, 1996, all Convertible CPSL payments made by Licensee will be refunded to Licensee without interest.

6.   Default.

Failure by Licensee to make any payment when due under this Agreement or to comply with any of the other terms and conditions of this Agreement or any of the terms and conditions of the sale of the Season Ticket(s) (including without limitation the timing of payment therefor and conduct at games) imposed by the RAMS shall be a default. If Licensee defaults under this Agreement, then, at the sole option of Licensor, (a) this Agreement may be terminated, (b) Licensee shall hold no further rights to acquire the Convertible CPSL(s) or Season Ticket(s) associated therewith, (c) Licensor shall be entitled to retain all payments previously made by Licensee to Licensor hereunder, and (d) Licensee shall remain liable to Licensor for all losses suffered as a result of such default.  In addition, upon default by Licensee, Licensor shall be entitled to recover all reasonable attorneys' fees and court costs incurred in connection with Licensee's default. Notwithstanding the foregoing, if Licensee's actions result in the loss of Licensee's rights to purchase or retain Season Ticket(s) for reasons other than Licensee's failure to timely purchase Season Ticket(s), Licensee shall be entitled to sell or transfer Licensee's Convertible CPSL in a bona fide transaction occurring within sixty (60) days of the date Licensee is notified of Licensee's loss of rights to Licensee's Season Ticket(s), subject, however, to any rights of such Licensee's Qualifying Lender, if any.

7.   Disclaimer.

Licensee covenants and acknowledges that neither Licensor, the Authority (as defined below), the Stadium Manager (as defined below), nor the RAMS have made any representations whatsoever regarding the Convertible CPSL(s) other than as may be set forth in this Agreement.

8.   Reservation of Rights by Licensor.

In addition to all rights at law or equity or under the other terms of this Agreement, Licensor hereby expressly reserves the following rights:

A.    The right to terminate this Agreement and refund part or all of Licensee's deposit, either if Licensor determines that Licensee's credit is not satisfactory for this License and the future obligation of Licensee to acquire tickets, or for any other reason satisfactory to Licensor in its sole discretion, including, but not limited to, the right to reduce the total number of Convertible CPSL(s) purchased by Licensee if necessary; and

B.    The right to assign, pledge as collateral, transfer or sell all or any part of the rights and obligations of Licensor and Licensee under this Agreement to one or more third parties who shall succeed to all or any part of the rights vested in and granted herein to Licensor.

9.    Best Efforts.

RJW 1/16/95   5:43pm            B -4-

If the RAMS play any of its NFL games other than at the Stadium (e.g. at Busch Stadium if the Stadium is not completed on time), Licensor will use its best efforts to assure Licensee the right to purchase, on a pro rata priority basis, tickets for seats in the stadium where the transferred games are played.  Licensee shall be obligated to buy tickets for Games played in the Stadium in St. Louis and NFL games played at Busch Stadium for which tickets are available for purchase by Licensee.

10.  <u>Representations of Licensee</u>.

Licensee hereby represents, warrants and/or acknowledges as follows:
A.  Licensee has read and understands the terms of this Agreement;
B.  Licensee is not acquiring the Convertible CPSL(s) as an investment and has no expectation of profit as a licensee of the Convertible CPSL(s);
C.  Licensee is acquiring the Convertible CPSL(s) solely for the right to purchase Season Ticket(s) to NFL Games played in the Stadium;
D.  Licensee is acquiring the Convertible CPSL(s) for Licensee's own use and not with a view to the distribution of the Convertible CPSL(s) to others;
E.  Licensee will not have any equity or other ownership interest in either Licensor, the Authority, the Stadium Manager, the RAMS, or the Stadium or any of the Stadium's facilities and will not have any rights to dividends or other distribution rights from Licensor or any other party or entity described in this Agreement as a result of being a licensee of a Convertible CPSL, and further will not have any voting rights with respect to Licensor matters as a result of being a licensee of a Convertible CPSL;
F.  The transfer of the Convertible CPSL will be restricted and the Convertible CPSL may be terminated under certain conditions, as explained in this Agreement; and
G.  Licensee has full authority to enter into and sign this Agreement and carry out its terms and conditions and when signed, this Agreement shall be a binding obligation on Licensee, enforceable in accordance with its terms.

11.  <u>Use of Seats</u>.

Licensee and Licensee's invitees shall at all times maintain proper decorum while using the Licensee's Seats and shall abide by all applicable governmental laws, ordinances, orders, directions, rules and regulations and by such rules and regulations as are adopted and revised from time to time regarding Licensee's Seats or for the Stadium.  Licensee shall be responsible for all damage caused to the Licensee's Seats by Licensee and Licensee's invitees, ordinary wear and tear excepted.  In addition, Licensee shall not take any action which would cause an increase in premiums of any insurance policy carried by either Licensor, the Authority, the Stadium Manager or the RAMS, by causing Licensor or any other party to fail to meet any requirement or condition of such policy or otherwise.  Without limiting the foregoing, Licensee specifically agrees that neither Licensee nor Licensee's invitees will:  (a) bring into the Stadium any alcoholic or intoxicating beverage, any illegal drugs or, except as prescribed by a physician, any controlled substance; (b) permit the Licensee's Seats to be used for any illegal, improper, immoral or objectional purpose, or in any way obstruct or interfere with the rights of any other licensees or Game attendees; or (c) film, record or transmit from the Licensee's Seats all or any portion of any NFL Football game or other event, or any description thereof, by any means (including without limitation radio or television broadcasting, whether broadcast "live" or by means of film or tape).

