# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MCALLISTER, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | No. 4:16-CV-172 SNLJ<br>No. 4:16-CV-262<br>No. 4:16-CV-297 |
| THE ST. LOUIS RAMS, LLC, | ) ) | No. 4:16-CV-189<br>CONSOLIDATED |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is comprised of four consolidated lawsuits[1] relating to the St. Louis Rams football team's January 2016 decision to move the team to a new stadium in Inglewood, California. The Rams' home stadium had been located in St. Louis, Missouri since 1995. The St. Louis Rams required football fans who wished to purchase season tickets to buy Personal Seat Licenses ("PSLs") that entitled the PSL holder to buy one season ticket per year in a designated section of the stadium. Approximately 46,000 PSLs were sold. Upon the announcement that the Rams would move to California, lawsuits were filed by PSL holders and others against the Rams claiming damages arising from the Rams' move.

After consolidating the various cases, the Court addressed motions to dismiss and motions for judgment on the pleadings. The result depended on which PSL Agreement

---

[1] *McAllister v. The St. Louis Rams*, No. 4:16-CV-172 SNLJ (E.D. Mo.) ("McAllister"); *Envision, LLC, et al. v. The St. Louis Rams, LLC*, No. 4:16-CV-00262-CDP (E.D. Mo.) ("Envision"); *Arnold, et al. v. The St. Louis Rams, LLC*, No. 4:16-cv-00297-SNLJ (E.D. Mo.) ("Arnold"); and *Pudlowski v. St. Louis Rams*, LLC, 4:16-cv-189-SNLJ (E.D. Mo.) ("Pudlowski"). This Memorandum and Order pertains only to McAllister's case against the Rams.

1

applied to a given PSL holder. An entity known as FANS, Inc. had sold PSLs for home football games until September 1, 1995, later extended to March 1996. Those PSLs were sold pursuant to an agreement known as the "FANS" PSL contract.[2] After March 1996, the Rams sold the PSLs directly pursuant to the "Rams" PSL contract.

Plaintiff McAllister alleged that the Rams had terminated the PSLs thus triggering the Rams' contractual duty to refund "deposits" that the Rams had received pursuant to the contracts. This Court held that the "best efforts" obligations expired along with the FANS Contract upon the Rams' move to California based on a clause unique to the FANS Contract: "The Rams terminated the FANS Agreement because it became invalid on the Rams' move to California and now must 'refund…deposits'" according to the contract. (#44 at 11.)

On the other hand, the Rams PSL agreement contained no such clause, so it was not terminated upon the Rams' move to California. The Rams agreement requires the Rams to use "Best Efforts to secure tickets for seats at games where the transferred home games are played." (#44 at 8.)

The Court thus granted judgment on the pleadings to McAllister as to the FANS contract. The Rams moved to reconsider because, implicit in the Court's holding was that the Rams were liable under the FANS PSL agreement. Buried in the final paragraph of the pertinent section of briefing was the Rams' one-sentence statement that the Rams were "not parties" to the FANS Agreement. (#42 at 13.) In its Memorandum and Order granting the Motion to Reconsider (#63), the Court noted that the Rams' opposition to the motion for judgment on the pleadings had been

---

[2] FANS, Inc. apparently sold PSLs under two different contracts. The parties appear to agree, however, that, for purposes of this motion, the two FANS Contracts are identical, so this Court will not distinguish between them.

> focused entirely elsewhere --- as if the Rams had taken over the FANS, Inc. obligations under the FANS Agreement. For example, the Rams specifically stated: "[T]he 'refund' provision simply provided the Rams with a non-controversial right to limit the number of seats sold to any Licensee and, if a deposit had been made, to refund all or a portion of it back." (#42 at 6.) The Rams made that statement without any reservation and cited both the FANS and Rams Agreements in support.
>
> Despite that statement in their briefing, the Rams deny that they "succeeded" to FANS, Inc.'s rights and responsibilities under the FANS Agreement.

(#63 at 2.) This Court thus granted the motion for reconsideration and held that the question of the Rams' liability on the FANS agreement would be addressed another day.

McAllister has now filed a motion for partial summary judgment on the matter of the Rams' liability for the FANS PSL agreement based on Count IV of the Complaint.

**I.     Legal Standard**

Pursuant to Rule 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the moving party. *Mt. Pleasant*, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The Court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to the discussion.

## II. Discussion

Plaintiff McAllister contends that the Rams are liable for the FANS PSL Agreement because (1) FANS, Inc. was acting as the Rams' legal agent; and (2) the Rams team was successor-at-interest to the FANS PSL agreement after FANS, Inc. dissolved in 1998. The Rams disagree. The Rams argue that FANS, Inc. was solely an agent for the Regional Convention and Visitors Commission (the "CVC"), <u>not</u> an agent for the Rams. The Rams have filed a third party complaint against the CVC for contractual indemnification for claims arising out of the CVC's operations, functions, and obligations, including with respect to the FANS PSLs. That matter has been referred to arbitration pursuant to the Rams' and CVC's contract.

