**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RONALD MCALLISTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16-CV-172 SNLJ |
| | ) | No. 4:16-CV-262 |
| | ) | No. 4:16-CV-297 |
| THE ST. LOUIS RAMS, LLC, | ) | No. 4:16-CV-189 |
| | ) | CONSOLIDATED |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is comprised of four consolidated lawsuits[1] relating to the St. Louis Rams football team's January 2016 decision to move the team to a new stadium in Inglewood, California. The Rams' home stadium had been located in St. Louis, Missouri since 1995. The St. Louis Rams required football fans who wished to purchase season tickets to buy Personal Seat Licenses ("PSLs") that entitled the PSL holder to buy one season ticket per year in a designated section of the stadium. Approximately 46,000 PSLs were sold. Upon the announcement that the Rams would move to California, lawsuits were filed by PSL holders and others against the Rams claiming damages arising from the Rams' move.

PSL holders purchased their PSLs subject to License Agreements, which are at the heart of this controversy. An entity known as FANS, Inc. sold PSLs for home football games until September 1, 1995. Those PSLs were sold pursuant to an agreement known

---

[1] *McAllister v. The St. Louis Rams*, No. 4:16-CV-172 SNLJ (E.D. Mo.) ("McAllister"); *Envision, LLC, et al. v. The St. Louis Rams, LLC*, No. 4:16-CV-00262-CDP (E.D. Mo.) ("Envision"); *Arnold, et al. v. The St. Louis Rams, LLC*, No. 4:16-cv-00297-SNLJ (E.D. Mo.) ("Arnold"); and *Pudlowski v. St. Louis Rams*, LLC, 4:16-cv-189-SNLJ (E.D. Mo.) ("Pudlowski"). The Pudlowski matter is not part of this memorandum and order.

as the "FANS" contract.[2]  After September 1, 1995, the Rams sold the PSLs directly pursuant to the "Rams" contract.

The Rams announced they would move the team from St. Louis to California in January 2016.  The Rams claim that all rights and obligations under the Rams and FANS Contracts expired when the team moved to California, and lawsuits were filed.  Plaintiff McAllister alleged that the Rams terminated the PSLs thus triggering the Rams' contractual duty to refund "deposits" that the Rams had received.  Two other groups of plaintiffs --- led by Envision and Arnold --- sued under the theory that the Rams were still required to use "best efforts" to secure tickets to home games in California for PSL holders and that PSL holders still had the right to transfer their PSLs by sale or otherwise.

This Court consolidated those cases, and the parties filed motions to test the plaintiffs' legal theories.  The results depended entirely on which PSL Agreement --- the FANS Contract or the Rams Contract --- was at issue.  This Court held that the "best efforts" obligations expired along with the FANS Contract upon the Rams' move to California based on a clause unique to the FANS Contract:  "The Rams terminated the FANS Agreement because it became invalid on the Rams' move to California and now must 'refund…deposits'" according to the contract.  (#44 at 11.)

On the other hand, the Rams Contract contained no such clause, so it was not terminated upon the Rams' move to California. The Rams Contract requires the Rams to use "Best Efforts to secure tickets for seats at games where the transferred home games are played."  (#44 at 8.)

---

[2] FANS, Inc. apparently sold PSLs under two different contracts.  The parties appear to agree, however, that, for purposes of these motions, the two FANS Contracts are identical, so this Court will not distinguish between them.

2

The result was that the Arnold and Envision "ticket theory" applied to the Rams PSL Contract while the McAllister "refund theory" applied to the FANS PSL Contract. The parties apparently agreed that Arnold and Envision would thus go forward with a class of Rams PSL holders while McAllister would represent the FANS PSL holders. McAllister filed an early motion for class certification consistent with that understanding --- moving for certification of a class of only FANS PSL holders. Months later, McAllister filed an amended motion for class certification that seeks to represent classes of both FANS and Rams PSL holders. (#106; *see also* #222 (amending class definitions by interlineation).) McAllister asserts that the FANS Contract has been terminated as stated in this Court's order (#44) and that the Rams Contract has more recently been shown to be terminated by the Rams. That recent termination occurred, McAllister argues, when Rams PSL owners called the Rams' ticket office after the Rams announced season tickets were available, the ticketing agent told them "Those PSLs are no longer valid." (*See* #105 at 10.)

