UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RONALD McALLISTER, | |
| Plaintiff, | Case Nos. 4:16-cv-00172-SNLJ |
| | 4:16-cv-00262 |
| v. | 4:16-cv-00297 |
| | CONSOLIDATED |
| THE ST. LOUIS RAMS, LLC, | |
| Defendant. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND INCORPORATED MEMORANDUM IN SUPPORT

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND .................................................................................................. 2

    A.     The Pleadings ........................................................................................... 2

        1.     Plaintiffs' Claims ......................................................................... 2

        2.     The Rams' Counterclaim and Third-Party Claim ....................... 4

    B.     The Course of This Litigation .................................................................. 4

        1.     Motions for Judgment on the Pleadings...................................... 4

        2.     Discovery ..................................................................................... 5

        3.     Expert Witnesses......................................................................... 5

        4.     Motions for Class Certification................................................... 6

        5.     Other Motion Practice ................................................................. 7

        6.     The Rams' Petition to Appeal..................................................... 9

        7.     Mediation .................................................................................. 10

III.   The Settlement Agreement ............................................................................... 11

    A.     The Classes ............................................................................................ 11

    B.     Monetary Relief for the Classes............................................................. 12

    C.     The Class Release .................................................................................. 13

    D.     The Notice Program ............................................................................... 13

    E.     Opt-Outs and Objections........................................................................ 14

F. The Claims Process ............................................................................. 15

G. Payment of Claims ........................................................................... 16

H. Class Representative Incentive Awards .......................................... 16

I. Attorneys' Fees and Costs ............................................................... 17

IV. ARGUMENT ............................................................................................. 17

A. The Settlement Should Be Approved ............................................. 17

1. The Settlement Agreement Meets the New Rule 23(e) Factors ............... 20

a. The Court Will Likely Be Able to Approve the Proposal Under 23(e)(2) ................................................................... 20

b. Class Certification ....................................................... 33

B. The Class Notice Should Be Approved. .......................................... 33

1. Manner of Notice ....................................................... 34

2. Contents of Notice ....................................................... 36

V. FINAL FAIRNESS HEARING ................................................................ 37

VI. CONCLUSION .......................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Boeing Co. v. Van Gemert,*
   444 U.S. 472 (1980) ...................................................................... 22

*Burnett v. Griffith,*
   769 S.W.2d 780 (Mo.1989) ........................................................... 25

*Chong v. Parker,*
   361 F.3d 455 (8th Cir. 2004) .................................................... 25, 30

*Claxton v. Kum & Go, L.C.,*
   2015 WL 3648776 (W.D. Mo. June 11, 2015) ............................. 25

*Galloway v. Kansas City Landsmen, LLC,*
   833 F.3d 969 (8th Cir. 2016) ........................................................ 23

*Grannan v. Alliant Law Grp., P.C.,*
   2012 WL 216522 (N.D. Cal. Jan. 24, 2012) ................................. 34

*Hammer v. JP's Sw. Foods, L.L.C.,*
   2010 WL 11509076 (W.D. Mo. Sept. 20, 2010) ........................... 35

*Hashw v. Dep't Stores Nat'l Bank,*
   182 F. Supp. 3d 935 (D. Minn. 2016) ........................................... 35

*Huyer v. Njema,*
   847 F.3d 934 (8th Cir. 2017) ....................................... 26, 27, 28, 29

*In re Merrill Lynch Tyco Research Sec. Litig.,*
   249 F.R.D. 124 (S.D.N.Y. 2008) .................................................. 33

*In re Target Corp. Customer Data Sec. Breach Litig.,*
   892 F.3d 968 (8th Cir. 2018) ........................................................ 18

*In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig.,*
   716 F.3d 1057 (8th Cir. 2013) ......................................... 17, 18, 29

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.,*
   396 F.3d 922 (8th Cir. 2005) .................................................. Passim

*In re Wireless Telephone Federal Cost Recovery Fees Litigation,*
   2004 U.S. Dist. LEXIS 23342, *26 (W.D. Mo. April 20, 2004) ............ 35

*Keil v. Lopez*,
   862 F.3d 685 (8th Cir. 2017) ................................................................. 21-22, 29

*Komoroski v. Util. Serv. Partners Private Label, Inc.*,
   2017 WL 3261030 (W.D. Mo. July 31, 2017) .......................................... 18

*Little Rock School District v. Pulaski County Special School District No. 1*,
   921 F.2d 1371 (8th Cir. 1990) ............................................................ 17-18

*Marshall v. National Football League*,
   787 F.3d 502 (8th Cir. 2015) ...................................................................... 29

*McKeage v. Bass Pro Outdoor World, L.L.C.*,
   2014 WL 12754996 (W.D. Mo. Oct. 7, 2014) ......................................... 33

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ................................................................... 25

*Schoenbaum v. E.I. Dupont De Nemours & Co.*,
   2009 WL 4782082 (E.D. Mo. Dec. 8, 2009) ............................................ 18

*Van Horn v. Trickey*,
   840 F.2d 604 (8th Cir. 1988) ............................................... 18, 19, 21, 29


**Statutes**

Mo. Rev. Stat. § 407.010 *et seq.* ................................................................. 3

Mo. Rev. Stat. § 407.020 ........................................................................... 22

Mo. Rev. Stat. § 537.675.3 ......................................................................... 25


**Rules**

Fed. R. Civ. P. 23 ....................................................................... 17, 18, 36, 37

Fed. R. Civ. P. 23(a)(4) ............................................................................. 20

Fed. R. Civ. P. 23(b)(3) ............................................................................. 33

Fed. R. Civ. P. 23(c)(2)(B) .................................................................. 33, 36

Fed. R. Civ. P. 23(c)(3) ............................................................................. 36

Fed. R. Civ. P. 23(e) ................................................................... 17, 19, 20, 34

Fed. R. Civ. P. 23(e)(1) ..................................................................... 20, 33

Fed. R. Civ. P. 23(e)(1)(B) ............................................................ 19, 20, 33

Fed. R. Civ. P. 23(e)(1)(B)(i) ................................................................. 33

Fed. R. Civ. P. 23(e)(2) ....................................................... 19, 20, 33, 37

Fed. R. Civ. P. 23(e)(2)(A) ........................................................................ 20

Fed. R. Civ. P. 23(e)(2)(B) ........................................................................ 20

Fed. R. Civ. P. 23(e)(2)(C) ................................................................... 21, 29

Fed. R. Civ. P. 23(e)(2)(C)(i) .............................................................. 26, 29

Fed. R. Civ. P. 23(e)(2)(C)(ii) ................................................................. 30

Fed. R. Civ. P. 23(e)(2)(C)(iii) ........................................................... 30, 31

Fed. R. Civ. P. 23(e)(2)(C)(iv) ................................................................. 31

Fed. R. Civ. P. 23(e)(2)(D) ........................................................................ 31

Fed. R. Civ. P. 23(e)(3) ........................................................... 11, 19, 21

## Other Authorities

3 Newberg on Class Actions, § 8:6 (5th ed. 2018) ....................................... 33

3 Newberg on Class Actions, § 8:15 (5th ed. 2018) ..................................... 34

4 Newberg on Class Actions § 13:10 (5th ed. 2018) .................................... 18

5 Newberg on Class Actions § 15:72 (5th ed. 2018) .................................... 23

Manual for Complex Litigation (Fourth), § 21.632 (2014) ........................... 34

Manual for Complex Litigation (Fourth), § 21.634 (2014) ........................... 37

T. Eisenberg, M. Heise *et al.*, *The Decision to Award Punitive Damages: An Empirical Study*,
    2 J. Legal Analysis 57, 57 (2010) (2010) ............................................. 25

W. Rubenstein, Newberg on Class Actions § 13:12 (5th ed. 2007) ............................................. 18

Plaintiffs Ronald McAllister, Richard Arnold, R. McNeeley Cochran, and Brad Pearlman ("Plaintiffs") are pleased to bring the Court a class-action settlement ("Settlement") that will provide each Class Member making a valid claim a substantial cash payment in the hundreds or thousands of dollars depending on the seat location of their Personal Seat License(s) ("PSL"). This is an excellent outcome for both Classes. Accordingly, Plaintiffs request that the Court enter an Order (1) approving the Settlement as fair, reasonable and adequate, (2) approving a Claims Administrator, (3) preliminarily approving the form, manner and content of the Class Notice; and (4) setting the date of the Fairness Hearing for no earlier than 120 days from the date preliminary approval is granted. In support thereof, Plaintiffs state the following:

## I.      INTRODUCTION

The proposed Settlement is fair, reasonable and adequate. It is the product of extensive arm's-length negotiations between counsel for Plaintiffs and Defendant The St. Louis Rams, LLC ("Defendant" or "the Rams"), with the assistance and guidance of the Honorable William Ray Price, Jr., as mediator. The Court should grant preliminary approval because the Settlement provides substantial monetary relief to the Class and avoids the inherent risks, delays and expense associated with continued, protracted class action litigation. As explained below, the terms are consistent with applicable case law, and easily satisfy all applicable criteria for preliminary approval.

