UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RONALD McALLISTER,

    Plaintiff,

v.

THE ST. LOUIS RAMS, LLC,

    Defendant.

Case Nos.  4:16-cv-00172-SNLJ
                4:16-cv-00262
                4:16-cv-00297
                CONSOLIDATED

## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND INCORPORATED MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................... 1

II.     BACKGROUND ..................................................................................... 2

    A.     The Pleadings ........................................................................... 2

        1.     Plaintiffs' Claims ........................................................ 2

        2.     The Rams' Counterclaim and Third-Party Claim ...................... 4

    B.     The Course of This Litigation .................................................... 4

        1.     Motions for Judgment on the Pleadings.............................. 4

        2.     Discovery ....................................................................... 5

        3.     Expert Witnesses........................................................... 5

        4.     Motions for Class Certification........................................ 6

        5.     Other Motion Practice .................................................... 8

        6.     The Rams' Petition to Appeal........................................ 9

        7.     Mediation ..................................................................... 10

III.     THE SETTLEMENT AGREEMENT ............................................... 11

    A.     The Classes ............................................................................. 12

    B.     Monetary Relief for the Classes............................................... 12

    C.     The Class Release .................................................................... 13

IV.     PRELIMINARY APPROVAL AND SUBSEQUENT DEVELOPMENTS.................... 13

    A.     The Order of Preliminary Approval........................................... 13

    B.     Subsequent Developments ........................................................ 14

V.     ARGUMENT: THE SETTLEMENT SHOULD BE APPROVED................................. 18

    A.     The Settlement Agreement Meets the New Rule 23(e) Concerns ........................ 20

        1.     Procedural Concerns ..................................................... 21

            a.     The Class Representatives and Class Counsel Have Adequately Represented the Classes............................. 21

            b.     The Proposal was Negotiated at Arm's Length. ........................... 21

2. Substantive Concerns ................................................................................ 21

    a. The Relief Provided for the Class is Adequate ............................ 21

        i. Benefits to the Class from the Settlement ......................... 22

        ii. The Merits of the Cases and Risks of Trial ...................... 26

        iii. The Costs and Delays of Trial and Appeal ...................... 29

        iv. Method of Distributing Relief to the Class ...................... 30

        v. Attorneys' Fees ................................................................ 31

        vi. The Settlement Agreement .............................................. 32

    b. The Settlement Treats Class Members Equitably Relative to Each Other ............................................................................................. 32

B. The Settlement Agreement Meets the Additional *Van Horn* Factors .................. 33

VI. CONCLUSION ............................................................................................... 34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Becker v. Bank of New York Mellon Tr. Co., N.A.*,
  2018 WL 6727820 (E.D. Pa. Dec. 21, 2018) ........................................................... 33

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ........................................................................................... 23

*Burnett v. Griffith*,
  769 S.W.2d 780 (Mo.1989) ................................................................................ 25

*Chong v. Parker*,
  361 F.3d 455 (8th Cir. 2004) ......................................................................... 25, 30

*Claxton v. Kum & Go, L.C.*,
  2015 WL 3648776 (W.D. Mo. June 11, 2015) .................................................. 26

*Cty. of Monmouth, New Jersey v. Fla. Cancer Specialists, P.L.*,
  2019 WL 1487340 (M.D. Fla. Apr. 4, 2019) ..................................................... 19

*Devlin v. Scardelletti*,
  536 U.S. 1 (2002) ............................................................................................... 34

*Galloway v. Kansas City Landsmen, LLC*,
  833 F.3d 969 (8th Cir. 2016) ......................................................................... 23, 24

*Huffman v. Prudential Ins. Co. of Am.*,
  2019 WL 1499475 (E.D. Pa. Apr. 5, 2019) ...................................................... 19

*Huyer v. Njema*,
  847 F.3d 934 (8th Cir. 2017) ................................................................... 27, 28, 29

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  892 F.3d 968 (8th Cir. 2018) ......................................................................... 19, 34

*In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig.*,
  716 F.3d 1057 (8th Cir. 2013) ................................................................. 18, 19, 30

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
  396 F.3d 922 (8th Cir. 2005) ...................................................................... Passim

*Kautsch v. Premier Commc'ns*,
  2008 WL 11426766 (W.D. Mo. Nov. 20, 2008) ............................................... 34

*Keil v. Lopez,*
  862 F.3d 685 (8th Cir. 2017) .................................................................. 15, 22, 30, 34

*Little Rock School District v. Pulaski County Special School District No. 1,*
  921 F.2d 1371 (8th Cir. 1990) ............................................................................. 18

*Marshall v. National Football League,*
  787 F.3d 502 (8th Cir. 2015) ........................................................................ 30, 34

*McLeod v. Bank of Am., N.A.,*
  2019 WL 1170487 (N.D. Cal. Mar. 13, 2019) ...................................................... 19

*O'Connor v. Uber Techs., Inc.,*
  2019 WL 1437101 (N.D. Cal. Mar. 29, 2019) ...................................................... 32

*Petrovic v. Amoco Oil Co.,*
  200 F.3d 1140 (8th Cir. 1999) ............................................................................. 26

*Shaw v. Toshiba America Information Systems, Inc.,*
  91 F.Supp.2d 942 (E.D.Tex.2000) ...................................................................... 34

*Sullivan v. DB Invs., Inc.,*
  667 F.3d 273 (3d Cir. 2011) ................................................................................ 15

*Swinton v. SquareTrade, Inc.,*
  2019 WL 617791 (S.D. Iowa Feb. 14, 2019) ............................................ 19, 20, 32

*Van Horn v. Trickey,*
  840 F.2d 604 (8th Cir. 1988) ........................................................................ Passim

**Statutes**

Mo. Rev. Stat. § 407.010 *et seq.* ............................................................................. 3

Mo. Rev. Stat. § 408.020 ........................................................................................ 23

Mo. Rev. Stat. § 537.675. ...................................................................................... 26

**Rules**

Fed. R. Civ. P. 23(a)(4) .......................................................................................... 21

Fed. R. Civ. P. 23(e) .................................................................................. 13, 19, 20

Fed. R. Civ. P. 23(e)(1) .......................................................................................... 20

Fed. R. Civ. P. 23(e)(1)(B)(i) ................................................................. 18

Fed. R. Civ. P. 23(e)(2) ............................................................... 18, 20

Fed. R. Civ. P. 23(e)(2)(A) ................................................................ 21

Fed. R. Civ. P. 23(e)(2)(B) ................................................................ 21

Fed. R. Civ. P. 23(e)(2)(C) ........................................................... 22, 29

Fed. R. Civ. P. 23(e)(2)(C)(i) ........................................................ 26, 29

Fed. R. Civ. P. 23(e)(2)(C)(ii) ............................................................ 30

Fed. R. Civ. P. 23(e)(3) ......................................................... 11, 20, 22

**Other Authorities**

5 Newberg on Class Actions § 15:72 (5th ed. 2018) .................................. 23

Advisory Committee Notes, 2018 Amendments, Subdivision (e)(2), 324 F.R.D. 904, 918 ........ 19

T. Eisenberg, M. Heise *et al.*, *The Decision to Award Punitive Damages: An Empirical Study*, 2 J. Legal Analysis 57, 57 (2010) (2010) ................................................ 26

Plaintiffs Ronald McAllister, Richard Arnold, R. McNeeley Cochran, and Brad Pearlman ("Plaintiffs") respectfully request that this Court grant final approval of the parties' Settlement Agreement ("Settlement"). This outcome will provide each Class Member making a valid claim a substantial cash payment, up to thousands of dollars depending on the seat location of their Personal Seat License(s) ("PSL") and number of PSLs. As Plaintiffs pointed out in their motion for preliminary approval last December,[1] this is an excellent outcome for both Classes. Since then, by all accounts, members of the Classes have given the Settlement their overwhelming approval. Thousands have filed claims thus far (the deadline is still three months away). The deadline for objections and opt-outs has long passed, and not one Class Member objected, and only one requested exclusion. Accordingly, Plaintiffs request that the Court approve the Settlement as fair, reasonable and adequate. In support thereof, Plaintiffs state the following:

## I.     INTRODUCTION

The proposed Settlement is fair, reasonable and adequate. It is the product of extensive arm's-length negotiations between counsel for Plaintiffs and Defendant The St. Louis Rams, LLC ("Defendant" or "the Rams"), with the assistance and guidance of the Honorable William Ray Price, Jr., as mediator. The Court should grant final approval because the Settlement provides substantial monetary relief to the Classes and avoids the inherent risks, delays and expense associated with continued, protracted litigation. As explained below, the terms are consistent with applicable case law, and easily satisfy all applicable criteria for approval.