39734 1/16/95   5:43pm                    β -5-

12. <u>Assumption of Risk; Liability; Indemnity</u>.

Licensee, for Licensee and Licensee's invitees, assumes all risk of personal injury to, or for any damage to or any loss of property of, Licensee or its invitees, arising out of, during or related to their attendance at events held in the Stadium. Licensee acknowledges that alcoholic beverages will be available in the Stadium and that attendance at sporting events may expose attendees to certain risks of injury including, but not limited to, incidents involving other patrons who have consumed alcoholic beverages, injury from thrown or dropped objects, spills of food or beverages and the unruly behavior of other patrons. Licensee hereby agrees to assume all responsibility and liability for the consumption in the Stadium of alcoholic beverages by Licensee and its invitees and for the conduct and behavior of Licensee and its invitees. Licensee agrees to indemnify and hold harmless Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., and the RAMS, and the respective owners, officers, directors, employees and agents of each such entity, from and against any claims, damages, actions, suits and expenses, including attorneys' fees and other costs, arising out of or related to this Agreement, the use of alcohol at the Stadium by Licensee or Licensee's invitees, the conduct and behavior of Licensee and Licensee's invitees and/or the use of the Licensee's Seats by Licensee or Licensee's invitees, whether such claims are now existing or later arising, and whether or not such loss is alleged to be caused by the negligence of Licensor, the Authority, the Stadium Manager, St. Louis NFL Corp., or the RAMS, the respective owners of each such entity, or their respective officers, directors, employees or agents.

13. <u>Additional Terms</u>.

A.      Licensee acknowledges that the Stadium will be managed, maintained and operated by The Regional Convention and Visitors Commission (the "Stadium Manager") pursuant to certain agreements between the Stadium Manager and the Authority (collectively the "Stadium Agreements"). All rights granted to Licensee pursuant to this Agreement are subject to the terms and conditions of the Stadium Agreements and those other agreements signed in connection with the RAMS agreement to relocate to St. Louis. Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years. Licensee acknowledges that Licensee has no claim against the RAMS with respect to this Convertible CPSL and/or its termination whatsoever. Licensee understands and acknowledges the possibility that the RAMS may not play its games in the Stadium or St. Louis for the entire term contemplated by this License. Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this CPSL, including without limitation (i) for the conversion of the kind described in Section 2 hereof and (ii) should the RAMS not play its home games in the Stadium or in St. Louis for any reason.

B.      Licensee hereby acknowledges that although the RAMS are not a party to this Agreement, the RAMS is a third party beneficiary under this Agreement and will directly and\or indirectly realize certain benefits from this Agreement. In addition, Licensee acknowledges that various other parties named in Sections 10 and 11 above, namely the Stadium Manager, the Authority, and St. Louis NFL Corp., are also third party beneficiaries of this Agreement and may directly or indirectly realize certain benefits from this Agreement.

C.      This Agreement shall be construed and enforced in accordance with the

Rams-McAllister000482

laws of the State of Missouri without regard to the laws of conflict.  Any action, suit or other proceeding brought by or against the Licensee or Licensor, including any claim for injuries or damages relating to the license of a part of the Stadium, the Licensee, and Licensee's guests and invitees, shall be brought in the United States District Court for the Eastern District of Missouri, Eastern Division, or in the Circuit Court of the State of Missouri, Twenty-First (21st) Judicial Circuit.

D.    All notices and other communication required to be given pursuant to this License to Licensor or to Licensee shall be in writing and shall be sent to the addresses set forth on the signature page of this Agreement.  Any notice given herein shall be deemed delivered when addressed as above provided, postage prepaid, certified mail, return receipt requested, and deposited in a United States General or Branch Post Office or with a nationally recognized overnight courier.

E.    This Agreement contains the entire agreement of the parties with respect to the matters provided for herein, and shall supersede any representations or agreements previously made or entered into by the parties hereto.  No modification hereto shall be permitted by Licensee whatsoever.

F.    This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, and their permitted successors and assigns.  This Agreement may be assigned by Licensor in whole or part without any notice to Licensee; this Agreement shall not be assigned or transferred by Licensee except as set forth above.  This License Agreement shall not be binding and enforceable until signed by a duly authorized representative of Licensor .

        [THE REST OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK]

55734 1/16/95    5:43pm                     β-7-

Rams-McAllister000483

<u>EXHIBIT A--STADIUM DIAGRAM</u>

23734 1/16/95   5:43pm

$\beta$ -8-

Rams-McAllister000484