Critical to this Court's analysis are the FANS PSL agreement itself and the "Relocation Agreements" between the Rams, on the one hand, and FANS, Inc., the CVC, and the St. Louis Regional Convention and Sports Complex Authority (the "Sports Authority") on the other hand. Those "Relocation Agreements" include, among others, the Charter Personal Seat License Master Agreement (the "Master PSL Agreement"). The Master PSL Agreement formed the basis for FANS, Inc. to sell PSLs under the

4

FANS PSL Agreement. Both parties contend that these agreements support their theories.

### A. The FANS PSL Agreement

The FANS PSL agreement is between the PSL holder (the "Licensee") and a "Licensor." Although "Licensor" is undefined in the agreement, it appears obvious that FANS, Inc. is Licensor because the agreement is titled as follows:

**FANS, Inc., 10 S. Broadway, Suite 425, St. Louis, Mo 63102**
**Standard Terms and Conditions of Regular Patron CPSL Agreement**

Then the first section of the agreement states

1. **CPSL License Fee and Stadium Area**.
   Licensor promises, upon full payment of the License Fee, to grant to Licensee the number of Regular Patron Charter Personal Seat Licenses ("CPSL(s)") stated on the Signature Page….

That first section goes on to refer to "Licensee's obligation to pay a separate fee for NFL playoff games (the "Games"), played by the RAMS in the Stadium at America's Center (the "stadium") located in the City of St. Louis, Missouri." That is the first mention of the Rams football team in the FANS PSL agreement.

As this Court has already held, the FANS PSL agreement terminated when the Rams no longer played football in St. Louis because the agreement states "Licensee acknowledges that this Agreement remains valid only as long as NFL Football is played at the Stadium by the RAMS, up to a maximum of thirty (30) years." (FANS Agreement § 12.A.) The very next section states that "although the RAMS are not a party to this Agreement, the RAMS are a third party beneficiary under this Agreement and will directly and/or indirectly realize certain benefits from this Agreement." (*Id.* § 12.B.)

5

The agreement also states that "Licensor hereby expressly reserves the following rights….the Right to terminate this Agreement and refund part or all of Licensee's deposit…" (*Id.* § 7.A.) The Court held that because the agreement had terminated by virtue of the Rams leaving St. Louis's Stadium, the agreement required the "refund [of] part or all of Licensee's deposit." (*Id.* § 7.A; *see* #44 at 9-10.) In the relevant briefing, the Rams had stated that the "[T]he 'refund' provision simply provided the Rams with a non-controversial right to limit the number of seats sold to any Licensee and, if a deposit had been made, to refund all or a portion of it back." (#42 at 6 (emphasis added).) The Rams cited both the FANS and Rams Agreements in support. As mentioned above, this position was confusing in light of the Rams' argument that in fact they are not liable for the FANS Agreement as "Licensor." The issue of the Rams' liability is critical because the entity FANS, Inc. dissolved in 1998.

McAllister argues that the Rams are liable to FANS PSL holders under agency principles. Even though FANS, Inc. no longer existed, the Rams still honored the FANS PSLs because it continued to sell season tickets to those PSL holders for nearly 20 years. McAllister insists that the natural result is that the Rams are responsible for upholding the contract. However, because McAllister presents, at best, disputed issues of fact with respect to the three elements of an agency relationship discussed below, the Court cannot grant summary judgment to plaintiff.

    **B.    Principal-Agent Relationship**

A principal is typically liable for the acts of its agent. *Motorsport Marketing, Inc. v. Wiedmaier, Inc.*, 195 S.W.3d. 492, 498 (Mo. App. 2006). To prove an agency relationship, plaintiff must show: (1) the agent holds the power to alter legal relations between the principal and third parties; (2) the agent is a fiduciary with respect to matters

6

within the scope of the agency; and (3) the principal has the right to control the conduct of the agent with respect to matters entrusted to the agent. *State ex. rel. Ford Motor Co. v. Bacon*, 63 S.W.3d. 641, 642 (Mo. banc 2002). A principal may be responsible for the acts and agreements of its agent if the agent acts with actual or apparent authority. *Bluehaven Funding, LLC v. First Am. Title Ins. Co.*, 4:06CV1425SNLJ, 2009 WL 1421207, at *8 (E.D. Mo. May 20, 2009), aff'd, 594 F.3d 1055 (8th Cir. 2010). *See also Hardcore Concrete*, 220 S.W.3d.at 355 n.4. "Normally, whether a principal-agent relationship exists is a question for the jury, but when the facts are undisputed and only one reasonable conclusion can be drawn from them, it is a question of law." *Weitz Co. v. MH Washington*, 631 F.3d 510, 522 (8th Cir. 2011).