Arnold and Envision have also moved to certify classes under the "ticket theory." (#167, #170.) As part of their motions, they ask that the Court not certify McAllister's classes of Rams PSL holders.

The Court has thoroughly reviewed the 200+ pages of class certification briefing and accompanying exhibits. For the following reasons, the Court will certify the Arnold plaintiffs' proposed Rams Class and Subclass with modifications, appoint counsel for Arnold and Envision as class counsel for the Rams Class and Subclass, certify McAllister's FANS Class and Subclass with modifications, and appoint McAllister's counsel as class counsel for the FANS Class and Subclass.

# I. The Plaintiffs and their Proposed Class Definitions

Each of the three groups of plaintiffs --- McAllister, Arnold, and Envision --- offers class definitions for certification.

## A. McAllister

McAllister bought two PSLs --- one from FANS, Inc. in 1995 and one from the Rams in 2005. He bought the first PSL pursuant to the "FANS Contract" and the second PSL pursuant to a similar but not identical "Rams Contract." McAllister alleges that in 2016, when the Rams moved to California, they terminated both contracts, thus triggering the Rams' contractual duty to refund PSL owners all or part of the deposits they paid under the FANS Contract. In the alternative, he alleges that the contracts are illusory and void and that the Rams are liable for refunds under an unjust enrichment theory, as well as for violations of the Missouri Merchandising Practices Act , § 407.025.1 ("MMPA"), and other theories. McAllister seeks relief on behalf of himself and other PSL owners.

Each Contract provides the PSL owner the right to purchase season tickets in a designated section of the Stadium at America's Center (later known as the "Edward Jones Dome at America's Center" until 2016) in St. Louis. The right to purchase season tickets extends through the end of the 2024 football season. The Contracts provide that they are governed by Missouri law. The Contracts also provide that the licensor might terminate them for any reason satisfactory to the licensor in its sole discretion, upon payment of a refund. McAllister claims that the Rams breached these provisions by terminating the PSLs and not providing refunds. This Court found that the Rams terminated the FANS Contract when they moved from St. Louis (#44 at 6 ("As a result [of the move to California], the FANS Agreement is invalid and terminated by its own terms.")). The Rams Contract, though, was slightly different, and this Court held that the Rams had not

terminated the Contract by moving from St. Louis.  As noted, McAllister contends that the Rams Contract might still have been terminated according to their ticket agent, who stated that "those PSLs are no longer valid."  As a result, McAllister hopes to show that the Rams terminated both contracts by the time they began selling season tickets in California.  For

In the alternative, McAllister alleges that both the FANS and Rams Contracts are illusory.  The FANS Contract contains a provision under which the licensee relinquished any claim against the Rams regarding the PSL and agreed not to sue the Rams for damages or injunctive relief related to the PSL, including for the reason that the Rams not play home games in St. Louis.  McAllister thus alleges those provisions render the Rams' promises illusory because they take away the ability of the PSL owners to enforce the contracts.

McAllister proposes the following Classes and Subclasses:

**FANS Class**.  All persons or entities who, at the conclusion of the 2015 season, owned a PSL purchased from Fans, Inc.

**FANS MMPA Subclass**.  All natural persons who are members of the FANS Class.

**Rams Class**.  All persons or entities who, at the conclusion of the 2015 season, owned a PSL: (a) purchased from the St. Louis Rams; or (b) acquired through the Rams' PSL transfer program.

**Rams MMPA Subclass**.  All natural persons who are members of the Rams Class.

## B.    Arnold

Plaintiff Richard Arnold's two friends bought FANS PSLs in 1995.  Years later, those friends transferred their PSLs to Arnold.  Based on language in the "Transfer Instructions" and "Transfer Form," all transferees (like Arnold) agreed "to accept and be bound by all terms and conditions of the Rams PSL Agreement."  Arnold is thus a Rams PSL holder who also purchased season tickets until the Rams moved back to California.

Plaintiff Brad Pearlman was transferred two PSLs from Firstar Bank --- which originally bought FANS PSLs in 1995.  Thus Pearlman also became a Rams PSL holder who also purchased season tickets until the Rams moved back to California.