Each Class Member making a valid claim will receive a sizable cash payment based on an agreed schedule. That payment will amount to 30% of the price of their PSLs (in other words, the PSLs' face value), up to a total of $12 million for each of the two Classes ($24 million total), a cap that is very unlikely to be exceeded. For members of the FANS Class, this will represent a pro-rata refund based on the remaining years of their PSLs and is the entire amount of their claim

for damages for breach of contract. *See Class* Action Complaint, Doc. #1, ¶92. For the Rams Class, their cash recovery closely tracks their damages as calculated by their damages expert. Moreover, the benefits to the Classes are enhanced because they will receive their payments with no deduction for attorneys' fees, legal expenses, settlement administration expenses, or class representative service payments. The Rams have agreed to pay those fees and costs separately.

In sum, this is a robust Settlement that provides substantial benefits to tens of thousands of St. Louis Rams PSL holders. As explained below, the parties have established all necessary prerequisites for preliminary approval, as set forth by case law in the Eighth Circuit.

## II.    BACKGROUND

### A.  The Pleadings

#### 1.  Plaintiffs' Claims

These actions arise out of two form contracts by which Plaintiff and thousands of others bought PSLs entitling them to buy season tickets to St. Louis Rams home football games.  The first of these contracts, called the "FANS Agreement," was used by a civic organization, called FANS, Inc., to sell PSLs from the time of the Rams' move to St. Louis before the 1995 season until March 1996. Thereafter, the Rams sold PSLs pursuant to a similar contract, called the "Rams Agreement." Under both contracts, PSLs were priced the same, with face values of $250, $500, $1,000, $2,500, $3,000, and $4,500 per PSL depending on the location (or "tier") of the seat.

The contracts extended the right to buy season tickets through 2024 (a 30-year term for those who bought PSLs when the Rams came here in 1995). However, when the Rams left for Los Angeles after the 2015 season, they provided nothing to their PSL owners, neither a refund for the unused years nor the right to use the PSLs to buy tickets in the team's new home.

2

Plaintiffs brought two separate lawsuits to enforce these contracts. These cases were subsequently consolidated, along with two other cases, *Pudlowski, et al. v. The St. Louis Rams, LLC, et al*., No. 4:16-cv-00189-RLW (E.D. Mo.) and *Envision, LLC, et al. v. The St. Louis Rams, LLC*, No. 4:16-CV-00262-CDP (E.D. Mo.).[1] Docs. #33 and #47.

Plaintiff McAllister filed his case in this Court on February 19, 2016. Doc. #1. He brought claims for breach of both the FANS and Rams Agreements, as well as unjust enrichment based on the alternative claim that the contracts were illusory and void, along with claims for money had and received, breach of the implied covenant of good faith and fair dealing and violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq.* On behalf of himself and a putative class of PSL owners, he based his contract claim on the allegation that the Rams had terminated the contracts when they moved from St. Louis and had breached Paragraphs 7.A of the FANS Agreement and 6.A of the Rams Agreement. Those provisions require that, in the event of termination, the Rams refund all or part of the licensee's deposit. He sought as damages a refund of a pro rata portion of the amount paid for the PSLs. For FANS PSLs, which were unusable for the last nine years of their 30-year term, that meant a refund of 30% of what they had paid. He also sought interest, costs and attorneys' fees.

Plaintiffs Arnold and Cochran (later joined by Mr. Pearlman, Doc. #84, and collectively referred to as "the *Arnold* Plaintiffs") sued in the Circuit Court of St. Louis County on January 29, 2016. The Rams removed their case to this Court on March 4, 2016. The *Arnold* Plaintiffs initially brought a claim for breach of contract under both agreements, later amended to add a claim for violation of the MMPA (and to limit the claim to one based on the Rams Agreement). (Doc. #131.) On behalf of themselves and other PSL holders, they based their claim on the

---

[1] *Pudlowski* was subsequently remanded to the Circuit Court of the City of St. Louis. Doc. #358. The plaintiffs' allegations in *Envision* were similar to those in *Arnold*, but the Court did not appoint the *Envision* plaintiffs as Class Representatives. Accordingly, they are not parties to the Settlement Agreement.

Rams' alleged breach of Paragraph 7, which required the Rams to use their "best efforts" to ensure PSL holders the right to purchase tickets wherever the Rams played their home games, be it St. Louis or somewhere else. They sought unspecified damages, along with attorneys' fees and interest.

### 2. The Rams' Counterclaim and Third-Party Claim

On July 6, 2017, the Rams filed a motion for leave to file (a) a counterclaim against Mr. McAllister for a declaratory judgment that the Regional Convention and Visitors Commission ("CVC"), not the Rams, are liable to him under the FANS PSLs and (b) a third party complaint against CVC for indemnity on the claims of the FANS Class. Docs. #132 and #133. No one opposed the motion for leave, and the Court granted it. Doc. #148.

### B. The Course of This Litigation

From the beginning, these lawsuits have been hotly contested. They have been marked by frequent motions filed by both sides.

### 1. Motions for Judgment on the Pleadings

Shortly after answering the Complaints, the Rams filed a motion for judgment on the pleadings in *Arnold* and *Envision.* While that motion was pending, on July 21, 2016, Mr. McAllister filed a motion for partial judgment on the pleadings as to liability. On September 21, 2016, the Court granted the Rams' motion as to the FANS Agreement, but denied it as to the Rams Agreement. Doc. # 44. Thus, the Court dismissed the *Arnold* Plaintiffs' claims under the FANS Agreement, but not their claims under the Rams Agreement. At the same time, the Court granted Mr. McAllister's motion for judgment on the pleadings as to the FANS Agreement but denied it as to the Rams Agreement. On October 3, 2016, the Rams moved for reconsideration of the portion of the order granting Mr. McAllister's motion as to the FANS Agreement. They argued that a factual question existed as to whether FANS, Inc., was the Rams' agent. Doc. #45.

4

On December 14, 2016, the Court sustained that motion and vacated its order granting Mr. McAllister judgment on the pleadings. Doc. #63.

### 2. Discovery

Subsequently, the Court held a Rule 16 conference, and discovery began in early 2017. The parties exchanged responses to written discovery and produced thousands of pages of documents, including the Rams' hard copy records on the Plaintiffs, electronic spreadsheets regarding all PSL holders, and various contracts the Rams had entered into with third parties. The parties also obtained more than 22,000 pages of documents from CVC, the Regional Sports Authority, and PriceWaterhouseCoopers, related to the early years of the PSL program, as well as documents from STR Marketplace, LLC, related to the Rams' communications following their relocation. The Rams deposed eight Plaintiffs in May 2017, and Plaintiffs took Rule 30(b)(6) depositions of Kevin Demoff, the Rams' Chief Operating Officer, in July 2017 and January 2018. In addition, in March 2018 the *Arnold* Plaintiffs deposed Greg Kish of Legends, the consulting group that the Rams hired to price their PSLs in Los Angeles.

### 3. Expert Witnesses

In July 2017, the Rams designated Bruce A. Strombom, Ph. D., an economist and Managing Principal of Analysis Group, a national economic, financial and strategy consulting firm, as an expert witness on class certification and produced his expert report. Plaintiffs took his deposition on July 20 and 21, 2017

Subsequently, Mr. McAllister designated Brian Kriegler, Ph. D., a statistician and Managing Director of Econ One Research, Inc., a national economic and statistical consulting firm, as a rebuttal expert on class certification and produced his expert report. The Rams deposed him on September 19, 2017.

### 4. Motions for Class Certification.

Mr. McAllister filed a motion for class certification on December 12, 2016, supplemented on December 19, 2016, an amended motion on April 19, 2017, and an amendment on September 21, 2017; he eventually sought to represent a class of PSL owners under both contracts. Docs. #62, #62-1, #70, #105, #106, and #222. The Arnold and Envision Plaintiffs filed separate motions for class certification on August 3, 2017, limited to Rams PSL owners. Docs. #167, 168-1, #170, and #171. The Rams filed separate responses to the *McAllister* and *Arnold/Envision* motions. Docs. #257, #263. Each Plaintiffs' group filed a reply brief. Docs. # 290, # 292-1, 294. With leave of Court, each of the parties' memoranda exceeded the page limitations of the Court's local rules. The Rams responded to the reply briefs in a Sur-Reply. Doc. #309.

On March 13, 2018, the Court granted the motions in part and denied them in part. Doc. #355. The Court certified a class in the *McAllister* case for FANS PSL Holders, as follows:

> **FANS Class**. All persons or entities who, at the conclusion of the 2015 season, owned a PSL purchased from Fans, Inc. that was not later transferred or upgraded.

> **FANS MMPA Subclass**. All natural persons who are members of the FANS Class and who never claimed the PSL expense as a tax deduction for business purposes.

*Id.* 22. The Court appointed Mr. McAllister as Class Representative and his attorneys as Class Counsel. At the same time, the Court denied Mr. McAllister's request to certify his proposed Class of Rams PSL holders. The Court ruled that "the Rams Agreement entitled Rams PSL holders to activation of the Best Efforts Clause – not to a refund of deposits." *Id.* 22.

The Court also certified a modified version of the *Arnold* Plaintiffs' proposed class, as follows:

> **Rams Class:**

> A) All persons or entities who:

> 1) purchased PSLs directly from the Rams; or
>
> 2) had any Rams or FANS PSL transferred to them; or
>
> 3) upgraded their PSL tier; and
>
> B) purchased Rams season tickets through their PSLs for the 2015 season; or
>
> C) did not purchase Rams season tickets for the 2015 season but did not receive a PSL cancellation notice from the Rams.
>
> **MMPA subclass:** All natural persons who are members of the Rams Class who purchased PSLs primarily for personal, family, or household purposes and who never claimed the PSL expense as a tax deduction for business purposes.