Each Class Member making a valid claim will receive a sizable cash payment amounting to 30% of the original price of their PSLs (in other words, the PSLs' face value), up to a total of $12 million for each Class ($24 million total), a cap that is unlikely to be exceeded. For the

---

[1] Plaintiffs' Motion for Preliminary Approval of Settlement and Incorporated Memorandum in Support ("Preliminary Approval Motion"), Doc. #394 at 1.

FANS Class, this represents a pro-rata refund based on the remaining years of the PSLs and is the entire amount of the damage claim for breach of contract. *See* Class Action Complaint, Doc. #1, ¶92. The recovery of the Rams Class closely tracks the damages calculated by their damages expert. Moreover, the benefits to the Classes are enhanced because there will be no reduction for attorneys' fees, legal expenses, settlement administration expenses, or class representative service payments. The Rams have agreed to pay those fees and costs separately.

In sum, this is a robust Settlement that provides substantial benefits to the Rams' PSL holders. As explained below, the parties have established all necessary prerequisites for final approval, as set forth by case law in the Eighth Circuit.

## II. BACKGROUND

### A. The Pleadings[2]

#### 1. Plaintiffs' Claims

These actions arise out of two form contracts by which Plaintiffs and thousands of others bought PSLs entitling them to buy season tickets to St. Louis Rams home football games. The first of these contracts, called the "FANS Agreement," was used by a civic organization, called FANS, Inc., to sell PSLs from the time of the Rams' move to St. Louis before the 1995 season until March 1996. Thereafter, the Rams sold PSLs pursuant to a similar contract, called the "Rams Agreement." Under both contracts, PSLs were priced the same, with face values of $250, $500, $1,000, $2,500, $3,000, and $4,500 depending on the location (or "tier") of the seat.

The contracts extended the right to buy season tickets through 2024 (a 30-year term for those who bought PSLs when the Rams moved to St. Louis in 1995). However, when the Rams left for

---

[2] This section is repeated from Plaintiffs' Preliminary Approval Motion.

Los Angeles after the 2015 season, they provided nothing to their PSL owners, neither a refund for the unused years nor the right to use the PSLs to buy tickets in the team's new home.

Plaintiffs brought two separate lawsuits to enforce these contracts. These cases were subsequently consolidated, along with two other cases, *Pudlowski, et al. v. The St. Louis Rams, LLC, et al.*, No. 4:16-cv-00189-RLW (E.D. Mo.), and *Envision, LLC, et al. v. The St. Louis Rams, LLC*, No. 4:16-CV-00262-CDP (E.D. Mo.).[3] Docs. #33 and #47.

Plaintiff McAllister filed his case in this Court on February 19, 2016. Doc. #1. He brought claims for breach of both the FANS and Rams Agreements, as well as unjust enrichment based on the alternative claim that the contracts were illusory and void, along with claims for money had and received, breach of the implied covenant of good faith and fair dealing and violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq.* On behalf of himself and a putative class of PSL owners, he based his contract claim on the allegation that the Rams had terminated the contracts when they moved from St. Louis and had breached Paragraphs 7.A of the FANS Agreement and 6.A of the Rams Agreement. Those provisions require that, in the event of termination, the Rams refund all or part of the licensee's deposit. He sought as damages a refund of a pro rata portion of the amount paid for the PSLs. For FANS PSLs, which were unusable for the last nine years of their 30-year term, that meant a refund of 30% of what they had paid. He also sought interest, costs and attorneys' fees.

Plaintiffs Arnold and Cochran (later joined by Mr. Pearlman, Doc. #84, and collectively referred to as "the *Arnold* Plaintiffs") sued in the Circuit Court of St. Louis County on January 29, 2016. The Rams removed their case to this Court on March 4, 2016. The *Arnold* Plaintiffs

---

[3] *Pudlowski* was subsequently remanded to the Circuit Court of the City of St. Louis. Doc. #358. The plaintiffs' allegations in *Envision* were similar to those in *Arnold*, but the Court did not appoint the *Envision* plaintiffs as Class Representatives. Accordingly, they are not parties to the Settlement Agreement.

initially brought a claim for breach of contract under both agreements, later amended to add a claim for violation of the MMPA (and to limit the claim to the Rams Agreement). (Doc. #131.) On behalf of themselves and other PSL holders, they based their claim on the Rams' alleged breach of Paragraph 7, which required the Rams to use their "best efforts" to ensure PSL holders the right to purchase tickets wherever the Rams played their home games, be it St. Louis or somewhere else. They sought unspecified damages, along with attorneys' fees and interest.

### 2. The Rams' Counterclaim and Third-Party Claim

On July 6, 2017, the Rams filed a motion for leave to file (a) a counterclaim against Mr. McAllister for a declaratory judgment that the Regional Convention and Visitors Commission ("CVC"), not the Rams, are liable to him under the FANS PSLs and (b) a third party complaint against CVC for indemnity on the claims of the FANS Class. Docs. #132 and #133. No one opposed the motion for leave, and the Court granted it. Doc. #148.

## B. The Course of This Litigation[4]

From the beginning, these lawsuits have been hotly contested. They have been marked by frequent motions filed by both sides.

### 1. Motions for Judgment on the Pleadings

Shortly after answering the Complaints, the Rams moved for judgment on the pleadings in *Arnold* and *Envision.* While that motion was pending, on July 21, 2016, Mr. McAllister moved for partial judgment on the pleadings as to liability. On September 21, 2016, the Court granted the Rams' motion as to the FANS Agreement but denied it as to the Rams Agreement. Doc. #44. Thus, the Court dismissed the *Arnold* Plaintiffs' claims under the FANS Agreement, but not their claims under the Rams Agreement. At the same time, the Court granted Mr. McAllister's motion

---

[4] This section is repeated from Plaintiffs' Preliminary Approval Motion.

for judgment on the pleadings as to the FANS Agreement but denied it as to the Rams Agreement. On October 3, 2016, the Rams moved for reconsideration of the portion of the order granting Mr. McAllister's motion as to the FANS Agreement. They argued that a factual question existed as to whether FANS, Inc., was the Rams' agent. Doc. #45. The Court sustained that motion and vacated its order granting Mr. McAllister judgment on the pleadings. Doc. #63.

### 2. Discovery

Subsequently, the Court held a Rule 16 conference, and discovery began in early 2017. The parties exchanged responses to written discovery and produced thousands of pages of documents, including the Rams' hard copy records on the Plaintiffs, electronic spreadsheets regarding all PSL holders, and various contracts the Rams had entered into with third parties. The parties also obtained more than 22,000 pages of documents from CVC, the Regional Sports Authority, and PriceWaterhouseCoopers, related to the early years of the PSL program, as well as documents from STR Marketplace, LLC, related to the Rams' communications following their relocation. The Rams deposed eight Plaintiffs in May 2017, and Plaintiffs took Rule 30(b)(6) depositions of Kevin Demoff, the Rams' Chief Operating Officer, in July 2017 and January 2018. In addition, in March 2018 the *Arnold* Plaintiffs deposed Greg Kish of Legends, the consulting group that the Rams hired to price their PSLs in Los Angeles.

### 3. Expert Witnesses

In July 2017, the Rams designated Bruce A. Strombom, Ph.D., an economist and Managing Principal of Analysis Group, a national economic, financial and strategy consulting firm, as an expert witness on class certification and produced his expert report. Plaintiffs took his deposition on July 20 and 21, 2017

Subsequently, Mr. McAllister designated Brian Kriegler, Ph.D., a statistician and Managing Director of Econ One Research, Inc., a national economic and statistical consulting firm, as a

rebuttal expert on class certification and produced his expert report. The Rams deposed him on September 19, 2017.

### 4. Motions for Class Certification

Mr. McAllister filed a motion for class certification on December 12, 2016, supplemented on December 19, 2016, an amended motion on April 19, 2017, and an amendment on September 21, 2017; he eventually sought to represent a class of PSL owners under both contracts. Docs. #62, #62-1, #70, #105, #106, and #222. The Arnold and Envision Plaintiffs filed separate motions for class certification on August 3, 2017, limited to Rams PSL owners. Docs. #167, 168-1, #170, and #171. The Rams filed separate responses to the *McAllister* and *Arnold/Envision* motions. Docs. #257, #263. Each Plaintiffs' group filed a reply brief. Docs. #290, # 292-1, 294. With leave of Court, each of the parties' memoranda exceeded the page limitations of the Court's local rules. The Rams responded to the reply briefs in a Sur-Reply. Doc. #309.