 1. **Power to alter legal relations**

With respect to the first requirement, that the agent holds the power to alter legal relations between the principal and third parties, plaintiff says that the Rams provided FANS, Inc. with the power to alter legal relationships between the Rams and third parties. McAllister points out that the FANS PSL contract gave PSL owners the right to buy season tickets from the Rams for specific seats year after year. Plaintiff further states that the Rams gave FANS, Inc., the authority to sell those PSLs.

Plaintiff's evidence on this point is thin. FANS PSLs specifically provided that "the Rams are not a party to this Agreement" and further provided that the FANS licensees would have no rights against the Rams under the PSLs. (FANS Agreement §§ 12.A & 12.B.) That Agreement stated

> Licensee acknowledges that Licensee has no claim against the RAMS with respect to this CPSL and/or its termination whatsoever…. Licensee expressly agrees not to sue the RAMS for damages or injunctive relief related to this CPSL.

7

*Id.* In addition, the Rams note that the FANS Agreements specifically disclaimed any representations not included in the agreements (FANS Agreement § 6) while the Master PSL Agreement precluded FANS and the CVC from making any representations not contained in the FANS PSLs (such as that the Rams would be bound by the PSLs). Thus, the Rams insist, FANS and CVC not only lacked authority to bind the Rams to any obligations with respect to FANS licensees, but they were contractually barred from representing that they could do so.

Next, McAllister points to evidence he says shows that the Rams and FANS, Inc. were part of a "team" selling PSLs/season tickets and that proceeds of the sales would in essence go to the Rams. For example, a *Post Dispatch* article stated that the money would be "used to meet the 'wish list' of items the Rams want met in order to move to St. Louis." In addition, the Rams' owner (then Georgia Frontiere) said at a press conference that "we have special jerseys for some team members" and handed a jersey to U.S. Senator Thomas F. Eagleton, who was the Chairperson of FANS, Inc.. McAllister thus argues that the Rams and FANS, Inc.'s joint marketing efforts conveyed FANS, Inc.'s apparent authority. *Essco Geometric v. Harvard Indus*., 46 F.3d 718, 726 (8th Cir. 1995) ("If a principal allows an agent to occupy a position which, according to the ordinary habits of people in the locality, trade or profession, carries a particular kind of authority, then anyone dealing with the agent is justified in inferring that the agent has such an authority.") In response, the Rams cite *Bluehaven*, which held that co-branded marketing materials did not serve as a grant of apparent authority. *See* 2009 WL 1421207 at *6, *9. Further, as part of that same press conference, Senator Eagleton said that he was speaking as the head of FANS, Inc. and that the selling of PSLs was not the responsibility of the

8

Rams' owner. He also said details would be forthcoming about the PSLs at a later press conference.

At best, then, McAllister's evidence presents a question of fact regarding whether FANS had the power to alter legal relationships.

### 2. Fiduciary

The second requirement is that the agent was "a fiduciary with respect to matters within the scope of the agency." *Bluehaven Funding*, 2009 WL 1421207 at *7. A fiduciary is "[s]omeone who is required to act for the benefit of another person on all matters within the scope of their relationship; one who owes to another the duties of good faith, loyalty, due care, and disclosure." FIDUCIARY, Black's Law Dictionary (10th ed. 2014). McAllister points out that the Master PSL Agreement required FANS, Inc. to "use its best efforts, until September 1, 1995, to sell a [PSL] for every seat in the Facilities except the Excluded Seats and the Rams Reserved Seats." (#149-2, § 2.1 at 5.) The Master PSL Agreement also imposed upon FANS, Inc. a duty of loyalty to the Rams by forbidding FANS or any of its officers, directors, employees, agents, or representatives, to either "take any action or fail to take any action which would materially detract from the rights and benefits the Rams are to receive as third-party beneficiaries" under the FANS PSL agreement. (*Id.* § 2.5.)

The Rams say that FANS, Inc. could not have been the Rams' fiduciary because the Rams lacked control over FANS, Inc.'s actions. Indeed, the Missouri test for a fiduciary requires, among other things, that there be "a surrender of independence by the subservient party to the dominant party." *Chmieleski v. City Products Corp.*, 660 S.W.2d 275, 294 (Mo. App. 1983). The Rams point out that all three parties --- the Rams, CVC, and FANS, Inc. --- were sophisticated parties represented by able counsel. FANS, Inc.,

9

even as it sold PSLs, surrendered no independence. Each party had its own duties under the contract. All that existed between the Rams and FANS, Inc. was a negotiated, arm's length contractual relationship, which is insufficient to establish a fiduciary relationship as a matter of law. *See, e.g.*, *Edwards v. Sittner*, 213 S.W.2d 652, 655 (Mo. App. 1948). McAllister has not met his burden to show that FANS, Inc. was a fiduciary.