Finally, Robert Cochran bought a FANS PSL in 1995.  Upon his death, the estate transferred the PSL to his son, R. McNeely Cochran.  Cochran is thus also a Rams PSL holder who purchased season tickets until the Rams moved back to California.

Collectively, the "Arnold plaintiffs" allege that all the Rams PSL holders have suffered the same injury:  they have been denied by the Rams the opportunity to buy football tickets in Los Angeles pursuant to the "best efforts" cause as well as have been denied the opportunity to sell their PSLs to Los Angeles fans.  The Arnold plaintiffs also bring claims under the MMPA.

The Arnold plaintiffs propose one class definition and one subclass definition:

> **Rams Class:**
> A) All persons or entities who:
> > 1) purchased PSLs directly from the Rams; or
> > 2) had any Rams or FANS PSL transferred to them; or
> > 3 upgraded their PSL tier; and
>
> B) purchased Rams season tickets through their PSLs for the 2015 season; or

C) did not purchase Rams season tickets for the 2015 season but did not receive a PSL cancellation notice from the Rams.

**MMPA subclass:** All natural persons who are members of the Rams Class who purchased PSLs primarily for personal, family, or household purposes.

## C.     Envision

Plaintiff Envision, L.L.C. alleges that it --- or its "predecessors in interest, Envision, Inc. and Quatrix, Inc." (#171 at 9) --- purchased a total of six PSLs when the Rams moved to St. Louis for $4,500 each.   Quatrix purchased two PSLs from FANS. Envision, Inc. purchased four PSLs from the Rams.  Envision, Inc. paid for season tickets for the six seats every year until around 1999, when Envision , L.L.C. began paying for the season tickets.

Plaintiffs Robert and Sue Bohm, purchased two PSLs from FANS in April 1995, but they subsequently upgraded their PSLs twice, and for each upgrade they paid additional license fees.  The upgraded PSLs were governed by the Rams Contract.  The Bohms paid for season tickets for their two seats every year through the 2015 season.

Nonparty Robert Messmer was a charter PSL holder who upgraded his PSLs. Plaintiff Edward Mock paid the additional license fee to the Rams LLC for the upgraded PSLs.  Then, in July 2011, Messmer transferred his PSLs to Mock; Mock paid a transfer fee to the Rams LLC and the transfer was recorded on the Rams' books.  The paperwork that Mock signed stated he agreed to be bound by "the Rams PSL Agreement."  Ever since, Mock has been billed by the Rams and paid for season tickets through the end of the 2015 season.

Collectively, the "Envision plaintiffs" allege the same injuries as do the Arnold plaintiffs, but the Envision plaintiffs propose the following class and subclass definitions:

**Class**. All persons or entities who possessed PSLs subject to the Rams' Agreement, and who continued to be PSL owners through, and purchased season tickets for, the 2015 season, including the following subclasses:

**Charter Subclass**. All persons or entities who purchased one or more PSLs directly from the St. Louis Rams, and who continued to be PSL owners through, and who purchased season tickets for, the 2015 season;

**Upgrade Subclass**. All persons, or entities who originally signed a PSL Agreement with FANS, Inc. or the Rams, and later upgraded their PSLs, and who continued to be PSL owners through, and purchased season tickets for, the 2015 season;

**Transfer Subclass**. All persons or entities who took transfer of one or more PSLs after September 1, 1995, whose interest in the PSLs was recorded on the books and records of the Rams, and who continued to be PSL owners through, and purchased season tickets, for the 2015 season;

**MMPA Subclass**. All natural persons who are members of the Class (excluding entities because, pursuant to the Missouri Merchandising Practices Act "MMPA"), § 407.025.1, RSMo, damages are only recoverable by persons who purchase or lease merchandise "primarily for personal, family or household purposes").

## II.    Legal Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with [Federal Rule of Civil Procedure] 23." *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013) (citations omitted). First, however, the class "must be adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) (internal quotation omitted).