*Id.* 22-23. The Court appointed the *Arnold* Plaintiffs as Class Representatives and their counsel, as well as the *Envision* attorneys, as Class Counsel.

On April 4, 2018, Mr. McAllister moved to amend his class definition to include former season ticket holders. Doc. # 367. After that motion was fully briefed (*see* Docs. #371 and #374) the Court granted it and redefined the FANS class definition as follows:

> **FANS Class**. All persons or entities who, at the conclusion of the 2015 season, owned a PSL purchased from Fans, Inc. that was not later transferred or upgraded and who (a) had purchased Rams season tickets through their PSLs for the 2015 season or (b) did not purchase Rams season tickets for the 2015 season but did not receive a PSL cancellation notice from the PSL Licensor.

Doc. #375 at 3.

### 5. Other Motion Practice

In addition to the above, the parties engaged in active and hotly disputed motion practice. (Plaintiffs omit some discovery motions from this discussion.)[2]

---

[2] Although it did not involve Plaintiffs, on August 9, 2017, the Rams filed a motion to compel arbitration of their claim against CVC. Docs. #183 and #184. That motion was fully briefed (*see* Docs. #206, #217, #218) and granted on November 17, 2017. Doc. #276.

**Rams Motion for Stay.** On the same date that the Rams moved to file their counterclaim and third-party claim, they asked the Court to stay these proceedings pending an arbitration with CVC. Doc. #134, #135 and #153. Plaintiffs opposed this motion, which would have brought the case to a standstill. Docs. #176, #143-1. The Court granted the motion as between the Rams and CVC, but otherwise denied it and allowed the case to continue. Doc. #180.

**McAllister Motion for Partial Summary Judgment.** On August 28, 2017, Mr. McAllister moved for partial summary judgment and reinstatement of partial judgment as to liability on the breach of contract claim under the FANS Agreement. Docs. #208-#210. He argued that the evidence established, as a matter of law, that the Rams had appointed FANS, Inc. as their agent in the sale, granting and administering of the FANS PSLs and that the Rams were the successor-in-interest to the FANS PSL agreement after FANS, Inc. was dissolved in 1998. The Rams opposed the motion (Doc. #233), and Plaintiff replied. Doc. #274. The Court denied the motion on March 13, 2018. Doc. #354. It ruled that Mr. McAllister had presented "at best, disputed issues of fact with respect to the three elements of an agency relationship ...." *Id.* 6. For the same reason, the Court denied Mr. McAllister's successor-liability argument. *Id.* 12.

**McAllister Motion to Dismiss Counterclaim.** On the same day that Mr. McAllister filed his summary-judgment motion, he moved to dismiss the Rams' Counterclaim. Doc. #211 and #212. He argued, in part, that the Counterclaim was redundant of defenses that they had asserted in their Answer. The Rams opposed the motion (Doc. 234), and Mr. McAllister replied. Doc. #273. On March 23, 2018, the Court granted the motion. Doc. #362.

**Arnold Third Motion to Compel.** Because of the Rams' alleged discovery abuses, including the failure to produce documents and answer interrogatories, the *Arnold* Plaintiffs moved to compel the Rams to comply with their discovery obligations. Doc. #321 and #322

8

(filed 2/6/2018). In opposing the motion, the Rams argued that the discovery requests had been overbroad. Doc. #344. The *Arnold* Plaintiffs filed a reply brief. Doc. #346. On April 12, 2018, the Court granted the motion, except as to certain respects that the *Arnold* Plaintiffs had not pursued, and ordered that the Rams produce their Los Angeles-based Chief Operating Officer, Kevin Demoff, for re-deposition in St. Louis. Doc. #372. (The parties held that deposition in abeyance pending mediation.)

**McAllister Motion for Sanctions.** On March 12, 2018, Mr. McAllister moved for sanctions against the Rams for producing an allegedly unprepared witness to testify on its behalf under Rule 30(b)(6) concerning his claim under the Rams Agreement. Docs. #351 and #352. The Rams opposed the motion. Doc. #357. In light of the Court's decision on class certification, ruling against Mr. McAllister on this claim, he withdrew the motion. Doc. 360.

**Rams Motion to Stay Pending Petition to Appeal.** The Rams moved to stay the action pending their Rule 23(f) Petition to appeal the class certification order. Doc. #365. Plaintiffs opposed the motion, and the Rams replied. Docs. #368 and #369. The Court denied the motion on April 9, 2018. Doc. #370.

### 6.  The Rams' Petition to Appeal

The Rams sought to overturn the Court's class-certification order in a request for permission to appeal filed in the Eighth Circuit on March 27, 2018. *The St. Louis Rams, LLC v. McAllister*, No. 18-8001 (8th Cir.). Plaintiffs responded on April 6 (McAllister) and April 9 (Arnold). In light of the Court's modification of the FANS Class definition, the Rams filed a motion to submit an amended petition exceeding the Court's word limitation, which Plaintiffs opposed. While this motion and the underlying Petition were pending, the parties agreed to mediate. On May 10, 2018, they therefore asked the Eighth Circuit to hold the Petition in abeyance while they tried to settle these cases. The Court granted that request and has held the Petition in abeyance.

### 7.  Mediation

This settlement results from a lengthy mediation process, with three mediation sessions spaced over a year apart. On February 28, 2017, the Court referred these cases to Alternative Dispute Resolution. Doc. #83. The parties selected the Honorable William Ray Price, Jr., former Chief Justice of the Missouri Supreme Court and currently with Armstrong Teasdale LLP, as the neutral. The parties held a mediation session before Judge Price on April 21, 2017, but broke off discussions when it was clear that the cases could not then be settled.

After the Court's class-certification order, the parties decided to resume their efforts to settle, once again with Judge Price as mediator. On May 10, 2018, the Rams filed a consent motion to stay the cases pending the mediation, which the Court granted. Docs. #376 and #377. This case has been stayed since then. To assist in the negotiations, the Rams allowed Mr. McAllister's consultants to inspect approximately 63 boxes of hard-copy PSL records and to make and retain digital copies of records contained in a sample of 10 of those boxes.

The parties conducted their second mediation session on June 21, 2018. That session was unsuccessful, and the parties agreed to continue settlement discussions; to aid negotiations, the *Arnold* Plaintiffs agreed to allow a limited exchange of information regarding their expert's opinions, including communicating with the expert directly.

The parties conducted their final mediation session on July 20, 2018. After a long day, the parties reached agreement. They agreed on a claims-made process, with a mandatory verified claim form for any Class Member seeking an award, pursuant to which the Rams agreed to pay up to a cap of $24 million ($12 million for each Class). The Rams insisted on (and Plaintiffs thought reasonable) a claims-made process in light of their indemnity claim against CVC regarding the FANS Class. That claim requires them to determine conclusively whether a PSL owner is a FANS Class Member or Rams Class Member, something they could not do from their

10

electronic data. The parties agreed that notice would be provided via email and postcard to those listed in two spreadsheets of PSL account holders maintained by the Rams, one with those who had purchased season tickets through the 2015 season and the other with those with active PSLs through at least the 2006 season who thereafter did not renew their season tickets. Notice would also be made by publication in the St. Louis *Post-Dispatch*. The parties agreed that they would have the right to challenge the class membership of any individual claimant.

Only after parties agreed to those terms did they discuss the payment of attorneys' fees and costs. The Rams agreed that they would pay a capped amount of attorneys' fees, costs, and incentive awards to the class representatives, as approved by the Court. These amounts would not come out of the $24,000,000 cap available to be paid to Class Members and, therefore, would not diminish Class Members' recovery.

### III.    The Settlement Agreement

Following the mediation, the parties continued to engage in arm's-length negotiations over the terms of a formal Settlement Agreement ("Sett. Agrt."). Those discussions continued for four months before the parties memorialized their Settlement Agreement, which is attached hereto as Ex. 1, as contemplated by Rule 23(e)(3).[3] Here is a summary of its most important terms.

### A.  The Classes

The classes are precisely what the Court certified:

> "FANS Class" or "FANS Class Members" means all persons or entities who, at the conclusion of the 2015 NFL football season, owned a PSL purchased from FANS, Inc. that was not later transferred or upgraded and who (a) had purchased Rams season tickets through their PSLs for the 2015 season or (b) did not purchase Rams season tickets for the 2015 season but did not receive a cancellation notice from the PSL licensor.

---

[3] Exhibit 1 is an unexecuted copy of the Settlement Agreement. We will supplement with an executed copy when we receive the Rams' signatures, which the Rams have indicated are forthcoming.

***

"Rams Class" or "Rams Class Members" means:

A)      All persons or entities who:

       1)      purchased PSLs directly from the Rams; or

       2)      had a Rams or FANS PSL transferred to them; or

       3)      upgraded their PSL tier; and

B)      purchased Rams season tickets through their PSLs for the 2015 season; or

C)      did not purchase Rams season tickets for the 2015 season but did not receive a PSL cancellation notice.

Sett. Agrt. ¶¶ II. Z and YY.