On March 13, 2018, the Court granted the motions in part and denied them in part. Doc. #355. The Court certified a class in the *McAllister* case for FANS PSL Holders, as follows:

> **FANS Class**. All persons or entities who, at the conclusion of the 2015 season, owned a PSL purchased from Fans, Inc. that was not later transferred or upgraded.

> **FANS MMPA Subclass**. All natural persons who are members of the FANS Class and who never claimed the PSL expense as a tax deduction for business purposes.

*Id.* 22. The Court appointed Mr. McAllister as Class Representative and his attorneys as Class Counsel. At the same time, the Court denied Mr. McAllister's request to certify his proposed Class of Rams PSL holders. The Court ruled that "the Rams Agreement entitled Rams PSL holders to activation of the Best Efforts Clause – not to a refund of deposits." *Id.* 22.

The Court also certified a modified version of the *Arnold* Plaintiffs' proposed class, as follows:

> **Rams Class:**
>
> A) All persons or entities who:
>
>> 1) purchased PSLs directly from the Rams; or
>>
>> 2) had any Rams or FANS PSL transferred to them; or
>>
>> 3) upgraded their PSL tier; and
>
> B) purchased Rams season tickets through their PSLs for the 2015 season; or
>
> C) did not purchase Rams season tickets for the 2015 season but did not receive a PSL cancellation notice from the Rams.
>
> **MMPA subclass:** All natural persons who are members of the Rams Class who purchased PSLs primarily for personal, family, or household purposes and who never claimed the PSL expense as a tax deduction for business purposes.

*Id.* 22-23. The Court appointed the *Arnold* Plaintiffs as Class Representatives and their counsel, as well as the *Envision* attorneys, as Class Counsel.

On April 4, 2018, Mr. McAllister moved to amend his class definition to include former season ticket holders. Doc. #367. After that motion was fully briefed (*see* Docs. #371 and #374) the Court granted it and redefined the FANS class definition as follows:

> **FANS Class**. All persons or entities who, at the conclusion of the 2015 season, owned a PSL purchased from Fans, Inc. that was not later transferred or upgraded and who (a) had purchased Rams season tickets through their PSLs for the 2015 season or (b) did not purchase Rams season tickets for the 2015 season but did not receive a PSL cancellation notice from the PSL Licensor.

Doc. #375 at 3.

### 5. Other Motion Practice

In addition to the above, the parties engaged in active and hotly disputed motion practice. (Plaintiffs omit some discovery motions from this discussion.)[5]

**Rams Motion for Stay.** On the same date that the Rams moved to file their counterclaim and third-party claim, they asked the Court to stay these proceedings pending an arbitration with CVC. Docs. #134, #135 and #153. Plaintiffs opposed this motion, which would have brought the case to a standstill. Docs. #176, #143-1. The Court granted the motion as between the Rams and CVC, but otherwise denied it and allowed the case to continue. Doc. #180.

**McAllister Motion for Partial Summary Judgment.** On August 28, 2017, Mr. McAllister moved for partial summary judgment and reinstatement of partial judgment as to liability on the breach of contract claim under the FANS Agreement. Docs. #208-#210. He argued that the evidence established, as a matter of law, that the Rams had appointed FANS, Inc. as their agent in the sale, granting and administering of the FANS PSLs and that the Rams were the successor-in-interest to the FANS PSL agreement after FANS, Inc. was dissolved in 1998. The Rams opposed the motion (Doc. #233), and Plaintiff replied. Doc. #274. The Court denied the motion on March 13, 2018. Doc. #354. It ruled that Mr. McAllister had presented "at best, disputed issues of fact with respect to the three elements of an agency relationship ...." *Id.* 6. For the same reason, the Court denied Mr. McAllister's successor-liability argument. *Id.* 12.

**McAllister Motion to Dismiss Counterclaim.** On the same day that Mr. McAllister filed his summary-judgment motion, he moved to dismiss the Rams' Counterclaim. Docs. #211 and #212. He argued, in part, that the Counterclaim was redundant of defenses that they had asserted in

---

[5] Although it did not involve Plaintiffs, on August 9, 2017, the Rams filed a motion to compel arbitration of their claim against CVC. Docs. #183 and #184. That motion was fully briefed (*see* Docs. #206, #217, #218) and granted on November 17, 2017. Doc. #276.

their Answer. The Rams opposed the motion (Doc. #234), and Mr. McAllister replied. Doc. #273. On March 23, 2018, the Court granted the motion. Doc. #362.

**Arnold Third Motion to Compel.** Because of the Rams' alleged discovery abuses, including the failure to produce documents and answer interrogatories, the *Arnold* Plaintiffs moved to compel the Rams to comply with their discovery obligations. Docs. #321 and #322 (filed 2/6/2018). In opposing the motion, the Rams argued that the discovery requests had been overbroad. Doc. #344. The *Arnold* Plaintiffs filed a reply brief. Doc. #346. On April 12, 2018, the Court granted the motion, except as to certain respects that the *Arnold* Plaintiffs had not pursued, and ordered that the Rams produce their Los Angeles-based Chief Operating Officer, Kevin Demoff, for re-deposition in St. Louis. Doc. #372. (The parties held that deposition in abeyance pending mediation.)

**McAllister Motion for Sanctions.** On March 12, 2018, Mr. McAllister moved for sanctions against the Rams for producing an allegedly unprepared witness to testify on its behalf under Rule 30(b)(6) concerning his claim under the Rams Agreement. Docs. #351 and #352. The Rams opposed the motion. Doc. #357. In light of the Court's decision on class certification, ruling against Mr. McAllister on this claim, he withdrew the motion. Doc. #360.

**Rams Motion to Stay Pending Petition to Appeal.** The Rams moved to stay the action pending their Rule 23(f) Petition to appeal the class certification order. Doc. #365. Plaintiffs opposed the motion, and the Rams replied. Docs. #368 and #369. The Court denied the motion on April 9, 2018. Doc. #370.

### 6. The Rams' Petition to Appeal

The Rams filed a petition in the Eighth Circuit on March 27, 2018, seeking permission to appeal this Court's class certification order. *The St. Louis Rams, LLC v. McAllister*, No. 18-8001 (8th Cir.). Plaintiffs responded on April 6 (McAllister) and April 9 (Arnold). In light of the

Court's modification of the FANS Class definition, the Rams filed a motion to submit an amended petition exceeding the Court's word limitation, which Plaintiffs opposed. While this motion and the underlying Petition were pending, the parties agreed to mediate. On May 10, 2018, they therefore asked the Eighth Circuit to hold the Petition in abeyance while they tried to settle these cases. The Court granted that request and held the Petition in abeyance.

### 7. Mediation

This settlement results from a lengthy mediation process, with three mediation sessions spaced over a year apart. On February 28, 2017, the Court referred these cases to Alternative Dispute Resolution. Doc. #83. The parties selected the Honorable William Ray Price, Jr., former Chief Justice of the Missouri Supreme Court and currently with Armstrong Teasdale LLP, as the neutral. The parties held a mediation session before Judge Price on April 21, 2017, but broke off discussions when it was clear that the cases could not then be settled.

After the Court's class-certification order, the parties decided to resume their efforts to settle, once again with Judge Price as mediator. On May 10, 2018, the Rams filed a consent motion to stay the cases pending the mediation, which the Court granted. Docs. #376 and #377. This case has been stayed since then. To assist in the negotiations, the Rams allowed Mr. McAllister's consultants to inspect approximately 63 boxes of hard-copy PSL records and to make and retain digital copies of records contained in a sample of 10 of those boxes.

The parties conducted their second mediation session on June 21, 2018. That session was unsuccessful, and the parties agreed to continue settlement discussions; to aid negotiations, the *Arnold* Plaintiffs agreed to allow a limited exchange of information regarding their expert's opinions, including allowing counsel for the Rams to communicate with the expert directly.

The parties conducted their final mediation session on July 20, 2018. After a long day, the parties reached agreement. They agreed on a claims-made process, with a mandatory verified

claim form for any Class Member seeking an award, pursuant to which the Rams agreed to pay up to a cap of $24 million ($12 million for each Class). The Rams insisted on (and Plaintiffs thought reasonable) a claims-made process in light of their indemnity claim against CVC regarding the FANS Class. That claim requires them to determine conclusively whether a PSL owner is a FANS Class Member or Rams Class Member, something they could not do solely from their electronic data. The parties agreed that notice would be provided via email and postcard to those listed in two spreadsheets of PSL account holders maintained by the Rams, one containing information concerning those who had purchased season tickets through the 2015 season and the other with information for those with active PSLs through at least the 2006 season who thereafter did not renew their season tickets. Notice would also be made by publication in the *St. Louis Post-Dispatch*. The parties agreed that they would have the right to challenge the class membership of any individual claimant.