### 3. Right to control

Third, plaintiff must show that the principal has "the right to control the conduct of the agent with respect to matters entrusted to the agent." *Bluehaven Funding*, 2009 WL 1421207 at *7. "Under Missouri agency law, the ***right to control***, rather than the ***actual*** exertion of control, is sufficient to permit vicarious liability to attach." *West v. Sharp Bonding Agency, Inc.*, 327 S.W.3d 7, 13 (Mo. App. 2010) (emphasis in original). McAllister argues that the Rams had control over all significant aspects of the PSL program. The Rams, he says, approved the PSL contract and the circumstances under which that contract was used.

Although the Rams had the right to review FANS, Inc.'s promotional materials if the materials used the Rams logo, they otherwise lacked the right to direct or control FANS, Inc.'s sale of PSLs: Section 3.14 of the Master PSL Agreement specifically provides "it is hereby acknowledged and agreed by FANS and CVC that the RAMS has no right to approve or control the sale of the Initial CPSLs…."

In addition, the Rams deny that they imposed the agreements at issue on FANS, Inc. Instead, the Rams offer evidence that the Relocation Agreements and FANS PSLs were negotiated at arm's length and that FANS and CVC proposed the PSL program, and the terms of the FANS PSL Agreement, to the Rams. Notably, the Rams say that the PSL program and the terms of the FANS PSL Agreement were modeled on a PSL program

10

undertaken by the Carolina Panthers NFL team. The PSL program was advantageous to the CVC because selling PSLs allowed the CVC to fund the project without using taxpayer money. Plaintiff responds to the these facts with an "objection" and suggest that the Rams are citing to documents out of context, but the plaintiffs fail to rebut the facts or otherwise explain how these facts are not germane.

Next, the Rams contend that the proper test relates to the principal's control over the agent after their contractual relationship is established. "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." Restatement (Third) Of Agency § 1.01 (2006). The Rams insist that, although they had a contractual relationship with FANS, Inc., there was no principal-agent relationship.

The Court cannot grant summary judgment to plaintiff McAllister regarding the relationship between the Rams and FANS, Inc.. There is at least a question of fact as to whether FANS, Inc. was acting as the Rams' legal agent in light of the arm's length relationship between the Rams, the CVC, and FANS, Inc. It may be that FANS, Inc. was solely the agent of the CVC. The CVC and the Rams are currently in arbitration to resolve the claims between those parties. The issue of the Rams' liability on the FANS agreement remains unsettled.

### C. Successor Liability

McAllister finally suggests that the Rams continued as principal and succeeded its dissolved agent, as Licensor, in the administering and the ultimate termination of the FANS PSLs. The Master PSL Agreement placed a time limit on FANS, Inc.'s authority to act as agent, and, when that time passed and FANS, Inc. dropped out (and, by 1998

11

dissolved its corporate existence) the Rams exercised the power that plaintiff says the Rams had had all along, succeeding their agent to directly administer the FANS PSLs.

The Rams respond that they had no obligation to "administer" the PSL program and never assumed any obligation to do so. Rather, the Rams were merely required to meet their contractual obligations under the Master PSL Agreement to FANS and the CVC to sell tickets to FANS licensees and process their transfers. (Master PSL Agr. §§ 1.2, 1.10.) Second, the Rams argue that they do not have successor liability under Missouri law. Instead, the Rams state that such liability belongs to the CVC. Notably, the plaintiff does not address the requirements for the imposition of successor liability, which involves analysis of whether acquisition and control over a predecessor preserves and continues the predecessor enterprise. *See, e.g.*, *Chem. Design, Inc. v. Am. Standard, Inc.*, 847 S.W.2d 488, 491 (Mo. App. 1993). The Rams contend that the CVC assumed FANS, Inc.'s liabilities when FANS, Inc. dissolved in 1998.

The plaintiff insists that because the Rams continued to sell season tickets to FANS PSL holders, the Rams in essence continued to "administer" the FANS PSL Agreement and were thus made parties to the Agreement. Plaintiff again relies on agency law to argue that the Rams were a party to every FANS PSL sold by FANS, Inc. because the Rams and FANS, Inc. were in a principal/agent relationship. The Court has already determined that it cannot hold as a matter of law that the Rams and FANS, Inc. were in a principal/agent relationship. The plaintiff's successor liability argument also fails.

### III. Conclusion

The Court must deny partial summary judgment to plaintiff McAllister and declines to reinstate its earlier judgment on the pleadings in McAllister's favor.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff McAllister's motion for partial summary judgment (#209) is DENIED.

Dated this  13th  day of March, 2018.

                                            STEPHEN N. LIMBAUGH, JR.
                                            UNITED STATES DISTRICT JUDGE