The Rule 23 inquiry then has two parts. First, Rule 23(a) establishes four prerequisites for class certification: (1) the class is so <u>numerous</u> that joinder of all

members is impracticable; (2) there are questions of law and fact <u>common</u> to the class; (3) the claims or defenses of the representative parties are <u>typical</u> of the claims or defenses of the class; and (4) the representative parties will fairly and <u>adequately</u> protect the interests of the class. Fed. R. Civ. P. 23(a).  Second, a plaintiff seeking to maintain a class action must also satisfy at least one provision of Rule 23(b). *Comcast*, 133 S.Ct. at 1432.  Here, plaintiffs rely on Rule 23(b)(3), which requires that questions of law or fact common among class members must <u>predominate</u> over questions affecting only individual members, and a class action must be <u>superior</u> to other available methods for failure and efficiently adjudicating the controversy.  The burden is on the plaintiff.  *See Coleman v. Watt*, 40 F.3d 25, 258 (8th Cir. 1994).

"The preliminary inquiry of the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case." *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013) (internal quotation marks and citation omitted). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast*, 133 S.Ct. at 1432 (internal quotation marks and citation omitted).

## III. Discussion

The Court will first discuss the six class certification factors as set forth by the plaintiffs generally.  Then, the Court will address the defendant's arguments against certification.

### A. The Class Certification Factors

#### 1. Numerosity

Rule 23(a)(1) requires the Class to be "so numerous that joining of all members would be impracticable."  It is undisputed that approximately 46,000 PSLs were sold by

FANS and the Rams. At least 8,500 individuals or entities held PSLs at the end of the 2015 season. All three plaintiffs' proposed classes thus satisfy the numerosity requirement.

### 2. Commonality

Commonality "is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (internal quotation omitted). A single common question is adequate for the purposes of satisfying Rule 23(a)(2). *Ebert v. General Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016). Defendants do not appear to contest that commonality is satisfied. Indeed, numerous common questions have been identified by both the McAllister and Arnold/Envision groups. (*See* #105 at 14-17; #171 at 17-18; #173 at 7.)

### 3. Typicality

Typicality requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). That is, there must be "other members of the class who have the same or similar grievances as the plaintiff." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) (citation omitted). Plaintiff says that here the claims of every member of each class are based on the same actions and course of conduct of the Rams.

### 4. Adequacy

The adequacy requirement looks to whether the Class representative and Class counsel will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To satisfy the adequacy requirement, plaintiff must establish that: (1) the class representative's interests are not antagonistic to those of unnamed class members, and (2)

the plaintiff's counsel must be fully competent to prosecute the action as a class action."
*St. Louis Heart Ctr., Inc. v. Vein Centers For Excellence, Inc.*, 4:12 CV 174 CDP, 2013
WL 6498245, at *8 (E.D. Mo. Dec. 11, 2013) (citing *Linquist v. Bowen*, 633 F. Supp.
846, 859 (W.D. Mo. 1986)).

Plaintiffs say they are members of the respective classes they seek to represent and
that they seek the same type of relief, based on the same form contracts and the same
theories of the same violations of the law.  They say they are fully willing and able to
assist in the prosecution of the case relying upon the expertise of counsel.  Counsel all
have the ability, resources, commitment, and experience necessary to conduct this class
action.

### 5.    Predominance

Rule 23(b)(3) requires a court to find that "the questions of law or fact common to
class members predominate over any questions affecting only individual members…"
Fed. R. Civ. P. 23(b)(3).  The element of predominance "tests whether proposed class
members are sufficiently cohesive to warrant adjudication by representation." *In re Zurn
Pex Plumbing Products Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011) (quotation
omitted).  The Eighth Circuit has stated that "[i]f, to make a prima facie showing on a
given question, the members of a proposed class will need to present evidence that varies
from member to member, then it is an individual question." *Blades v. Monsanto Co*., 400
F.3d 562, 566 (8th Cir. 2005).  The question is a common one only if "the same evidence
will suffice for each member to make a prima facie showing." *Id*.; *see also Rikard v. U.S.
Auto Prot., LLC*, 287 F.R.D. 486, 492 (E.D. Mo. 2012).

Plaintiffs contend that the individual questions here are minor and do not
predominate.  Importantly, plaintiffs say that questions of liability and damages will be

resolved with common evidence. As the Eighth Circuit has observed, "when there are issues common to the class that predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages…." *Day v. Celadon Trucking Services*, Inc., 827 F.3d 817, 833 (8th Cir. 2016) (internal quotation omitted).