PSL owners may opt out of the Classes, in which case they will not be bound by any orders or judgments in this case, not be entitled to relief, and not be affected under the Settlement Agreement. Those who opt out will also not release any claims by virtue of the Settlement Agreement, or be entitled to object to it. *Id.*, ¶ III.G.

### B.  Monetary Relief for the Classes

Subject to a damages cap and on a claims-made basis, the Rams will pay each Class Member an amount based on the tier price of their PSLs, as follows:

| PSL Tier Price in the Stadium | Pay-Out for Qualified Claim |
|---|---|
| $250 | $75 |
| $500 | $150 |
| $1,000 | $300 |
| $2,500 | $750 |
| $3,000 | $900 |
| $4,500 | $1,350 |

Sett. Agrt., ¶ III.A.1. The Rams' payments are subject to a cap of $12 million per Class, or $24 million altogether. *Id.* In the extremely unlikely event that the claims exceed the cap, then

12

individual payments to the affected Class will be reduced pro rata so that the pay-out to the Class will not exceed $12 million. The pro rata adjustment will be as approved by Judge Price. *Id.*

### C.  The Class Release

All Class Members (*i.e.*, putative Class Members who do not opt out), will release the Rams from claims related to the subject matter of this case. The detailed release language can be found in Section III.D of the Agreement.

### D.  The Notice Program

The parties have chosen RG/2 Claims Administration ("RG/2") to serve as the Claims Administrator. RG/2, one of the leading class action notice and administration firms in the country, is highly experienced in class action settlement notice and administration. *See* https://www.rg2claims.com/ (accessed 12/1/2018).

The Notice program will use the most recent contact information in the Rams' possession to provide individual email and regular mail (postcard) notice within 21 days after Preliminary Approval. Sett. Agrt, ¶¶ II.H. and III.F.1 and 2. In addition, publication notice will be provided in the St. Louis *Post-Dispatch* sports section on three successive Sundays in 1/8 page format, and a "Long Form Notice" will be available on a website. These Notices, which are attached to the Settlement Agreement as Exs. 1, 2, 3 and 4, will apprise the Classes of the nature of the lawsuits, the class definitions, and the Classes' claims and Rams' defenses. The Notices will also explain the binding effect of the settlement on Class Members who do not opt out and that the Class Member (a) may enter an appearance through an attorney, (b) will be excluded upon request (and the time and manner for so requesting), and (c) may object to the settlement (and if so, how). Additionally, the Notices will apprise Class Members of what they will receive, how and when to make a claim, and the date and location of the final fairness hearing.

Within 10 days of Preliminary Approval, the Claims Administrator will create and maintain a website (www.RamsPSLClassActionSettlement.com) with links to the Settlement Agreement, the terms and conditions of the two PSL Agreements, the Long Form Notice, the Claim Form (which may be filled out and submitted online), and Class Counsel's contact information. Sett. Agrt., ¶ III.F.4. There will also be information to assist Class Members in determining whether they have a claim, and, if so, its amount; that material will include the Transfer Form, the Cancellation Notice, and a stadium diagram with PSL tiers, such as this:[4]



The Settlement Parties shall jointly approve the website in advance of posting on the internet. *Id.* The Rams will pay all the fees and expenses of the Claims Administrator. Sett. Agrt., ¶ III.A.2.

**E.  Opt-Outs and Objections**

Putative Class Members will have 75 days after the Preliminary Approval Date to opt out of their Class or object to the settlement. Sett. Agrt., ¶ II.NN, OO. For the procedures for opting out or objecting, *see* Sett. Agrt., ¶ III.G.

---

[4] This diagram is taken from one of the documents cited in the Settlement Agreement. Plaintiffs anticipate that extraneous information, such as "2011 Season Prices," will be removed from the version posted on the website.

### F.  The Claims Process

The "Claim Period" begins with the giving of Notice and ends 60 days after the Approval Hearing. Sett. Agrt., ¶ II.I. To recover, a Class Member must, during the Claim Period, submit to the Claims Administrator a completed Claim Form. The Claim Form will be available on the Settlement Website for either printing and mailing or for submission online and will require that Class Members set forth their current address, contact information, social security number or taxpayer identification number (for tax reporting purposes), and an attestation under penalty of perjury to all of the information submitted (Ex. E thereto). To show their eligibility, FANS Class Members must indicate (1) that the PSL was purchased on or before March 31, 1996 (before the Rams' 2nd season in St. Louis)[5] and (2) that the Class Member (a) did not obtain the PSL by transfer from another PSL owner, (b) did not upgrade to a higher PSL tier, (c) never sold the PSL or gave it away, and (d) used the PSL to buy season tickets for the 2015 season or never received a written cancellation notice; Rams Class Members must indicate that (1) the PSL was bought on or after April 1, 1996, received by transfer from another owner or upgraded to a higher price tier and (2) the Class Member either used the PSL for 2015 season tickets or never received a written cancellation notice from the Rams. For both PSLs, the Class Member will indicate the number of PSLs at each tier level. (Ex. E thereto.)

The Claims Administrator will conclusively determine the timeliness of the submission. Sett. Agrt., ¶ III.B.2. Within seven days of receipt, the Claims Administrator will forward the completed Claim Form to the Settlement Parties. *Id.*, ¶ III.B.3. Within 14 days of its receipt, the Claims Administrator will determine whether the Claimant has submitted a Qualified Claim (*i.e.*, eligible to receive an award), and, if so, whether the Claimant is a member of the FANS Class, the Rams Class or both, the amount of any Award and how much of the Award is attributable to

---

[5] This is the date after which FANS Inc. stopped selling PSLs.

the FANS Class cap or the Rams Class cap; the Claims Administrator will also give written notice of that determination to counsel for the Rams, the Classes and CVC. *Id.*, ¶ III.B.4. In the event of an incomplete claim, the Administrator will notify Class Counsel and the Claimant, who will have seven business days to provide the missing information. *Id.*, ¶ III.B.4, 5. Counsel for a party will have 30 days to challenge the Administrator's determination, with counsel for other parties given 14 days to respond to the challenge. *Id.*, ¶ III.B.6. All challenges will be conclusively decided by Judge Price based on specified criteria. *Id.*, ¶ III.B.6.

Within 160 days after the Approval Hearing, the Claims Administrator will provide a Final Qualified Claimant List to the Settlement Parties' counsel, consisting of such information as the complete and final list of Claimants with Qualified Claims, the Class to which they belong, the amounts of their Awards, and the amount of any pro rata adjustment. *Id.*, ¶ III.B.8.

### G.  Payment of Claims

Within 14 days of the delivery of the Final Qualified Claimant List, the Rams will deposit into an interest-bearing escrow account administered by the Claims Administrator the full amount needed to pay all Qualified Claims. Sett. Agrt., ¶ III.A.6. If the Effective Date (the date on which the Court's Final Order and Judgment become final, *id.*, ¶ II.U) has occurred, the Administrator will send payments to each approved Claimant within 30 days after providing the Final Qualified Claimant List. Otherwise, the Administrator will send payments to each approved Claimant within 30 days after the Effective Date. *Id.*, ¶ III.C.

### H.  Class Representative Incentive Awards

Class Counsel will ask the Court to approve incentive awards of $20,000 each for Messrs. McAllister and Arnold, $7,000 for Mr. Cochran, and $3,000 for Mr. Pearlman, totaling $50,000. These awards will compensate them for the substantial time and effort they devoted to this litigation, including responding to interrogatories, producing documents, testifying in deposition,

attending the mediation sessions, and communicating regularly with counsel. The Rams have agreed not to oppose a request for incentive awards of $50,000 in the aggregate and have agreed to pay the lesser of that amount or the incentive awards approved by the Court. Sett. Agrt., ¶ III.A.3. This amount will *not* be applied to the settlement caps of $12 million to each Class. *See id.*, ¶¶ II.FF. and III.A.1.

## I. Attorneys' Fees and Costs

The Rams will not oppose Class Counsel's request for attorneys' fees totaling $7,200,000 (30% of the aggregate cap of $24 million and about 23% of the total amount that the Rams will make available to Class Members and Attorneys) and costs pursuant to Fed. R. Civ. P. 23 totaling $200,000. They have agreed to pay the lesser of those amounts or the total amount of fees and costs awarded by the Court. Sett. Agrt., ¶ III.A.4. The fee award will be paid within 14 days of the Effective Date and will *not* be applied to the settlement caps. *Id.* ¶ III.H.1 Thus, these fees and costs will not reduce the individual payments that each approved Claimant will receive. Plaintiffs will submit their request for attorneys' fees and costs in a separate motion.

## IV.   ARGUMENT

## A.  The Settlement Should Be Approved

Fed. R. Civ. P. 23(e) requires judicial review to determine that any "[s]ettlement, [v]oluntary [d]ismissal, or [c]ompromise" of the claims, issues, or defenses of a certified class is "fair, reasonable, and adequate." In reviewing proposed class settlements, courts begin with the guiding principle that "a class action settlement is a private contract negotiated between the parties" and is "presumptively valid." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005); *In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013); *see also Little Rock School District v. Pulaski County*

17

*Special School District No. 1*, 921 F.2d 1371, 1388 (8th Cir. 1990) ("A strong public policy favors agreements, and courts should approach them with a presumption in their favor."). The court's role in reviewing a negotiated class settlement is simply to "ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." *In re Wireless*, 396 F.3d at 934.