Only after the parties agreed to those terms did they discuss the payment of attorneys' fees and costs. The Rams agreed that they would pay a capped amount of attorneys' fees, costs, and incentive awards to the class representatives, as approved by the Court. These amounts would not come out of the $24,000,000 cap available to be paid to Class Members and, therefore, would not diminish Class Members' recovery.

## III.    THE SETTLEMENT AGREEMENT

Following the mediation, the parties continued arm's-length negotiations over the terms of a formal Settlement Agreement ("Sett. Agrt."). Those discussions continued for four months before the parties memorialized their Settlement Agreement, which is attached hereto as Ex. 1, as contemplated by Rule 23(e)(3).[6] Here is a summary of its most important terms.

---

[6] The Settlement Agreement is in the court file as Doc. #394-1, with the Rams' executed signature page at Doc. #397-1.

## A. The Classes[7]

The classes are precisely what the Court certified:

> "FANS Class" or "FANS Class Members" means all persons or entities who, at the conclusion of the 2015 NFL football season, owned a PSL purchased from FANS, Inc. that was not later transferred or upgraded and who (a) had purchased Rams season tickets through their PSLs for the 2015 season or (b) did not purchase Rams season tickets for the 2015 season but did not receive a cancellation notice from the PSL licensor.
>
> ***
>
> "Rams Class" or "Rams Class Members" means:
>
> A) All persons or entities who:
>
> 1) purchased PSLs directly from the Rams; or
>
> 2) had a Rams or FANS PSL transferred to them; or
>
> 3) upgraded their PSL tier; and
>
> B) purchased Rams season tickets through their PSLs for the 2015 season; or
>
> C) did not purchase Rams season tickets for the 2015 season but did not receive a PSL cancellation notice.

Sett. Agrt., ¶¶ II. Z and YY.

PSL owners were allowed to opt out of the Classes, in which case they would not be bound by any orders or judgments in this case, not be entitled to relief, and not be affected under the Settlement Agreement. Those who opt out would also not release any claims by virtue of the Settlement Agreement, or be entitled to object to it. *Id.*, ¶ III.G.

## B. Monetary Relief for the Classes[8]

Subject to a damages cap and on a claims-made basis, the Rams will pay each Class Member an amount based on the tier price of their PSLs, as follows:

---

[7] This section is taken from Plaintiffs' Preliminary Approval Motion.
[8] This section is taken from Plaintiffs' Preliminary Approval Motion.

| PSL Tier Price in the Stadium | Pay-Out for Qualified Claim |
| --- | --- |
| $250 | $75 |
| $500 | $150 |
| $1,000 | $300 |
| $2,500 | $750 |
| $3,000 | $900 |
| $4,500 | $1,350 |

Sett. Agrt., ¶ III.A.1. The Rams' payments are subject to a cap of $12 million per Class, or $24 million altogether. *Id.* In the extremely unlikely event that the claims exceed the cap, then individual payments to the affected Class will be reduced pro rata so that the pay-out to the Class will not exceed $12 million. The pro rata adjustment will be as approved by Judge Price. *Id.*

### C. The Class Release[9]

 All Class Members (*i.e.*, putative Class Members who do not opt out), will release the Rams from claims related to the subject matter of this case. The detailed release language can be found in Section III.D of the Agreement.

## IV. PRELIMINARY APPROVAL AND SUBSEQUENT DEVELOPMENTS

### A. The Order of Preliminary Approval

On January 24, 2019, the Court entered its Order for Preliminary Approval of Settlement ("Preliminary Approval"), Doc. #398, preliminarily approving the Settlement as "fair, reasonable, and adequate under Federal Rule of Civil Procedure 23(e)." *Id.* at 1, ¶ 2.

The Court found that the notice plan in the Settlement Agreement was "the best notice practicable under the circumstances, [was] a reasonable manner for notice, and constitute[d] valid, due, and sufficient notice to the classes in full compliance with the requirements of applicable law, including but not limited to the Due Process Clause of the United States

---

[9] This section is taken from Plaintiffs' Preliminary Approval Motion.

Constitution ...." Preliminary Approval Order at 2, ¶ 5. The Court directed the Rams to retain RG/2 Claims Administration, the entity proposed by the parties, as Claims Administrator, to disseminate the postcard, e-mail and Publications Notice proposed by Plaintiffs and to create a settlement website ("Settlement Website"), www.RamsPSLClassActionSettlement.com, containing the Settlement Agreement, a long-form notice, the Claim Form and other documents, including Plaintiffs' application for attorneys' fees and incentive payments, along with supporting materials. *Id.* at 1-2, ¶ 3.

The Court directed the Claims Administrator to begin disseminating notice and to unveil the Settlement Website within 30 days of the date of the Order, or February 20, 2019. *Id.* at 2-3.

The deadline for Class Members to mail objections or a request for exclusion was 75 days after entry of the Preliminary Approval Order, or April 9, 2019. *Id.* at 4-6, ¶¶ 8-9. Any objection not timely made was deemed waived and foreclosed except for good cause shown. *Id.* at 5, ¶ 8.c. The Court also set a deadline of May 24, 2019, for "[t]he (a) Motion for Final Approval of the Settlement Agreement, together with the supporting memorandum and papers, and (b) Class Counsel's Fee Application and motion for payment of incentive awards, together with supporting memorandum and papers ...." *Id.* at 6, ¶ 10. The Final Approval Hearing was set for Monday, June 24, 2019, at 10:30 a.m. *Id.* at 3, ¶ 7. "At the Final Approval Hearing, the Court will address whether the Settlement should be finally approved, whether and in what amount Class Counsel shall be awarded their attorneys' fees, costs and expenses, and whether and in what amount the Class Representatives shall be entitled to incentive awards." *Id.* at 3-4, ¶ 7.

### B. Subsequent Developments

Timely notice went out to Class Members. E-mail and Post Card Notices were sent on or about February 19, 2019. Publication Notice appeared in the *St. Louis Post-Dispatch* sports section on three successive Sundays, beginning on February 17, 2019. The Settlement Website

was launched on February 16, 2019. By all accounts, the notice program was successful, and Class members began making their claims the week of February 16, 2019.

Further enhancing the ability of Class Members to learn about the claims process was the widespread coverage it received in the local news media. In seeking preliminary approval, Plaintiffs stated: "Furthermore, because there has been wide coverage of these cases in local and national news media, Plaintiffs anticipate that the Settlement will be well-publicized." Preliminary Approval Motion at 34. That in fact happened.[10]

The reaction of PSL owners has been enthusiastic. Thus far, 8,562 PSL owners have had claims approved; this is 43% of the 19,879 Class members in the Rams' databases to whom notices were sent.[11] Ex. 2 (Decl. of Ryan L. Bruning). These approved claims total $9,383,000, representing 19,548 seats (*i.e.,* separate PSLs), with the validity of more than 750 additional claims still to be decided. *Id.* Under the Court's approved Class Notice, the deadline for submitting a claim is August 23, 2019.[12]

---

[10] *See*, *e.g.*, D. Hunn, "If you had a Rams PSL, you should file for refunds on Monday," St. Louis Post-Dispatch (Feb. 14, 2019), available at https://www.stltoday.cavidom/news/local/metro/if-you-had-a-rams-psl-you-should-file-for/article_b197cc2d-0543-5d3b-8967-85fd14256f8.html (accessed 4/23/2019); Kayla Drake, "Former Rans fans can now get their PSL refunds," KMOV4 (Feb. 16, 2019), available at https://www.kmov.com/news/former-rams-fans-can-now-get-their-psl-refunds/article_d4493ff6-3266-11e9-a638-bbed2b09d732.html (accessed 4/23/2019); Nicole Sanders, "PSL Claims Weekend: Refund process for Rams season ticket holders to begin soon" KMOV4 (Feb. 14, 2019, available at https://www.kmov.com/news/psl-claims-weekend-refund-process-for-rams-season-ticket-holders/article_30eb4992-2fb1-11e9-9977-1f982d5d3dcb.html (accessed 4/23/2019); Nathan Rubbelke, "What Rams PSL holders need to know about the team's $24 million settlement," St. Louis Business Journal (Jan. 25, 2019), available at https://www.bizjournals.com/stlouis/news/2019/01/25/what-rams-pls-holders-need-to-know-about-the-team.html (accessed 3/2/2019); Brett Blume, "Refund Website For St. Louis Rams PSL Holders to Go Live this Month" KMOX NewsRadio 1120 (February 5, 2019, available at https://kmox.radio.com/articles/refund-website-st-louis-rams-psl-holds-set-go-live-month (accessed 4/23/2019).