### 6. Superiority

Rule 23(b)(3) also requires a court to find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b) (emphasis added). The "superiority" criterion requires a comparison of the efficiency, expense, and manageability of a class action with other methods for adjudication. The Rule requires that the Court consider

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

As for (A), the class members' interests, the parties are aware of no individual lawsuits involving the PSL contracts other than those brought in these consolidated actions. Thus there is no evidence that class members have interest in individually controlling their claim. Those facts also support factor (B), the extent of other existing litigation.

Factor (C) is the desirability of concentrating this litigation in this form as opposed to other forums where class members might sue. McAllister points out that this Court is already familiar with the contracts and claims at issue and thus it simplifies and streamlines the litigation process for this Court to hear the class action. *See Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002). Arnold adds that the Rams included a forum selection clause in the Rams PSL and chose federal court by removing two of the three consolidated cases to this Court. Thus, the Rams cannot dispute that this is the preferred forum to resolve this dispute.

Finally, factor (D), manageability, looks at "how the problems that might occur in managing a class suit compared to the problems that would occur in managing litigation without a class suit." Newberg on Class Actions § 4:72 at 284 (5th Ed.). "This is, by far, the most critical concern in determining whether a class action is a superior means of adjudication." *Id.* McAllister characterizes his class action as "ideal" because, according to McAllister, it has "well-defined Classes and Subclasses as well as a defendant whose records will identify class members." (#105 at 17.) Only Missouri law need apply due to the choice-of-law provision, further enhancing this case's manageability as a class action. Arnold and Envision offer similar arguments and note that manageability of the class actions is preferable to managing a multitude of individual litigations.

### B. The Rams' Arguments

It would appear from the above discussion that the McAllister, Arnold, and Envision plaintiffs easily make their showings for the six class certification factors. The Rams, however, take issue with several factors and with the threshold issue of ascertainability. *See Sandusky Wellness Ctr., LLC*, 821 F.3d at 996 ("[the class] must be adequately defined and clearly ascertainable.").

The Rams' arguments are discussed below.

### 1.    Manageability and Ascertainment of Class Members

The Rams first argue that there is no manageable way to ascertain the class or subclasses.  The class definitions require the identification of PSL holders at the end of the 2015 season.  Oddly, the Rams say this is not possible.

The Rams used a system called Archtics (which is maintained by Ticketmaster, the well-known seller of tickets for sporting events, shows, and concerts) to manage their PSLs and season ticket sales.  The Rams have produced an electronic "snapshot" of the Archtics database for seasons from 2006 through 2015.  The database includes various "column headings" that convey information for each account such as "owner_name" and "event_name" (identifying whether an account was for a PSL holder), mailing address, seat and section number, and purchase price and block purchase price.

The Rams first point out that the "owner_name" data field does not necessarily identify the name of the actual PSL owner/contracting party.  Rather than identifying the PSL holder, "owner_name" "is simply the name of the entity or person to which the Rams sent invoices and correspondence."  (#257 at 18.)  The Rams cite the Envision's PSL as an example:  Rams data shows Envision, Inc., and Quatrix, Inc., not Envision L.L.C. (plaintiff here), as the "owner_name" for the six PSLs allegedly licensed by plaintiff Envision, L.L.C..

The plaintiffs respond that the Rams should not be allowed to argue that their data was suitable for business use and yet not suitable for determining class members.  This Court agrees.  The data sufficiently identifies class members and provides a mechanism with which to provide class members with notice.  Class membership and contact details may be easily confirmed through responses to the class notice.

Next, the Rams contend that it will be impossible to sort Rams Class Members from FANS Class Members. There is no variable in the Archtics data set that identifies whether a PSL holder held the PSL subject to the Rams or the FANS Agreement. For example, there is no "date of purchase" variable that would help answer that question, and transfers and upgrades of PSLs complicate the analysis further. Plaintiffs respond that ascertainment of which Agreement applies is quite simple because "what was ascertainable to [defendant] in the course of adhering to its own policy is ascertainable for the purpose of identifying members of the class." (#290 at 10 (quoting *Herrera v. LCS Fin. Services Corp.*, 274 F.R.D. 666, 674 (N.D. Cal. 2011)).