Procedurally, approval of a settlement involves "a three-step process." *Komoroski v. Util. Serv. Partners Private Label, Inc*., 2017 WL 3261030, at *1 (W.D. Mo. July 31, 2017) (quoting W. Rubenstein, Newberg on Class Actions § 13:12 (5th ed. 2007)). The three steps are preliminary approval, notice to the class of the proposed settlement (with an opportunity for class members to opt out or object) and final approval. 4 Newberg on Class Actions § 13:10 (5th ed. 2018).

Substantively, prior to the recent amendments to Rule 23, which went into effect on December 1, 2018, the Eighth Circuit required a district court to consider four factors in determining whether a settlement was fair, adequate and reasonable: (1) the merits of the plaintiff's case, weighted against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *In re Uponor,* 716 F.3d at 1063 (quoting *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988)). These are called the "*Van Horn* factors." *See In re Target Corp. Customer Data Sec. Breach Litig*., 892 F.3d 968, 978 n. 8 (8th Cir. 2018). Prior to the 2018 amendments, "[a]t the preliminary approval stage, the 'fair, reasonable, and adequate' standard [was] lowered, with emphasis only on whether the settlement [was] within the range of possible approval due to an absence of any glaring substantive or procedural deficiencies." *Schoenbaum v. E.I. Dupont De Nemours & Co*., 2009 WL 4782082, at *3 (E.D. Mo. Dec. 8, 2009). The amendments changed

that provision. Now before sending notice of the settlement to the class, the Court must find the following:

> [G]iving notice is justified by the parties' showing that the court will likely be able to:
>
>> (i) approve the proposal under Rule 23(e)(2); and
>>
>> (ii) certify the class for purposes of judgment on the proposal.

Fed. R. Civ. P. 23(e)(1)(B). Under Rule 23(e)(2), in ultimately determining whether to approve the settlement – and at this stage in deciding whether the court will likely be able to approve it – the court is to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Rule 23(e)(2).

These new amendments to Rule 23(e) partially overlap with the *Van Horn* factors. There is a well-developed jurisprudence in the Eighth Circuit on preliminary approval of settlements under those factors. Therefore, the Court may consider decisions regarding the *Van Horn* factors in making its determination.

### 1.  The Settlement Agreement Meets the New Rule 23(e) Factors

As noted above, the amended Rule 23(e)(1) requires the Court to consider certain factors in deciding whether to give notice to the class of the proposed settlement. Some of these are essentially the same as the Eighth Circuit's *Van Horn* factors, and some are different. But this Settlement meets all of them.

### a.  The Court Will Likely Be Able to Approve the Proposal Under 23(e)(2)

The first decision the Court must make under Rule 23(e)(1)(B) is that it will likely be able to "approve the proposal under Rule 23(e)(2)." That provision sets forth several factors to consider in making its determination. Here, the Court should have no difficulty in deciding that each of these is likely to be met.

### i.  The Class Representatives and Class Counsel Have Adequately Represented the Classes

The Court must first determine whether the Class Representatives and Class Counsel have adequately represented the Classes. Rule 23(e)(2)(A). In certifying the Classes, the Court found that the adequacy of representation requirement of Rule 23(a)(4) had been met and that Plaintiffs and their counsel would adequately represent the Classes. Doc. #355 at 10-11. The Court's confidence has certainly been borne out. The robustness of the Settlement that the Class Representatives and Class Counsel achieved shows that. So do the long and difficult negotiations needed to accomplish that result. Thus, this factor is present.

### ii.  The Proposal Was Negotiated at Arm's Length.

Under Rule 23(e)(2)(B), the second factor is whether the proposal was negotiated at arm's length. That is certainly the case here. The parties conducted three lengthy mediation sessions under the direction of Judge William Ray Price, Jr., as mediator, and then continued to

negotiate on the written Settlement Agreement for four months. This was hardly a colluded settlement.

### iii.    The Relief Provided for the Class is Adequate

The third factor is whether the Settlement provides adequate relief to the Class, taking into account

> (i) the costs, risks, and delay of trial and appeal;
>
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>
> (iv) any agreement required to be identified under Rule 23(e)(3);

Rule 23(e)(2)(C). This factor, including subfactor (i), overlap with the first and third *Van Horn* factors, (1) the merits of the plaintiff's case, weighted against the terms of the settlement and (3) the complexity and expense of further litigation. Thus, the *Van Horn* line of cases on these factors are pertinent. *Van Horn* stated: "The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Van Horn*, 840 F.2d at 607. That should still be the case in determining whether the Settlement provides adequate relief.

The terms of this Settlement – which were agreed to with the assistance of a well-respected mediator after lengthy arm's-length negotiations – provide substantial benefits to Class Members. Moreover, although Plaintiffs' attorneys have confidence in the strength of their case, as evidenced by the numerous substantive motions already filed during the litigation, there would have been a number of defense contentions they would have had to overcome if they had taken the case to trial. Thus, as in *Keil v. Lopez*, this factor "weighs in favor of approving the settlement because 'the outcome of the litigation would be far from certain' if the case had not

21

settled, ..., whereas 'the settlement provides substantial benefits to the class ...'" 862 F.3d 685, 695 (8th Cir. 2017) (citations omitted).

(A)      **Benefits to the Class from the Settlement**

Class Members will receive a specified amount that will come to 30% of the face value of their PSLs, less any adjustment if the damages cap is exceeded in the highly unlikely event that valid claims in their Class exceed $12 million.

For FANS Class members, 30% of what they paid for their PSLs represents a precise pro-rata refund of their license fee based on the remaining 9 years of their 30-year PSLs. It is exactly the damages their Complaint seeks for breach of the FANS Agreement. *See* Complaint ¶, 92. Thus, achieving this result at trial would have constituted a victory for the FANS Class. Obtaining the result without the expense, time, and uncertainties involved in taking the case to trial is of significant value to the Class Members.

The only element of the damage claim that it lacks is prejudgment interest from the date of the breach in January 2016. Complaint ¶ 92. Interest would add 9% per annum for a contract claim. Mo. Rev. Stat. § 407.020. Thus, for the approximately three-and-a-half years between the time the claim accrued and when Class Members will receive payment, prejudgment interest would add approximately 31.5% to their claim. Adding 31.5% to a claim of 30% of the face value of the PSL would increase the percentage to 39.45.1% of the PSL's face value (30% times 1.31).

But that doesn't mean that if the FANS Class prevailed at trial on its breach-of-contract claim, Class Members would receive that full amount. That is because costs and attorneys' fees normally come out of the damage award, considerably reducing the recovery. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)("[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee

22

from the fund as a whole."); 5 Newberg on Class Actions § 15:72 (5th ed. 2018) ("The court's task in reviewing counsel's proposed percentage award is to ensure that the resulting fee is fair to the absent class members, from whose recoveries the fee will be extracted").

Here, the Rams, not Class Members, are paying the costs and fees of the Class' attorneys. Thus, without a settlement, it is possible FANS Class Members could receive less through a judgment. For example, in *Galloway v. Kansas City Landsmen, LLC*, 833 F.3d 969, 973 (8th Cir. 2016), the court affirmed a class action settlement in the Western District of Missouri with a fee award that was 33% of the Class' damages. The district court had found, "[i]n the Court's experience, 33% is in the middle of the range that attorneys performing contingency fee work in this market typically charge their clients when a case settles at this stage in the litigation." *Id.* If, as in *Galloway*, a 33% fee award were made after trial, Class Members would receive *less* than they will receive under this Settlement. For example, Mr. McAllister, who owned a $1,000 PSL, will receive a Settlement award of $300, which will not be reduced by attorneys' fees. If, instead of settling, he took his breach-of-contract claim to trial and prevailed, he would be awarded the same $300, increased with prejudgment interest to approximately $418.35. But if he had to pay 33% in attorneys' fees, his net recovery would be only $280.29. He is better off with the Settlement.

The claim of the Rams Class is harder to value. Their damages depend on what the right to sell their PSLs would have been worth if those PSLs could have been used to buy season tickets to Rams' home games in Los Angeles.[6] Until 2020, the Rams are playing in the Los Angeles Coliseum, where fans have been able to buy season tickets to Rams' home games without PSLs. The value of the St. Louis PSLs is therefore negatively impacted because season tickets in the Coliseum have been readily available without a PSL.

---

[6] *See* Arnold's Memorandum Supporting His Motion for Class Certification, Doc. #168-1, at 7.

The Rams have started selling PSLs at their new Inglewood stadium, where they expect to begin play in 2020. Those PSLs will last for 50 years and upon expiration (or if the Rams stop playing in that stadium) will be fully refundable for their face value. But St. Louis PSLs end after the 2024 season, at which point the rights of Rams Class Members to buy Rams season tickets would end. And they are not refundable. Thus, a St. Louis PSL would likely be worth less than 10% (five years out of 50, minus the refundable portion of the Los Angeles PSL) of the face value of a Los Angeles PSL for a comparable seat. The least expensive St. Louis PSL was $250; the least expensive at Inglewood: $500.[7] At one-tenth the Inglewood face value, direct breach-of-contract damages for a $250 PSL owner would be $25, compared to $75 which the PSL owner will receive under the Settlement. And doing the same calculations as above, the *net* recovery with interest would be $34.86, reduced by 33% attorneys' fee to $23.35. But a Class Member with a $250 St. Louis PSL will receive $75 under the Settlement. Like FANS Class Members, that Rams Class Member is better off under the Settlement than if he or she prevailed at trial.