[11] By all accounts, even if this were the final claim rate, it would be remarkably high because "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns." *Keil v. Lopez*, 862 F.3d 685, 697 (8th Cir. 2017) (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011). The claim rate in this case is seven times the rate that is rarely exceeded.

[12] *See*, *e.g.*, "Legal Notice of Proposed Class Action Settlement" posted on the Settlement Website, https://www.ramspslclassactionsettlement.com/pdf/Rams_LongFormNotice.pdf (accessed 4/26/2019), at 6.

RG/2 Claims Administrators receives all claims from Class Members and does an initial review to determine whether claimants are properly Class Members and, if so, whether the submitted claim is for the appropriate number of seats and tiers. Largely because of misunderstanding of the difference between the FANS Class and the Rams Class, a number of claimants submitted claims for more seats than the actual number of PSLs held by them. Other PSL owners submitted claims which identified their seats as being in the wrong tier (PSL face value). Pursuant to agreement between Class Counsel and counsel for the Rams, it was agreed that where PSL owners claimed more seats or a different tier than set forth in the Rams' ticket database, RG/2 would adjust the claim to be consistent with the Rams' ticket data base. Class Counsel has provided individualized notice of adjustment of claim via e-mail (or letter where the PSL holder failed to identify an e-mail address or provided an invalid e-mail address) to hundreds of PSL holders and invited them to respond if they believed the adjustment had been made in error. Only several PSL holders have responded that they believed the adjustment was wrong.

The Rams have also challenged 1,489 claims, primarily on the grounds that (1) claimant's PSLs had been cancelled, (2) the claimant didn't have authority to make the claims in question, or (3) the claimant did not match any of the Rams' records (*i.e.,* the Rams had no electronic or paper records indicating the claimant had been a PSL holder). Class Counsel has attempted to contact each of these claimants by telephone, e-mail or both, to apprise them of the challenge and to attempt to obtain additional information or documents to defend against the challenge to their claim.

With regard to the cancellation issue, the Rams have so far challenged 1,166 claims on the ground that its records showed that the claimants had been provided with a cancellation notice

(as that term is defined in the Settlement Agreement). Class Counsel responded to the first batch of such challenges, 423 in total, which were filed by the Rams on or about April 10, 2019. Judge Price, acting as arbitrator, largely overruled these challenges (by Order dated May 1, 2019) on the basis that the records relied upon by the Rams for most claims did not contain a cancellation notice. The Rams filed another challenge letter on May 15, 2019. Included in this letter were challenges to another 35 claims, on the basis that the claimants allegedly received notice of cancellation. However, the Rams rely with regard to these challenges on the same type of documentation which Judge Price has previously found to be inadequate to prove notice of cancellation.

Class Counsel has contacted claimants whose claims were denied or challenged for lack of authority to obtain necessary proof of authority. In many of these cases, Class Counsel has been able to negotiate withdrawal of these challenges by the Rams based on information obtained from claimants. In its most recent Challenge letter (dated May 15, 2019), the Rams have challenged two claims on the basis of lack of proof of authority. Class Counsel anticipate having to defend further challenges from the Rams on this basis as more claims are received.

Class Counsel has also contacted by telephone, e-mail or both all claimants whose claims have been challenged by the Rams because they have no record of the claimant being a PSL holder. In its May 15, 2019 Challenge letter, the Rams challenged 120 claims on the basis that there was no record of the claimant having been a PSL owner. Class Counsel anticipate filing a memorandum in response, and supporting documents, to the Rams challenges on or prior to May 29.

The Rams also made challenges in their May 23, 2019 Challenge letter on several other miscellaneous grounds. Class Counsel anticipates responding to these challenges, as well.

Providing notice to persons whose claims have been adjusted, denied or challenged, and processing claimants' responses, has required a substantial investment of time and resources by Class Counsel and their respective law firms.

Moreover, as measured by objections and opt-outs, the reaction of Class Members has been overwhelmingly positive. To be timely, these had to be postmarked by April 9. Not a single timely (or untimely) objection was received. There has been only one request for exclusion. That was from an individual in Hammond, Louisiana, who owned one PSL, according to the Rams' records. Ex. 2 (Decl. of Ryan L. Bruning).

## V.     ARGUMENT: THE SETTLEMENT SHOULD BE APPROVED

In granting preliminary approval and directing that notice of the Settlement be given the Classes, the Court was required to determine that it would likely be able to approve the proposed Settlement under Rule 23(e)(2). Fed. R. Civ. P. 23(e)(1)(B)(i). Since the Court granted preliminary approval, nothing has happened to show that that expectation was misplaced. Indeed, based on the fact that of about 22,000 Class Members, not a single one has objected to the Settlement and only one opted out, the grounds for approval are even stronger now.

In reviewing proposed class settlements, courts begin with the guiding principle that "a class action settlement is a private contract negotiated between the parties" and is "presumptively valid." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005); *In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013); *see also Little Rock School District v. Pulaski County Special School District No. 1*, 921 F.2d 1371, 1388 (8th Cir. 1990) ("A strong public policy favors agreements, and courts should approach them with a presumption in their favor."). The court's role in reviewing a negotiated class settlement is simply to "ensure that the agreement is not the product of fraud or collusion

and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." *In re Wireless*, 396 F.3d at 934.

Both before and after it was amended in December 2018, Fed. R. Civ. P. 23(e) required judicial review to determine that any "[s]ettlement, [v]oluntary [d]ismissal, or [c]ompromise" of the claims, issues, or defenses of a certified class is "fair, reasonable, and adequate." Before that amendment, the Eighth Circuit required a district court to consider four factors in making that determination: (1) the merits of the plaintiff's case, weighted against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *In re Uponor,* 716 F.3d at 1063 (quoting *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988)). These were called the "*Van Horn* factors." *See In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 978 n. 8 (8th Cir. 2018).

The December 2018 amendment added to what must be considered, but did not eliminate those factors. As the Advisory Committee notes, "[t]he goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes, 2018 Amendments, Subdivision (e)(2), 324 F.R.D. 904, 918. One court recently noted that "[t]hese changes are mostly form over substance ...." *Swinton v. SquareTrade, Inc.*, 2019 WL 617791, at *5 (S.D. Iowa Feb. 14, 2019). Indeed, district courts have continued to consider factors that had been established prior to this amendment. *See Huffman v. Prudential Ins. Co. of Am.,* 2019 WL 1499475, at *4 (E.D. Pa. Apr. 5, 2019) (considering pre-existing Third Circuit factors); *Cty. of Monmouth, New Jersey v. Fla. Cancer Specialists, P.L.*, 2019 WL 1487340, at *2-*3 (M.D. Fla. Apr. 4, 2019) (same as to Eleventh Circuit factors); *McLeod v. Bank of Am., N.A.*, No. 16-CV-03294-EMC, 2019 WL 1170487, at *3 (N.D. Cal. Mar. 13, 2019) (same as to

Ninth Circuit factors); *Swinton*, 2019 WL 617791, at *5 (considering pre-existing Eighth Circuit factors, along with Rule 23(e)(2) concerns).

The amended Rule 23(e)(2) focuses on four "core concerns of procedure and substance." The Rule provides:

> If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> > **(A)** the class representatives and class counsel have adequately represented the class;
> >
> > **(B)** the proposal was negotiated at arm's length;
> >
> > **(C)** the relief provided for the class is adequate, taking into account:
> >
> > > **(i)** the costs, risks, and delay of trial and appeal;
> > >
> > > **(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > >
> > > **(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and
> > >
> > > **(iv)** any agreement required to be identified under Rule 23(e)(3); and
> >
> > **(D)** the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

This settlement meets both the new Rule and the *Van Horn* factors.

## A. The Settlement Agreement Meets the New Rule 23(e) Concerns

As noted above, the amended Rule 23(e)(1) requires the Court to consider certain concerns. Some of these are essentially the same as factors the Eighth Circuit established in *Van Horn*, and some are different. But this Settlement meets all of them.