Purchasers of Rams PSLs are forever Rams PSL holders. As for FANS PSLs that were upgraded or transferred, the Rams' general policy was that any upgrade or transfer resulted in the PSL being held subject to the Rams Agreement. Only one form was used for transfers. That form states that "by executing the transfer form, the new PSL holder agrees to accept and be bound by all terms and conditions of the Rams PSL Agreement." As for upgrades, a new PSL agreement was executed in the event of a PSL upgrade. The Rams only issued Rams Agreements, never FANS Agreements, so any upgraded PSL resulted in a Rams PSL holder.

Plaintiff Arnold, for example, also suggests that he can mail notifications to all PSL holders and then ask the PSL holders to certify whether the bought the PSL directly from the Rams. If yes, then that holder is a Rams PSL Class Member. If not, they would certify whether they upgraded PSLs. If yes, then they are a Rams PSL Member. If not, they would certify whether they received their PSL via transfer. If so, they are Rams PSL Members. If not, then the respondent is a FANS PSL holder. The Court is satisfied that

the FANS and Rams Classes can be manageably sorted.[3]  *See, e.g.*, *Hart v. BHH, LLC*, 15CV4804, 2017 WL 2912519, at *7 (S.D.N.Y. July 7, 2017) (certifying class dependent on class members answering questions in notice).

Finally, the Rams contend that the MMPA subclasses are unascertainable and unmanageable because it will be too difficult to determine --- as threshold inquires for MMPA claims --- which PSL holders are "natural persons" and which used their PSLs for "household purposes."  As the plaintiffs point out, the MMPA itself authorizes class actions.  § 407.025 RSMo.  The fact that some individual proof may be required does not prevent the plaintiffs from carrying their burden to show that common questions otherwise predominate.  *See Dale v. DaimlerChrysler*, 204 S.W.3d 151, 176 (Mo. App. 2006) (upholding certification of class of vehicle purchasers for MMPA claim despite need to determine whether vehicle was purchased for business or commercial purposes); *Jenkins v. Pech*, No. 8:14cv41, 2015 WL 3658261, at *8 (D. Neb. June 12, 2015) ("The court is persuaded by the rationale expressed in numerous cases that have held that the need to differentiate business from consumer debt is not an obstacle to class certification.").

### 2.    Predominance of Individual Issues

Next, the Rams suggest that individual issues predominate over common questions.  As for the breach of contract claim, the Rams reiterate their concerns about identifying the actual contract holder and identifying which contract terms apply (the

---

[3] In the Reply and Surreply briefing, the parties discuss the existence of an old, hundreds-of-pages-long spreadsheet from the Regional Sports Authority that purports to list FANS PSL holders at the time the Rams began selling their own PSLs.  The plaintiffs suggest that this list may be used as a cross-check of FANS PSL holders, but the Rams say it is unreliable.  It is unnecessary to discuss that list further, however, because the Court finds the class to be otherwise ascertainable and will certify the classes.

Rams Agreement or FANS Agreement). The Court has addressed those matters in the preceding section.

The Rams also point out that, with respect to the breach of contract claim, there are several ways PSL holders (class members) might have defaulted on the contracts, and thus the Rams say they have individual defenses. This argument fails. First, the Rams may have had the *option* to terminate PSL contracts for certain reasons, but, plaintiff say, if the Rams had exercised that option, then a given PSL holder would not be listed as having had a PSL at the end of the 2015 season. Second, the law is clear that

> When there are issues common to the class that predominate, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."

*Day*, 827 F.3d at 833 (quoting *Tyson*, 136 S.Ct. at 1045). The Court is convinced that common questions predominate for the breach of contract claims.

The Rams also contend that, as to McAllister's unjust enrichment claim, individual issues predominate because some class members did not pay any money to the Rams, which means no benefit was conferred as required by the elements necessary to support their claim. McAllister responds that his theory is that transferees all stepped into the shoes of the transferors and that the benefit to the Rams went with the PSL. (#297 at 21.) Setting aside for the moment the above-discussed premise that any transferred PSLs became subject to the Rams Agreement and not the FANS Agreement, the Court agrees with McAllister that if the Rams are correct that transferees have no claim for unjust enrichment, then the transferees will lose those claims "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Common questions predominate as to this claim.