Moreover, other factors affect what PSLs owned by Rams Class Members are worth in Los Angeles. For example, the valuation would have to account for the fact that, after expiring, those PSLs would not be renewable. A jury might find that football fans would demand a discount for a PSL that would potentially leave them out in the cold after five years. In addition, some Los Angeles PSLs will include free parking, food, drinks and access to exclusive club space.[8] St. Louis PSLs would include none of those perks, and their value would be reduced accordingly. Finally, the damage model, to some extent, depends on the Rams selling all of the PSLs at the new stadium, an issue that is still uncertain in a fickle L.A. market with so many entertainment

---

[7] https://www.therams.com/news/rams-launch-sales-of-premier-and-reserved-seats-at-new-la-stadium; https://www.cbssports.com/nfl/news/rams-selling-seat-licenses-for-up-to-100000-at-new-l-a-stadium-chargers-cheaper/ (both accessed 10/24/2018).
[8] *See* http://www.latimes.com/sports/nfl/la-sp-rams-chargers-psl-20180306-story.html (accessed 10/4/2018).

options. Because of these factors, the amount that Rams Class Members would likely receive at trial is uncertain. The award from this settlement closely approximates the aggregate value of the PSLs and is therefore reasonable.

Another factor potentially affects what Class Members might recover at trial. That is that both Classes also have MMPA claims. Plaintiffs' alleged MMPA compensatory damages are the same as for breach of contract, but the MMPA also allows punitive damages. That doesn't mean, however, that the Settlement, which includes nothing for punitive damages, is inadequate. "Only outrageous conduct stemming from an 'evil motive or reckless indifference' can give rise to an award of punitive damages" under Missouri law. *Chong v. Parker*, 361 F.3d 455, 458–59 (8th Cir. 2004) (*quoting Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo.1989)). Jury awards of punitive damages are rare, even where plaintiffs prevail on claims for compensatory damages.[9] Furthermore, under Mo. Rev. Stat. § 537.675.3, Class Members would have to pay 50% of any punitive damage award to the State. In *Claxton v. Kum & Go, L.C.*, 2015 WL 3648776 (W.D. Mo. June 11, 2015), the court found that "[i]t is reasonable that the class would want to settle and receive immediate relief rather than wait and face a motion for summary judgment regarding punitive damages or uncertainty at trial on the issue of punitive damages." *Id.* at *5-6. *See also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (affirming the approval of a settlement that did not include punitive damages even though two opt-out class members had received punitive damages in their individual trials). Likewise, it is reasonable not to include punitive damages in this settlement.

One final factor is the cap limiting Rams' payments to $12 million for each Class. It is unlikely, however, that the cap will be met by either Class and, even if it is, it will reduce Class

---

[9] T. Eisenberg, M. Heise *et al.*, *The Decision to Award Punitive Damages: An Empirical Study*, 2 J. Legal Analysis 57, 57 (2010).

Members' awards by small amounts. During mediation, both sides estimated that it would take approximately $25 million to pay claims of 100% of PSL owners on the Rams' database. That means that the claims would exceed the cap only if 95% or more of all Class Members submitted claims. That is unlikely, however, because PSL owners who dropped their season tickets are excluded from the Class if they received a cancellation notice from the Rams. Plaintiffs do not know how many PSL owners that is, but it is surely some. In addition, Plaintiffs are unaware of a reported class action with a claim rate of 95%. Thus, the cap is unlikely to be exceeded.

(B)    <strong>The Merits of the Cases and Risks of Trial</strong>

Rule 23(e)(2)(C)(i) requires the Court to consider the risks of trial and appeal. Plaintiffs believe their cases are strong. But the Rams have different interpretations of the PSL Agreements, and they deny they breached them, deny that Plaintiffs' damages are what Plaintiffs contend, and deny that the Classes were properly certified. They have raised numerous issues that must be considered in determining the likelihood that Plaintiffs would prevail at trial or that, if they did, how much they would recover. In *Huyer v. Njema*, 847 F.3d 934, 939 (8th Cir. 2017), the court found that this factor weighed in favor of approving the settlement because "Plaintiffs' ability to recover by proceeding to trial was not inevitable." In *In re Wireless*, 396 F.3d at 933, the court affirmed approval of a settlement based on the district court's finding "that the outcome of the litigation would be far from certain." The same considerations are present and warrant approval here.

*Issues Related to FANS Class*

There are at least two specific unresolved issues related to the claims of the FANS Class. One pertains to whether the Rams were subject to the obligations of the Licensor under the FANS Agreement. The second relates to the definition of "deposit" under the Agreement.

26

**Whether the Rams are obligated as Licensor.** The Rams were not an original signatory to the FANS Agreement, under which FANS was the Licensor. The Rams adamantly deny that they succeeded to FANS' obligations.[10] Mr. McAllister moved for partial summary judgment on the ground that FANS was the Rams' agent and that the Rams were therefore liable under the Agreement.[11] The Rams opposed the motion, and the Court denied it, ruling that Mr. McAllister had presented "at best, disputed issues of fact with respect to the three elements of an agency relationship ...." Mem. and Order of 3/13/2018, Doc. #354 at 6. Whether the Rams are subject to the Licensor's obligations would therefore have to be presented to the jury. As in *Huyer*, 847 F.3d at 939, and *In re Wireless,* 396 F.3d at 933, the outcome of that issue is "far from certain" and "not inevitable."

**The "Deposit" issue.** Under the FANS Agreement, the Licensor must refund all or part of the Licensee's "deposit" if it terminates the contract. Mr. McAllister contends that the entire license fee is the "deposit" because it was "given as security or in part payment" of what a Licensee needed to pay to acquire season tickets and was paid to secure "the performance of a contract."[12] The Rams disagree; they contend that the "deposit" is the initial deposit that PSL owners paid for their PSLs and is a small fraction of the face value of the PSLs. Mr. McAllister believes he has the better of the argument. However, in considering the issue, the Court stated, "It is unclear from the FANS Agreement just what would or could constitute a 'deposit' in the context of the Agreement." Mem. and Order of 9/21/2016, Doc. #44, at 11. The Court was therefore unable to decide the question on the pleadings. *Id.* at 11-12. Thus, the outcome is "far from certain" and "not inevitable." *Huyer*, 847 F.3d at 939; *In re Wireless*, 396 F.3d at 933.

---

[10] *See* The St. Louis Rams, LLC's Motion for Reconsideration, Doc. #45.
[11] Plaintiff McAllister's Motion for Partial Summary Judgment and Reinstatement of Partial Judgment as to Liability on "Count IV Fans" (Breach of Contract), Doc. #209.
[12] *See* Reply Memorandum in Support of Plaintiff McAllister's Motion for Partial Judgment on the Pleadings as to Liability in Count IV (Breach of Contract), Doc. #3, at 11.

*Issues Related to Rams Class*

There are at least two issues related to the claims of the Rams Class that would make the outcome uncertain. One relates to whether the "Best Efforts" provision requires that the Rams honor St. Louis PSLs in Los Angeles. The second pertains to the amount of damages that Class Members might recover.

**"Best Efforts" Provision.** As described above, the Rams Class alleges that the Rams violated the "Best Efforts" provision of the Rams Agreement, which requires that Rams use their best efforts to provide PSL owners with season tickets if they play games other than at "the Stadium." The Court agreed with the *Arnold* Plaintiffs' interpretation of that provision. Mem. and Order of Mar. 13, 2018, Doc. #355, at 22. However, Judge Hamilton reached the opposite conclusion about the same provision in *RCN Capital, LLC v. Los Angeles Rams, LLC*, No. 4:17CV1240 (E.D. Mo.) (Ex. 2 at 10.). Contrary to this Court's view, Judge Hamilton ruled that the contract "did not grant rights to purchase season tickets to games played in stadiums other than the Stadium" (*i.e.*, the Stadium at America's Center). *Id.* at 9. She stated, "[T]his Court respectfully disagrees with Judge Limbaugh's analysis in *McAllister*." *Id.* Although the Arnold Plaintiffs strongly believe that Judge Limbaugh's analysis is correct, if they prevailed at trial and the Rams appealed, it is "far from certain" and "not inevitable" that the Eighth Circuit would agree with this Court rather than Judge Hamilton. *See Huyer*, 847 F.3d at 939; *In re Wireless*, 396 F.3d at 933.

**Damages.** The *Arnold* Plaintiffs believe that they will be able to prove their damages claim for the Rams Class. As discussed above, however, a number of factors make it "far from certain" and "not inevitable" that that will be the case. *See Huyer*, 847 F.3d at 939; *In re Wireless*, 396 F.3d at 933.

28

*Issue Related to Both Classes.*

**Class certification**. The Rams' Rule 23(f) Petition is pending in the Eighth Circuit. Plaintiffs believe that it has no merit and should be denied. However, whether the Eight Circuit would agree with Plaintiffs is "far from certain" and "not inevitable." *Huyer*, 847 F.3d at 939; *In re Wireless*, 396 F.3d at 933. Thus, there is risk that the Eight Circuit would order that the Classes be decertified.