## 1. Procedural Concerns

### a. The Class Representatives and Class Counsel Have Adequately Represented the Classes.

The Court must first determine whether the Class Representatives and Class Counsel have adequately represented the Classes. Rule 23(e)(2)(A). In certifying the Classes, the Court found that the adequacy of representation requirement of Rule 23(a)(4) had been met and that Plaintiffs and their counsel would adequately represent the Classes. Doc. #355 at 10-11. The Court's confidence has certainly been borne out. The robustness of the Settlement that the Class Representatives and Class Counsel achieved shows that. So do the long and difficult negotiations needed to accomplish that result. Furthermore, since the claims period began, Class Counsel have all actively assisted Class Members in making their claims, both in filling out the Claims form (such as assisting them in determining which Class they are in) and in advising Class Members whose claims were initially denied on how to revise them to make sure they met the requirements for acceptance.

### b. The Proposal was Negotiated at Arm's Length.

Under Rule 23(e)(2)(B), the second factor is whether the proposal was negotiated at arm's length. In granting preliminary approval, this Court found that it was. Preliminary Approval Order at 1, ¶ 2. That finding was correct. The parties conducted three lengthy mediation sessions under the direction of Judge William Ray Price, Jr., as mediator, and then continued to negotiate on the written Settlement Agreement for four months.

## 2. Substantive Concerns

### a. The Relief Provided for the Class is Adequate

The third factor is whether the Settlement provides adequate relief to the Class, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3);

Rule 23(e)(2)(C). This concern, including subfactor (i), overlap with the first and third *Van Horn* factors, (1) the merits of the plaintiff's case, weighted against the terms of the settlement and (3) the complexity and expense of further litigation. Thus, the *Van Horn* line of cases on these factors are pertinent. *Van Horn* stated: "The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Van Horn*, 840 F.2d at 607. Because the framers of the amended rule included the risks of trial and appeal, that factor still applies.

The terms of this Settlement provide substantial benefits to Class Members. Moreover, although Plaintiffs' attorneys had confidence in the strength of their case, there would have been a risk of failure in the face of the Rams' defenses. Thus, as in *Keil*, this factor "weighs in favor of approving the settlement because 'the outcome of the litigation would be far from certain' if the case had not settled, ..., whereas 'the settlement provides substantial benefits to the class ...'" 862 F.3d at 695 (citations omitted).

### i.      Benefits to the Class from the Settlement

Class Members will receive 30% of the face value of their PSLs, less any adjustment in the highly unlikely event that valid claims in their Class exceed $12 million.

For FANS Class Members, 30% of what they paid for their PSLs represents a precise pro-rata refund of their license fee based on the remaining nine years of their 30-year PSLs. It is exactly the damages their Complaint seeks for breach of the FANS Agreement. *See* Complaint,

¶ 92. Thus, achieving this result at trial would have constituted a victory for the FANS Class. Obtaining that result without the expense, time, and uncertainties involved in taking the case to trial is of significant value to the Class Members.

The only element of the damage claim that the Settlement lacks is prejudgment interest from the date of the breach. Complaint, ¶ 92. Interest would add 9% per annum for a contract claim. Mo. Rev. Stat. § 408.020. Assume that instead of mediating and settling, the parties had gone to trial, and Plaintiffs prevailed with judgment entered in four years. That would give them an additional 36%. Adding 36% to a claim of 30% of the face value of the PSL would increase the percentage to 40.8% of the PSL's face value (30% times 1.36).

But that doesn't mean that if the FANS Class prevailed at trial on its breach-of-contract claim, Class Members would receive that full amount. That is because costs and attorneys' fees normally come out of the damage award, considerably reducing the recovery. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)("[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."); 5 Newberg on Class Actions § 15:72 (5th ed. 2018) ("The court's task in reviewing counsel's proposed percentage award is to ensure that the resulting fee is fair to the absent class members, from whose recoveries the fee will be extracted").

Here, the Rams, not Class Members, are paying the costs and fees. Thus, without a settlement, it is possible FANS Class Members could receive less even if they won at trial. For example, in *Galloway v. Kansas City Landsmen, LLC*, 833 F.3d 969, 973 (8th Cir. 2016), the court affirmed a class action settlement in the Western District of Missouri with a fee award that was 33% of the Class' damages. The district court had found, "[i]n the Court's experience, 33% is in the middle of the range that attorneys performing contingency fee work in this market

typically charge their clients when a case settles at this stage in the litigation." *Id.* If, as in *Galloway*, a 33% fee award were made after trial, Class Members would receive *less* than they will under this Settlement. Take Mr. McAllister, with his $1,000 PSL and $300 award. If, instead of settling, he went to trial and prevailed after four years, he would be awarded the same $300, increased with interest to approximately $408. But if he had to pay 33% in attorneys' fees, his net recovery would be only $273.36. He is better off with the Settlement.

The claim of the Rams Class is harder to value. Their damages depend on what the right to sell their PSLs would have been worth in Los Angeles.[13] Until 2020, the Rams are playing in the Los Angeles Coliseum, where fans have been able to buy season tickets to Rams' games without PSLs. The value of the St. Louis PSLs is therefore negatively impacted because season tickets in the Coliseum have been readily available without a PSL. In other words, there may not have been a market for St. Louis PSLs for those four years.

The Rams have started selling PSLs at their new Inglewood stadium, where they expect to begin play in 2020. Those PSLs will last for 50 years and upon expiration (or if the Rams stop playing in that stadium) will be fully refundable for their face value. But St. Louis PSLs end after the 2024 season, at which point the rights of Rams Class Members to buy Rams season tickets would end. And they are not refundable. Thus, a St. Louis PSL would likely be worth less than 10% of the face value of a Los Angeles PSL for a comparable seat (five years out of 50, minus the refundable portion of the Los Angeles PSL). The least expensive St. Louis PSL was $250; the least expensive at Inglewood: $500.[14] At one-tenth the Inglewood face value, direct breach-of-contract damages for a $250 St. Louis PSL owner would be $50. Doing the same calculations

---

[13] *See* Arnold's Memorandum Supporting His Motion for Class Certification, Doc. #168-1 at 7.
[14] https://www.therams.com/news/rams-launch-sales-of-premier-and-reserved-seats-at-new-la-stadium; https://www.cbssports.com/nfl/news/rams-selling-seat-licenses-for-up-to-100000-at-new-l-a-stadium-chargers-cheaper/ (both accessed 10/24/2018).

as above, the *net* recovery with interest would be $68, reduced by 33% attorneys' fee to $45.56. But a Class Member with a $250 St. Louis PSL will receive $75 under the Settlement. Like FANS Class Members, that Rams Class Member is better off under the Settlement.

Moreover, other factors affect what PSLs owned by Rams Class Members are worth in Los Angeles. For example, the valuation would have to account for the fact that, after expiring, PSLs from St. Louis would not be renewable. A jury might find that football fans would demand a discount for a PSL that would potentially leave them out in the cold, unable to buy season tickets, after five years. In addition, some Los Angeles PSLs include free parking, food, drinks and access to exclusive club space.[15] St. Louis PSLs would include none of those perks, and their value would have to be reduced accordingly. Finally, the damage model, to some extent, depends on the Rams selling all of the PSLs at the new stadium, an issue that is still uncertain in a fickle L.A. market with so many entertainment options. Because of these factors, the amount that Rams Class Members would likely receive at trial is uncertain. The award from this Settlement closely approximates the aggregate value of the PSLs and is therefore reasonable.

Another factor potentially affects what Class Members might recover at trial. That is that both Classes also have MMPA claims. Plaintiffs' alleged MMPA compensatory damages are the same as for breach of contract, but the MMPA allows punitive damages. But that doesn't mean that the Settlement, which includes nothing for punitive damages, is inadequate. "Only outrageous conduct stemming from an 'evil motive or reckless indifference' can give rise to an award of punitive damages" under Missouri law. *Chong v. Parker*, 361 F.3d 455, 458–59 (8th Cir. 2004) (*quoting Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo.1989)). Jury awards of punitive

---

[15] *See* http://www.latimes.com/sports/nfl/la-sp-rams-chargers-psl-20180306-story.html (accessed 10/4/2018).

damages are rare, even where plaintiffs obtain compensatory damages.[16] Furthermore, under Mo. Rev. Stat. § 537.675.3, plaintiffs have to pay 50% of any punitive award to the State. In *Claxton v. Kum & Go, L.C.*, 2015 WL 3648776 (W.D. Mo. June 11, 2015), the court found that "[i]t is reasonable that the class would want to settle and receive immediate relief rather than wait and face a motion for summary judgment regarding punitive damages or uncertainty at trial on the issue of punitive damages." *Id.* at *5-6; *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (affirming the approval of a settlement that did not include punitive damages even though two opt-out class members had received punitive damages in their individual trials). Likewise, it is reasonable not to include punitive damages in this Settlement.