The Rams also contend that individual questions predominate with respect to the MMPA claim because the class members must show that they used the PSLs for household purposes. As stated above, the fact that some individual proof may be required does not prevent the plaintiffs from carrying their burden to show that common questions otherwise predominate. *See Dale*, 204 S.W.3d at 176; *Jenkins*, 2015 WL 3658261 at *8. Further, in the event that some PSL holders did use their tickets for business purposes, the class can be narrowed by excluding PSL holders who deducted the cost of their PSLs or tickets for tax purposes.

The Rams also object that there is no classwide damages measure. Again, as explained above, the Supreme Court has indicated that "when there are issues common to the class that predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages…." *See Day*, 827 F.3d at 833 (quoting *Tyson*, 136 S.Ct. at 1045) (emphasis added). Regardless, the plaintiffs have in fact proposed classwide damages models. The Arnold/Envision plaintiffs propose a measure of damages based upon the value of PSLs in California, with damages to be based on what the PSLs would have been worth at the time the Rams first moved to Los Angeles. The Rams argue that the plaintiffs' remedy is to buy tickets, not to transfer their PSLs. That is an argument more suitable for summary judgment. The Arnold/Envision plaintiffs have met their burden with respect to class certification.

Finally, the Rams object that McAllister's proposed damages formula for a refund involving the purchase price of the PSL cannot support class certification. First, the Rams say that they do not have the data necessary to implement the formula, but the

Rams should be hard-pressed to hide behind their data systems' shortcomings to avoid class certifications. And, as this Court will again repeat, individual damages questions are not a bar to certification. *See Day*, 827 F.3d at 833 (quoting *Tyson*, 136 S.Ct. at 1045). The Rams further contend that transfers and upgrade information further complicates the damages issue, but it appears that transferred and upgraded PSLs resulted in the PSL being held according to the Rams Agreement, and thus no FANS Class Members will have upgraded or transferred tickets. The Court declines to certify a Rams Class for McAllister, so his damages formula applies only to FANS Class Members. The Rams' objections are without merit.

### 3. Inadequacy of Class Representatives

The Rams challenged the adequacy and typicality of the class representatives. As explained above, the class representatives must have "claims…typical of the claims…of the class" and the class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)-(4).

As to McAllister, the Rams contend that, although McAllister purchased a FANS PSL in 1995, when McAllister purchased an additional PSL from the Rams in 2005, he signed a Rams Agreement and listed both PSLs. The Rams thus suggest that McAllister is not a member of his own class. McAllister responds that the Rams can point to no document showing that the FANS Agreement was superseded or replaced by the Rams Agreement. This appears to be so, particularly because the transaction did not involve a transfer or an upgrade, but rather a simple purchase of a new, additional PSL from the Rams.

As for Envision plaintiffs Robert and Sue Bohm, the Rams contend that they are inadequate because one of their attorneys, David Bohm, is Robert's brother. The Rams suggest that the Bohms have a conflict of interest with their proposed classes as a result of that relationship: the close relationship between Robert Bohm and his brother may result in the plaintiff Bohm's inability to place the interests of the class above that of class counsel. Indeed, the Eighth Circuit has observed that

> In situations where there is a close familial bond between a class counsel and a class representative, it seems to us that there is a clear danger that the representative may have some interests in conflict with the best interests of the class as a whole when making decisions that could have an impact on attorney fees.

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1155 (8th Cir. 1999). Nonetheless, plaintiff Bohm states that his interests are not antagonistic with those of the class, and he cites numerous other class actions that have been certified despite such a relationship between a class representative and class counsel.

As discussed below, however, this alleged conflict is of no consequence because the Court will adopt the Arnold plaintiffs' class definition and appoint them as class representatives. Although the Court will appoint both Arnold's and Envision's counsel as class counsel, the Envision plaintiffs will be members of the class and not class representatives.

## C.     The Class Definitions

The Court is invited to certify two groups of classes --- the McAllister classes of both FANS and Rams PSL Holders, and either Arnold or Envision's definition of Rams PSL Holders. As explained above, the Court will certify classes and subclasses over the

Rams' objections. However, the Court now explains its choice to certify McAllister's FANS Class and Subclass and Arnold's Rams Class and Subclass.