*Summary Regarding Benefits and Risk*

As discussed above, it is "far from certain" and "not inevitable" that either Class would prevail at trial and recover an amount equal to what they would receive in this Settlement. *See Huyer*, 847 F.3d at 939; *In re Wireless*, 396 F.3d at 933. On the other hand, the Settlement provides substantial benefits to the Classes. Thus, this factor, which is part of what the Court is to consider under Rule 23(e)(2)(C), weighs heavily in favor of preliminary approval. Because it is the most important factor, for that reason alone the Court should give its preliminary approval.

### (C)     **The Costs and Delays of Trial and Appeal.**

The second specified factor to consider in determining the adequacy of the relief is "the costs, risks, and delay of trial and appeal." Rule 23(e)(2)(C)(i). Risks were discussed above. The costs and delays are similar to the third *Van Horn* factor, the "complexity and expense of further litigation." *Keil*, 862 F.3d at 695. That is easily met here because class actions, in general, "place an enormous burden of costs and expense upon [ ] parties." *Marshall v. National Football League*, 787 F.3d 502, 512 (8th Cir. 2015) (citation omitted). In *In re Uponer*, 716 F.3d at 1063, this factor "weighed in favor of approval because 'class actions place an enormous burden of costs and expense upon the parties.'"

29

That is the case here, where there are two different classes with claims based on two different contracts, each with multiple legal theories. One is a claim of violation of the unfairness provision of the MMPA, which would place in issue the motive of Defendant. *See Chong*, 361 F.3d at 458-59. That would probably necessitate the testimony of multiple present and former Rams employees. To try the claim of the FANS Class would also involve the factual issue of whether FANS was the Rams' agent, which involves three separate complex elements. *See* Mem. and Order of 313/2018, Doc. #354. Trial of the Rams Class claims would entail valuation of the PSLs, an issue that involves equating the St. Louis PSLs with ones from a different market, usable for a period ten times as long, with a refund available at the end of the term, and with different perks. In addition, the parties would undoubtedly present competing expert testimony. The Rams' expert addressed only class certification, not merits issues. Thus far, counsel for the FANS Class spent more than $25,000 on their expert, with more costs expected. Counsel for the Rams' Class spent over $50,000 on their damages experts, with further costs expected. Retaining additional experts on the merits would likely be hugely expensive. Accordingly, this factor weighs in favor of preliminary approval.

### (D)      Method of Distributing Relief to the Class

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Rule 23(e)(2)(C)(ii). Plaintiffs outlined that method above. *See supra,* Sections III.F and III. G. It is both efficient and effective. As shown below in the discussion of Notice, virtually every Class Member will receive personal notice. That notice will explain in clear and simple terms the relief that the Class Member will receive and how to make a claim. The claims process will be administered by RG/2, an experienced and well-respected claims administrator. Class Members will receive their payments within about six months after the Final Approval Hearing.

(E)    **Attorneys' fees**

In determining whether the relief provided the Classes is adequate, the Court must also

consider "the terms of any proposed award of attorney's fees, including timing of payment."

Rule 23(e)(2)(C)(iii). As described above, Plaintiffs will submit their requests for fees in a

separate motion. The Rams have agreed not to oppose a request for attorneys' fees totaling

$7,200,000 (30% of the aggregate cap of $24 million and about 23% of the total amount that the

Rams will make available to Class Members and Attorneys) and have agreed to pay the lesser of

that amount (plus costs of $200,000) or the total amount of fees and costs awarded by the Court.

The fees will be paid within 14 days of the Effective Date. Sett. Agrt., ¶¶ III.A.4 and H.

This provision does not make final approval unlikely because the final say on attorneys' fees

will be with the Court. But, whatever the fee award, it will *not* be applied to the settlement caps.

*Id.* ¶ III.H. Thus, the fees will not affect the relief that each approved Claimant will receive.

Insofar as attorneys' fees are concerned, the settlement is therefore fair, reasonable and adequate.

(F)    **The Settlement Agreement**

The final factor the Court is to consider in determining whether the settlement provides

adequate relief to the Classes is the Settlement Agreement itself. Rule 23(e)(2)(C)(iv). That

agreement is attached hereto as Ex. 1 and explained in detail herein.

### iv.    The Settlement Treats Class Members Equitably Relative to Each Other

In determining whether the settlement is fair, reasonable and adequate, the Court is also to

consider "whether ... the proposal treats class members equitably relative to each other." Rule

23(e)(2)(D). This is a new factor in the December 2018 amendments, and there is no case law

interpreting it. The Advisory Committee Notes state: "Matters of concern could include whether

the apportionment of relief among class members takes appropriate account of differences

31

among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."

Here the scope of relief affects Class Members the same, whether the Court were to consider the relief provided within each Class or between the Classes, because everyone receives identical relief depending on the tier level (*i.e.*, face value) of their PSL, according to the following schedule:

| PSL Tier Price in the Stadium | Pay-Out for Qualified Claim |
|---|---|
| $250 | $75 |
| $500 | $150 |
| $1,000 | $300 |
| $2,500 | $750 |
| $3,000 | $900 |
| $4,500 | $1,350 |

Sett. Agrt., ¶ III.A.1. In each instance, the pay-out comes to 30% of the face value of PSL. With respect to treatment relative to Class Members within each Class, that is exactly the same. Although there are differences in the claims of the two Classes, during settlement negotiations, each Class was represented independently by its own Class Counsel, who negotiated for, and approved, the Settlement for the Class they represent. Because of uncertainty in the valuation of the Rams' Class Members' claims and because of the varying risks of continued litigation for the two Classes, providing the same pay-outs for each tier seemed to both sets of Class Counsel eminently equitable. Another possible distinction exists between Class Members who renewed their season tickets and those who did not but received no cancellation notice from the Rams. Those two groups are treated the same because this Court properly put both groups on equal footing and drew no distinction between them when it adopted the Class definitions.

32

### v.   Summary Regarding Approval of Settlement

The above discussion shows beyond question that the Settlement meets the requirements of Rule 23(e)(1)(B)(i) in that the Court likely will be able to approve the Settlement under Rule 23(e)(2).

### b.   Class Certification

There is another factor introduced in the 2018 amendments to Rule 23(e)(1). That is that the parties must show "that the court will likely be able to ... (ii) certify the class for purposes of judgment on the proposal." Rule 23(e)(1). However, because the Court has already certified the Classes, this provision does not apply to this Settlement. The Advisory Committee Notes to the 2018 Amendments state: "If the court has already certified a class, the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted." This Settlement calls for change in none of these.

### B.   The Class Notice Should Be Approved.

Rule 23 has two provisions regarding notice. Rule 23(c)(2)(B) requires that, '[f]or any class certified under Rule 23(b)(3)," notice to the class be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Id.*; *see also* W.B. Rubenstein, 3 Newberg on Class Actions, § 8:6 (5th ed. 2018). "The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." Rule 23(c)(2)(B). Under that rule, "[n]otice need not be perfect, but need be only the best notice practicable under the circumstances...." *McKeage v. Bass Pro Outdoor World, L.L.C.*, 2014 WL 12754996, at *4 (W.D. Mo. Oct. 7, 2014) (quoting *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 133 (S.D.N.Y. 2008)). Rule 23(e)(1)(B) provides that, when a class is settled, "[t]he court must direct notice in a reasonable

manner to all class members who would be bound by the proposal ....” *See* W.B. Rubenstein, 3 Newberg on Class Actions, § 8:15 (5th ed. 2018).

Because this case was settled before notice of class certification was given, notice to the Classes must comply with both requirements. *Grannan v. Alliant Law Grp., P.C*., 2012 WL 216522, at *3 (N.D. Cal. Jan. 24, 2012) (“In class action settlements, it is common practice to provide a single notice program that satisfies both of these notice standards.”); see also Manual for Complex Litigation (Fourth), § 21.632 (2014) (“For economy, the notice under Rule 23(c)(2) and the Rule 23(e) notice are sometimes combined.”) The parties’ proposed notice does that.

### 1. Manner of Notice

The notice is both the best notice practicable under the circumstances and will provide notice in a reasonable manner to all Class Members. Notice will be sent by postcards and email to PSL owners named in two Rams spreadsheets listing all PSL owners who had bought 2015 season tickets and all PSL owners who had dropped their season tickets between 2006 and 2015 (the Rams have no electronic records of PSL owners who had dropped their season tickets before that). The spreadsheets contain a total of 25,047 names (with some duplicates), with postal addresses for all but six and email addresses for 21,255 or approximately 85% of the total. As a backup, publication notice will be provided by means of an advertisement in the sports section of the St. Louis *Post-Dispatch* on three successive Sundays in 1/8 page format. All three of these notices will direct Class Members to a “Long Form Notice” available at the Settlement website. Furthermore, because there has been wide coverage of these cases in local and national news media,[13] Plaintiffs anticipate that the Settlement will be well-publicized. Indeed, the day after the

---

[13] Developments in these cases have been reported in the *St. Louis Post*-Dispatch, *St. Louis Business Journal* and the websites of television stations KSDK, KMOV and KTVI, as well as in national publications ESPN.com, *USA Today* and *Forbes. See*, *e.g.*, J. Thomas, “Rams football games are long gone from St. Louis, but the legal ones go on,” *St. Louis Post-Dispatch* (Sept. 6, 2018) (available at https://www.stltoday.com/sports/football/professional/rams-

Rams reported to the Court that the case was settled, there was extensive local media coverage of that fact.[14] Thus, Class Members who do not receive email or postcard notice are still likely to learn of the Settlement.

"There is no question that individualized notice by mail to the last known address is the best notice practicable in a class action." *Hammer v. JP's Sw. Foods, L.L.C.*, 2010 WL 11509076, at *1 (W.D. Mo. Sept. 20, 2010) (quoting *In re Wireless Telephone Federal Cost Recovery Fees Litigation*, 2004 U.S. Dist. LEXIS 23342, *26 (W.D. Mo. April 20, 2004). In *Hashw v. Dep't Stores Nat'l Bank*, 182 F. Supp. 3d 935, 946 (D. Minn. 2016), the court upheld a settlement where "direct notice was provided to all class members for whom Defendants had either an email or mailing address, comprising nearly 80% of the class," along with notice in two national publications with a circulation of more than 5 million people. The notice plan in this case is even better, with regular mail to nearly every identifiable Class Member, email to approximately 85% of them and publication in the local newspaper most read by St. Louis sports fans. These measures will assure that virtually every Class Member will receive individualized notice.

---

football-games-are-long-gone-from-st-louis-but/article_af55e70b-7938-5ce9-bba6-1d405d94dcf5.html); B. Frederickson, "BenFred: Count me out on NFL, but here's hoping St. Louis sees Kroenke in court" (Sept. 5, 2018) (available at https://www.stltoday.com/sports/columns/ben-frederickson/benfred-count-me-out-on-nfl-but-here-s-hoping/article_6675c1c5-765d-5296-8ef7-4eb5aa011a46.html); D. Heitner, "Rams Fight Back Against Fans Who Purchased Personal Seat Licenses," *Forbes* (July 26, 2017 (available at https://www.forbes.com/sites/darrenheitner/2017/07/26/rams-fight-back-against-fans-who-purchased-personal-seat-licenses/#4457e713364); "KSDK's Casey Nolan talks lawsuits against Rams, judge's ruling favoring St. Louis PSL owners" (available at http://insidestl.com/ksdks-casey-nolan-talks-lawsuits-against-rams-judges-ruling-favoring-st-louis-psl-owners/1972925); D. Rovell, "Rams sued by season-ticket holder for reimbursement of PSL contract," *espn.com* (Feb. 11, 2016) (available at http://www.espn.com/nfl/story/_/id/14762028/rams-sued-season-ticket-holder-reimbursement-psl-contract); J. Kirn, "Another Rams lawsuit, this time seeking PSL refunds" (St. Louis Business Journal Feb. 10, 2016)(available at https://www.bizjournals.com/stlouis/news/2016/02/10/another-rams-lawsuit-this-time-seeking-psl-refunds.html); "New Lawsuit claims Rams broke agreement with season ticket holders," KTVI (Jan. 21, 2016) (available at https://fox2now.com/2016/01/21/new-lawsuit-claims-rams-broke-agreement-with-season-ticket-holders/).
[14] *See* https://www.stltoday.com/news/local/metro/rams-agree-to-settle-lawsuit-over-st-louis-seat-licenses/article_2861a496-3548-52c4-9496-b66b20ad2149.html; ;https://www.bizjournals.com/stlouis/news/2018/11/27/rams-to-settle-st-louis-seat-license-lawsuits.html; https://fox2now.com/2018/11/27/settlement-reached-in-lawsuit-against-rams-over-st-louis-seat-licenses/; https://kmox.radio.com/articles/rams-settle-lawsuit-st-louis-psl-holders; https://www.ksdk.com/article/sports/rams-to-settle-st-louis-seat-license-lawsuits/63-617958407.

### 2.  Contents of Notice

Rule 23 requires that the notice "clearly and concisely state in plain, easily understood language" the following:

>   (i) the nature of the action;
>
>   (ii) the definition of the class certified;
>
>   (iii) the class claims, issues, or defenses;
>
>   (iv) that a class member may enter an appearance through an attorney if the member so desires;
>
>   (v) that the court will exclude from the class any member who requests exclusion;
>
>   (vi) the time and manner for requesting exclusion; and
>
>   (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). The parties' proposed Notice does that. *See* Sett. Agrt. ¶ II.T and Ex. I thereto (E-mail Notice); ¶ II.RR and Ex. H thereto (Postcard Notice); ¶ II.VV and Ex, J thereto (Publication Notice); and ¶ GG and Ex. K thereto (Long Form Notice).

The Postcard, Email and Publication Notices will direct Class Members to the Settlement website, www.RamsPSLClassActionSettlement.com, where, along with the Long Form Notice, will be found links to the Settlement Agreement, the terms and conditions of the FANS and Rams PSL Agreements (Exs. A and B thereto), and other information (such as the Transfer Form, a Cancellation Notice (Exs. D and C thereto), and a stadium diagram with PSL tiers) that will assist Class Members in determining the Class to which they belong. The website will also contain the Claim Form. *See* Sett. Agrt., ¶ II.H and Ex. E thereto. Class Members may either print the form and mail it in or fill it out and submit it online. As can be seen, the Claim Form is simple and easily understood. The website will also contain the Administrator and Class Counsel's contact information. Thus, the Notices should be approved.

36

## V.  FINAL FAIRNESS HEARING

Following notice to the Classes, a fairness hearing needs to be held on the proposed Settlement. *See* Fed. R. Civ. P. 23(e)(2). "At the fairness hearing, the proponents of the settlement must show that the proposed settlement is fair, reasonable and adequate. The parties may present witnesses, experts and affidavits or declarations. Objectors and class members may also appear and testify." Manual for Complex Litigation (Fourth), § 21.634 (2014). Accordingly, Plaintiffs request that the Court schedule a hearing on final approval of the Settlement to be held no earlier than 120 days after entry of the Preliminary Approval Order. Plaintiffs suggest the Court's Preliminary Approval Order set the date of the hearing so that it can be disclosed in the Class Notice.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order:

A. Finding that the Settlement meets the requirements of Rule 23(e)(1) for preliminary approval and providing notice to the Classes;

B. Approving the Notice plan pursuant to Rule 23 and appointing RG/2 as Claims Administrator responsible for implementing the Class Notice and claims for relief as approved by the Court;

D. Setting the date and time of the final Fairness Hearing to be held no earlier than 120 Days after entry of the Preliminary Approval Order; and

E. Granting such other and further relief the Court deems just and proper.

Plaintiffs respectfully submit the accompanying, proposed Preliminary Approval Order for the Court's review and consideration. Plaintiffs stand ready to provide any additional materials that the Court may require to consider and preliminarily approve this Settlement.

Dated: December 5, 2018                         Respectfully submitted,

                                                */s/ Richard S. Cornfeld*
                                                Richard S. Cornfeld, #31046MO
                                                LAW OFFICE OF RICHARD S. CORNFELD

1010 Market Street, Suite 1645
St. Louis, Missouri 63101
Telephone: (314) 241-5799
Facsimile: (314) 241-5788
rcornfeld@cornfeldlegal.com

Anthony S. Bruning, #30906MO
Anthony S. Bruning, Jr., #60200MO
Ryan L. Bruning, #62773MO
Edward M. Roth, #37294MO
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
Telephone: (314) 735-8100
Facsimile: (314) 735-8020
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

Mark Goldenberg, #41355MO
Thomas P. Rosenfeld, #35305MO
Kevin P. Green, #63497MO
GOLDENBERG HELLER & ANTONOLI, PC
2227 South State Route 157
Edwardsville, Illinois 62025
Telephone: (618) 656-5150
Facsimile: (618) 656-6230
mark@ghalaw.com
tom@ghalaw.com
kevin@ghalaw.com

***Attorneys for Plaintiff Ronald McAllister and
Class Counsel for FANS Class***


*/s/ Fernando Bermudez (w/consent)*
Fernando Bermudez, #39943MO
BERMUDEZ LAW STL, LLC
7701 Forsyth Boulevard
Suite 950
St. Louis, Missouri 63108
Telephone: (314) 339-3082
Facsimile: (314) 862-1606
fbermudez@bermudezlawstl.com

Martin M. Green, #16465MO
LAW OFFICES OF MARTIN GREEN P.C.
7701 Forsyth Boulevard
Suite 950
St. Louis, Missouri 63105
Telephone: (314) 862-6800
Facsimile: (314) 862-1606
green@martingreenpc.com

*Attorneys for Plaintiffs Richard Arnold, R. McNeely Cochran, and Brad Pearlman*

*/s/ David R. Bohm (w/consent)*
David R. Bohm, #35166MO
Michael R. Cherba, #59642MO
DANNA MCKITRICK, P.C.
7701 Forsyth Boulevard
Suite 800
St. Louis, Missouri 63105
Telephone: (314) 726-1000
Facsimile: (314) 725-6592
dbohm@dmfirm.com
mcherba@dmfirm.com

*Attorney for Plaintiffs Envision, LLC, Robert D. Bohm, Sue Bohm, and Edward E. Mock*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was filed electronically

with the Clerk of Court to be served by operation of the Court's electronic filing system upon all

Counsel of Record this 5th day of December, 2018.


                                         */s/ Richard S. Cornfeld*