One final factor is the cap limiting Rams' payments to $12 million for each Class. It is unlikely, however, that the cap will be met by either Class and, even if it is, it will reduce Class Members' awards by small amounts. During mediation, both sides estimated that it would take approximately $25 million to pay claims of 100% of PSL owners. That means that claims would exceed the cap only if at least 95% or more made claims. That is unlikely, however, because PSL owners who dropped their season tickets are excluded from the Class if they received a cancellation notice from the Rams. Plaintiffs do not know how many that is, but it is surely some. In addition, Plaintiffs are unaware of a reported class action with a claim rate of 95%. Thus, the cap is unlikely to be exceeded.

### ii.    The Merits of the Cases and Risks of Trial

Rule 23(e)(2)(C)(i) requires the Court to consider the risks of trial and appeal. Plaintiffs believe their cases are strong. But the Rams have different interpretations of the PSL Agreements, and they deny they breached them, deny that Plaintiffs' damages are what Plaintiffs

---

[16] T. Eisenberg, M. Heise *et al.*, *The Decision to Award Punitive Damages: An Empirical Study*, 2 J. Legal Analysis 57, 57 (2010).

contend, and deny that the Classes were properly certified. They have raised numerous issues that must be considered in determining the risk of going to trial. In *Huyer v. Njema*, 847 F.3d 934, 939 (8th Cir. 2017), the court found that this factor weighed in favor of approving the settlement because "Plaintiffs' ability to recover by proceeding to trial was not inevitable." In *In re Wireless*, 396 F.3d at 933, the court affirmed approval of a settlement based on the district court's finding "that the outcome of the litigation would be far from certain." The same considerations are present and warrant approval here.

(A)     **Issues Related to FANS Class**

There are at least two specific unresolved issues related to the claims of the FANS Class. One pertains to whether the Rams were subject to the obligations of the Licensor under the FANS Agreement. The second relates to the definition of "deposit" under the Agreement.

**Whether the Rams are obligated as Licensor.** The Rams were not an original signatory to the FANS Agreement, under which FANS was the Licensor. The Rams adamantly deny that they succeeded to FANS' obligations.[17] Mr. McAllister moved for partial summary judgment on the ground that FANS was the Rams' agent and that the Rams were therefore liable under the Agreement.[18] The Rams opposed the motion, and the Court denied it, ruling that Mr. McAllister had presented "at best, disputed issues of fact with respect to the three elements of an agency relationship ...." Mem. and Order of 3/13/2018, Doc. #354 at 6. Whether the Rams are subject to the Licensor's obligations would therefore have to be presented to the jury. As in *In re Wireless,* 396 F.3d at 933, and *Huyer*, 847 F.3d at 939, the outcome of that issue is "far from certain" and "not inevitable."

---

[17] *See* The St. Louis Rams, LLC's Motion for Reconsideration, Doc. #45.
[18] Plaintiff McAllister's Motion for Partial Summary Judgment and Reinstatement of Partial Judgment as to Liability on "Count IV Fans" (Breach of Contract), Doc. #209.

**The "Deposit" issue.** Under the FANS Agreement, the Licensor must refund all or part of the Licensee's "deposit" if it terminates the contract. Mr. McAllister contends that the entire license fee is the "deposit" because it was "given as security or in part payment" of what a Licensee needed to pay to acquire season tickets and was paid to secure "the performance of a contract."[19] The Rams disagree; they contend that the "deposit" is the initial deposit that PSL owners paid for their PSLs and is a small fraction of the PSLs' face value. Mr. McAllister believes he has the better of the argument, but the Court stated, "It is unclear from the FANS Agreement just what would or could constitute a 'deposit' in the context of the Agreement." Mem. and Order of 9/21/2016, Doc. #44 at 11. The Court was therefore unable to decide the question on the pleadings. *Id.* at 11-12. Again, the outcome is "far from certain" and "not inevitable." *Huyer*, 847 F.3d at 939; *In re Wireless*, 396 F.3d at 933.

(B)    <strong>Issues Related to Rams Class</strong>

There are at least two issues related to the claims of the Rams Class that would make the outcome uncertain. One relates to whether the "Best Efforts" provision requires that the Rams honor St. Louis PSLs in Los Angeles. The second pertains to the amount of damages that Class Members might recover.

**"Best Efforts" Provision.** As described above, the Rams Class alleges that the Rams violated the "Best Efforts" provision of the Rams Agreement, which requires that Rams use their best efforts to provide PSL owners with season tickets if they play games other than at "the Stadium." The Court agreed with the *Arnold* Plaintiffs' interpretation of that provision. Mem. and Order of Mar. 13, 2018, Doc. #355 at 22. However, Judge Hamilton reached the opposite conclusion about the same provision in *RCN Capital, LLC v. Los Angeles Rams, LLC*, No.

---

[19] *See* Reply Memorandum in Support of Plaintiff McAllister's Motion for Partial Judgment on the Pleadings as to Liability in Count IV (Breach of Contract), Doc. #3 at 11.

4:17CV1240 (E.D. Mo.) (Ex. 3 at 10). She ruled that the contract "did not grant rights to purchase season tickets to games played in stadiums other than the Stadium" (*i.e.*, the Stadium at America's Center). *Id.* at 9. She stated, "[T]his Court respectfully disagrees with Judge Limbaugh's analysis in *McAllister*." *Id.* Although the Arnold Plaintiffs strongly believe that Judge Limbaugh's analysis is correct, if they prevailed at trial and the Rams appealed, it is "far from certain" and "not inevitable" that the Eighth Circuit would agree with this Court. *See Huyer*, 847 F.3d at 939; *In re Wireless*, 396 F.3d at 933.

**Damages.** The *Arnold* Plaintiffs believe that they will be able to prove their damages claim. As discussed above, however, a number of factors make it "far from certain" and "not inevitable" that that will be the case. *See Huyer*, 847 F.3d at 939; *In re Wireless*, 396 F.3d at 933.

### (C) Issue Related to Both Classes.

**Class certification**. The Rams' Rule 23(f) Petition is pending, though currently stayed. Plaintiffs believe it has no merit and should be denied. However, that outcome is "far from certain" and "not inevitable." *Huyer*, 847 F.3d at 939; *In re Wireless*, 396 F.3d at 933. Thus, there is risk that the Eight Circuit would order that the Classes be decertified.

### (D) Summary Regarding Benefits and Risk

As discussed above, it is "far from certain" and "not inevitable" that either Class would prevail at trial and on appeal and recover what they would receive in this Settlement. *See Huyer*, 847 F.3d at 939; *In re Wireless*, 396 F.3d at 933. These are real risks. On the other hand, the Settlement provides substantial benefits to the Classes. Thus, this factor, which is part of what the Court is to consider under Rule 23(e)(2)(C), weighs heavily in favor of approval.

### iii. The Costs and Delays of Trial and Appeal

In determining the adequacy of the relief, the Court must also consider "the costs ... and delay of trial and appeal." Rule 23(e)(2)(C)(i). This is similar to the third *Van Horn* factor, the

"complexity and expense of further litigation." *Keil*, 862 F.3d at 695. That factor is easily met here because class actions, in general, "place an enormous burden of costs and expense upon [ ] parties." *Marshall v. National Football League*, 787 F.3d 502, 512 (8th Cir. 2015) (citation omitted). In *In re Uponer*, 716 F.3d at 1063, this factor "weighed in favor of approval because 'class actions place an enormous burden of costs and expense upon the parties.'"

That is the case here, where there are two different classes with claims based on two different contracts, each with multiple legal theories. One is a claim of violation of the unfairness provision of the MMPA, which would place in issue the motive of Defendant. *See Chong*, 361 F.3d at 458-59. That would probably necessitate the testimony of multiple present and former Rams employees. To try the claim of the FANS Class would also involve the factual issue of whether FANS was the Rams' agent, which involves three separate complex elements. *See* Mem. and Order of 313/2018, Doc. #354. Trial of the Rams Class claims would entail valuation of the PSLs, an issue that involves equating the St. Louis PSLs with ones from a different market, usable for a period ten times as long, with a refund available at the end of the term, and with different perks. In addition, the parties would undoubtedly present competing expert testimony. The Rams' expert addressed only class certification, not merits issues. Thus far, counsel for the FANS Class spent more than $25,000 on their expert, with more costs expected. Counsel for the Rams' Class spent over $50,000 on their damages experts, with further costs expected. Retaining additional experts on the merits would likely be hugely expensive. Accordingly, this factor weighs in favor of approval.

### iv.  Method of Distributing Relief to the Class

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Rule 23(e)(2)(C)(ii). Plaintiffs outlined that method above. *See supra,* Sections III.F and III. G. It is

both efficient and effective. Virtually every Class Member received personal notice by postcard and/or email. As approved by the Court, that notice explained in clear and simple terms the relief that the Class Member would receive and how to make a claim. The claims process is being administered by RG/2, an experienced and well-respected claims administrator. Class Members will receive their payments within a few months after the Final Approval Hearing.

### v. Attorneys' Fees

In determining whether the relief provided the Classes is adequate, the Court must also consider "the terms of any proposed award of attorney's fees, including timing of payment." Rule 23(e)(2)(C)(iii). Plaintiffs submitted their requests for fees in a separate motion.[20] They did so on March 15, three weeks before the deadline for objections to the Settlement – even though that was well before the fee-request deadline – so that Class Members would be able to review it before deciding whether to object.

As it happened, no Class Members objected to the fee application (or any other aspect of the Settlement). Frankly, that is not surprising. Under the Settlement Agreement, attorneys' fees up to $7.2 million and expenses up to $200,000 – the amounts Plaintiffs requested – will be paid separately from the awards to Class Members and will therefore not diminish what any Class member receives. *See* Sett. Agrt., ¶ III.H. The fees and expenses will be paid within 14 days of the Effective Date. ¶¶ III.A.4 and H. Insofar as attorneys' fees are concerned, the Settlement is therefore fair, reasonable and adequate.

---

[20] Plaintiffs' Application for Attorneys' Fees, Motion for Incentive Awards and Incorporated Memorandum in Support ("Fee Application"), Doc. #399.

### vi.    The Settlement Agreement

The final factor the Court is to consider in determining whether the Settlement provides adequate relief to the Classes is the Settlement Agreement itself. Rule 23(e)(2)(C)(iv). That agreement is attached hereto as Ex. 1 and explained in detail herein.

### b.  The Settlement Treats Class Members Equitably Relative to Each Other

In determining whether the Settlement is fair, reasonable and adequate, the Court is also to consider "whether ... the proposal treats class members equitably relative to each other." Rule 23(e)(2)(D). The Advisory Committee Notes state: "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."

Here the scope of relief affects Class Members the same, whether the Court were to consider the relief provided within each Class or between the Classes, because awards will be proportional to the value of the Class Members' PSL(s):

| PSL Tier Price in the Stadium | Pay-Out for Qualified Claim |
|---|---|
| $250 | $75 |
| $500 | $150 |
| $1,000 | $300 |
| $2,500 | $750 |
| $3,000 | $900 |
| $4,500 | $1,350 |

Sett. Agrt., ¶ III.A.1. In each instance, the pay-out comes to 30% of the PSL's face value. With respect to treatment relative to Class Members within each Class, that is exactly the same. *See O'Connor v. Uber Techs., Inc.*, 2019 WL 1437101, at *14 (N.D. Cal. Mar. 29, 2019) (finding that "proportional distribution treats Class Members equitably."); *Swinton*, 2019 WL 617791, at *8 (approving settlement that "provides relief commensurate to the value of their respective

MMWA claims."); *Becker v. Bank of New York Mellon Tr. Co., N.A.*, 2018 WL 6727820, at *7
(E.D. Pa. Dec. 21, 2018) ("Allocating settlement proceeds to class members based on their
proportional shares of the bonds satisfies this factor.").

Although there are differences in the claims between the two Classes, each Class was
represented during settlement negotiations independently by its own Class Counsel, who
negotiated for, and approved, the Settlement for the Class they represent. Because of uncertainty
in the valuation of the Rams' Class Members' claims and because of the varying risks of
continued litigation for the two Classes, providing the same pay-outs for each tier seemed to both
sets of Counsel eminently equitable. Another possible distinction exists between Class Members
who renewed their season tickets and those who did not but received no cancellation notice.
Those two groups are treated the same because this Court properly put both groups on equal
footing and drew no distinction between them when it adopted the Class definitions.

Moreover, Class Members presumably agree that they were treated equitably because none
of them objected on the grounds of disparate treatment. Accordingly, this element is met.

### B. The Settlement Agreement Meets the Additional *Van Horn* Factors

This Settlement meets the two *Van Horn* factors that are not expressly incorporated into the
2018 amendment to Rule 23(e)(2), the defendant's financial condition and amount of opposition
to the settlement.

**Defendant's financial condition.** This factor does not warrant disapproving the Settlement.
According to *Forbes*, the Rams rank as the fourth most valuable team in the National Football
League with a value of $3.2 Billion as of September 2018.[21] *Forbes* shows that between 2015,
the Rams' last year in St. Louis, and 2016, their first year in Los Angeles, the team's valuation

---

[21] https://www.forbes.com/teams/los-angeles-rams/ (accessed 4/25/ 2018).

doubled, from $1.45 Billion to $2.9 Billion. *Id.* Since the Rams' owner bought the team for $750 million in 2010, the team's valuation has quadrupled, representing an increase of 19% per year. *Id.* As of September 2018, the Rams' operating income since they moved from St. Louis totaled more than $210 million. *Id.* Thus, Defendant is "in good financial standing, which would permit it to adequately pay for its settlement obligations ..." *See Marshall*, 787 F.3d at 512. This factor is therefore neutral. *Id.*; *accord, In re Target*, 892 F.3d at 968; *Keil*, 862 F.3d at 697-98.

**The amount of opposition to the settlement.** Opposition, if there is any at all, is minimal. As noted above, no Class members filed objections, and only one, an owner of one PSL, opted out. (For what it is worth, that is an opt-out rate of less than one-half of one-thousandth of one percent.) So favorable is this Settlement to the Class that it did not even attract so-called "professional objectors." *See Devlin v. Scardelletti,* 536 U.S. 1, 23 n. 5 (2002) (Scalia, dissenting) (quoting *Shaw v. Toshiba America Information Systems, Inc.*, 91 F.Supp.2d 942, 973 (E.D.Tex.2000). In *Kautsch v. Premier Commc'ns*, 2008 WL 11426766, at *3 (W.D. Mo. Nov. 20, 2008)), the court found that the absence of objections to the settlement demonstrated that it was "fair, reasonable, and adequate." The same is true here.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant final approval of the Settlement.

Dated: May 24, 2019                           Respectfully submitted,

*/s/ Richard S. Cornfeld*
Richard S. Cornfeld, #31046MO
LAW OFFICE OF RICHARD S. CORNFELD
1010 Market Street, Suite 1645
St. Louis, Missouri 63101
Telephone: (314) 241-5799
Facsimile: (314) 241-5788
rcornfeld@cornfeldlegal.com

Anthony S. Bruning, #30906MO
Anthony S. Bruning, Jr., #60200MO
Ryan L. Bruning, #62773MO
Edward M. Roth, #37294MO
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
Telephone: (314) 735-8100
Facsimile: (314) 735-8020
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

Mark Goldenberg, #41355MO
Thomas P. Rosenfeld, #35305MO
Kevin P. Green, #63497MO
GOLDENBERG HELLER & ANTONOLI, PC
2227 South State Route 157
Edwardsville, Illinois 62025
Telephone: (618) 656-5150
Facsimile: (618) 656-6230
mark@ghalaw.com
tom@ghalaw.com
kevin@ghalaw.com

***Attorneys for Plaintiff Ronald McAllister and Class Counsel for FANS Class***


*/s/ Fernando Bermudez (w/consent)*
Fernando Bermudez, #39943MO
BERMUDEZ LAW STL, LLC
7701 Forsyth Boulevard
Suite 950
St. Louis, Missouri 63108
Telephone: (314) 339-3082
Facsimile: (314) 862-1606
fbermudez@bermudezlawstl.com


Martin M. Green, #16465MO
LAW OFFICES OF MARTIN GREEN P.C.
7701 Forsyth Boulevard
Suite 950
St. Louis, Missouri 63105

Telephone: (314) 862-6800
Facsimile: (314) 862-1606
green@martingreenpc.com

***Attorneys for Plaintiffs Richard Arnold, R. McNeely Cochran, and Brad Pearlman***

*/s/ David R. Bohm (w/consent)*
David R. Bohm, #35166MO
Michael R. Cherba, #59642MO
DANNA MCKITRICK, P.C.
7701 Forsyth Boulevard
Suite 800
St. Louis, Missouri 63105
Telephone: (314) 726-1000
Facsimile: (314) 725-6592
dbohm@dmfirm.com
mcherba@dmfirm.com

***Attorney for Plaintiffs Envision, LLC, Robert D. Bohm, Sue Bohm, and Edward E. Mock***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all Counsel of Record this 24th day of May, 2019.


  */s/ Richard S. Cornfeld*