### 1. McAllister's Proposed Class Definitions

As noted, the parties apparently agreed that Arnold and Envision would represent a class of Rams PSL holders while McAllister would represent the FANS PSL holders. Then, McAllister amended his motion for class certification to seek to represent classes of both FANS and Rams PSL holders. (#106; *see also* #222 (amending class definitions by interlineation).) McAllister asserts that the FANS Contract has been terminated as stated in this Court's order (#44) and that the Rams Contract has more recently been shown to be terminated by the Rams: when Rams PSL owners called the Rams' ticket office after the Rams announced season tickets were available, the ticketing agent told them "Those PSLs are no longer valid." (*See* #105 at 10.)

Both the Rams and the Arnold and Envision plaintiffs oppose McAllister's motion to certify a class of Rams PSL Holders. The Rams assert that McAllister is improperly trying to certify a class based on an unpleaded theory of recovery. Arnold and Envision argue that the Court has already ruled against McAllister's claim under the Rams Agreement.

The Court declines to certify McAllister's proposed Rams Class. McAllister cites witnesses who testify that the Rams told PSL holders that the Rams "PSLs are no longer valid." (#105 at 4.) This does not entitle McAllister to represent a class of Rams PSL Holders seeking to get their "deposits" back. The Rams have always maintained that both PSL contracts terminated when they moved to California. The fact that the Rams' ticket agents continue to say the contracts are "invalid" does not affect this Court's ruling

that the Rams Agreement entitled Rams PSL holders to activation of the Best Efforts

Clause --- not to a refund of deposits:

> The Licensees' remedy, although not the remedy sought by the McAllister
> plaintiff, is to obtain tickets to the transferred games in California through
> the Best Efforts provision.  The termination/refund provision is
> inapplicable.

(#44 at 12.)

McAllister's proposed class definition for the FANS PSL Holders will be certified

with modifications as follows:

> **FANS Class**.  All persons or entities who, at the conclusion of the 2015
> season, owned a PSL purchased from Fans, Inc. that was not later
> transferred or upgraded.

> **FANS MMPA Subclass**.  All natural persons who are members of the
> FANS Class and who never claimed the PSL expense as a tax deduction for
> business purposes.

McAllister will be appointed as class representative, and his counsel will be appointed

class counsel.

## 2.    Arnold/Envision Proposed Class Definition

The Arnold and Envision plaintiffs each propose definitions for a class and

subclasses.  The Court will certify a modified version of Arnold's proposed class

definition as manageable, ascertainable, and in accordance with the facts of the case.

> **Rams Class:**
> A) All persons or entities who:
>> 1) purchased PSLs directly from the Rams; or
>> 2) had any Rams or FANS PSL transferred to them; or
>> 3 upgraded their PSL tier; and
>
> B) purchased Rams season tickets through their PSLs for the 2015
> season; or

C) did not purchase Rams season tickets for the 2015 season but did not receive a PSL cancellation notice from the Rams.

**MMPA subclass:** All natural persons who are members of the Rams Class who purchased PSLs primarily for personal, family, or household purposes and who never claimed the PSL expense as a tax deduction for business purposes.

The Court will appoint the Arnold plaintiffs as class representatives. At the invitation of Arnold's counsel, counsel for both Arnold and Envision will be appointed as class counsel.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff Ronald McAllister's motion for class certification (#106, as amended #222) is GRANTED in part and DENIED in part. Plaintiff Ronald McAllister is appointed as Class Representative for the FANS Class and FANS MMPA Subclass. McAllister's attorneys, as listed on the motion, are appointed as counsel for the FANS Class and FANS MMPA Subclass.

**IT IS FURTHER ORDERED** that plaintiff Richard Arnold's motion for class certification (#167) is GRANTED in part and DENIED in part and plaintiff Envision's motion for class certification (#170) is GRANTED in part and DENIED in part. Plaintiffs Richard Arnold, R. McNeeley Cochran, and Brad Pearlman are appointed as Class Representatives for the Rams Class and Rams MMPA Subclass. Counsel for the Arnold and Envision plaintiffs, as listed on their motions for class certification, are appointed as counsel for the Rams Class and Rams MMPA Subclass.

Dated this __13th__ day of March 2018.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE